## STATEMENT REGARDING PROPRIETARY INFORMATION, INVENTIONS ASSIGNMENT, ARBITRATION, AND RESTRICTIVE COVENANTS AGREEMENT

Attached to this statement is your copy of the NuVasive Proprietary Information, Inventions Assignment, Arbitration, and Restrictive Covenants Agreement (the "**Agreement**").

Please take the time to review the Agreement carefully. It contains material restrictions on your right to disclose or use, during or after your engagement with the Company, certain information and technology learned by you during and/or as a result of your engagement. Also, depending upon the state in which you work, in exchange for the consideration described in the Agreement (which may include, but is not limited to, your initial employment with the Company, your continuing employment with the Company, and/or other valuable consideration such as confidential information, Company goodwill and/or specialized training), this Agreement may also restrict your right to work for the Company's competitors for a period of time following your engagement.

The Company considers this Agreement to be very important to the protection of its business. If you violate its terms, the Company will enforce the Agreement to the fullest extent permitted by applicable law and pursue, as appropriate, injunctions, restraining orders, and/or money damages.

If you have any questions concerning this Agreement, the Company encourages you to consult with an attorney of your choosing. The employees and agents of the Company are not authorized to, and will not, give you legal advice concerning this Agreement.

If you have read and understand the Agreement, and if you agree to its terms and conditions, please return a fully executed copy of it to the Company, retaining one copy for yourself.

1

**EXHIBIT**
**1**

PROPRIETARY INFORMATION, INVENTIONS ASSIGNMENT, ARBITRATION AND
RESTRICTIVE COVENANT AGREEMENT

In consideration of my engagement by the Company, the compensation I (the "**Shareowner**") receive from the Company (including for example monetary compensation, Company goodwill, confidential information, restricted stock units and/or specialized training), and the Proprietary Information that will be entrusted to me in my capacity as an employee or agent of the Company, and where permitted by the state in which I perform the services subject to this Agreement, my continued engagement with Company, I agree to certain restrictions placed by the Company on my use of information belonging to the Company. I understand that, during the course of my work as an agent or employee of the Company, I have had and will have access to Proprietary Information (a term which is defined below) concerning the Company, its employees, its operations, its vendors and its customers. I acknowledge that the Company has developed, compiled, and otherwise obtained - often at great expense - this information and that this information has great value to the Company's business. I agree to hold in strictest confidence all Proprietary Information and will not disclose any Proprietary Information to anyone outside of the Company, as defined more fully below.

## I. DEFINITIONS

### A.    The "Company"

As used in this Agreement, the "**Company**" refers to NuVasive, Inc., a Delaware Corporation with its headquarters in San Diego, California, and each of its subsidiaries or affiliated companies, their successors and assigns. I recognize and agree that my obligations under this Agreement and all terms of this Agreement apply to me regardless of whether I am employed by (or serve as an agent for) or work for NuVasive, Inc. or any of its subsidiaries, affiliates, successors or assigns, including, but not limited to, Impulse Monitoring, Inc.

### B.    "Proprietary Information": Definition and Ownership

I understand that the Company possesses and will possess Proprietary Information that is important to its business. For purposes of this Agreement, "**Proprietary Information**" is information that was, is or will be developed, created, or discovered by or on behalf of the Company, or which became or will become known by, or was or is conveyed by a third party to the Company, which is not generally known by the public or within the industry, and which has commercial value in the Company's business or the business of a third party disclosing such information.

"Proprietary Information" includes, but is not limited to, the following (whether or not patentable, copyrightable, or registrable under any intellectual property laws or industrial property laws in the United States or elsewhere): information about research, development, experiments, databases, database criteria, user profiles, clinical investigations, clinical trials, trade secrets, designs, methodologies, technology, know-how, processes, data, ideas, techniques,

2

inventions, product specifications, manufacturing processes, compositions, features and modes of operation, internal documentation, technical, business, financial, client, marketing, and product development plans, forecasts, other employees' positions, skill levels, duties, compensation and all other terms of their employment (except to the extent disclosure is permitted by law), client and supplier lists, contacts at or knowledge of clients or prospective clients of the Company, and other information concerning the Company's or its clients' actual or anticipated products or services, business, research or development, or any information which is received in confidence by or for the Company from any other person unless (i) the information is or becomes publicly known through lawful means; (ii) the information was rightfully in my possession or part of my general knowledge prior to my engagement by the Company as specifically identified and disclosed by me in Exhibit "A"; or (iii) the information is disclosed to me without confidential or proprietary restriction by a third party who rightfully possesses the information (without confidential or proprietary restriction). I understand that my engagement creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information, and that the Company agrees to share its Proprietary Information with me in direct reliance upon my acceptance of the covenants and obligations in this Agreement.

All Proprietary Information and all title, patents, patent rights, copyrights, trade secret rights, trademarks, trademark rights, and other intellectual property and rights anywhere in the world (collectively "**Rights**") in connection therewith shall be the sole property of the Company. I hereby assign to the Company any Rights I may have or acquire in Proprietary Information.

C.   "Company Materials"

I understand that the Company possesses or will possess "Company Materials" that are important to its business.  For purposes of this Agreement, **"Company Materials"** are documents or other media, including those solely in electronic form, or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company, whether such documents, media or items have been prepared by me or by others.

"Company Materials" include, but are not limited to, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, tapes or printouts, recordings and other printed, typewritten or handwritten documents, sample products, prototypes and models.

II.   OBLIGATIONS TO PROTECT PROPRIETARY INFORMATION

I represent and warrant that from the time of my first contact or communication with the Company, I have held in strict confidence all Proprietary Information and have not disclosed any Proprietary Information to anyone outside of the Company, or used, copied, published, or summarized any Proprietary Information except to the extent necessary to carry out my responsibilities as an employee or agent of the Company.

At all times, both during my engagement by the Company and after its termination, I will (a) keep in confidence and trust and will not disclose any Proprietary Information except to other Company employees, agents and representatives who need to know, or to third parties who are

3

bound by written confidentiality agreements to the extent necessary to carry out my responsibilities as an employee or agent of the Company and in a manner consistent with any such third party confidentiality agreements, and (b) use and/or disclose Proprietary Information only for the benefit of the Company.

### III.   MAINTENANCE AND RETURN OF COMPANY MATERIALS

All Company Materials are and shall be the sole property of the Company. I agree that during my engagement by the Company, I will not remove any Company Materials from the business premises of the Company or deliver any Company Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my engagement. I further agree that, immediately upon the termination of my engagement by me or by the Company for any reason, or during my engagement if so requested by the Company, I will return all Company Materials (including those materials solely in an electronic form), apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copy of this Agreement and/or other documents presented to me by the Company that I have signed.

### IV.   DISCLOSURE OF INVENTIONS TO THE COMPANY

As used in this Agreement, "**Inventions**" means any work of authorship, discovery, improvement, invention, design, graphic, source, HTML and other code, trade secret, technology, algorithms, computer program or software, audio, video or other files or content, idea, design, process, technique, formula or composition, know-how and data, whether or not patentable or copyrightable. I agree to maintain adequate and current written records and promptly disclose in writing to my immediate supervisor or as otherwise designated by the Company, all Inventions made, discovered, conceived, reduced to practice or developed by me, either alone or jointly with others, during the term of my engagement.

I will also disclose to the Senior Vice President of Global Human Resources of the Company, or another Company officer, designated by the Chief Executive Officer of the Company, all Inventions made, discovered, conceived, reduced to practice, or developed by me, either alone or jointly with others, within six (6) months after the termination of my engagement with the Company which resulted, in whole or in part, from my prior engagement by the Company. Such disclosures shall be received by the Company in confidence (to the extent such Inventions are not assigned to the Company pursuant to Section V below) and do not extend the assignment made in Section V below. I will not disclose Inventions covered by this Section IV to any person outside the Company unless I am requested to do so by management personnel of the Company.

4

## V.   OWNERSHIP OF INVENTIONS

### A.   Generally

I agree that all Inventions that I make, conceive, reduce to practice or develop (in whole or in part, either alone or jointly with others) during my engagement shall be the sole property of the Company, to the maximum extent permitted by law, and I hereby assign such Inventions and all Rights therein to the Company.  No assignment in this Agreement shall extend to Inventions that I have developed entirely on my own time without using the Company's equipment, supplies, facilities, or Proprietary Information except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company or (ii) result from any work that I performed for the Company.  I will advise the Company promptly in writing of any inventions that I believe meet the foregoing criteria and are not otherwise disclosed on Exhibit A.

### B.   Works Made for Hire

The Company shall be the sole owner of all Rights, title and interest in Inventions.  I further acknowledge and agree that such Inventions, including, without limitation, any computer programs, programming documentation, and other works of authorship, are "works made for hire" for purposes of the Company's rights under copyright laws.  To the extent that any Inventions may not be considered a "work made for hire", I hereby assign to the Company such Inventions and all Rights therein, except Inventions the assignment of which is excluded in Section V.A., above.

### C.   License

If any Inventions assigned hereunder are based on, or incorporated into, or are improvements or derivatives of, or cannot be reasonably made, used, reproduced and distributed without using or violating, technology or rights owned or licensed by me and not assigned hereunder, I hereby grant the Company a perpetual, worldwide, royalty-free, non-exclusive and sub-licensable right and license to exploit and exercise all such technology and rights in support of the Company's exercise or exploitation of any assigned Inventions (including any modifications, improvements and derivatives thereof).

### D.   List of Inventions

I have attached hereto as Exhibit "A" a complete list of all existing Inventions to which I claim ownership as of the date of this Agreement and that I desire to specifically clarify are not subject to this Agreement, and I acknowledge and agree that such list is complete.  If no such list is attached to this Agreement, or if Exhibit A is attached and is blank, I represent that I have no such Inventions at the time of signing this Agreement.

5

### E.   Cooperation

I agree to perform, during and after my engagement, all acts deemed necessary or desirable by the Company to permit and assist it in further evidencing and perfecting the assignments made to the Company under this Agreement and in obtaining, maintaining, defending and enforcing Rights in connection with such Inventions and improvements thereto in any and all countries. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings.  I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorney-in-fact to act for and on my behalf and instead of me, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth above in this Subsection E, including, without limitation, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Inventions and improvements thereto with the same legal force and effect as if executed by me.

### F.   Assignment or Waiver of Moral Rights

Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively **"Moral Rights"**).  To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

### G.   California-based Shareowners.

With respect to California-based Shareowners, any agreement to assign or offer to assign any rights in an invention shall not apply to an invention that the Shareowner has developed entirely on his/her own time, without using the Company's equipment, supplies, facilities, or trade secret information, *except* for those inventions that either (1) related at the time of conception or reduction to  practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the Company; or (2) result from any work performed by the Shareowner for the Company.  This disclosure is being provided in accordance with California Labor Code Section 2870.

## VI.   NON-SOLICITATION

I understand that during my engagement with the Company, I will have access to and obtain knowledge of the Company's Proprietary Information (including trade secrets as defined herein), and that the Company will be irreparably harmed if I were to use that Proprietary Information - whether directly or indirectly - to the detriment of the Company, and its actual or potential business and/or human resources.  In addition, I understand and agree that the business of the Company will be disrupted, damaged and/or otherwise harmed by the unfair "raiding" of

6

Company employees and/or agents. Therefore, I agree that during the term of my engagement and for one (1) year immediately thereafter, I will not:

(a) solicit, entice, persuade, induce, call upon or provide services to any of the Customers (as defined in Section VII), accounts or clients that I worked with, had responsibility or oversight of, provided services related to, or learned significant information about during my employment (or other association) with the Company for any purpose other than for the benefit of the Company; or

(b) induce or influence, or seek to induce or influence, any person who is employed or engaged by the Company (as an agent, employee, independent contractor, or in any other capacity), or any successor thereto, with the purpose of obtaining such person as an employee, consultant or independent contractor for a business competitive with the Company, or causing such person to terminate or reduce his or her employment, agency or relationship with the Company, or any successor thereto.

For California-based Shareowners, these obligations continue for the twelve (12) month period immediately following the termination of my engagement, regardless of the reason for termination, to the extent that any such prohibited activity involves my unfair use or disclosure of Company trade secrets protected by applicable law.

## VII.    NON-COMPETITION

In order to protect the Company's Proprietary Information and trade secrets, and the valuable goodwill developed by the Company, I agree that during the course of my engagement I will not, without the prior written consent of the Company, (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or otherwise for, (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate myself with, any Conflicting Organization. A Conflicting Organization is: any person, group of persons, or organization that is engaged in, or about to be engaged in, research on, consulting regarding, or development, production, marketing or selling of any product, process, invention or service, which resembles, competes with, or replaces a product, process, machine, invention or service upon which I shall have worked or about which I became knowledgeable as a result of my relationship with the Company, and whose use or marketability could be enhanced by the application of Proprietary Information to which I shall have had access during such relationship. Conflicting Organization also includes any group purchasing organization ("**GPO**"), integrated health network ("**IHN**"), hospital or hospital system with whom the Company has contracted or negotiated with in an attempt to contract, during the course of my engagement with the Company as well as any person, group of persons, or organization that is engaged in, or about to be engaged in, research on or consulting regarding, medical device and service pricing or contracting on behalf of any GPO, IHN, hospital system or hospital with whom the Company has contracted or negotiated in an attempted to contract during the course of my engagement with the Company. For Shareowners not based in California, these same obligations continue for the twelve (12) months period immediately following the termination of my engagement, regardless of the reason for the termination. For California-based Shareowners, these obligations continue

7

for the twelve (12) month period immediately following the termination of my engagement, regardless of the reason for termination, to the extent that any such prohibited activity involves my unfair use or disclosure of Company trade secrets protected by applicable law.

Furthermore, if at any time during the last twelve (12) months of my employment with the Company I am employed as a Neurophysiologist, Clinical Associate, Regional Manager, Senior Regional Manager, Sales Associate, Sales Specialist, Senior Sales Specialist, Area Sales Manager, Sales Director, Market Development Manager, Senior Market Development Manager, Director of Market Development, Senior Director of Market Development, Vice President or Senior Vice President of Sales (or any substantially similar position to those listed above) the following clarifications to the above-described post-employment restrictions shall apply:

Based on my position and the exposure to the Company's Proprietary Information and trade secrets that I was afforded in that position, and the valuable goodwill developed by the Company, to which I was exposed and able to take advantage of in performing my duties, I agree that the above-described restrictions in this Section VII shall be limited to the Customers, for which I, or any shareowner, distributor or employee or independent contractor of any distributor under my direct or indirect supervision, was assigned responsibility for by the Company, participated in sales calls and/or marketing efforts on behalf of the Company, and/or covered medical procedures on behalf of Company, during the last twelve months of my employment with Company unless my engagement with the Company lasts less than twenty-four (24) months, in which case, the restrictions described above shall also include the geographical territory and/or actual or prospective customers described or defined in any non-compete agreement with an individual or entity other than the Company that I executed and complied with during the time I was engaged with and receiving compensation from the Company.

For purposes of this Section VII, **"Customer"** refers to hospitals (including but not limited to surgery centers and other healthcare institutions and their employees), payers (including but not limited to insurance companies and third party billers), and physicians (or other health care practitioners including but not limited to the employees of any surgeon or other healthcare practitioners) who use, order or approve the use or ordering of Company products or services.

By accepting the engagement contemplated hereby, I represent and agree that performance of my duties for the Company does not (and will not) create a conflict with any other contractual obligations or restrictions applicable to me.

I acknowledge that I will derive significant value from the Company's agreement herein to provide me with that Proprietary Information necessary for me to optimize the performance of my duties to the Company. I further acknowledge that my fulfillment of the obligations contained in this Agreement, including, but not limited to, my obligation neither to disclose nor to use the Company's Proprietary Information other than for the Company's exclusive benefit and my obligation not to compete contained above, is necessary to protect the Company's Proprietary Information and, consequently, to preserve the value and goodwill of the Company. I further acknowledge the time, geographic and scope limitations of my non-competition obligations are reasonable, especially in light of the Company's desire to protect its Proprietary

8

Information, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company during the period and with the limitations described above.

The restrictive covenants contained in Sections VI and VII above shall be construed as a series of separate covenants, one for each geographic area in which I perform services following my engagement with the Company. Each such separate covenant shall be deemed identical in terms to the covenant contained above. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event the provisions of the above non – competition and/or non-solicitation covenant(s) are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by such law.

## VIII.    COMPANY AUTHORIZATION FOR PUBLICATION

Prior to my submitting, or disclosing for possible publication or general dissemination outside the Company (such as through public speaking engagements or literature), any material prepared by me that incorporates information that concerns the Company's business or anticipated research, I agree to deliver a copy of such material to an officer of the Company for his or her review. Within twenty (20) days following such submission, the Company agrees to notify me in writing whether the Company believes such material contains any Proprietary Information or Inventions, and I agree to make such deletions and revisions as are reasonably requested by the Company to protect its Proprietary Information and Inventions. I further agree to obtain the written consent of the Company prior to any review of such material by persons outside the Company.

## IX.    FORMER EMPLOYER INFORMATION

I represent that my performance of all the terms of this Agreement and as an employee or agent of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my engagement by the Company, and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employers or others. I have not entered into and I agree I will not enter into any agreement, either written or oral, in conflict herewith or in conflict with my engagement with the Company. I further agree to conform to the rules and regulations of the Company.

9

## X.    AT-WILL ENGAGEMENT

I agree and understand that engagement with the Company is "at-will," meaning that it is not for any specified period of time and can be terminated by me or by the Company at any time, with or without advance notice, and for any or no particular reason or cause. I agree and understand that it also means that other than the at-will nature of my employment, all my duties and responsibilities, compensation, as well as the Company's personnel policies and procedures, may be changed at any time by the Company. I understand and agree that nothing about the fact or the content of this Agreement is intended to, nor should be construed to, alter the at-will nature of my engagement with the Company.

## XI.    SEVERABILITY

If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions shall be modified to the minimum extent necessary to comply with applicable law and the intent of the parties. If any provision of this Agreement (other than Sections VI and VII, which will be modified and/or reformed as set forth therein), or application of it to any person, place, or circumstances, shall be held by a court of competent jurisdiction to be unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect.

## XII.    AUTHORIZATION TO NOTIFY NEW EMPLOYER

I hereby authorize the Company to notify my new employer about my rights and obligations under this Agreement after the termination of my engagement with the Company.

## XIII.    MUTUAL ARBITRATION AGREEMENT

The Company and I agree that in the event of any dispute or claim relating to or arising out of my employment with the Company, the terms of this Agreement or their interpretation, all such disputes shall be fully and finally resolved by binding arbitration conducted before a single neutral arbitrator from AAA in the state in which I last resided while employed by Company, pursuant to the then current employment arbitration rules (rules can be accessed at www.adr.com or through human resources). The arbitrator shall permit adequate discovery. In addition, the arbitrator is empowered to award all remedies otherwise available in a court of competent jurisdiction. Any judgment rendered by the arbitrator may be entered by any court of competent jurisdiction. The arbitrator shall issue an award in writing and state the essential findings and conclusions on which the award is based. By executing this Agreement, the Company and I are both waiving the right to a jury trial with respect to any such disputes. In California (and any other jurisdiction in which it is required by law) the Company shall bear the costs of the arbitrator, forum and filing fees. In all other jurisdictions, the Company and I shall split the costs of the arbitrator, forum and filings fees equally. Each party shall bear its own respective attorneys' fees and all other costs, unless otherwise provided by law and awarded by the arbitrator. This mutual arbitration agreement does not include claims that, by law, may not be subject to mandatory arbitration. In addition, this arbitration agreement does not prevent either

10

party from seeking temporary and/or preliminary injunctive relief, as permitted by applicable state law, through either AAA or an appropriate court of competent jurisdiction.

The Company and I agree that we each may bring claims against the other only in his, her or its individual capacity and not as a Plaintiff or class member in any purported class or representative proceeding. Further, unless both parties agree otherwise, the arbitrator may not preside over any form of a representative or class proceeding. The Company and I agree that if this class/representative action waiver is found to be unenforceable, then the entirety of this Section XIII (Mutual Arbitration Agreement) shall be null and void.

## XIV.   WAIVER OF JURY TRIAL

The Company and I agree that if the Mutual Arbitration Agreement is found to be unenforceable or is otherwise invalidated that we each knowingly, voluntarily, irrevocably and unconditionally waive any right to a trial by jury in respect of any action, suit or proceeding directly or indirectly arising out of or relating to this Agreement or my employment with the Company.

## XV.   ENTIRE AGREEMENT

This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions between us. I understand and acknowledge that (i) no other representation or inducement has been made to me, (ii) I have relied on my own judgment and investigation in accepting my engagement with the Company, and (iii) I have not relied on any contrary representation or inducement made by any officer, employee or representative of the Company. No modification of or amendment to this Agreement nor any waiver of any rights under this Agreement will be effective unless in a writing signed by the President of the Company and me. I understand and agree that any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

## XVI.   EFFECTIVE DATE, ASSIGNABILITY AND BINDING UPON SUCCESSORS

This Agreement shall be effective as of the first day of my engagement with the Company, and shall be binding upon me, my heirs, executors, and administrators. This Agreement is freely assignable by the Company, and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

## XVII.   GOVERNING LAW

This Agreement shall be interpreted and enforced in accordance with Delaware law, without giving effect to its laws pertaining to conflict of laws. To the extent, if any, the Company and my agreement to have this Agreement so interpreted and enforced is found unlawful, this Agreement will be interpreted and enforced in accordance with the laws of the state(s) in which I reside(d) at the time(s) relevant to the specific dispute.

11

## XVIII.   REMEDIES

I recognize that nothing in this Agreement is intended to limit any remedy of the Company otherwise available under the Uniform Trade Secrets Act. I recognize that my violation of this Agreement could cause the Company irreparable harm, the amount of which may be extremely difficult to estimate, making any remedy at law or in damages inadequate. Thus, I agree that the Company shall have the right to apply to any court of competent jurisdiction for an order restraining any breach or threatened breach of this Agreement and for any other it deems appropriate. This right shall be in addition to any other remedy available to the Company.

In addition, where permitted by the law of the state governing this Agreement, my failure to comply with any of the restrictions contained in Sections VI and VII of this Agreement for any length of time (the "**Non-Compliance Period**") shall extend the duration of the restrictions contained in Sections VI and VII by the length of the Non-Compliance Period. For example, should I breach the restrictions contained in Sections VI and/or VII for three (3) months following my separation of employment, my non-competition obligations under Section VII will not expire until fifteen (15) months after my separation of employment. This shall be in addition to any other remedy available to the Company.

## XIX.   APPLICATION OF THIS AGREEMENT

I agree that my obligations set forth in this Agreement, along with the Agreement's definitions of Proprietary Information shall be equally applicable to Proprietary Information related to any work performed by me for the Company prior to the execution of this Agreement.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND ITS TERMS. I ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY. I HAVE COMPLETELY NOTED ON EXHIBIT A TO THIS AGREEMENT ANY PROPRIETARY INFORMATION THAT I DESIRE TO EXCLUDE FROM THIS AGREEMENT.

1/6/2018
Date

Digitally Signed By: Tim Sean Day on
1/6/2018
Signature
Tim Sean Day
Name (Please Print)

12

EXHIBIT A

1.      The following is a complete list of all Inventions relevant to the subject matter of my engagement with the Company that have been made, discovered, conceived, first reduced to practice or developed by me or jointly with others prior to my engagement by the Company that I desire to remove from the operation of the Proprietary Information and Inventions Agreement:

___✓___     No Inventions.
_____     See below:  Any and all Inventions regarding:
_____     Additional sheets attached.

2.      I propose to bring to my engagement the following materials and documents of a former employer:

__✓__     No materials or documents
__ __     See below:

Date: 1/6/2018                          Signature: Digitally Signed By: Tim Sean Day
                                                   On 1/6/2018

Rev. 12/10/12            Shareowner Initials   TD

Sales Representative Agreement
Key Terms Summary

| Sales Representative Contact | | NuVasive Contact | |
|---|---|---|---|
| Address: | 8 Fraser Drive | Address: | 7475 Lusk Boulevard |
| City, State, ZIP: | Andover MA 01810 | City, State, ZIP: | San Diego, CA 92121 |
| Attn: | Tim Day | Attn: | Legal Department |
| Phone: | 617.352.9385 | Phone: | (858) 909-1800 |
| Email: | | Email: | contracts@nuvasive.com |

| Products |
|---|
| All NuVasive Products, excluding products manufactured by NuVasive Specialized Orthopedics™, Inc. (except for MAGEC® products) |

| Effective Date | Term of the Agreement | Territory |
|---|---|---|
| January 1, 2019 | 3 years | Listed on Exhibit B |

This Key Terms Summary, together with:

- the Terms and Conditions
- Exhibit A (Definitions)
- Exhibit B (Territory)
- Exhibit C (Commissions)
- Exhibit D (Shared Services)
- Exhibit E (Sales Training Course Catalog)
- Exhibit F (Certification of Compliance)
- Exhibit G (Other Products/Services Solicited by Representative or a Representative Affiliate)

is entered into as of the Effective Date by and between NuVasive, Inc., a Delaware corporation ("NuVasive"), and Rival Medical LLC, a limited liability company ("Representative") (collectively the "Parties" and each a "Party"). The above exhibits shall each be referred to as an "Exhibit." The Key Terms Summary, the Terms and Conditions, the Exhibits and any addendums attached hereto shall collectively be referred to as the "Agreement." Capitalized terms used in this Agreement shall have the meaning set forth in Exhibit A (Definitions). By signing below, each Party acknowledges that it has read and agreed to the terms set forth in this Agreement, and the signatory below is authorized to execute this Agreement on behalf of its respective Party.

| NuVasive, Inc. | Rival Medical LLC |
|---|---|
| Signature: | Signature: |
| Print Name: Paul McClintock | Print Name: Tim Day |
| Title: Vice President, U.S. Commercial | Title: Authorized Signatory |

EXHIBIT
2

## TERMS AND CONDITIONS

ARTICLE I.
APPOINTMENT AND AUTHORITY OF REPRESENTATIVE

Section 1.01   <u>Sales Representative</u>. Subject to the terms and conditions herein, NuVasive hereby appoints Representative as NuVasive's sales representative to solicit orders for and Promote Products in the Territory during the Term, and Representative hereby accepts such appointment.

Section 1.02   <u>Representative Limitations</u>. Representative shall not (directly or indirectly) (a) advertise or Promote any Products outside the Territory, (b) solicit or procure any orders for Products from outside the Territory, (c) otherwise act as NuVasive's representative with respect to the Products outside the Territory, or (d) advertise or Promote any NuVasive products other than the Products, without the prior written consent of NuVasive. Representative shall promptly forward to NuVasive any and all inquiries relating to the Products received by Representative from outside the Territory.  Representative may only submit and procure orders from customers located and taking delivery of Products within the Territory.

Section 1.03   <u>Quota Commitment</u>. Representative shall solicit orders for at least the quantity of Products set forth in the quota commitments provided by NuVasive to Representative in writing (the "**Quota Commitments**"). NuVasive will provide the Quota Commitment for the first full calendar year of the Agreement within thirty (30) calendar days after the Effective Date.  Quota Commitments for subsequent calendar years during the Term shall be determined by NuVasive in its sole discretion based on dialogue with Representative, and delivered to Representative within thirty (30) days of the start of each applicable calendar year during the Term. NuVasive may deliver a Quota Commitment to Representative at intervals more frequently than annually, including with respect to newly introduced Products and/or modifications to the Territory.  Representative acknowledges and agrees that (a) if the Territory is subdivided into regions as set forth in **Exhibit B**, then NuVasive may designate separate Quota Commitments for each such region, and (b) each Quota Commitment may set forth quota commitments for the calendar year as well as for each calendar quarter within such calendar year.  The only orders that shall count towards the Quota Commitment shall be bona fide orders properly submitted by Representative to NuVasive in accordance with the Agreement and that that would, upon acceptance by NuVasive, qualify for the payment of a Commission to Representative.

Section 1.04   <u>Poor Standing</u>. If Representative fails to secure orders for (a) eighty-seven percent (87%) of its Quota Commitment in any calendar quarter, (b) ninety-three percent (93%) of its Quota Commitment in any two consecutive calendar quarters, or (c) ninety-five percent (95%) of its aggregate Quota Commitment for any given calendar year; then in each case Representative shall be deemed in "**Poor Standing**" and NuVasive may, at its discretion and without prejudice to any other rights NuVasive may have under this Agreement, exercise its rights under Section 9.03 until such time as Representative fulfills 100% of its Quota Commitment for a calendar quarter.

Section 1.05   <u>Independent Contractors.</u>  The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (a) give either Party the power to direct and control the day-to-day activities of the other Party, (b) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (c) allow Representative to create or assume any obligation on behalf of NuVasive, or otherwise bind NuVasive, for any purpose whatsoever.  Because Representative is an independent contractor, NuVasive will not withhold or make payments for social security, make unemployment insurance or disability insurance contributions, or obtain workers' compensation insurance on Representative's behalf or provide Representative any benefits that would be equivalent to benefits that

NuVasive provides its employees. All financial and other obligations associated with each Party's business and its performance of obligations under this Agreement are the sole responsibility of the respective Party. Each Party shall be solely responsible for all of the acts of its employees or its agents. For the avoidance of doubt, with respect to its sales representatives, Representative shall be solely responsible for hiring, promoting, discharging, scheduling appointments, establishing pay scales and/or other remuneration, remunerating, reimbursing for work-related expenses, implementing discipline and any other action directly related to the employment of such sales representatives. Notwithstanding anything contained herein to the contrary, Representative will cooperate fully with NuVasive personnel in all respects with regard to performing the obligations of this Agreement, including participating in requested teleconferences, meetings and travel, and providing sales target and sales forecasting information to NuVasive upon reasonable request.

ARTICLE II.
COMMISSIONS

Section 2.01   <u>Sole Compensation</u>.   Representative's sole compensation for its performance under this Agreement shall be a commission ("**Commission**") based on Net Sales of Products resulting from Representative's procurement of orders pursuant to this Agreement, determined in accordance with **Exhibit C** attached hereto.

Section 2.02   <u>Basis of Commission</u>.   The Commission shall apply solely to Product orders (a) procured by Representative from customers within the Territory in accordance with this Agreement, (b) that have been accepted by NuVasive in its sole discretion, and (c) for which shipment of Products and recognition of revenue by NuVasive has occurred. For clarification, the Commission shall not apply with respect to (i) any sale made to any customer outside the Territory, or (ii) any sale made in violation of this Agreement or applicable law.

Section 2.03   <u>Time and Manner of Payment</u>.   The undisputed portion of the Commission pursuant to Article II on a given order shall be due and payable thirty (30) calendar days after the end of the calendar month in which NuVasive invoices and ships that order. Any disputed portion of the Commission pursuant to Article II on a given order shall be due and payable thirty (30) calendar days after the calendar month in which a payment determination is made.

Section 2.04   <u>Commission Charge Back</u>.   NuVasive shall have the absolute right to (a) withhold any disputed amounts otherwise payable as Commission and (b) set cash discounts, make allowances and adjustments to customer orders, accept returns from its customers, and write off as bad debts any overdue customer accounts as NuVasive deems advisable in its discretion. In each such case, NuVasive shall charge back to Representative's account, and/or withhold from payment of any future Commissions, any Commission previously paid or credited to it with respect to such cash discounts, allowances, adjustments, returns or bad debts. Representative also agrees to accept charges for: (i) pricing arrangements or side deals not approved by NuVasive; (ii) lost, damaged or missing inventory entrusted to Representative; (iii) operating expenses (including but not limited to set rent and freight) in excess of the contribution margin targets as communicated to Representative from time to time and determined by NuVasive in its sole discretion; and (iv) Representative's failure to comply with its obligations under this Agreement and/or NuVasive policies (e.g., NuVasive's inventory management policy and pricing policy as updated from time to time).

Section 2.05   <u>Monthly Statements</u>.   NuVasive shall submit or otherwise make available (electronically or by other means) to Representative monthly statements of the Commissions due and

payable to Representative under the terms of this Agreement, with reference to the specific invoices on which the Commissions are being paid (the "**Monthly Statement**").

Section 2.06    Disputes.  Representative shall notify NuVasive in writing of any dispute regarding any Monthly Statement (along with substantiating documentation and a reasonably detailed description of the dispute) within ten (10) calendar days from the Representative's receipt of such Monthly Statement. Representative will be deemed to have accepted all Monthly Statements for which NuVasive does not receive timely written notification of disputes. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Notwithstanding anything to the contrary, Representative shall continue performing its obligations under this Agreement during any such dispute.

ARTICLE III.
PRICING

Section 3.01    Prices and Terms of Sale.  NuVasive shall provide or otherwise make available (electronically or by other means) to Representative copies of its current price lists, its delivery schedules, and its standard Terms and Conditions of Sale, each of which may be established and amended from time to time in the sole discretion of NuVasive (the "**Terms and Conditions of Sale**").  Representative shall quote to customers only the then current authorized prices, delivery schedules, and Terms and Conditions of Sale, and shall have no authority to quote or offer any discount to such prices or change any such Terms and Conditions of Sale, without the prior written consent of NuVasive.  NuVasive may change the prices, delivery schedules, and Terms and Conditions of Sale, at any time and from time to time, such changes to be effective thirty (30) days after delivery by NuVasive to Representative of written notice of any such changes; provided that, such changes shall be effective immediately with respect to any new customers during such thirty (30) day period.  Each order for a Product shall be governed by the prices, delivery schedules, and Terms and Conditions of Sale in effect at the time the order is accepted by NuVasive, and all quotations by Representative shall contain a statement to that effect.

Section 3.02    Orders; Acceptance.  All orders from customers for the Products shall be in writing, and the originals shall be submitted directly by the customer to NuVasive.  All orders obtained by Representative shall be subject to acceptance by NuVasive at its sole discretion.  Representative shall have no authority to make any acceptance or delivery commitments to customers.

Section 3.03    Collection.  Representative acknowledges and agrees that Representative shall not take any action with respect to collection from customers, provided that, at NuVasive's request, Representative will assist NuVasive in the collection of any accounts receivable of NuVasive.

ARTICLE IV.
WARRANTY

Section 4.01    Customer Warranty.  Any warranty for the Products shall be limited to those set forth in the then current Terms and Conditions of Sale and shall run directly from NuVasive to the customer, and pursuant to the warranty the customer shall return any allegedly defective Products directly to NuVasive.  Representative shall not (a) modify or change any such warranty terms and conditions, (b) make any false or misleading representations or statements to customers or others regarding NuVasive or the Products, or about NuVasive competitors or competitor products, or (c) make any representations, warranties or guarantees with respect to the specifications, features or capabilities of the Products that are not consistent with the Promotional Materials supplied by NuVasive.  In the event that Representative does make any such false, additional or inconsistent representations, statements, warranties or guarantees in violation of this Agreement, then without limiting NuVasive's other remedies for such violation,

Representative shall be solely responsible for any liability resulting from any such actions.  Representative shall have no authority to accept any returned Products.

**Section 4.02    Disclaimer of Warranties.  Except for the warranties provided to customers in the Terms and Conditions of Sale, NuVasive makes no other representation or warranty of any kind or nature whether express or implied with respect to the Products or any NuVasive Trademarks, and NuVasive hereby expressly disclaims all other representations or warranties, express or implied, including implied warranties of merchantability, fitness for a particular purpose, noninfringement and title, and any warranties arising from a course of dealing, usage, or trade practice. Representative understands and agrees that the disclaimer of warranties in this Agreement is a fundamental part of this Agreement and that NuVasive would not agree to enter this Agreement without such disclaimer.**

ARTICLE V.
ADDITIONAL REPRESENTATIVE OBLIGATIONS

Section 5.01    Delivery of Product to Customer.  If any Products are delivered directly from NuVasive to Representative, Representative shall deliver such Products to customers using NuVasive's documented and appropriate procedures for handling, storage, packing, preservation and delivery, and in accordance with any written instruction provided by NuVasive.  Subject to applicable law, Representative or one of Representative's Affiliates shall attend all surgical cases in the Territory that utilize the Products.

Section 5.02    Sales Action Plans.  Representative shall provide to NuVasive, within thirty (30) calendar days following the end of each calendar year, an annual sales action plan detailing Representative's sales goals and execution strategies for the coming year.  In addition, Representative shall deliver to NuVasive, by the fifth (5th) day of each calendar quarter, a quarterly action plan detailing Representative's sales history, revised sales plans and strategies for such quarter. The format of such reporting will be determined by NuVasive.

Section 5.03    Representative Infrastructure and Promotion of the Products.  NuVasive and Representative acknowledge and agree that development of proper infrastructure on the part of Representative is vital for the success of the business.  Representative will make business investments for the purpose of expanding its infrastructure in order to fulfill its responsibilities under this Agreement (the "**Infrastructure Investments**"). The Infrastructure Investments required by NuVasive will be supported with resources from NuVasive, as determined by NuVasive in its sole discretion.  As the Infrastructure Investments are defined and communicated to Representative from time to time, Representative agrees to comply with the Infrastructure Investments and agrees that failure to do so shall entitle NuVasive to charge Representative for fines and/or costs, in addition to the other rights contained herein.  Representative acknowledges and agrees to maintain sufficient personnel (including the replacement of personnel that are terminated or otherwise leave Representative's employ during the Term) to effectively and consistently Promote the Products to all hospitals and clinics in the Territory as contemplated by the Agreement, with a focus on selling a complete mix of the various Products. Representative shall also provide sufficient support to its sales representatives in order to enable them to effectively Promote the Products in their assigned territories.  Any accounts or portions of the Territory without sufficient representation may, at NuVasive's sole discretion, be immediately removed from the Territory under Section 9.03.

Section 5.04    Notice of Changes.  Representative shall promptly advise NuVasive of (a) any changes in Representative's status, organization, personnel, and similar matters, (b) any changes in the key personnel, organization, and status of any major customers of NuVasive in the Territory, and (c) any political, financial, legislative, industrial or other events in the Territory that could affect the mutual

business interests of Representative and NuVasive, whether harmful or beneficial.

Section 5.05    Shared Services.  NuVasive and Representative agree that NuVasive shall provide Representative with certain services relating to Representative's Promotion of Products in the Territory ("**Shared Services**").  These Shared Services and costs related to such Shared Services are detailed in **Exhibit D**.  **Exhibit D** may be modified, updated or supplemented by NuVasive from time to time in its sole discretion.

Section 5.06    Product Complaints.  Representative shall: (a) promptly investigate and monitor all customer and/or regulatory complaints and correspondence concerning the use of the Products in the Territory and (b) immediately notify NuVasive of all such complaints and correspondence.  Representative hereby assigns to NuVasive all of its rights (including intellectual property rights), title and interests in and to any customer feedback with regard to the Products.

Section 5.07    Representations; Marketing.  Representative shall Promote the Products solely in accordance with the training provided by NuVasive.  NuVasive shall provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures, instructional material, advertising literature, product samples, and other Product data as outlined in **Exhibit D** ("**Promotional Materials**").  Representative shall use only the Promotional Materials supplied by NuVasive in its Promotion of the Products unless NuVasive approves otherwise in writing, and Representative shall not add, delete, or modify any language in the Promotional Materials in any manner, except for adding Representative's contact information.  The Promotional Materials may not be distributed or transferred to any third party other than bona fide customers in the Territory who are considering ordering the Products.

Section 5.08    Compliance with Laws and Policies.  Representative will comply with all applicable federal, state, local, municipal, regulatory and/or governmental agency laws, statutes, regulations, edicts, guidance, directives, and ordinances, including, but not limited to: (a) the Social Security Act; (b) the Health Insurance Portability and Accountability Act; (c) all federal and state health care anti-fraud, anti-bribery anti-kickback and abuse laws such as 42 U.S.C. § 1320a-7b(b); (d) the Federal Food, Drug, and Cosmetic Act and its implementing regulations, (e) all rules, regulations, and guidance of the FDA; (f) all rules and regulations of the Center for Medicare and Medicaid Services; and (g) applicable local, state and federal wage and hour laws, statutes, rules and regulations.  Without limiting the generality of the foregoing, except to the extent allowed by applicable law, Representative will make no offer, payment or other inducement (whether directly or indirectly) to induce the referral of business, the purchase, lease or order of any item or service, or the recommending of the purchase, lease or order of any item or service.  Representative will comply, and will ensure its personnel carrying out activities under this Agreement comply, with all operating and compliance policies of NuVasive, including the Medical Device Manufacturers Association Code of Conduct on Interactions with Healthcare Providers, the NuVasive Code of Ethical Business Conduct, the NuVasive Global Business Ethics and Compliance Program, including the U.S. Healthcare Compliance Policy Guide, NuVasive's Insider Trading Policy and Inventory Management Policy (if any, relating to wide variety of inventory management issues, including inventory investment, accountability for inventory management (such as cost-sharing) and consignment inventory), as such policies may be created, updated and provided to Representative from time to time, and including any applicable training requirements with respect to such policies.  Additionally, on not less than an annual basis, Representative shall certify to compliance with the U.S. Healthcare Compliance Policy Guide by submitting a Certification of Compliance (in such form as attached hereto as **Exhibit F**) to NuVasive that Representative is in compliance with this Section 5.08 and any other compliance terms in this Agreement in a form acceptable to NuVasive. Representative shall provide on a timely basis, to be determined by NuVasive, all information of Representative and Representative Affiliates to comply with the Physician

Payments Sunshine Act and/or any similar state law. Representative shall at all times conduct its activities on behalf of NuVasive in accordance with the labeling limitations on the Products, the terms of this Agreement, NuVasive's written policies and procedures, and in compliance with applicable state and federal laws in effect from time to time, including the FDA's quality system regulations, Adverse Event Reporting System and/or current good manufacturing practice regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures. Representative shall provide NuVasive with such information and data as may be requested by NuVasive pursuant to this Agreement.

Section 5.09    Competitive Products; Non-Solicitation.

(a) Representative has identified in **Exhibit G** all products and services for which Representative or Representative Affiliates (directly or indirectly) act as a sales representative, agent, employee, or similar position. Representative shall update **Exhibit G** so that it is complete and accurate at all times and Representative agrees that failure to update **Exhibit G** shall constitute a material breach of the Agreement and may result in NuVasive exercising its rights under Section 9.03.

(b) Representative represents and warrants to NuVasive that, as of the Effective Date, it does not (nor does any Representative Affiliate or any other entity or person affiliated with Representative or a Representative Affiliate) currently represent, promote, sell, solicit, or otherwise commercialize (directly or indirectly) any products or services that are competitive with any NuVasive product or service (including the Products).

(c) During the Term and for a period of twelve (12) months thereafter, Representative and Representative Affiliates shall not (i) represent, promote, sell, solicit, or otherwise commercialize (directly or indirectly) any products or services that are, in NuVasive's reasonable judgment, competitive with any of NuVasive's products or services (including the Products) without the prior written consent of NuVasive, (ii) solicit, encourage, or induce, or cause to be solicited, encouraged or induced (directly or indirectly) any Restricted Persons within the Territory, to terminate or adversely modify any business relationship with NuVasive, or not to proceed with, or enter into, any business relationship with NuVasive, nor otherwise interfere with any business relationship between NuVasive, and any Restricted Persons within the Territory, or (iii) solicit or offer to work (directly or indirectly) or hire any of NuVasive's employees, agents or representatives. The twelve (12) month period during which the restrictions of this Section are applicable after the Term shall toll for any period of time in which Representative is not in compliance herewith.

(d) If after the Effective Date, (i) NuVasive releases a new product or service (including a new Product) that is competitive with a product or service that Representative or a Representative Affiliate at the time represents, promotes, solicits or otherwise commercializes, or (ii) Representative acquires a new Representative Affiliate, and such Representative Affiliate is engaged in the representation, promotion, sale, solicitation, or commercialization (directly or indirectly) of any products or services that are, in NuVasive's reasonable judgment, competitive with any of NuVasive's products or services (including the Products); then in each case Representative shall cease, and shall cause its Representative Affiliates to cease, such activities with respect to such competitive products within ninety (90) calendar days of the date such new product or service is released in the case of (i), or the acquisition of the new Representative Affiliate in the case of (ii).

(e) Representative (i) represents, warrants and covenants that each Representative Affiliate engaged by it as of the Effective Date or any time thereafter during the Term, will have executed an agreement in form and substance sufficient to contractually obligate such person or entity to comply with the restrictions contained in this Section 5.09 prior to performing any services for the benefit of NuVasive,

or Promoting the Products or receiving any information regarding the Products (a "**Compliance Agreement**"), (ii) shall cause each Compliance Agreement to name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 5.09, and (iii) will vigorously enforce the restrictions contained in this Section 5.09 and each Compliance Agreement at its own cost (and in the event Representative fails to adequately enforce such restrictions, NuVasive may do so at Representative's cost). Representative shall provide NuVasive a copy of each Compliance Agreement with respect to each Representative Affiliate immediately upon such person or entity becoming a Representative Affiliate. Each Compliance Agreement shall require all sales representatives to comply with the terms of Section 5.08 and Section 5.09 hereof. Representative shall be liable to NuVasive for any breaches by the Representative Affiliate of the Compliance Agreement.

(f)  Representative acknowledges and agrees that the foregoing non-competition obligations are reasonable and necessary to protect the legitimate interests of NuVasive, including the protection of NuVasive's Confidential Information. Representative further acknowledges and agrees that such obligations are an essential part of, and consideration for, NuVasive's promises contained in this Agreement.

Section 5.10    Non-Disparagement. Representative shall not in any way disparage NuVasive, its products, or its agents or employees, including, without limitation, taking any action or making any statement the intent or reasonably foreseeable effect of which is to impugn or injure the reputation or goodwill of NuVasive or any of its agents or employees. The Parties acknowledge and agree that Representative shall not be deemed to have violated the foregoing if Representative provides truthful testimony pursuant to a valid subpoena or court order or as otherwise required by law.

ARTICLE VI.
REPRESENTATIONS AND WARRANTIES OF REPRESENTATIVE

Section 6.01    Corporate Power. Representative represents, warrants and covenants that: (a) it is duly organized and validly existing under the laws of its state of incorporation; (b) it has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof; (c) it is qualified and licensed to do business and is in good standing in every jurisdiction where such qualification and licensing is required; and (d) the person executing this Agreement on Representative's behalf has been duly authorized to do so by all requisite corporate action.

Section 6.02    Binding Agreement. This Agreement is a legal and valid obligation binding upon the Parties and enforceable in accordance with its terms. The execution, delivery and performance of this Agreement by the Parties do not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, nor violate any material law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

Section 6.03    Non-Contravention. Representative represents, warrants and covenants that its performance of all the provisions of this Agreement and as an agent of NuVasive does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by it in confidence or in trust prior to its engagement by NuVasive, and Representative agrees not to disclose to NuVasive any confidential or proprietary information or material belonging to any previous employers or other entities with whom Representative has been involved. Representative represents and warrants that it has not entered into (and is not bound by) any agreement, either written or oral, that is in conflict herewith or in conflict with the engagement contemplated hereby. Representative further represents, warrants and covenants that it will not (directly or indirectly) engage in the development of products or intellectual property that are for use in (or applicable to) any products or services that are competitive with NuVasive's

products or services, and that Representative has disclosed to NuVasive all relevant details regarding any such development activity that occurred in the past.

Section 6.04    Debarment.  Representative represents, warrants and covenants that neither it nor any Representative Affiliate have been nor are debarred, suspended, excluded or are otherwise ineligible under Section 306 of the Federal Food, Drug and Cosmetic Act (as amended by the Generic Drug Enforcement Act of 1992) or are listed on any applicable federal exclusion list including the then-current: (a) HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov), (b) General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov); and (c) FDA Debarment List (available through the Internet at http://www.fda.gov/ora/compliance_ref/debar/).

Section 6.05    Interaction with Health Care Providers.  Representative represents, warrants and covenants that neither it nor any Representative Affiliate have any arrangement (e.g., grants, donations, sponsorships, reimbursement of expenses, etc.) or agreement, oral or written, with a Health Care Provider, other than for the purchase of Products.  Representative will not enter into any arrangement or agreement with a Health Care Provider without the express prior written consent of NuVasive's Compliance Officer or his/her designee.

ARTICLE VII.
INTELLECTUAL PROPERTY

Section 7.01    Use.  Subject to the terms of this Agreement, NuVasive hereby grants to Representative a non-exclusive, non-transferable, non-sublicensable, limited, revocable license during the Term to use those trademarks, service marks, logos, and trade names that NuVasive may specify to Representative from time to time ("**NuVasive Trademarks**") for use solely in connection with the Promotion of the Products in the Territory pursuant to the terms of this Agreement.  Representative shall have no further rights or interest in such NuVasive Trademarks.  Representative shall fully comply with all written guidelines communicated by NuVasive concerning the use of the NuVasive Trademarks ("**Trademark Guidelines**").  Should NuVasive notify Representative that the use of any NuVasive Trademarks violate the then in effect Trademark Guidelines, Representative shall bring such use into conformance with the Trademark Guidelines and shall provide to NuVasive a specimen of such conforming use.  Notwithstanding the foregoing, NuVasive, at its discretion, may terminate this trademark license if it determines that Representative is using the NuVasive Trademarks in a manner that violates said guidelines. Representative shall cooperate with NuVasive, at NuVasive's expense, to register the NuVasive Trademarks in any jurisdiction, including executing appropriate documents and otherwise assisting NuVasive.  Representative will immediately bring to the attention of NuVasive any improper or wrongful use of NuVasive's Trademarks, emblems, designs or other similar intellectual property rights which come to the notice of Representative and will in the performance of its duties under this Agreement use reasonable efforts to safeguard the property rights and interests of NuVasive.  All goodwill arising out of any uses of the NuVasive Trademarks will inure solely to the benefit of NuVasive.

Section 7.02    Quality Control and Approval of Representations.  All representations of the NuVasive Trademarks that Representative intends to use (including in any catalogue or other marketing collateral) shall first be submitted to NuVasive for written approval (which shall not be unreasonably withheld) of design, color, and other details.  Representative may not mark the Products or Product packaging materials with its own trademarks, service marks, trade names, or logos or those of any third party.  Nothing in this section shall limit the restriction in Section 5.07 that Representative shall only use the Promotional Materials supplied by NuVasive in its Promotion of the Products unless otherwise agreed by NuVasive in writing.

Section 7.03     Property Rights.   Representative agree that NuVasive owns all right, title, and interest in the product lines that include the Products and in all of NuVasive's Intellectual Property relating to the design, manufacture, operation or service of the Products. The use by Representative of any of these property rights is authorized only for the purposes herein set forth, and upon termination or expiration of this Agreement such authorization shall cease.

Section 7.04     Prohibited Acts.   At no time during or after the Term shall Representative:

(a) take any action that may interfere with any of NuVasive's rights in or to NuVasive's Intellectual Property;

(b) challenge or assist others to challenge NuVasive's ownership of the NuVasive Trademarks or other right in NuVasive's Intellectual Property;

(c) attempt or assist others to attempt to register any trademarks, marks or trade names confusingly similar to NuVasive's Intellectual Property;

(d) register or apply for registrations, anywhere in the world, for the NuVasive Trademarks or domain names or any other trademark or domain name that is similar to the NuVasive Trademarks or that incorporates any of the NuVasive Trademarks in whole or in confusingly similar part;

(e) use any mark, anywhere, that is confusingly similar to NuVasive's Trademarks;

(f) engage in any action that tends to disparage, dilute the value of, or reflect negatively on the Product or any NuVasive Trademark;

(g) misappropriate any of NuVasive's Intellectual Property; or

(h) alter, obscure or remove any of the NuVasive Trademarks or any intellectual property rights notices placed on the products purchased under this Agreement (including Products), marketing materials or other materials that NuVasive may provide.

## ARTICLE VIII.
## CONFIDENTIALITY

Section 8.01     Non-Disclosure.   Each Party shall not, except as otherwise expressly provided herein, use, disclose, disseminate or otherwise allow access to the Confidential Information of the other Party to anyone other than to employees that have a need to know such Confidential Information to implement this Agreement and who are bound by written confidentiality obligations with provisions no less stringent than those contained in this Article VIII.   Each Party shall prevent unauthorized disclosure or use of the Confidential Information of the other Party.   Each Party shall execute all documents and otherwise shall take all necessary steps to ensure that each be able to enforce rights hereunder pertaining to Confidential Information.   Each Party shall be responsible for any breach of this Section 8.01 by employees, contractors or agents.

Section 8.02     Ownership.   As between the Parties, each receiving Party acknowledges and agrees that the disclosing Party (or its licensors) owns all rights, title and interests, including Intellectual Property Rights, in and to the disclosing Party's Confidential Information.

Section 8.03     Notification.  If a Party learns or believes that any person who has had access to the Confidential Information of the other Party has violated or intends to violate this Agreement, the receiving Party shall immediately notify the other Party and shall cooperate with the other Party in seeking injunctive or other equitable relief against any such person.

Section 8.04     Exceptions.  Neither Party shall disclose the Confidential Information of the disclosing party to any third party without prior written consent of the disclosing party.  This obligation is subject to the following exceptions: (a) disclosure by the Parties and their Affiliates is permissible if required by government or court order, discovery request, or subpoena in pending litigation provided that: (i) the Party disclosing the information first gives the other Party prior written notice in order to enable that Party to seek a protective order or motion to quash (or other equivalent protection), such permissible disclosure limited to the Confidential Information legally required to be disclosed, and (ii) any such disclosure is subject to protective order, with such permissible disclosure protected under an "Outside Attorneys Eyes Only" or higher confidentiality designation; (b) disclosure by the Parties and their Affiliates is permissible if otherwise required by any applicable securities exchange rules or regulations, such permissible disclosure limited to Confidential Information legally required to be disclosed; and (c) the Parties and their Affiliates may disclose Confidential Information the extent reasonably necessary, on a confidential basis, to their accountants, attorneys, financial advisors, and entities with audit rights.

Section 8.05     Reproduction of Confidential Information.  Confidential Information shall not be reproduced except as required to implement this Agreement.  Any reproduction or derivative of any Confidential Information of the disclosing Party by the receiving Party shall remain the property of the disclosing Party and shall contain all confidential or proprietary notices or legends which appear on the original.

Section 8.06     Equitable Remedies.  Any unauthorized disclosure or use of Confidential Information by Parties shall be a material breach of this Agreement, and Parties shall be entitled to all remedies available under law or in equity, including injunctive relief without the need to post a bond therefor.

ARTICLE IX.
TERM

Section 9.01     Term.  Unless terminated earlier as provided in this Agreement, the term of this Agreement commences on the Effective Date, and shall continue for the period set forth in the "Term of the Agreement" field of the **Key Terms Summary** (the "**Term**").

Section 9.02     Termination by Either Party for Material Breach.  If either Party materially breaches any provision of this Agreement, and such breach is not cured within thirty (30) calendar days following the delivery of written notice of such breach by the non-breaching Party to the breaching Party (provided that, such thirty (30) day notice period shall not be required if the breach by its nature cannot be cured within thirty (30) days), then the non-breaching Party may terminate this Agreement immediately upon delivery of written notice, and if the non-breaching Party is NuVasive, then NuVasive shall also have the right, in its sole discretion, to modify or remove the Territory. If this Agreement is terminated or Territory is removed or modified by NuVasive due to Representative's uncured material breach, then no Termination Full Amount, Termination Poor Standing Amount, or other compensation shall be due or owed to Representative.

Section 9.03    Termination by NuVasive/Modification of Territory.

(a)    NuVasive may, in its sole discretion and upon delivery of written notice to Representative, modify the Territory, remove the Territory (or any portion thereof), or terminate this Agreement without payment of the Termination Full Amount, Termination Poor Standing Amount, or other compensation: if (i) the Territory is not sufficiently covered by sufficient Representative representation in accordance with the sales action plan agreed to by the Parties and delivered pursuant to Section 5.02; (ii) Representative breaches any of the provisions of Section 5.08, Section 5.09,  Section 5.10, Section 6.04, Section 6.05, or Section 12.05 of this Agreement; (iii) Representative fails to make the Infrastructure Investments in accordance with Section 5.03; or (iv) Representative undergoes a Change of Control.

(b)    If Representative in in Poor Standing, NuVasive may in its sole discretion and upon delivery of written notice to Representative, modify the Territory, remove the Territory (or any portion thereof), or terminate this Agreement if NuVasive pays Representative the applicable Termination Poor Standing Amount.

(c)    Notwithstanding any other provision in this Agreement, NuVasive may, in its sole discretion and upon delivery of written notice to Representative modify the Territory, remove the Territory, or terminate this Agreement at any time, without cause and regardless of whether Representative is in Poor Standing, if NuVasive pays Representative the Termination Full Amount.

Section 9.04    Termination for Insolvency.  This Agreement may be terminated by either Party without notice and without any compensation or consideration due to the other Party: (a) upon the other Party making an assignment for the benefit of creditors; (b) upon the other Party's dissolution or ceasing to do business; (c) if the other Party makes, applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property; (d) if the other Party is generally unable to pay its debts as they become due; or (e) if the other Party has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law.

Section 9.05    Effect of Terminations.

(a) Accrued Obligations.  Termination or expiration of this Agreement shall not relieve either Party of obligations incurred prior to the effective date of such termination or expiration.

(b) Return of Materials.  All NuVasive Intellectual Property, Promotional Materials, Products, designs, drawings, formulas or other data, photographs, samples, literature, sales aids of every kind and NuVasive Confidential Information shall remain the property of NuVasive.  Within ten (10) calendar days after the termination or expiration of this Agreement, Representative shall prepare all such items in its possession for shipment, as NuVasive may direct, at NuVasive's reasonable expense.  Upon termination or expiration of this Agreement, Representative shall not make, use, dispose of or retain any copies or derivatives of any NuVasive Confidential Information in any form.  Effective upon the termination or expiration of this Agreement, Representative shall cease to use all NuVasive Trademarks.  Representative shall comply with all requests from NuVasive regarding the return of inventory, Products, Promotional Materials, samples, and other NuVasive property.   For clarity, all Compliance Agreements and customer relationships belong to NuVasive and shall be retained by NuVasive after termination or expiration of this Agreement.

(c) No Other Compensation.  NuVasive shall not, by reason of the termination or expiration of this Agreement, be liable to Representative for compensation, indemnification, reimbursement or damages on account of any loss of prospective profits or anticipated sales or on account of expenditures,

investments, leases or commitments made in connection with this Agreement or the anticipation of extended performance hereunder. For clarity, if this Agreement expires pursuant to its terms, then no Termination Full Amount, Termination Poor Standing Amount, or other compensation shall be due or owed to Representative.

Section 9.06   Treatment of Representative Affiliates Upon Termination, Expiration or Modification of Territory.   In the event that: (a) this Agreement is terminated or expires for any reason; (b) the Territory is modified, for any reason; or (c) NuVasive exercises any of its rights under Section 9.03, then in each case: (i) NuVasive shall have the right to hire, employ, or otherwise engage any Representative Affiliates providing services within the Territory (or in the case of a modification, such portion of the Territory that is removed) on terms determined by NuVasive in its sole discretion; (ii) at the request of NuVasive, all Compliance Agreements (or similar agreements then in effect) designated by NuVasive for Representative Affiliates within the Territory (or in the case of a modification, such portion of the Territory that is removed), as applicable, shall be automatically and immediately assigned to NuVasive; and (iii) Representative shall take all other reasonable steps to ensure that the services of all such Representative Affiliates engaged by NuVasive are continued uninterrupted on behalf of NuVasive, including, without limitation, releasing Representative Affiliates from any non-compete and other restrictive covenants between Representative and the Representative Affiliate that would otherwise restrict NuVasive from hiring or contracting with such Representative Affiliate.   Representative shall not challenge or dispute, and waives any claim arising out of, the hiring, employment or engagement of such Representative Affiliate by NuVasive as set forth in this Section 9.06, including asserting any claim based upon any restrictive covenants agreed to between Representative and such Representative Affiliate.

Section 9.07   Survival.   The provisions of Article IV, Section 5.09(c) (for the period specified therein), Section 5.10, Article VI, Article VII (except for the grant of rights and licenses by NuVasive), Article VIII, Article IX, Article X, Article XI (for the period specified therein), and Article XII shall survive the termination or expiration of this Agreement for any reason.   All other rights and obligations of the Parties shall cease upon termination or expiration of this Agreement.

ARTICLE X.
INDEMNITY

Section 10.01   Indemnification by Representative.   Representative shall indemnify, defend and hold harmless NuVasive and its present and former, direct and indirect, subsidiaries, affiliates, employees, officers, directors, stockholders, members, agents, representatives, and permitted successors and permitted assigns (each a "**NuVasive Indemnitee**") from and against (a) any and all Losses finally awarded to a third party by a court of competent jurisdiction or agreed to in a settlement approved by Representative that result from any Claim made or brought against a NuVasive Indemnitee, and (b) subject to Section 10.03, any Litigation Costs incurred by a NuVasive Indemnitee while investigating or conducting the defense of any Claim, in any such case (a) and (b), solely to the extent such Claim is directly based on or directly arises out of or from (i) any breach by Representative of any of its representations, warranties and covenants under this Agreement; (ii) any bodily injury, death of any person or damage to real or tangible personal property caused by the acts or omissions of Representative or any Representative Affiliate; or (iii) the gross negligence and willful misconduct of Representative or any Representative Affiliates, provided, however, that such indemnification right shall not apply to any Losses or Litigation Costs to the extent directly attributable to: (x) the negligence, reckless misconduct, or intentional misconduct of a NuVasive Indemnitee, or (y) a claim for which NuVasive is obligated to indemnify a Representative Indemnitee under Section 10.02.

Section 10.02   Indemnification by NuVasive.   NuVasive shall indemnify, defend and hold harmless Representative and its directors, officers, employees and agents (each a "**Representative Indemnitee**") from and against (a) any and all Losses finally awarded to a third party by a court of competent jurisdiction or agreed to in a settlement approved by NuVasive, and (b) subject to Section 10.03, any Litigation Costs incurred by a Representative Indemnitee while investigating or conducting the defense of any Claim, in any such case (a) and (b), solely to the extent such Claim is directly based on or directly arises out of (i) an alleged manufacturing or design defect in a Product or (ii) any Product infringing upon or misappropriating any intellectual property rights of such third party, provided, however, that such indemnification right shall not apply to any Losses or Litigation Costs to the extent directly attributable to: (x) the negligence, reckless misconduct, or intentional misconduct of a Representative Indemnitee; (y) the modification or alteration of the Products by or on behalf of a Representative Indemnitee in a manner not approved in writing by NuVasive; or (z) a claim for which Representative is obligated to indemnify a NuVasive Indemnitee under Section 10.01.   If, in connection with any Claim, it is determined by NuVasive that Representative acted beyond its authority, or failed to comply with any of its material obligations under this Agreement, NuVasive shall be immediately relieved of its obligations to Representative under this Section 10.02.

Section 10.03   Indemnification Procedure.   Promptly after receipt by a Party seeking indemnification under this Article X (an "**Indemnitee**") of notice of any pending or threatened Claim against it, such Indemnitee shall give written notice to the Party from whom the Indemnitee is entitled to seek indemnification pursuant to this Article X (the "**Indemnifying Party**") of the commencement thereof; provided that, the failure to notify the Indemnifying Party shall not relieve it of any liability that it may have to any Indemnitee hereunder, except to the extent the Indemnifying Party demonstrates that it is materially prejudiced thereby.  The Indemnifying Party shall be entitled to participate in the defense of such Claim and, to the extent that it elects within seven (7) calendar days of its receipt of notice of the Claim from the Indemnitee, to assume control of the defense and settlement of such Claim  (unless (a) the Indemnifying Party is also a party to such proceeding and the Indemnifying Party has asserted a cross claim against the Indemnitee or a court has otherwise determined that such that joint representation would be inappropriate, or (b) the Indemnifying Party fails to provide reasonable assurance to the Indemnitee of its financial capacity to defend the Indemnitee in such proceeding) with counsel reasonably satisfactory to the Indemnitee and, after notice from the Indemnifying Party to the Indemnitee of its election to assume the defense of such Claim, the Indemnifying Party shall not, as long as it diligently conducts such defense, be liable to the Indemnitee for any Litigation Costs subsequently incurred by the Indemnitee.  No compromise or settlement of any Claim may be effected by the Indemnifying Party without the Indemnitee's written consent, which consent shall not be unreasonably withheld or delayed, provided no consent shall be required if: (i) there is no finding or admission of any violation of law or any violation of the rights of any person and no effect on any other claims that may be made against the Indemnitee; (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party; and (iii) the Indemnitee's rights under this Agreement are not restricted by such compromise or settlement.

SECTION 10.04      LIMITATION OF LIABILITY.   TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NUVASIVE SHALL NOT BE LIABLE TO REPRESENTATIVE OR TO ANY ENTITY OR PERSON CLAIMING THROUGH OR UNDER REPRESENTATIVE FOR ANY LOSS OF PROFIT OR INCOME OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES OF ANY KIND, WHETHER IN AN ACTION FOR CONTRACT, TORT, OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT, EVEN IF NUVASIVE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NUVASIVE'S MAXIMUM LIABILITY TO REPRESENTATIVE FOR ANY CLAIM UNDER THIS AGREEMENT SHALL NOT EXCEED THE AMOUNTS PAID OR PAYABLE TO REPRESENTATIVE BY NUVASIVE HEREUNDER DURING THE SIX (6) MONTH PERIOD PRIOR TO THE MONTH IN

WHICH THE EVENT GIVING RISE TO THE CLAIM OCCURRED (THE "LIABILITY CAP AMOUNT"). REPRESENTATIVE ACKNOWLEDGES THAT THESE LIMITATIONS OF LIABILITY ARE AN ESSENTIAL ELEMENT OF THE BARGAIN BETWEEN THE PARTIES AND IN THEIR ABSENCE THE TERMS AND CONDITIONS OF THIS AGREEMENT WOULD BE SUBSTANTIALLY DIFFERENT. NOTWITHSTANDING THE FOREGOING, IN THE EVENT THAT NUVASIVE TERMINATES THIS AGREEMENT PURSUANT TO SECTION 9.03(B) OR 9.03(C) AND THE AMOUNT OF THE TERMINATION POOR STANDING AMOUNT OR TERMINATION FULL AMOUNT, AS APPLICABLE, IS GREATER THAN THE LIABILITY CAP AMOUNT, THEN THE LIABILITY CAP AMOUNT SHALL NOT APPLY OR IN ANY WAY LIMIT THE TERMINATION POOR STANDING AMOUNT OR TERMINATION FULL AMOUNT, AS APPLICABLE.

Section 10.05    Set-off Right. NuVasive may withhold payment of any amounts due and payable under this Agreement by reason of any set-off of any claim or dispute with Representative, whether relating to Representative's indemnification obligations breach, bankruptcy or otherwise. For the avoidance of doubt, the withholding of payment shall not relieve Representative of its obligations arising under this Agreement.

Section 10.06    Insurance.  During the Term and for a period of two (2) years thereafter, Representative shall maintain in full force and effect the following insurance coverage of not less than the following amounts: (a) General Liability including Products/Completed Operations Liability – Two Million Dollars ($2,000,000) aggregate, One Million Dollars ($1,000,000) Bodily Injury/Property Damage per occurrence, One Million Dollars ($1,000,000) Personal and Advertising Injury, One Hundred Thousand Dollars ($100,000) Damage to Rented Premises, Ten Thousand Dollars ($10,000) Premises Medical Payments; (b) Property Coverage equal to replacement value of property owned along with extra expense coverage to cover period of time to replace office premises; (c) Professional Liability – One Million Dollars ($1,000,000) aggregate and per occurrence; (d) Automobile Liability for owned, non-owned and hired autos (as applicable) – One Million Dollars ($1,000,000) per accident; and (e) Workers Compensation sufficient to meet statutory required benefits of the state in which your employees are domiciled; all from carrier(s) reasonably acceptable to NuVasive.  On an ongoing basis, Representative shall provide NuVasive with one or more certificates of insurance showing that Representative maintains insurance in accordance with this Section 10.06. Such certificates shall confirm that NuVasive has been named as an additional insured on Representative's insurance policies by endorsement to such policies and shall provide that there shall be no cancellation or reduction in coverage without thirty (30) calendar days' prior written notice to NuVasive.

ARTICLE XI.
RECORDS AND AUDITS

Section 11.01    Records and Audits. During the Term plus an additional six (6) years after its expiration or termination, Representative agrees to maintain all records required to substantiate Representative's compliance with the provisions of this Agreement and with all laws, regulations, policies, procedures and guidelines related to Representative's performance of its obligations under this Agreement, including Representative's required Infrastructure Investment. Upon reasonable request by NuVasive, Representative agrees to furnish a full and detailed statement of such records and NuVasive's business in the Territory.  NuVasive shall have the right during normal business hours and upon thirty (30) calendar days' prior written notice to audit Representative's and Representative Affiliate's records relative to NuVasive's business (including basic financial information of Representative) activities applicable to this Agreement and verify any Representative or Representative Affiliate statement sent to NuVasive.

ARTICLE XII.
MISCELLANEOUS

Section 12.01   Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving any effect to the choice of law principles thereunder.  The Parties agree that the U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

Section 12.02   Dispute Resolution.   Any controversy, dispute or question arising out of or in connection with this Agreement, or related to the interpretation, performance or non-performance of this Agreement or any breach hereof, shall be fully and finally resolved by binding arbitration conducted before a single neutral arbitrator from AAA in San Diego, California pursuant to the then current commercial dispute rules of the AAA (which can be accessed at www.adr.com), provided, however that if the dispute or claim involves a Party seeking at least one million dollars ($1,000,000) from the other Party, then the arbitration will be conducted by a panel of three arbitrators from AAA, with one arbitrator chosen by each of the Parties and the third appointed by the other two arbitrators.  The arbitrator(s) shall permit adequate discovery. In addition, the arbitrator(s) shall be empowered to award all remedies otherwise available in a court of competent jurisdiction.  Any judgment rendered by the arbitrator(s) may be entered by any court of competent jurisdiction.  The arbitrator(s) shall issue an award in writing and state the essential findings and conclusions on which the award is based.  By executing this Agreement, the Parties are both waiving the right to a jury trial with respect to any such disputes.  In all other jurisdictions the Parties shall split the costs of the arbitrator, forum and filings fees equally.  Each Party shall bear its own respective attorneys' fees and all other costs, unless otherwise provided by law and awarded by the arbitrator(s).  This arbitration section does not include claims that, by law, may not be subject to mandatory arbitration.  Nothing contained in this Agreement shall in any way deprive either Party of its right to obtain injunctions or other equitable relief from a court of competent jurisdiction, including preliminary relief, pending arbitration

Section 12.03   Notices.   Any notices required or permitted hereunder shall be given to the appropriate Party at the address specified in the **Key Terms Summary** or at such other address as the Party shall specify in writing.   Such notice shall be in writing and shall be deemed given: (a) upon personal delivery to the appropriate address; (b) if it is delivered by email, when the recipient, by an email sent to the email address for the sender provided in the **Key Terms Summary** or by a notice delivered by another method in accordance with this Section 12.03, acknowledges having received that email; (c) upon delivery by facsimile transmission with receipt confirmed; (d) if sent by certified or registered mail, postage prepaid, three (3) calendar days after the date of mailing; or (e) if sent by overnight courier, the next business day such courier regularly makes deliveries.

Section 12.04   Further Assurances.   On NuVasive's request, Representative shall, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, necessary to give full effect to this Agreement.

Section 12.05   Assignment by Representative.   Representative may not assign or transfer this Agreement or assign, transfer, or delegate any of its rights and obligations under this Agreement, including in connection with any Change of Control, without the prior written consent of NuVasive, which may be withheld, denied, or conditioned in the sole discretion of NuVasive.   Any purported assignment or delegation in violation of this Section is null and void. No assignment or delegation relieves Representative of any of its obligations under this Agreement.

Section 12.06   <u>Assignment by NuVasive</u>.  NuVasive may assign any of its rights or delegate any of its obligations without notice to, or the consent of, Representative, including in connection with any Change of Control.

Section 12.07   <u>Severability</u>.  If any provision(s) of this Agreement shall be held invalid, illegal or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall be valid and enforceable and the Parties shall negotiate in good faith a substitute, valid and enforceable provision which most nearly effects the Parties' intent in entering into this Agreement. If a court holds that the duration, scope, geographic range, or any other restriction stated in any provision of this Agreement is unreasonable under circumstances then existing, the Parties agree that the maximum duration, scope, geographic range, or other restriction that the court deems reasonable under such circumstances will be substituted and that the court will have the power to revise any of those restrictions to cover the maximum period, scope, geographic range, and/or other restriction permitted by law.

Section 12.08   <u>Modification; Waiver</u>.  This Agreement may not be altered, amended or modified in any way except in a writing signed by both Parties.  The failure of a Party to enforce any provision of the Agreement shall not be construed to be a waiver of the right of such Party to thereafter enforce that provision or any other provision or right.

Section 12.09   <u>Entire Agreement</u>.  This Agreement and the exhibits hereto, as listed in the **Key Terms Summary**, represent and constitute the sole, final and entire agreement between the Parties, and supersedes and merges all prior negotiations, agreements and understandings, oral or written, with respect to the matters covered by this Agreement.

Section 12.10   <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.  The Parties agree that a facsimile or electronic pdf may be executed as an original.

Section 12.11   <u>Advice of Counsel</u>.  Each of the Parties represent that they have had the opportunity to seek the advice of counsel with respect to the negotiation and execution of this Agreement.  Representative further represents that it has executed this Agreement of its own free will and is not relying on counsel for NuVasive with respect to any portion of this Agreement.

Section 12.12   <u>Interpretation</u>. Each Party acknowledges and agrees that (a) any applicable rule of construction to the effect that ambiguities are to be resolved against a drafting Party shall not be applied in connection with the construction or interpretation of this Agreement or any provision hereof; (b) no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement; (c) "including" (and any of its derivative forms) meaning including without limitation; (d) "may" means has the right but not the obligation to do something and "may not" means does not have the right to do something; and (e) "will" and "shall" are expressions of command, not merely expressions of future intent or expectation..

Section 12.13   <u>Headings</u>.  The headings used in this agreement are for convenience of reference only and shall not affect the construction of or be taken into consideration in interpreting this Agreement.

Section 12.14   <u>No Implied Licenses</u>.  Except as explicitly set forth herein, Representative is not granted any explicit or implied licenses in this Agreement.

*{Remainder of Page Intentionally Left Blank}*

## EXHIBIT A

## DEFINITIONS

1.  "**AAA**" means the American Arbitration Association.

2.  "**Agreement**" has the meaning set forth in the **Key Terms Summary**.

3.  "**Change of Control**" means any merger, consolidation or acquisition of a Party, with by or into another corporation, person or entity, the sale of all or substantially all of the assets of the Party, or any change in the ownership of more than 50% of the voting stock of a Party in one or more related transactions.

4.  "**Claim**" shall mean any charge, allegation, notice, civil, criminal or administrative claim, demand, complaint, cause of action, suit, proceeding, arbitration, hearing or investigation.

5.  "**Commission**" has the meaning set forth in Section 2.01.

6.  "**Compliance Agreement**" has the meaning set forth in Section 5.09.

7.  "**Confidential Information**" means the proprietary or confidential information of a Party which is disclosed to the receiving Party, whether before or after the Effective Date, and (a) if disclosed in writing, is either marked as confidential or is known, understood or reasonably expected to be confidential at the time of disclosure, or (b) if disclosed orally or in other intangible form, is either identified and treated as confidential at time of disclosure, or is known, understood or reasonably expected to be confidential at the time of disclosure, or is, without limiting the foregoing, identified in writing and marked confidential within thirty (30) calendar days after disclosure and relates to products, plans, designs, costs, prices, finances, marketing plans, business opportunities, personnel, research, development, know-how, trade secrets, inventions, blueprints, techniques, processes, algorithms, software programs, schematics, designs, contracts, customer lists, procedures, formulae, patent applications and other information relating to the Party's business, services, processes or technology. Confidential Information shall also include the terms of this Agreement. Confidential Information shall not include information that the receiving Party proves: (i) was known by receiving Party or was publicly available prior to disclosure by the disclosing Party to the receiving Party; (ii) became publicly available after disclosure by the disclosing Party to the receiving Party through no act of the receiving Party; (iii) is hereafter rightfully furnished to the receiving Party by a third party without confidentiality restriction; (iv) was independently developed by the receiving Party without reference to, or use of, the receiving Party's Confidential Information; or (v) is disclosed with the prior written consent of the disclosing Party or as expressly authorized under this Agreement.

8.  "**Effective Date**" means the effective date set forth in the **Key Terms Summary**.

9.  "**Exhibit**" has the meaning set forth in the **Key Terms Summary**.

10. "**FDA**" means the U.S. Food and Drug Administration.

11. "**Health Care Provider**" means the definition of "health care provider" as set forth in 29 CFR 825.125.

12. "**Indemnifying Party**" has the meaning set forth in Section 10.03.

13. "**Indemnitee**" has the meaning set forth in Section 10.03.

14. "**Infrastructure Investments**" has the meaning set forth in Section 5.03.

15. "**Intellectual Property**" or "**Intellectual Property Rights**" as used herein collectively means any and all patents, copyrights, trademarks, trade secrets, mask works, moral rights, know-how or any other proprietary right, and any applications for the foregoing, under the laws of the United States, or any other governmental jurisdiction (including the European Union).

16. "**Litigation Costs**" means any direct out-of-pocket costs and expenses (including reasonable attorneys' fees).

17. "**Losses**" means any claims, costs, damages, losses, liabilities, fines, penalties, and expenses.

18. "**Monthly Statement**" has the meaning set forth in Section 2.05.

19. "**MVP**" has the meaning set forth in **Exhibit D**.

20. "**Net Sales**" means the dollar amount actually received by NuVasive from a customer for the sales of the Product(s), less charges for shipping, handling, freight, taxes, C.O.D. charges, insurance, tariffs and duties, cash and trade discounts, rebates, charge back payments to managed healthcare organizations, GPO administrative fees, amounts allowed or credited for returns, uncollected or uncollectable amounts, services, taxes imposed upon the sale of the Products, and any other deductions permitted under Generally Accepted Accounting Principles (GAAP) to calculate net sales.

21. "**NuVasive Indemnitee**" has the meaning set forth in Section 10.01.

22. "**NuVasive Trademarks**" has the meaning set forth in Section 7.01.

23. "**Party**" and "**Parties**" has the meaning set forth in the **Key Terms Summary**.

24. "**Poor Standing**" has the meaning set forth in Section 1.04.

25. "**Products**" means the products listed in the **Key Terms Summary**.  Products subject to this Agreement may be changed, discontinued or added by NuVasive at its sole discretion upon thirty (30) calendar day's prior written notice to NuVasive.

26. "**Promote**," "**Promotional**" and "**Promotion**," and any variants of any of the foregoing, mean those activities to be undertaken by Representative and its authorized personnel to solicit orders for, encourage sales and appropriate use of the Product, including contacting customers in the Territory, and other forms of advertising, marketing, promotional and solicitation efforts.

27. "**Promotional Materials**" has the meaning set forth in Section 5.07.

28. "**Quota Commitments**" has the meaning set forth in Section 1.03.

29. "**Representative**" means the Representative listed in the **Key Terms Summary**.

30. "**Representative Affiliate**" means Representative's partners, employees, sub-contractors, sales personnel (whether employees of Representative or independent contractors), affiliates or agents who have provided services pursuant to this Agreement or have received information from Representative related to the Products.

31. "**Representative Indemnitee**" has the meaning set forth in Section 10.02.

32. "**Restricted Persons**" means any current, former, or prospective customers, group purchasing organizations, integrated health networks, hospitals, hospital groups, surgeons, physicians, or billing services with which NuVasive or an affiliate of NuVasive has a business relationship.

33. "**Shared Services**" has the meaning set forth in Section 5.05.

34. "**SP Incremental Sales Amount**" means the amount equal to all Net Sales generated in the Territory by Representative pursuant to the Agreement during the most recently-completed twelve-month period, less $10,539,162. Notwithstanding the foregoing, if the SP Incremental Sales Amount equals a negative amount, then the SP Incremental Sales Amount shall be equal to zero.

   "**Term**" has the meaning set forth in Section 9.01.

35. "**Termination Full Amount**" equals the applicable amount as set forth below:

| Time Period in which an Event Requiring the Calculation of the Termination Full Amount Occurs | Termination Full Amount |
|---|---|
| Effective Date – December 31, 2019 | $650,000 |
| January 1, 2020 – December 31, 2020 | $850,000 |
| January 1, 2021 – December 31, 2021 | An amount equal to the SP Incremental Sales Amount multiplied by 10% |

   Example calculations are set forth in **Exhibit H**.

36. "**Termination Poor Standing Amount**" equals the applicable amount as set forth below:

| Time Period in which an Event Requiring the Calculation of the Termination Poor Standing Amount Occurs | Termination Poor Standing Amount |
|---|---|
| Effective Date – December 31, 2019 | $650,000 |
| January 1, 2020 – December 31, 2020 | $700,000 |
| January 1, 2021 – December 31, 2021 | An amount equal to the SP Incremental Sales Amount multiplied by 10% |

   Example calculations are set forth in **Exhibit H**. In no event will Representative be entitled to <u>both</u> the Termination Full Amount and the Termination Poor Standing Amount (payment of the Termination Full Amount shall extinguish any right to the Termination Poor Standing Amount and payment of the Termination Poor Standing Amount shall extinguish any right to the Termination Full Amount).

37. "**Terms and Conditions of Sale**" has the meaning set forth in Section 3.01.

38. "**Territory**" means the territories specified in **Exhibit B**.

39. "**Trademark Guidelines**" has the meaning set forth in Section 7.01.

**EXHIBIT B**

**TERRITORY**

The States of Massachusetts and Rhode Island

## EXHIBIT C

## COMMISSIONS

This Exhibit is incorporated by reference into and made a part of the Sales Representative Agreement between NuVasive and Representative. Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

### Calendar Year 2019 Commissions (Excluding Commission for MAGEC® Products)

| | |
|---|---|
| **Monthly Commission Rate** | |
| Osteocel Pro, Osteocel Plus, Propel | |
| • Stocking | 16.15% |
| • Non-Stocking | 14.15% |
| All other allograft Products | 16.15% |
| All other NuVasive Products[1] | 17.15% |
| | |
| **QTR PTQ Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics)** | |
| >=110% of Quota Commitment | 5.25% |
| >=108% of Quota Commitment | 4.75% |
| >=105% of Quota Commitment | 4.25% |
| >=102% of Quota Commitment | 2.25% |
| >=100% of Quota Commitment | 1.50% |
| | |
| **Quarterly Growth Bonus (Paid on same quarter Net Sales in excess of the prior year (if any), excluding Net Sales of MAGEC and allograft/biologics)** | 10.00% |

[1] *IOS Disposables*: NuVasive will separately provide commission rates for IOS disposables.

**EXHIBIT C**

**COMMISSIONS (continued)**

**Calendar Year 2020 Commissions (Excluding Commission for MAGEC® Products)**

| | |
|---|---|
| **Monthly Commission Rate** | |
| Osteocel Pro, Osteocel Plus, Propel | |
| • Stocking | 16.15% |
| • Non-Stocking | 14.15% |
| All other allograft Products | 16.15% |
| All other NuVasive Products[1] | 16.15% |
| | |
| **QTR PTQ Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics)** | |
| >=110% of Quota Commitment | 5.75% |
| >=108% of Quota Commitment | 4.75% |
| >=105% of Quota Commitment | 4.25% |
| >=102% of Quota Commitment | 2.25% |
| >=100% of Quota Commitment | 1.50% |
| | |
| **Quarterly Growth Bonus (Paid on same quarter Net Sales in excess of the prior year (if any), excluding Net Sales of MAGEC and allograft/biologics)** | 10.00% |

[1] *IOS Disposables*: NuVasive will separately provide commission rates for IOS disposables.

**EXHIBIT C**

**COMMISSIONS (continued)**

**Calendar Year 2021 Commissions (Excluding Commission for MAGEC® Products)**

| **Monthly Commission Rate** | |
|---|---|
| Osteocel Pro, Osteocel Plus, Propel | |
| • Stocking | 18.00% |
| • Non-Stocking | 16.00% |
| All other allograft Products | 18.00% |
| All other NuVasive Products[1] | 18.00% |
| **QTR PTQ Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics)** | |
| >=110% of Quota Commitment | 4.00% |
| >=108% of Quota Commitment | 3.00% |
| >=105% of Quota Commitment | 2.30% |
| >=100% of Quota Commitment | 1.50% |
| | |
| **Quarterly Growth Bonus (Paid on same quarter Net Sales in excess of the prior year (if any), excluding Net Sales of MAGEC and allograft/biologics)** | 10.00% |

[1] *IOS Disposables*: NuVasive will separately provide commission rates for IOS disposables.

Commissions to be paid are determined by applying the appropriate commission rate to Net Sales (as described in Section 2.01 and Section 2.02 of the Agreement). Achievement of each of the QTR PTQ Bonus and Quarterly Growth Bonus is determined by measuring Net Sales of Product(s) (excluding all Net Sales of MAGEC).

Sales of Osteocel Pro, Osteocel Plus and Propel shall only be deemed "Stocking" sales if NuVasive receives a purchase order or valid purchase order number for the respective Product prior to shipping such Product, as evidenced by NuVasive's actual records (and the order is otherwise in accordance with the requirements of Section 3.02).

In the event the Territory is modified, then the Quarterly Growth Bonus opportunity may be amended or modified by NuVasive. The Quarterly Growth Bonus will not be retroactively applied back to dollar one, but instead is an incremental increase to the monthly commission rate for all Net Sales made in a quarter that are in excess of the same prior-year quarter.

NuVasive reserves the right to introduce new Products with different Commission structures.

**EXHIBIT C**

**COMMISSIONS (continued)**

**Commission for MAGEC Products**

Representative's sole compensation for procurement of orders for MAGEC Products pursuant to the Agreement shall be the applicable percentage set forth below on Net Sales of MAGEC Products resulting from Representative's procurement of orders therefore (the "**MAGEC Commission**"):

| | |
|---|---|
| Calendar Years 2019 and 2020 – MAGEC Products | 13.15% |
| Calendar Year 2021 – MAGEC Products | 15.00% |

The terms and conditions set forth in Section 2.01 and Section 2.02 of the Agreement applicable to the Commission for non-MAGEC Products shall apply to the MAGEC Commission.

For the avoidance of doubt, sales of MAGEC Products shall not count towards Representative's achievement of the Quota Commitment or the determination of Representative's QTR PTQ Bonus or Quarterly Growth Bonus, if any.

**Potential for Commission Increase**

In the event aggregate Net Sales in the Territory under this Agreement equal $40,216,000 (as the Territory is defined as of the Effective Date) (the "**Net Sales Threshold Amount**") prior to December 31, 2020, then:

(1) the Monthly Commission Rate for Osteocel Pro, Osteocel Plus, Propel, All other allograft products, All other NuVasive Products (excluding IOS Disposables), and MAGEC Products shall each be increased on a underline prospective basis by 1.85%; and

(2) the QTR PTQ Bonus schedule shall be amended and restated with the following schedule (as applicable) on a prospective basis:

(a) if the Net Sales Threshold Amount is achieved at any time during calendar year 2019, then the QTR PTQ Bonus schedule shall be:

| **QTR PTQ Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics)** | |
|---|---|
| >=110% of Quota Commitment | 3.50% |
| >=108% of Quota Commitment | 3.00% |
| >=105% of Quota Commitment | 2.50% |
| >=100% of Quota Commitment | 1.50% |

## EXHIBIT C

## COMMISSIONS (continued)

(b) if the Net Sales Threshold Amount is achieved at any time during calendar year 2020, then the QTR PTQ Bonus schedule shall be:

| QTR PTQ Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics) | |
|---|---|
| >=110% of Quota Commitment | 4.00% |
| >=108% of Quota Commitment | 3.00% |
| >=105% of Quota Commitment | 2.50% |
| >=100% of Quota Commitment | 1.50% |

Solely for purposes of calculating the Net Sales Threshold Amount, sales of capital equipment by Representative in the Territory shall be included in the calculation of Net Sales. For clarity, achievement of the Net Sales Threshold Amount shall have no effect on Commissions for calendar year 2021 and Commissions for calendar year 2021 shall remain unchanged. Further, no increase or changes shall be made to any Quarterly Growth Bonus upon achievement of the Net Sales Threshold Amount.

By way of example, if the Net Sales Threshold Amount is achieved on April 30, 2020, then the Monthly Commission Rate for Osteocel Pro, Osteocel Plus, Propel, All other allograft products, All other NuVasive Products (excluding IOS Disposables) and MAGEC Products as set forth on this Exhibit C as of the Effective Date shall be increased by 1.85% as of May 1, 2020 so the total Monthly Commission Rate shall be as follows:

| Monthly Commission Rate | |
|---|---|
| Osteocel Pro, Osteocel Plus, Propel | |
| • Stocking | 18.00% |
| • Non-Stocking | 16.00% |
| All other allograft Products | 18.00% |
| All other NuVasive Products[1] | 18.00% |

| MAGEC Products | 15.00% |
|---|---|

In addition, the QTR PTQ Bonus as of May 1, 2020 shall be as follows:

| QTR PTQ Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics) | |
|---|---|
| >=110% of Quota Commitment | 4.00% |
| >=108% of Quota Commitment | 3.00% |
| >=105% of Quota Commitment | 2.50% |
| >=100% of Quota Commitment | 1.50% |

**EXHIBIT D**

**SHARED SERVICES.**

NuVasive and Representative agree that the following Shared Services are beneficial to the efficient operation of their respective businesses. The Shared Services listed below are not meant to be exhaustive. Shared Services (and the costs relating to such Shared Services) may be modified, updated, added, supplemented or terminated in NuVasive's sole discretion with or without notice.

| Shared Service | Description |
|---|---|
| Recruiting | NuVasive agrees to post Representative job openings (as requested by Representative) on the NuVasive.com career page, subject to certain conditions as may be communicated to Representative from time to time by NuVasive. Access to this Shared Service is included in the base commission paid to Representative by NuVasive and may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
| Staff training | NuVasive agrees to provide Representative and its personnel with product, sales and professional development training programs and materials related to the Products as set forth in the Sales Training Course Catalog attached hereto as **Exhibit E**, which **Exhibit E** may be modified, updated or supplemented by NuVasive from time to time. Representative agrees (a) that all of its applicable employees and contractors engaged in Promoting or otherwise soliciting orders for the Products will complete NuVasive's sales training courses and program as outlined in **Exhibit E** within the timelines set forth therein, and (b) to implement a sales training plan agreed upon by Representative and NuVasive's sales management that makes full use of NuVasive's training courses and provides regular and thorough training to Representative's entire sales team. Representative shall sign all certifications confirming its applicable employees' and contractors' completion of such training, as may be requested by NuVasive. Access to this Shared Service is included in the base commission paid to Representative by NuVasive. Representative agrees to pay all costs for Representative and Representative Affiliate travel relating to staff training. |
| Data analytics | NuVasive agrees to provide Representative with data analytics support (e.g. sales performance, customer segmentation, competitive hiring modeling quota workbooks). Access to this Shared Service is included in the base commission paid to Representative by NuVasive and may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
| Software licenses | NuVasive agrees to provide Representative with required licenses to access NuVasive systems (e.g. CRM, SAP, Tableau). Access to this Shared Service is included in the base commission paid to Representative by NuVasive. NuVasive may modify, update, supplement or terminate Representative access to such NuVasive systems in its sole discretion with or without notice. |

| IT help desk | NuVasive agrees to provide reasonable IT help desk support for NuVasive systems.  Access to this Shared Service is included in the base commission paid to Representative by NuVasive and may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
|---|---|
| Promotional Materials | NuVasive shall provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures, instructional material, advertising literature, product samples, and other Product data at Representative's cost.  Access to this Shared Service may be modified, updated, supplemented or terminated by NuVasive in its sole discretion with or without notice. |
| Market development team support | NuVasive may provide market development team resources to Representative to support various initiatives, including, but not limited to, new surgeon conversion, market penetration, clinical training and new product launches.  Representative and NuVasive agree to share in market development team costs as determined on a case by case basis by NuVasive in its sole discretion.  Access to this Shared Service may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
| MVP participation | Representative agrees to meet NuVasive's requirements for attendance and participation in NuVasive's Marquis Visit Program ("**MVP**") as communicated by NuVasive to Representative from time to time.  Representative and NuVasive agree to share in MVP training costs as determined by NuVasive in its sole discretion.  Access to this Shared Service may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |

## EXHIBIT E

## SALES TRAINING COURSE CATALOG

Sales Training
Course Catalog 0628

**EXHIBIT F**

**FORM OF CERTIFICATION OF COMPLIANCE**

[SEE ATTACHED]

## EXHIBIT G

### OTHER PRODUCTS/SERVICES SOLICITED, SOLD OR MARKETED BY REPRESENTATIVE OR REPRESENTATIVE AFFILIATES

None.

## EXHIBIT H

## EXAMPLE CALCULATIONS

### Example 1: Termination for Uncured Material Breach

| | |
|---|---|
| Event: | Uncured Material Breach by Representative |
| Termination/Removal of Territory: | Termination of Entire Agreement by NuVasive |
| Provision: | Section 9.02 |
| Date of Event: | April 30, 2020 |
| Representative in Poor Standing: | No |
| | |
| Termination Full Amount: | $0.00 |
| Termination Poor Standing Amount: | $0.00 |

### Example 2: Removal of Territory for Failure of Representative to Sufficiently Cover the Territory

| | |
|---|---|
| Event: | Representative fails to Sufficiently Cover the Territory |
| Termination/Removal of Territory: | Removal of Portion of Territory |
| Provision: | Section 9.03(a)(i) |
| Date of Event: | April 30, 2020 |
| Representative in Poor Standing: | No |
| | |
| Termination Full Amount: | $0.00 |
| Termination Poor Standing Amount: | $0.00 |

### Example 3:  Termination of Entire Agreement by NuVasive in its Sole Discretion / Representative not in Poor Standing

| | |
|---|---|
| Event: | Termination of Agreement by NuVa for Convenience |
| Termination/Removal of Territory: | Termination of Entire Agreement by NuVasive |
| Provision: | Section 9.03(c) |
| Date of Event: | April 30, 2020 |
| Representative in Poor Standing: | No |
| | |
| Termination Full Amount: | $850,000 |
| Termination Poor Standing Amount: | $0.00 |

### Example 4:  Termination of Entire Agreement by NuVasive / Representative in Poor Standing

| | |
|---|---|
| Event: | Termination of Agreement by NuVa for Poor Standing |
| Termination/Removal of Territory: | Termination of Agreement |
| Provision: | Section 9.03(b) |
| Date of Event: | September 30, 2019 |
| Representative in Poor Standing: | Yes |
| | |
| Termination Full Amount: | $0.00 |
| Termination Poor Standing Amount: | $650,000 |

**Example 5:  Expiration of Agreement as of December 31, 2021**

| | |
|---|---|
| Event: | Agreement expires pursuant to its terms |
| Termination/Removal of Territory: | Expiration & Termination of Entire Agreement |
| Provision: | Section 9.01 |
| Date of Event: | December 31, 2021 |
| Representative in Poor Standing: | No |
| Termination Full Amount: | $0.00 |
| Termination Poor Standing Amount: | $0.00 |

No compensation or consideration shall be paid upon expiration of the Agreement pursuant to its terms.

**Example 6:  Termination of Entire Agreement by NuVasive / Representative in Poor Standing**

| | |
|---|---|
| Event: | Termination of Agreement by NuVa for Poor Standing |
| Termination/Removal of Territory: | Termination of Agreement |
| Provision: | Section 9.03(b) |
| Date of Event: | September 30, 2021 |
| Representative in Poor Standing: | Yes |
| Net Sales in Territory (8/1/20 – 9/30/21): | $31,000,000 |
| | |
| SP Incremental Sales Amount: | $31,000,000 - $10,539,162 = $20,460,838 |
| | |
| Termination Full Amount: | $0.00 |
| Termination Poor Standing Amount: | $2,046,083 = ($20,460,838, x 10%) |

**Example 7:  Termination of Entire Agreement by NuVasive / Representative not in Poor Standing**

| | |
|---|---|
| Event: | Termination of Agreement by NuVa for convenience |
| Termination/Removal of Territory: | Termination of Agreement |
| Provision: | Section 9.03(b) |
| Date of Event: | September 30, 2021 |
| Representative in Poor Standing: | No |
| Net Sales in Territory (8/1/20 – 9/30/21): | $31,000,000 |
| | |
| SP Incremental Sales Amount: | $31,000,000 - $10,539,162 = $20,460,838 |
| | |
| Termination Full Amount: | $2,046,083 = ($20,460,838, x 10%) |
| Termination Poor Standing Amount: | $0.00 |

**From:** Kirk Tyree
**Sent:** Tuesday, March 26, 2019 4:49 PM
**To:** Timothy Day <tday@rivalmedical.com>
**Subject:** RE: Quick Question

Hi Tim,

Per NuVa HR, your last day as an employee was January 3rd.

The independent contractor agreement with Rival Medical was effective as of January 1st.

Thanks, Kirk

**Kirk Tyree**
Senior Di
mobile  858 726 010

**From:** Timothy Day [mailto:tday@rivalmedical.com]
**Sent:** Tuesday, March 26, 2019 1:26 PM
**To:** Kirk Tyree <ktyree@nuvasive.com>
**Subject:** Quick Question

⚠ External Email

Kirk,

Quick question, my CPA is asking me some questions cause of Tax season that I am not sure how to answer. Hopefully you can help me.

Because I was a W2 of Nuva for technically two days in January of 2019. My contract I signed with Nuva at the start of 2018 was terminated when I transitioned to Rival Medical on Jan 3rd of 2019, correct? I guess cause my contract was for two years she is asking if that contract was terminated when I took on my distributorship.

Can you clarify this for me?

Thanks,

Tim Day

EXHIBIT
3

**From:** Timothy Day <tday@rivalmedical.com>
**Date:** March 30, 2019 at 11:26:31 AM PDT
**To:** Paul McClintock <PMcClintock@nuvasive.com>
**Subject: Resignation**

☐ External Email

Paul,

The purpose of this e-mail is to provide notice that Rival Medical, LLC has begun dissolution.
I am grateful for the friendships and memories that I have at NuVasive and will organize the
appropriate transition.

Tim Day



EXHIBIT
4

1

On 4/1/19, 9:01 AM, "Timothy Day" <tday@rivalmedical.com> wrote:

🔲 External Email

Paul,
    Since I have not heard from anyone, and I have confirmed with my team that coverage should not be an issue after today. I am going to make to April 1st my last day.

Thanks

Tim


561-305-3541


EXHIBIT
5

1



GULLETT SANFORD
ROBINSON & MARTIN PLLC

150 THIRD AVENUE SOUTH, SUITE 1700
NASHVILLE, TN 37201

t. 615.244.4994
f. 615.256.6339
w. GSRM.COM

April 1, 2019

<u>VIA E-MAIL & U.S. MAIL</u>

Rival Medical, LLC                          Tim Day
Attention: Tim Day                          8 Fraser Drive
8 Fraser Drive                              Andover, MA 01810
Andover, MA 01810                           tday@rivalmedical.com
tday@rivalmedical.com

Re:   **Notice of Material Breach and Litigation Hold**

Dear Mr. Day:

Your March 30, 2019, email to Paul McClintock which purports to terminate the January 1, 2019, Sales Agreement between NuVasive, Inc. and Rival Medical, LLC (the "Sales Agreement") caused NuVasive to hire me.

Section 9.01 of the Sales Agreement provides that its term commenced on January 1, 2019, and continues through December 31, 2021.  Rival Medical has no right or ability to unilaterally terminate the Sales Agreement and the attempted termination constitutes a material breach of the Sales Agreement.  Accordingly, please provide your written assurances, no later than close of business on April 2, 2019, that Rival Medical intends to honor the term and obligations the Sales Agreement imposes on it, including, without limitation, that it will:

> (1) continue to cover all surgical cases in the Territory (as defined by the Sales Agreement); and
>
> (2) conduct its business in the ordinary course and in a manner consistent with past practice and use its best efforts to maintain the business, employees, agents, customers, assets and operations as a going concern in accordance with past practice and under its obligations contained in the Sales Agreement.

If Rival Medical fails to timely cure its material breach and inform NuVasive of same, consider this correspondence NuVasive's written notice of termination pursuant to Section 9.02 of the



**EXHIBIT**
6

Tim Day
Rival Medical, LLC
April 1, 2019
Page 2

Sales Agreement, which releases NuVasive from making any further payments to Rival Medical. Further, if Rival Medical fails to cure its material breach and the Sales Agreement terminates, all Compliance Agreements between Rival Medical and its Representative Affiliates (as defined in the Sales Agreement) immediately assign to NuVasive pursuant to Section 9.06.

Finally, please remember your and Rival Medical's post-employment obligations – including obligations not to compete, not to solicit NuVasive's customers, and not to solicit NuVasive's employees – which are contained in, without limitation, your January 3, 2018, Proprietary Information, Inventions Assignment, Arbitration and Restrictive Covenant Agreement and the Sales Agreement.

NuVasive takes its contractual rights, and its business, confidential, proprietary, and trade secret information very seriously, and will take all necessary and appropriate steps to prevent any unlawful competition and/or misappropriation or disclosure of its trade secrets or confidential information, or any breach of its contracts, tortious interference with its business relations, or usurpation of its corporate opportunities. We are currently investigating the situation and are evaluating our legal options, including bringing any necessary legal action and/or arbitration to protect NuVasive's rights.  Accordingly, you and Rival Medical are now on notice of potential litigation and are required to take all necessary steps to preserve, and not destroy, conceal, or alter, any and all communications, documents, tangible things, and/or electronically stored information ("ESI") that may be relevant to this matter, including by way of example, and without limitation, emails, text messages, voicemails, records, files, and other data, wherever located and regardless of the format or media.  ESI should be given the broadest possible definition. Be advised that the destruction of such evidence could result in penalties, including legal sanctions.

I look forward to receiving the requested written assurances.

Very truly yours,

Christopher W. Cardwell

CWC/mtm

cc:     Christopher Mills, Esq. (via email: cm@bsms.law)
        Bryan Busch, Esq. (via email: bb@bsms.law)



GULLETT SANFORD
ROBINSON & MARTIN PLLC
150 THIRD AVENUE SOUTH, SUITE 1700
NASHVILLE, TN 37201

T  615.244.4994
F  615.256.6339
W  GSRM.COM

April 2, 2019

<u>VIA EMAIL bb@bsms.law)</u>
Bryan E. Busch
Busch Slipakoff Mills & Slomka, PC
2859 Paces Ferry Road SE, Suite 1700
Atlanta, Georgia 30339

Re:   NuVasive/Tim Day and Rival Medical, LLC

Dear Bryan:

Yesterday morning, Mr. Day informed NuVasive that he (which NuVasive and I assume to include Rival Medical) will perform no further services for NuVasive. This constitutes a material breach of the Sales Agreement which, pursuant to Section 9.02, cannot be cured within thirty (30) days. Accordingly, NuVasive exercises its right to remove the Territory (as defined in the Sales Agreement) from Rival Medical. As set forth in Section 9.02, this action relieves NuVasive of the obligation to provide Rival Medical with any other compensation and, pursuant to Section 10.05, NuVasive chooses to exercise its set-off right.

Additionally, NuVasive is exercising its right – granted by Section 9.06 – to hire, employ, and otherwise engage Rival Medical's sales representatives. So that these individuals are able to service NuVasive's customers without interruption, I demand that Rival Medical provide me with copies of all compliance agreements, compensation plans, personal services contracts, etc. between it and these sales representatives by Noon on April 3, 2019.

Next, I demand that your client, individually and as the sole member of Rival Medical, provide his written assurances that he will comply with the post-employment obligations contained in his PIIA and his Sales Agreement.

This letter is not an exhaustive recitation of NuVasive's rights against Mr. Day and/or Rival Medical, and NuVasive is not waiving any such rights. As litigation appears imminent, I remind you of my demand that Mr. Day and Rival Medical preserve all relevant evidence, including, without limitation, electronic communications.

I look forward to your timely response.

768303.1/020190350


EXHIBIT
7

Bryan Busch
April 2. 2019
Page 2

Very truly yours,

Christopher W. Cardwell

CWC/ld

cc:     Chris Mills (via email – cm@bsms.law)