**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NUVASIVE, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 19-cv-10800 |
| TIMOTHY DAY, | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NUVASIVE, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 19-cv-10995 |
| ADAM RICHARD, | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                                                                    **February 18, 2021**

**I.     Introduction**

Plaintiff NuVasive, Inc. ("NuVasive") filed these lawsuits against Defendants Timothy

Day ("Day") and Adam Richard ("Richard")[1] (collectively, "Defendants") alleging tortious

---

[1] NuVasive filed separate complaints against Day, 19-cv-10800, and Richard, 19-cv-10995.  Citations to docket entries will be "Day, D. __" or "Richard, D. __."

interference (Day, Count I), breach of contract (Day, Count II; Richard, Count I) and seeking injunctive relief (Day, Count III; Richard, Count II). The Court previously dismissed Day, Count III and Richard, Count II, the counts of injunctive relief. Day, D. 78; Richard, D. 49. NuVasive has now moved for partial summary judgment on its remaining claims as to each defendant: the tortious interference and breach of contract claims against Day and its breach of contract claim against Richard. Day, D. 146; Richard, D. 81.[2] Day has moved for partial summary judgment on the tortious interference claim, Count I, Day, D. 144, and Richard has moved for summary judgment against NuVasive on the sole remaining claim against him for breach of contract, Count I. Richard, D. 85.

For the reasons discussed below, the Court ALLOWS NuVasive's motion for partial summary judgment against Day in part as to the breach of contract claim, Day, D. 146, ALLOWS NuVasive's motion for summary judgment against Richard as to the breach of contract claim, Richard, D. 81, ALLOWS Day's motion for partial summary judgment as to the tortious interference claim, Day, D. 144, and DENIES Richard's motion for summary judgment, Richard, D. 85.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute regarding any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that "carries with it the potential to affect the outcome of the suit under the applicable law." García-González v. Puig-Morales, 761

---

[2] NuVasive captions its motions as motions for "partial" summary judgment, although it seeks summary judgment as to the remaining counts against both Day and Richard. Based upon counsel's oral argument, the Court understands that NuVasive is moving for summary judgment as to Defendants' liability on the remaining claims, but that, if it prevails on any or all claims, NuVasive still seeks an evidentiary hearing on damages.

F.3d 81, 87 (1st Cir. 2014) (quoting Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014)) (internal quotation mark omitted).  The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact." Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (citation omitted).  Once that burden is met, the non-moving party may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but, "with respect to each issue on which [he] would bear the burden of proof at trial," must "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citations omitted).  The Court views the record in the light most favorable to the non-moving party, "drawing reasonable inferences" in his favor. Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997). "Conclusory allegations, improbable inferences, and unsupported speculation," however, are "insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (citation and internal quotation mark omitted).

## III.   Procedural History

On April 22, 2019, NuVasive filed its complaint against Day asserting claims for tortious interference, breach of contract and injunctive relief.  Day, D. 1 at 7-8.  The following day, NuVasive moved for a preliminary injunction against Day, Day, D. 8.  Three days later, on April 26, 2019, NuVasive filed its complaint against Richard asserting claims for breach of contract and injunctive relief.  Richard, D. 1 at 7-8.  That same day, NuVasive moved for a preliminary injunction against Richard.  Richard, D. 4.  On May 29, 2019, the Court allowed the motion for a

preliminary injunction in part against Day and denied the motion against Richard.  Day, D. 31; Richard, D. 25.  Both Day and Richard then moved to dismiss all counts against them.  Day, D. 40; Richard, D. 27.  On October 9, 2019, the Court denied Day and Richard's respective motions to dismiss in part, allowing both only as to the claims for injunctive relief.  Day, D. 78; Richard, D. 49.  NuVasive has now moved for summary judgment against Day and Richard.  Day, D. 146; Richard, D. 81.  Day has cross moved for partial summary judgment on the tortious interference claim (Count I) and Richard has cross moved for summary judgment on the remaining count against him for breach of contract (Count I).  Day, D. 144; Richard, D. 85.  The Court heard the parties on the pending motions and took the matters under advisement.  Day, D. 176; Richard, D. 104.

## IV.    Factual Allegations

The Court previously provided the general background in its rulings on the preliminary injunction motion and motions to dismiss, Day, D. 31 at 2-3; Richard, D. 25 at 2-3; Day, D. 78 at 2-3; Richard, D. 49 at 2-3, which it will not repeat here.  The following facts are based upon the now developed factual record and, unless otherwise noted, are undisputed.

### A.    Defendants' Employment at NuVasive

NuVasive hired Day in August 2011 as a directly employed sales representative for an exclusive distributor of NuVasive's products.  Day, D. 80 ¶ 4.  In January 2018, NuVasive hired Richard as a directly employed sales representative.  Richard, D. 90 ¶ 1; D. 92 ¶ 1.

Both Richard and Day entered a Proprietary Information, Inventions Assignment, Arbitration, and Restrictive Covenants Agreement (the "NuVasive PIIA") with NuVasive that is governed by Delaware law.  Day, D. 80-1; Richard, D. 90-2 at 11.  Under the NuVasive PIIA, Richard and Day are prohibited from disclosing NuVasive's "Proprietary Information" to anyone

outside of NuVasive.  Day, D. 80-1 at 2-3; Richard, D. 90-2 at 12-13.   "Proprietary Information" is defined in the NuVasive PIIAs as including but not limited to "information about research, . . . user profiles . . . trade secrets, designs, . . .  ideas, techniques, inventions, product specifications, . . . client and supplier lists, contacts at or knowledge of clients or prospective clients of . . . [NuVasive], and other information concerning [NuVasive's] or its client's actual or anticipated products or services, business, research or development, or any information which is received in confidence by or for [NuVasive] from any person . . . ." Id.

The NuVasive PIIA additionally includes a non-solicitation clause (Section VI) and a non-competition clause (Section VII).  Day, D. 80-1 at 6-9; Richard, D. 90-2 at 16-19.  Both clauses include provisions extending the terms of the clauses for one year following the termination of Defendants' engagement with NuVasive.  Id.  The non-solicitation clause provides that Defendants agree not to "solicit, entice, persuade, induce, call upon or provide services to any of the Customers . . . accounts or clients that [they] worked with, had responsibility or oversight of, provided services related to, or learned significant information about during [their] employment (or other association) with [NuVasive] for any purpose other than for the benefit of [NuVasive]."  Day, D. 80-1 at 7; Richard, D. 90-2 at 17.  "Customers" refers to "hospitals (including but not limited to surgery centers and other healthcare institutions and their employees), payers (including but not limited to insurance companies and third party billers), and physicians (or other health care practitioners including but not limited to the employees of any surgeon or other healthcare practitioners) who use, order or approve the use of ordering of [NuVasive] products or services." Day, D. 80-1 at 8; Richard, D. 90-2 at 18.

The non-competition clauses require that Day and Richard, during the course of their engagement with NuVasive and for the twelve month period immediately following the

termination of their engagement,  would not "(i) serve as a partner, employee, consultant, officer, director, manger, agent, associate, investor or otherwise for, (ii) directly or indirectly, own purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate myself with any Conflicting Organization."   Day, D. 80-1 at 7; Richard, D. 90-2 at 17.   A Conflicting Organization is "any person, group of persons, or organization that is engaged in, or about to be engaged in, research on, consulting regarding, or development, production, marketing or selling of any product, process, invention or service, which resembles, competes with, or replaces a product, process, machine, invention or service upon which I shall have worked or about which I became knowledgeable as a result of my relationship with [NuVasive], and whose use or marketability could be enhanced by the application of Proprietary Information to which I shall have had access during such relationship."  Id.

### B.   Defendants' Employment at Rival Medical

On January 1, 2019, Rival Medical, LLC ("Rival") became the exclusive distributor for NuVasive's products in Massachusetts and Rhode Island.  Day, D. 160 ¶ 1; Richard, D. 92 ¶ 5. Rival and NuVasive entered a Sales Representative Agreement (the "Sales Agreement").  Day, D. 160 ¶ 1; Richard, D. 92 ¶ 6.  The Sales Agreement transitioned Day from a direct employee at NuVasive to an independent distributorship for the sale and promotion of NuVasive products. Day, D. 144 at 6. Day served as Rival's president and oversaw the sales representatives, sales associates, administrative assistants and provided customer service for the sale of NuVasive's products.  Id. at 6-7.

Richard transitioned to Rival as its sales representative in January 2019.  Richard, D. 92 ¶ 5.  As part of his transition from NuVasive employee to Rival employee, Richard entered into a

Rival Medical Sales Representative Agreement (the "Rival PIIA"). Id. ¶ 6. The Rival PIIA, which is governed by Massachusetts law, is substantively identical to the NuVasive PIIA. It forbids the disclosure of any Proprietary Information, contains a substantially identical non-solicitation clause (Section VI) and non-competition clause (Section VII) as the NuVasive PIIA. Richard, D. 90-2. The Rival PIIA also includes a clause that identifies NuVasive as an intended third-party beneficiary of the agreement. D. 90-2 at 5. Exhibit B of the Rival PIIA identifies Richard's assigned sales territory as Beth Israel Deaconess Medical Center ("BIDMC"), Brigham & Women's Hospital ("B&W"), New England Baptist Hospital ("NEBH"), Beth Israel Deaconess Milton ("BI-Milton"), St. Elizabeth's Medical Center (limited to Dr. Paul Glazer), Faulkner Hospital, and Milford Regional Hospital. Richard, D. 92 ¶ 7. Richard's assigned surgeons were Dr. Glazer, Dr. Hassan Zaidi, and Dr. Brian Kwon. Richard, D. 92 ¶ 8.

On March 30, 2019, only a few months after the formation of Rival, Day e-mailed NuVasive's President Paul McClintock ("McClintock") notice that Rival had begun dissolution. Day, D. 156-9.

### C.     Defendants' Employment at Alphatec

#### 1.     Day's Conduct While Working at Alphatec

The following day, April 1, 2019, Day informed McClintock that he would no longer perform services for NuVasive. Day, D. 160 ¶ 5. Day then began his employment at Alphatec Spine, Inc. ("Alphatec"), see Day, D. 158-6, which NuVasive identifies as a competitor in the spinal products market.

Day called Dr. Glazer at BIDMC on behalf of Alphatec shortly after he separated from NuVasive to discuss pricing for Alphatec products. Day, D. 158-3 at 16-17. Previously, Dr. Glazer

was an exclusive NuVasive user for seven years and the highest, revenue-generating surgeon in Rival's sales territory in Massachusetts and Rhode Island.  Day, D. 160 ¶ 11.

Day sent several e-mails to representatives and surgeons at hospitals in Massachusetts on behalf of Alphatec.  On March 31, 2019, Day e-mailed BIDMC representatives to inform them that he had separated from NuVasive.  Day, D. 160 ¶ 9.  Day then e-mailed these same BIDMC representatives on April 19, 2019 that he would be their new point of contact with Alphatec.  Day, D. 160 ¶ 10.  In May 2019, BIDMC began using Alphatec "ALIF" products.  Day, D. 160 ¶ 12-15.  Day acknowledges that he was involved in getting that system approved.  Day, D. 160 ¶ 14.  On May 10, 2019, Day sent an e-mail to BIDMC's clinical contract manager, Joseph Boyle, stating that he would "work on an addendum for the anterior fixations options that we met the pricing on."  Day, D. 158-12 at 2.  Day informed Boyle that he would need to circle back "with ATEC as the list price for the HL cages is $22,500 and [that he] cannot honor an 80% discount on  product that is far superior and unique to what any of the current vendors can provide."  Id.  In response to this e-mail, Boyle told Day that they needed "to meet the HL pricing as well, regardless of the price point on HL cages for the company [he] previously worked at."  Id.  Day indicated that they could "meet the referenced pricing for the plates and the file you sent me."  Day, D. 158-12 at 4.  On May 28, 2019, Day sent an e-mail to Sarah McKay ("McKay"), a representative of Tufts Medical Center, stating that he met McKay "briefly during [his] time as Nick's manager at NuVasive."  Day, D. 158-13.  Day explained that he was now at Alphatec and that he "wanted to see if there was any interest in us presenting some pricing.  I know price is of the utmost importance to Tufts and I think you will be compelled by the price points we can offer you."  Id.

Day also disclosed to employees at Alphatec information about custom surgical instruments Dr. Glazer used during his tenure at NuVasive.  Specifically, on April 24, 2019, Day

emailed Alphatec employees that Dr. Glazer had custom cobbs made during his NuVasive tenure and that Dr. Glazer would not utilize Alphatec's ALIF products without such custom cobbs.  Day, D. 160 ¶¶ 26-27.  On May 6, 2019, Alphatec created "some cobb tips designed" for Dr. Glazer. Day, D. 158-16 at 2.  On June 26, 2019, Day instructed Alphatec employees in an e-mail to also send Dr. Glazer custom reamers.  Day, D. 158-17 at 2.  An employee at Alphatec responded that he would ship two sets.  Id.

### 2.    Richard's Conduct While at Alphatec

Richard also joined Alphatec in April 2019.  See Richard, D. 92 ¶ 9.   On April 17, 2019, Richard exchanged e-mails with Alphatec's General Counsel, Craig Hunsaker, to discuss the medical facilities that fell within his non-compete/non-solicit territory.  Id.  In addition to the sales territory listed in the Rival PIIA, Richard reported that he serviced or covered surgeries at Massachusetts General Hospital ("MGH"), Newton-Wellesley Hospital ("Newton") and South Shore Hospital ("South Shore") during the last year of his employment at NuVasive.  Id.  In Richard's November 2019 deposition, he testified that he believed that he covered cases at MGH while employed by NuVasive, that it was possible that he covered cases at MGH while he was employed at Rival and that he supported surgeries or conducted sales on Alphatec's behalf at MGH, Newton, BMH, Cape Cod Healthcare and Tufts Medical.  Richard, D. 92 ¶¶ 10-11.

Richard continued to communicate with Dr. Glazer while employed at Alphatec.  During his November 2019 deposition, Richard acknowledged that he met with Day and Alphatec sales representative, Colin Behrmann ("Behrmann") at BIDMC to discuss how Alphatec would be managed with Dr. Glazer.  Richard, D. 90-1 at 19.  In May 2019, Richard attended a dinner with Dr. Glazer, Day and Alphatec's Chairman and CEO, Patrick Miles ("Miles").  Richard, D. 92 ¶ 14; see Richard, D. 90-5 at 4-5 (Behrmann Deposition).  Richard does not recall the purpose of

this dinner or what was discussed there.  Richard, D. 92 ¶ 15.  In June 2019, Richard attended

another dinner with Dr. Glazer and Day.  Id. ¶ 16.

Richard also completed "recon reports" for surgeons who had been within his NuVasive

sales territory.  On May 5, 2019, Day informed Richard that Miles was meeting with three doctors,

including Dr. Kwon and Dr. Zaidi (doctors Richard serviced while working for Rival) and

requested that Richard complete a recon report of the doctors.  Richard, D. 90-10 at 2.  Richard's

recon report noted information that Richard learned about Dr. Zaidi while he worked at NuVasive.

It stated that Dr. Zaidi's "practice was split between [NuVasive] and Depuy. . . [Dr. Zaidi] would

use [NuVasive] cages, and Depuys screws.  He would use [NuVasive] corpectomy cages for any

corpectomy.  Dr. Zaidi was very much in my corner, and got a number of other surgeons in the

hospital to start using [NuVasive] products for me.  He was transitioning more and more business

over to [NuVasive] before I left the company."  Richard, D. 90-11 at 3.  Richard further stated that

a goal for the meeting would be to get Dr. Zaidi "on board with ATEC" because Dr. Zaidi was a

"crucial piece to re-entering Brigham & Women's hospital."  Id.  According to Richard, Dr. Zaidi

is a "domino to cause a ripple into other client's practices within this account, as he was at

[NuVasive].  If the meeting goes well, I would love to get him on a flight to ATEC and see how

we can get him involved with Alphatec Spine Inc."  Id.  Day responded that the recon report had

"[a]wesome detail."  Richard, D. 90-12 at 2.  A few days later, on May 22, 2019, Day, Miles, and

Dr. Zaidi met for dinner.  Richard, D. 92 ¶ 20.  After this dinner, Dr. Zaidi agreed to visit Alphatec's

San Diego, California headquarter.  Id.

There are several e-mails in the record regarding Richard's work at MGH while at

Alphatec.  On November 27, 2019, Richard sent an e-mail to the MGH identifying himself as the

"spine rep who covers MGH now."  Richard, D. 92 ¶ 21.  On April 8, 2020, Day sent an e-mail to

a Chad Spear at 3:58 a.m. entitled "Quarter 1 2020 Recap."  Richard, D. 90-15. The report notes

that Richard's non-compete restrictions ended just the day prior on April 7, 2020 that Richard had

success at MGH, that Dr. Shin was super engaged with Richard and that Richard had done a great

job reengaging Dr. Kim.  Richard, D. 90-15 at 4.

Lastly, Richard wrote a note to a Dr. Aaron Beck on an unspecified date.  The note stated

that Richard met Dr. Beck when he worked with NuVasive.  Richard, D. 88-2.  He informed Dr.

Beck that he is now with Alphatec Spine and that he "would love to help [Dr. Beck] get off the

ground in any way that [he] can."  Id.  Richard further wrote that if Dr. Beck was looking for "a

more engaged role or some involvement in product development, we could have some really good

opportunity for you with us."  Id.  Richard, in his November 2019 deposition, stated that although

he was not certain, he believed that Dr. Beck probably worked at either MGH or B&W.  Richard,

D. 88-1 at 9.

## V.    Discussion

### A.    NuVasive and Day's Cross-Motions for Summary Judgment as to the Tortious Interference Claim (Day, Count I)

Day and NuVasive both move for summary judgment on NuVasive's claim that he

tortiously interfered with its Sales Agreement with Rival.  Day, D. 144; D. 146.  To prevail on a

claim for tortious interference with a contract, NuVasive must establish that "(1) [it] had a contract

with a third party; (2) the defendant knowingly induced the third party to break that contract; (3)

the defendant's interference, in addition to being intentional, was improper in motive or means;

and (4) [NuVasive] was harmed by the defendant's actions." G.S. Enter., Inc. v. Falmouth Marine,

Inc., 410 Mass. 262, 272 (1991).   The parties' dispute focuses on whether NuVasive can show the

third element, that Day interfered with Rival's contract with NuVasive.

As an initial matter, Day still contends that he cannot be liable for tortious interference where he is indistinguishable from Rival.  "A party to the contract cannot be held liable for intentional interference."  Harrison v. NetCentric Corp., 433 Mass. 465, 477 (2001) (citation Appley v. Locke, 396 Mass. 540, 543 (1986)).  "Where the corporation and the individual defendant are indistinguishable, including without limitation, where the individual is the corporation's sole stockholder, it would exalt from over substance to hold that the corporation could not be sued successfully in contract, but that the corporation's alter ego could be sued successfully in tort."  Id. at 478.

There is at least some suggestion in the record that Day is not the sole shareholder, but that his wife is also a shareholder.  Denise Roy, Rival's accountant, identified Day was the sole shareholder of Rival, Day, D. 144-2 at 4, but Monique Day was a manager of Rival.  Id.  Rival's response to NuVasive's first set of interrogatories, however, it stated that Day owned fifty-one percent of Rival and that his wife owned forty-nine percent.  Day, D. 156-3 ¶ 2.  Even if Day is not the sole shareholder, unlike in Harrison, 433 Mass. at 478, where the individual defendant was the "founder of the company, the chairman of the board, the chief executive officer, and a large shareholder of the closely held corporation," but it was unclear how many shares the defendant held, id. at n.14, Day was president, operator, majority shareholder and there is no suggestion that the role of Day's wife was anything other ministerial.  Thus, unlike Harris, id. at 478 (concluding there that "these facts do not permit us to conclude as a matter of law that [individual defendant] controlled the operation of the corporation to the degree that he should be viewed as its alter ego"), there is perhaps a stronger case for concluding that Day should be viewed as Rival's alter ego.

Day argues that even if his wife had some ownership in Rival, they would both be considered indistinguishable from Rival for purposes of the tortious interference claim.  Day, D.

171 at 3 (citing <u>Hunneman Real Estate Corp. v. Norwood Realty, Inc.</u>, 54 Mass. App. Ct. 416, 425 (2002)).  Still, in <u>Hunneman</u>, plaintiff alleged that both shareholders tortiously interfered with a contractual relationship and NuVasive does not allege that both Day and his wife interfered with its contractual relationship with Rival.

Even if Day distinguishable from Rival for the purposes of this interference claim, NuVasive has failed to show the other requisite element for this claim, namely that Day's dissolution of Rival was improper in motive or means for the purposes of showing the requisite interference element.  "Regarding the third element of an improper motive or means, the improper conduct must extend beyond the interference itself."  <u>inVentiv Health Consulting, Inc. v. Equitas Life Sciences</u>, 289 F. Supp. 3d 272, 283 (D. Mass. 2017) (internal citations and quotations omitted).  "Violation of a statute or a rule of common law or use of threats, misrepresentations of facts or other improper means provides a sufficient improper motive or means."  <u>Id.</u>  "[W]here the defendant is a corporate official acting in the scope of his corporate responsibilities, a plaintiff has a heightened burden of showing the improper motive or means constituted actual malice, that is, a spiteful, malignant purpose, unrelated to the legitimate corporate interest."  <u>Weiler v. PortfolioScope, Inc.</u>, 469 Mass. 75, 84 (2014) (internal quotation marks and citation omitted).

NuVasive and Day agree that Day is a corporate official who was acting within the scope of his corporate duties, and thus the actual malice standard is applicable.  Day, D. 144 at 11; Day, D. 156 at 7.  Here, NuVasive alleges that Day used improper means by breaching a fiduciary duty to Rival and when he caused Rival, without warning or notice to stop performing its obligations in the Sales Agreement to violate his restrictive covenant.  Day, D. 147 at 5-6.  NuVasive, therefore must establish, as a matter of law, that Day breached a fiduciary duty to Rival.  <u>See TalentBurst, Inc. v. Collabera, Inc.</u>, 567 F. Supp. 2d 261, 268 (D. Mass. 2008).  To prevail on a claim for breach

of fiduciary duty NuVasive must show:  (1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of that duty and the damages. Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 164 (1999).   Day owed a fiduciary duty to Rival as a member of its corporation.   See Brodie v. Jordan, 447 Mass. 866, 869 (2006).  As to breach of that duty, NuVasive argues that Day breached his duty to Rival by "exposing it to liability for breaking" the Sales Agreement.  Dissolving a partnership, however, does "not necessarily constitute breach[] of fiduciary duty." Karter v. Pleasant View Gardens, Inc., 248 F. Supp. 3d 299, 309 (D. Mass. 2017) (internal citation omitted).  Even assuming Day breached a duty to Rival, moreover, NuVasive has not presented anything in the record to establish Rival's damage (as opposed to NuVasive's damage).  There is, moreover, "no evidence that [Day] used threats, misrepresented any facts, defamed anyone, or used any other improper means. . ." United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990).  Thus, NuVasive has not established improper means.

As to improper motive, NuVasive argues that Day wanted to dissolve Rival because he desired to convert NuVasive's business to Alphatec.  Day, D. 147 at 5-6.  As evidence of same, NuVasive points to actions Day took leading up to and after the dissolution of Rival.  First, Day dissolved Rival with less than one business day of notice.  See Day, D. 158-1; Day, D. 158-5.  A few weeks later, Day sent e-mails to BIDMC stating that he would be their new point of contact at Alphatec.  Day, D. 160 ¶ 10.  NuVasive also notes that Day was aware that Rival represented NuVasive's entire sales force in the region and that it was harmed by the dissolution.  Day, D. 147 at 6.

These facts do not, however, establish that Day's interference was unrelated to any legitimate business interest.  See Pierce v. Cotuit Fire Dist., No. 10-cv-12091-DPW, 2013 WL

1187101, at *11 (D. Mass. Mar. 20, 2013), aff'd, 741 F.3d 285 (1st Cir. 2014).  There is no allegation by NuVasive that Day harbored ill will or spite toward NuVasive, cf. Hamann v. Carpenter, 937 F.3d 86, 91 (1st Cir. 2019), nor has NuVasive established that Day's actions were motivated merely by his desire to harm NuVasive.  See ADH Collision of Boston, Inc. v. Wynn Resorts, Ltd., No. 19-cv-10246-RGS, 2020 WL 3643509, at *3 (D. Mass. Jul. 6, 2020) (holding that "if the interfering party's conduct is directed, at least in part, to advancing its competitive interest, the fact that it is also motivated by other impulses, as, for example, hatred or  desire or revenge is not alone sufficient to make its interference improper") (citing Restatement (Second) of Torts § 768(1)(d) cmt. g) (internal quotation marks omitted)).  Day's desire to take business from NuVasive to his current employer, moreover, is in his own economic interest and thus is not "improper."  See United Truck Leasing Corp., 406 Mass. at 817 (holding that defendant's motives in benefiting his customers and himself financially did not constitute improper interference); Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B. 62 Mass. App. Ct. 34, 39 (2004) (stating "[t]hat the plaintiff may have suffered a loss as a consequence of the defendant's pursuing of its own interest is a by-product of a competitive marketplace; it does not render the defendant's efforts tortious").  NuVasive thus has failed to establish that Day used improper motive or means with actual malice.  Accordingly, the Court ALLOWS Day's motion for partial summary judgment as to the tortious interference claim and DENIES NuVasive's motion as to same.

**B.**      **NuVasive's Motion for Partial Summary Judgment Against Day on Breach of Contract Claim (Day, Count II)**

Under both Delaware and Massachusetts law, the elements of a breach of contract claim are "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."  VLIW Tech, L.L.C. v. Hewlett–Packard Co., 840 A.2d 606, 612 (Del. 2003); Coll v. PB Diagnostic Sys., Inc.,

50 F.3d 1115, 1122 (1st Cir. 1995) (applying Massachusetts law).  The parties do not dispute that there is an existing contract.  At issue is whether the record establishes that Day breached his non-solicitation and non-competition obligations.

>    1.    *NuVasive Has Established That Day Violated His Non-Competition Obligations*

To show that Day breached the non-competition provision, NuVasive must show that Day "serve[s] as a . . . employee . . . or otherwise, . . . work or consult for or otherwise affiliate myself with any Conflicting Organization."  Day, D. 80-1 at 7.  Previously, this Court held that NuVasive had not shown a substantial likelihood on the merits that Alphatec was a Conflicting Organization because while Alphatec products directly compete with NuVasive products, NuVasive failed to provide what Proprietary Information Day had or how it would "enhance" the use or marketability of Alphatec's products as required under the definition of Conflicting Organization.  Day, D. 31 at 13; D. 80-1 at 7.

Now the record establishes that Day sent several e-mails to surgeons and hospital representatives using information he gleaned while working at NuVasive.  Day sent an e-mail to the BIDMC clinical contract manager stating he would be able to meet NuVasive price points. Day, D. 158-12.  He also sent an e-mail to McKay, a Tufts Medical center representative noting that they met while he was working at NuVasive, that he had knowledge that price was of the utmost importance to Tufts and that the prices at Alphatec were compelling.  Day, D. 158-13.  Day also informed employees of Alphatec that he was aware that Dr. Glazer had custom cobbs during his tenure at NuVasive and that he would not utilize Alphatec's ALIF products without them.  Day, D. 160 ¶¶ 26-27.  Alphatec went on to create "cobb tips" for Dr. Glazer, and Day instructed an Alphatec employee to send Dr. Glazer custom reamers.  Day, D. 158-17.

Section I(B) of the NuVasive PIIA defines proprietary information to include information about products, knowledge of clients and their customer contact information. Day, D. 80-1 at 2-3. Considering this record, NuVasive has established that Day utilized NuVasive's client contacts, their custom products and other customers information while working at Alphatec, a Conflicting Organization. Accordingly, Day has breached his non-competition obligations by "serv[ing] as a . . . employee . . . with any Conflicting Organization." D 80-1 at 7-8.

    2.    *NuVasive Has Established That Day Violated His Non-Solicitation Obligations*

To show a breach of the non-solicitation clause, NuVasive must show that Day "solicit[ed], . . . call[ed] upon or provide[d] services to any of the Customers . . . accounts or clients that [he] worked with, had responsibility or oversight of, provided services related to, or learned significant information about during [his] employment (or other association) with [NuVasive] for any purpose other than for the benefit of [NuVasive]." Day, D. 80-1 at 7. Previously, this Court held that NuVasive had shown a reasonable likelihood of success on this claim. Day, D. 31 at 13. Among other things, this Court considered Joseph MacDermott's affidavit attesting that Day gave his Alphatec card to a surgeon with whom Day previously worked with at NuVasive and urged the surgeon, in a handwritten note, to reach out to take advantage of the "immense opportunity" with Alphatec. See id. This Court found that such evidence amounted to Day calling upon a customer of NuVasive for a purpose other than for the benefit of NuVasive, his former employer. Id.

Now, on a more developed record, NuVasive adds the additional fact that Day instructed BIDMC that Behrmann would replace him as its primary Alphatec contact on June 9, 2019. Day, D. 160 ¶ 30. This e-mail serves as evidence that prior to June 9, 2019, Day was the primary Alphatec contact for BIDMC. Serving as the primary contact for BIDMC, a client that Day worked with during his employment at NuVasive, for the benefit of Alphatec during the one year

immediately after his employment at NuVasive is a violation of his non-solicitation agreement. This, coupled with the other undisputed evidence discussed above regarding Day's breach of the non-competition provision, establishes that Day called upon and provided services to NuVasive customers for purposes other than to benefit NuVasive during his time at Alphatec.

3.      *NuVasive Has Established That Day's Violations Caused It Harm*

As evidence of the harm that it suffered from Day's breaches of contract, NuVasive relies upon language in Day's PIIA that he agreed that his use of Proprietary Information "to the detriment" of NuVasive would cause the company irreparable harm and NuVasive would be "otherwise harmed" by his solicitation in violation of the PIIA.  Day, D. 147 at 14; Day, D. 80-1 at 6.   Even if not presumed by the parties under Day's PIIA, the record reveals that NuVasive "sustained harm as a result of [Day's breach], that the damages sought are not speculative and that there is a causal connection between [Day's] acts or omissions and [NuVasive's] damages." Proctor Group Insurance Agency, Inc v. Jones, No. 2006-2050-A, 2008 WL 2875452, at *2 (Mass. Super. Ct. Jun. 6, 2008) (citing Lufkin's Real Estate, Inc. v. Aseph, 349 Mass. 343, 346 (1965) and Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 487 (1994)).   Notably, Day's actions harmed NuVasive in relation to its sales to its customers, including the hospitals and doctors discussed above.  See Day, D. 158-9 at 3-4; Day, D. 158-10 at 7-12; 17.

For all of these reasons, NuVasive has shown that summary judgment in its favor is warranted on the breach of contract claim against Day.

C. **Richard and NuVasive's Cross-Motions for Summary Judgment**

Richard and NuVasive both move for summary judgment that he breached his non-solicitation and non-competition obligations under both PIIAs.[3]

### 1. Alphatec is A Conflicting Organization

As discussed above, NuVasive must establish that Alphatec is a Conflicting Organization, Richard, D. 90-2 at 17, which it has done on this record. Without repeating the analysis above, the Court addresses Richard's arguments regarding same.

Richard does not appear to dispute that he had access to NuVasive's prices, trade secrets, customer information, details on products, sale techniques, product research, sales forecasts and information concerning NuVasive business. Richard, D. 92 ¶ 26. He only disputes whether this information constitutes Proprietary Information. Id. The NuVasive PIIA however states that Proprietary Information includes trade secrets, product specification, techniques, research, or development, as well as "information about . . . client, contacts or knowledge of clients . . . of. . . NuVasive . . . and other information concerning [NuVasive's] client's actual or anticipated products or services . . . ." Richard, D. 90-2 at 12-13.

As to whether Richard used any of NuVasive's Proprietary Information while working at Alphatec, the record establishes that on May 16, 2019, Richard, at Day's request, sent Day a recon report for Dr. Zaidi—one of his assigned surgeons at NuVasive. Richard, D. 90-10. This recon report had information that Richard learned about Dr. Zaidi while he worked at NuVasive. Richard, D. 90-11 at 3. Thus, Richard's recon report which noted information about Dr. Zaidi, a

---

[3] NuVasive argues in its response that the Court should view Richard's motion as a partial motion for summary judgment because Richards's motion only discusses the Rival PIIA and did not move for summary judgment on the NuVasive PIIA. Richard, D. 88 at 1. Richard's reply, however, clarifies that his summary judgment motion relies upon both contracts. Richard, D. 100 at 1-2.

NuVasive client and the "actual . . . products and services," Richard, D. 90-2 at 12-13, he used, constitutes Proprietary Information.

### 2.    *Richard Violated His Non-Competition Obligations*

Given that Richard "serve[d] as a . . . employee" at a Conflicting Organization and used information about a NuVasive customer and its products for Alphatec's benefit, he violated his non-competition obligations.  Richard, D. 80-1 at 7.  Richard argues however that the Rival PIIA provision is invalid under the Massachusetts Noncompetition Agreement Act ("MNCA") because it does not have a "garden leave clause" and it was not presented to Richard until after he began his employment with Rival.  Richard, D. 85 at 9.  The MNCA sets out requirements for noncompetition agreements entered after October 1, 2018 to be valid and enforceable.  See NuVasive, Inc. v. Day, 954 F.3d 439, 444 (1st Cir. 2020); Mass. Gen. L. c. 149, § 24L.  NuVasive and Richard entered the Rival PIIA in January 2019, Richard, D. 90 ¶¶ 5-6, thus the MNCA is applicable to the non-competition provision of the Rival PIIA.  It is, however, not applicable to the NuVasive PIIA that Richard entered with NuVasive in January 2018.  D. 90-2 at 22.  Even if the Court were to assume that the non-competition clause of the Rival PIIA was unenforceable in light of MNCA, NuVasive's breach of contract claim also relies upon the NuVasive PIIA, which is not subject to the MNCA.  Accordingly, the Court finds that NuVasive has established that Richard breached his non-competition obligations under the NuVasive PIIA.

### 3.    *Richard Violated His Non-Solicitation Obligations*

First, the record establishes that on multiple occasions Richard attended dinner with Alphatec employees and surgeons that he covered while at NuVasive.  In May 2019, Richard attended a dinner with Day, Miles, and Dr. Zaidi.  D. 92 ¶ 20.  After that dinner, Dr. Zaidi agreed to visit Alphatec's San Diego, California headquarter.  Id.  It is also undisputed that Richard

attended another dinner in June 2019 with Dr. Glazer and Day.  D. 92 ¶ 16.  Mere contact with NuVasive's customers, however, is not sufficient to establish that Richard solicited them.  See KPMG Peat Marwick LLP v. Fernandez, 709 A.2d 1160, 1162 (Del. Chanc. Ct. 1998).

Second, Colin Ennis ("Ennis") now attests that in April 2019, he observed Day and Richard in the BIDMC lobby speaking to a surgeon that they had solicited and serviced on NuVasive's behalf during their tenure at Rival.  Richard, D. 90-4 ¶ 20.  Richard denied being at the hospital that day.  Richard, D. 21-1 ¶ 6.  This Court has already found that this was insufficient to establish that Richard called upon or solicited customers.  Richard, D. 25 at 15.

While Richard's various dinner meetings and alleged April 2019 visit to BIDMC may not be sufficient to establish that he violated his non-solicitation obligations, there is now other evidence in the record that demonstrates same.  First, the non-solicitation clause of the PIIA prevents Richard from "provid[ing] services to any of the Customers, accounts or clients that [he] worked with, had responsibility or oversight of, provided services related to, or learned significant information about during [his] employment (or other association) with [NuVasive] for any purpose other than for the benefit of [NuVasive]."  Richard, D. 90-2 at 17.  The record establishes however that Richard's assigned sales territory while working for NuVasive at Rival were BIDMC, B&W, NEBH, BIDM, Faulkner Hospital and Milford Regional Hospital, Richard, D. 92 ¶ 7, that his assigned surgeons were Dr. Glazer, Dr Zaidi and Dr. Kwon, D. 92 ¶ 8, and that he serviced or covered surgeries at MGH, Newton and South Shore Hospital during the last year of his employment at NuVasive.  Richard, D. 92 ¶ 9; see Richard, D. 90-3.  During his November 2019 deposition, Richard acknowledged that he supported surgeries or conducted sales calls on Alphatec's behalf at MGH and Newton, D. 92 ¶ 11, and that at some point he visited BIDMC with Day and Behrmann to discuss how Alphatec would be managed.  Richard, D. 90-1 at 18-19

(Richard Deposition).  On November 27, 2019, Richard sent an e-mail to Mass General Brigham healthcare system identifying himself as the person who covers MGH.  Richard, D. 92 ¶ 21.  Lastly, Richard's handwritten note to Dr. Beck, who worked at either MGH or B&W, asking if Dr. Beck was interested in Alphatec product development also shows that Richard called upon doctors within his NuVasive sale territory on behalf of Alphatec. Thus, during the requisite period, Richard violated the terms of his non-solicitation agreement by providing services or attempting to provide services to customers that he serviced while working for NuVasive.

4.    *Richard's Violation of His PIIA Obligations Caused Harm to NuVasive*

Finally, NuVasive alleges that it is undisputed that Richard's violation of his restrictive covenant harmed NuVasive.  On this record, the Court agrees.  As with Day's PIIA, Richard's PIIA reflects the parties' agreement that NuVasive "will be irreparably harmed if it were to use that Proprietary Information—whether directly or indirectly—to the detriment of [NuVasive] and its actual or potential business and/or resources."  Richard, D. 90-2 at 16.  As evidence of same, NuVasive points to Day's April 8, 2020 report that Day sent to a fellow employee.  Richard, D. 89 at 10.  Day's April 8, 2020 report states that Dr. Glazer conducts business with Alphatec and that Dr. Shin began working with Alphatec in December.  Richard, D. 90-15 at 4.  Although the mere fact that customer move to a salesperson's new employer alone might not show a causal connection, Proctor Group Insurance Agency, Inc., 2008 WL 2875452, at *2, here NuVasive points to Richard's contact with various customers that he previously served at NuVasive and to the internal Alphatec recon report about facilitating sales relationships with them at Alphatec.

For all of these reasons, the Court allows NuVasive's motion for summary judgment on its breach of contract claim against Richard and denies Richard's cross motion for summary judgment.

**VI.**     **Conclusion**

For the above reasons, the Court ALLOWS NuVasive's motion for partial summary judgment against Day in part as to the breach of contract claim, Day, D. 146; ALLOWS NuVasive's motion for partial summary judgment against Richard on the breach of contract claim, Richard, D. 81; ALLOWS Day's motion for partial summary judgment as to the tortious interference claim, Day, D. 144, and DENIES Richard's motion for summary judgment, Richard, D. 85.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge