# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **NUVASIVE, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-10800-DJC |
| | ) | |
| **TIMOTHY DAY**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# POST-HEARING MEMORANDUM

On May 29, 2019, this Court enjoined Defendant, Tim Day, from violating a non-solicitation of customers provision found in his PIIA that contains his agreement not to "solicit, entice, persuade, induce, call upon or provide services to any of the Customers[1] . . . that [he] worked with, had responsibility or oversight of, provided services related to, or learned significant information about during his employment with NuVasive (or other association) with [NuVasive] for any purpose other than for the benefit of [NuVasive]." (D.E. 31 at pp. 3, 18). The Court's January 23, 2020, Order (D.E. 101) extended this injunction to March 3, 2020. In doing so, the Court noted that Day's PIIA contains a tolling provision and held:

> Contrary to Day's argument, the incidents of solicitation in violation of the PIIA in April and May 2019 were not isolated incidents. Instead, the allegation that the Massachusetts territory was part of Day's Alphatec sales territory until the injunction was issued coupled with the specific allegations of solicitation[2] shows a substantial likelihood of continuing violations during this period . . ."

---

[1] Day's PIIA defines "Customers" as "hospitals (including but not limited to surgery centers and other healthcare institutions and their employees), payers (including but not limited to insurance companies and third party billers), and physicians (or other health care practitioners including but not limited to the employees of any surgeon or other healthcare practitioners) who use, order or approve the use or ordering of Company products or services." (**Exhibit 39** at p. 8).

[2] These "incidents of solicitation" include Day, "among other things, meeting with Dr. Paul Glazer, a spine surgeon who operates at Beth Israel Deaconess Medical Center ("BIDMC"), exchanging emails with an BIDMC employee about getting pricing for Alphatec products approved at BIDMC, leaving a handwritten note for one of his former NuVasive surgeon-customers soliciting the surgeon's business and attending, along with other Alphatec employees, a marketing dinner to solicit business from Dr. Glazer." (D.E. 101).

(Id.). Then, on February 18, 2021, the Court entered an Order granting NuVasive summary judgment on its claims that Day violated the PIIA's non-solicitation of customers and non-compete provisions, (D.E. 185), and held, in relevant part, that "NuVasive sustained harm as a result of [those breaches], and that the damages sought are not speculative and that there is a causal connection between Day's acts or omissions and NuVasive's damages." (D.E. 185 at p. 18). Finally, during the October 13, 2021, Pre-Trial Conference, the Court, without limitation, adopted Magistrate Judge Kelley's Report and Recommendation (D.E. 217) in its October 14, 2021, Order (D.E. 226). By adopting the Report and Recommendation, the Court found that, without limitation, Day and Adam Richard intentionally destroyed text messages, Day's stated reasons for spoliating certain electronic communications "do[ ] not warrant comment," and an adverse inference instruction and an award of fees prosecuting the spoliation motions is appropriate.[3] (D.E. 217 at pp.14 n.11, 17-19). NuVasive attaches a copy of its Proposed Adverse Inference as **Exhibit A**.[4]

Following these Orders, the Court conducted a hearing between October 19 and 21, 2021, (the "Hearing") to determine the amount of damages NuVasive incurred as a result of Day's contractual violations and whether to hold Day in contempt of court due to his violations of the May 29, 2019, Memorandum and Order (the "Injunction"). Based upon the proof presented at the Hearing, NuVasive requests that the Court:

- award it $2,005,253 in lost profits as a result of Day's violations of the PIIA's non-competition and non-solicitation of customers provisions through March 3, 2020;[5]
- award it $157,049 in lost profits for each 30-day period subsequent to March 3, 2020, that the Court deems appropriate;

---

[3] The parties are attempting to resolve the issues surrounding the amount of attorneys' fees owed to NuVasive.
[4] To avoid confusion, NuVasive's citation to lettered exhibits are citations to exhibits to this memorandum, while citations to number exhibits are citations to exhibits entered into evidence at the Hearing.
[5] As noted in Misty Decker's report, this is the total of $1,793,198 in lost profits on sales to Drs. Glazer, Shin, and Kwon, as well as $212,055 in prejudgment interest on those sales. (**Exhibit 35**, § III, pp. 9-10).

- hold Day in contempt of the Court's Injunction; and
- either extend Day's non-competition and non-solicitation restrictions or provide an additional monetary award to NuVasive.

### A. Day violated the PIIA's non-competition and non-solicitation provisions before, during, and after the Injunction.

Facts contained in the Summary Judgment Order establish that Day violated the PIIA's non-competition and non-solicitation provisions before, during, and after the Injunction. (D.E. 185, pp. 7-9). In addition, presented during the Hearing did the same by proving that:

- Day met with Charlie Crockett throughout 2019 to discuss his (ultimately successful) efforts to sell Orthofix's biologic products that directly compete with NuVasive's biologic products to Dr. Glazer (Crocket Dep., attached as **Exhibit B**, 103:2-106:24; **Exhibit 42**);
- Day, Alphatec's CEO, and Adam Richard joined Dr. Glazer for dinner in June of 2019;
- Day waited until June 9, 2019, to stop serving as Alphatec's point of contact with BIDMC (**Exhibit 16**), but, shortly after doing so, approved custom instruments that Alphatec created for Dr. Glazer and, in June 26, 2019, emails, directed Alphatec to ship the instruments (**Exhibit 68**);
- Alphatec paid for Day, Alphatec's CEO, Dr. Glazer, their wives, and Dr. Glazer's step-daughter traveled to Napa, California, on July 26-28, 2019, (**Exhibit 2**, pp. 2-9),[6] and reimbursed Day for various expenses he incurred on the trip (during which Day admitted he participated in business meetings with Alphatec's CEO and that Alphatec's CEO had business meetings with Dr. Glazer);
- Alphatec reported providing Dr. Glazer with $293.28 in food and beverage the evening before an October 26, 2019, college football game that Day, Alphatec's CEO, Dr. Glazer, and their families attended in Columbus, Ohio[7] (**Exhibit 2**); and
- On November 21, 2019, Dr. Glazer – in an email that he and Day failed to produce – introduced Day to a purchasing agent for St. Elizabeth's Medical Center in order to accelerate Dr. Glazer's ability to utilize Alphatec's products at that facility.[8]

Further, Day's characterization of his frequent get-togethers with Dr. Glazer and Alphatec's San Diego-based CEO as "purely social" defies reason. Day, Chad Spear, and Derek Haughney testified that spine sales is a relationship business. (*See also* **Exhibit 4**, pp. 6-7). And

---

[6] On July 25, 2019 – the day before the group departed for Napa – Day gave a business presentation to Alphatec's Board of Directors regarding, among others, the Massachusetts and Rhode Island spine markets.

[7] Dr. Glazer initially testified that Day did not attend this dinner but then acknowledged he testified to the contrary in the late September to early October of 2020 arbitration between NuVasive and Rival Medical, LLC.

[8] Day's telephone records show that he and Dr. Glazer participated in 4 telephone calls on November 20 and 21, 2019. (**Exhibit 43**, p. 6).

Spear testified that a sales representative's relationship with a surgeon is often established and/or strengthened through social events. Consistent with Spear's testimony, in a case with similar facts, the Delaware Court of Chancery held that an individual subject to non-compete and non-solicit restrictions violated those restrictions by joining lunches with representatives from his new employer and former employer's customers. *TriState Courier & Carriage, Inc. v. Berryman*, C.A. No. 20574-NC, 2004 Del. Ch. LEXIS 43, at **32-34 (Del. Ch. April 15, 2004). In so holding, the Chancellor looked at "the totality of the circumstances" before finding that these lunches were not "purely social" as claimed by the defendant. Here, the evidence supports a similar conclusion. Indeed, nothing prevented Day, Alphatec's CEO, and Dr. Glazer from taking "purely social" trips between the time Alphatec's CEO left NuVasive in October of 2017 and the time Day joined Alphatec in April of 2019, but there is no evidence of them doing so. Rather, the evidence establishes that they began spending time together at a May 21, 2019, dinner – after Day joined Alphatec – when one of Day's stated goals was to obtain "[h]ospital approval" at BIDMC for Alphatec's entire product portfolio to discuss these trips with Dr. Glazer. (**Exhibit 27**).

### B. Day substantially contributed to NuVasive's lost profits.

Day's violations of his non-competition and non-solicitation obligations – both those articulated in the Summary Judgment Order and established in the Hearing – were substantial factors in causing NuVasive to lose profits. As the Court found in the Summary Judgment Order, Day obtained product and pricing approval at BIDMC, and Dr. Glazer could not have utilized Alphatec's products at BIDMC absent such approval. Respectfully, these acts – obtaining product and pricing approval at BIDMC – substantially contributed to NuVasive losing Dr. Glazer's business. But Day's efforts to move Dr. Glazer's business did not end with those acts. In addition to the acts described in Section A and/or the Summary Judgment Order:

- Spear admitted that Alphatec allowed Day to negotiate pricing with BIDMC;
- Day worked with Orthofix to provide Dr. Glazer with a biologic product that directly competes with the NuVasive biologic product that Dr. Glazer historically used, (**Exhibit 42**), and Dr. Glazer moved at least part of his biologics business from NuVasive to Orthofix's competitive line of Trinity biologics; and
- Dr. Glazer replaced his utilization of Alphatec's ALIF system with one marketed by Centinel Spine and distributed by Day, rather than with NuVasive's competitive system.

### C. The spoliated documents would provide additional evidence of Day's malfeasance and further linked that malfeasance to NuVasive's damages.

To be clear, Sections A and B describe the facts articulated in the Summary Judgment Order and presented at trial. NuVasive Proposed Adverse Inference (**Exhibit A**) regarding the electronic communications Day spoliated (and that were responsive to NuVasive's July 16, 2019, discovery requests) provides further support that Day violated his restrictive covenants, is in contempt of the Injunction Order, and substantially contributed to the damages NuVasive seeks. Indeed, even the last two pages of the few text messages Dr. Glazer produced as exemplars of his communications with Day show they discussed business via text messages, as they mention Alphatec's General Counsel, Craig Hunsaker, and Dr. Glazer's trip to Alphatec's San Diego headquarters. (**Exhibit 93**).

### D. There is no merit to Day's claim that the Court should apportion the reasons for NuVasive's lost profits.

Day's primary (if not sole) defense is that he played a minor role in causing NuVasive's lost profits and that any damages assessed against him should be reduced by other causes of those losses. This defense has no basis in law, as the case Day relies upon, *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, C.A. No. 7906-VCG, 2020 Del. Ch. LEXIS 76 (Del. Ch. Feb. 27, 2020), is entirely inapposite and has no bearing on this case. In that case, the Delaware Court of Chancery rejected the majority of the plaintiff's claims, and yet, its expert did not amend his opinions to reflect the "rather small subset" of allegations the plaintiff established at trial. *Id.*

at *56. Rather, as the Court indicated – and as Delaware case law confirms – Day is liable for all of NuVasive's lost profits that flow from his violations of his non-solicitation and non-competition obligations (though he may be entitled to an offset of the amount paid by Defendant Adam Richard to NuVasive to resolve its claims against him).

Day based this defense on over 700 pages of previously unidentified emails that Alphatec produced just before midnight on Thursday, October 14, 2021 (*i.e.* four days before the Hearing), under the auspices of supplementing Spear's response to a subpoena NuVasive served on him over 18 months prior on March 3, 2020. None of the recently-produced documents Day relied upon were responsive to that subpoena, and, as Spear testified that he discussed those documents with Alphatec's attorneys more than eighteen months prior, there was no legitimate reason for Alphatec to hold back this "supplementation" until the eve of trial. Further marring the legitimacy of Alphatec's late production is the fact that it self-selected the documents it produced. As NuVasive's counsel represented to the Court, he is aware of documents Alphatec produced in at least one other case that counter Day's argument that Dr. Glazer was free to (or would) utilize Alphatec's entire product portfolio absent Day's efforts to negotiate product approval and pricing with BIDMC. Indeed, they indicate that strong local representation (i.e., Day's presence in Boston) is necessary to convert Dr. Glazer's business. [9]

In addition to being late-produced, Day's interpretation of the recent Alphatec production ignores other evidence in the case. For example, the itinerary that Day created for the Alphatec CEO's May 21-22, 2019, visit identifies the topics of conversation during a May 21, 2019, dinner attended by the Alphatec CEO, Colin Behrmann, Richard, Day, and Dr. Glazer to include the

---

[9] Alphatec produced this document in litigation with NuVasive, and any parameters by which it selected the other 700 pages should have included this document. However, Alphatec excluded it because it contradicts Day's theory in stating that Dr. Glazer would not use any manufacturer's products, Alpahtec's included, without the local clinical support Day provided.

previously-mentioned trips to Napa and the football game, as well as "[h]ospital approval for entire portfolio, need to push on this" and "[f]eedback on products uses thus far (Just Invictus and Arsenal)."[10] (**Exhibit 27**). Respectfully, one cannot argue with a straight face that Day – who became Alphatec's main point of contact with BIDMC on April 19, 2019 (D.E. 185, p. 8) – would feel the need to discuss full product approval at BIDMC with Dr. Glazer, Alphatec's CEO, and others if BIDMC had, in fact, approved Alphatec's entire product approval.  Further, neither Alphatec nor any other spine company would guarantee Day income of at least $500,000 per year, award him over $1,000,000.00 in restricted stock units, and continue to indemnify him after he violated his restrictive covenants absent its belief in Day's ability to convert Dr. Glazer's business (and be the primary Alphatec support to sustain that business).

Finally, there is no merit to Day's claim that the finder of fact should apportion fault. In a similar case that also involved the breach of a non-compete provision, the Wisconsin Court of Appeals cited 5 Corbin on Contracts Section 999, which provides:

> [I]n all cases involving problems of causation and responsibility for harm, a good many factors may have united in producing the result; the plaintiff's total injury may have been the result of many factors in addition to the defendant's tort or breach of contract.  Must the defendant pay damages equivalent to the total harm suffered?  Generally the answer is Yes, even though there were contributing factors other than his own conduct.  Must the plaintiff show the proportionate part played by the defendant's breach of contract among all the contributing factors causing the injury, and must his loss be segregated proportionately?  To these questions the answer is generally No.  *In order to establish liability the plaintiff must show that the defendant's breach was "a substantial factor" in causing the injury.*

*Reiman Associates, Inc. v. R/A Advertising, Inc.*, 306 N.W.2d 292, 322 (Wis. Ct. App. 1981) (emphasis in original).  In accord with this holding, the Delaware Court of Chancery, in *RHIS, Inc. v. Boyce*, awarded damages equal to the 25 percent of the gross revenues earned by a former employee and his competing business for jobs referred to the former employee and the competing

---

[10] Invictus and Arsenal are both Alphatec posterior screw systems.

business by realtors encompassing the former employer's base of referral sources and with whom the former employee became acquainted while working for the former employer in violation of restrictive covenants. *RHIS, Inc. v. Boyce*, C.A. No. 18924, 2001 Del. Ch. LEXIS 118, at *7 (Del. Ch. Sep. 26, 2001). The Court concluded that the total harm was the appropriate measurement of damages, as the former employer could not provide a precise range for the profit margin in the home inspecting business; over 78 percent of the former employee's business came from his former employer's referral sources; and the record showed some individuals preferred the former employee, some were indifferent to which business performed the home inspection, and others stayed with the former employer. *Id.* at **17, 24.

Similarly, in *All Pro Maids, Inc. v. Layton*, C.A. No. 058-N, 2004 Del. Ch. LEXIS 116 (Del. Ch. Aug. 9, 2004), the same court ruled that a former employee who violated her restrictive covenants owed her former employer the profits the former employer would have earned in the former employee's non-compete year plus another year. *Id.* at **37-42. In making this award, the Delaware Court of Chancery rejected the defendants' argument that the former employer failed to prove they proximately caused its damages. *Id.* at *41. In reaching that conclusion, it found that:

> The evidence showed that APM clients dealt with Layton more than anyone else at APM. Sprinkle testified that Layton "had all the knowledge, what we charged, how often we went there, what kind of supplies they got, the dates, the cleaning, the contacts, the phone numbers, the cell phones. She knew everybody." It is therefore reasonable to infer that Layton contributed to MM's success in obtaining APM's former clients. Defendants' argument might well have merit if the Truitts had started a competing cleaning business on their own, but they chose not to do so. Instead, they joined with Layton to form MM. The Court finds that the evidence fully supports an award of damages against Defendants for the eleven clients at issue.

*Id.* Awarding NuVasive the lost profits (with interest) caused by Day's contractual violations comports with Delaware law, which holds that, "[t]he breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits

are speculative because they come from an uncertain world created by the wrongdoer." *SIGA Techs., Inc. v. Pharmathene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015). This "wrongdoer rule" resolves whatever uncertainty that may exist as to the amount of lost profits damages owed by the breaching party. *Id.* at 1131, n.132 (compiling cases); *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992) ("[Because the acts of a wrongdoer defendant created uncertainties], fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should be 'laid at the defendant's door.'"). Put simply, Day cannot escape liability for NuVasive's lost profits by claiming the amount of those damages cannot be established with certainty.

   E. **The Court should award NuVasive over $2,000,000 in lost profits and issue an appropriate sanction for Day's violations of the Injunction.**

Applying the appropriate law to this case's facts lead to the conclusion that the Court should award NuVasive at least $2,005,253, which reflects the profits NuVasive lost in sales to surgeons within Day's restricted area (Drs. Glazer, Kwon, and Shin) during his non-compete period (as tolled to March 3, 2020, by the Court's January 23, 2020, Order). Further, the Court should expand this award – either through applying the PIIA's tolling provision to Day's acts that violated his restrictive covenants,[11] as an appropriate sanction for violating the Injunction, or a combination of those two rationales – for twelve more thirty-day periods at a cost of $157,049 per thirty-day period, enabling NuVasive to receive the benefit of its bargain and mitigating the amounts Day would profit off of the hospitals where he facilitated the approval of Alphatec products.

---

[11] NuVasive concedes that the Court could find that some or all of Day's post-injunction violations of the PIIA violate his non-competition restrictions but not the Injunction.

If the Court does not believe that increasing the amount of NuVasive's lost profits is an appropriate remedy for Day's violations of the Injunction, other potential remedies include, without limitation, any or all of the following:

- awarding NuVasive its reasonable attorneys' fees and expenses associated with Day's failure to abide by the Injunction; *Chambers v. NASCO, Inc*., 501 U.S. 32, 45 (1991) ("a court may assess attorney's fees as a sanction for the "'willful disobedience of a court order.'"); *G. & C. Merriam Co. v. Webster Dictionary Co*., 639 F.2d 29, 41 (1st Cir. 1980); *Dystar Corp*., 1 F. Supp. 2d 48, 57 (D. Mass. 1997) (affirming an award of reasonable attorney's fees and costs associated with the contumacious conduct, even where the party could not prove actual damages);
- requiring Day to honor the terms of his PIIA for nine months, which is the approximate time that remained on his restrictive covenants at the time he became Alphatec's main point of contact with BIDMC; *MedX, Inc. v. Ranger*, 788 F. Supp. 288, 295 (E.D. La. 1992);
- not allowing Day to offset any damages awarded against him by the amount of NuVasive's settlement with Richard; and/or
- disgorging any profits arising from surgeons in Day's restricted area during his non-compete period, after NuVasive conducts limited discovery, *Edwards Moving & Rigging, Inc. v. Jenkins,* No. 8:19-cv-1004-T-36SPF, 2020 U.S. Dist. LEXIS 57074, at *12 (M.D. Fla. Apr. 1, 2020); and/or
- disgorging some or all of the $500,000.00 Alphatec paid to Day for the first twelve months of their relationship as stated in his Offer Letter (**Exhibit 40**), which explicitly instructed him to comply with his restrictive covenants.

Of course, this Court has great discretion in deciding how to enforce violations of its own orders, and, although the primary purpose of the sanction of civil contempt is to compensate the aggrieved party (i.e., NuVasive), any sanction may also possess a "punitive aspect." *Brine, Inc. v. STX, L.L.C.*, 367 F. Supp. 2d 61, 70 (D. Mass. 2005) (citing *Goya Foods, Inc. v. Wallack Management Co.*, 344 F.3d 16, 20 (1st Cir. 2003) (affirming a $6,000,000 civil contempt sanction, which included $1,400,000 in prejudgment interest).

Finally, at the conclusion of the Hearing, the Parties agreed to attempt to resolve the amount Day owes NuVasive as a result of the Court's adoption of Magistrate Judge Kelly's Report and Recommendation. NuVasive is in the process of calculating these amounts and will inform the Court if the Parties are unable to agree on an amount.

Respectfully submitted,

*/s/ Holly M. Polglase*
Holly M. Polglase (BBO #553271)
hpolglase@hermesnetburn.com
Michael S. Batson (BBO #648151)
mbatson@hermesnetburn.com
HERMES, NETBURN, O'CONNOR & SPEARING, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
Tel: (617) 728-0050
Fax: (617) 728-0052

Christopher W. Cardwell, Esq. (*pro hac vice*)
Mary Taylor Gallagher *(pro hac vice)*
M. Thomas McFarland, Esq. (*pro hac vice*)
GULLETT, SANFORD, ROBINSON & MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, TN 37201
(615) 244-4994 (Telephone)
(615) 256-6339 (Facsimile)
ccardwell@gsrm.com
mtgallagher@gsrm.com
tmcfarland@gsrm.com

*Attorneys for Plaintiffs NuVasive, Inc.*

## CERTIFICATE OF SERVICE

Pursuant to Local Rules 5.2(b)(2) and 5.4 of the Local Rules of the United States District Court for the District of Massachusetts, I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent by first-class mail to those indicated as non-registered participants, if any, on November 8, 2021.

*/s/ Holly M. Polglase*
Holly M. Polglase