UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    :
**NUVASIVE, INC.,**                 :
                                    :
    Plaintiff,                      :
                                    :
    vs.                             :   Civil Action No. 19-cv-10800
                                    :
**TIMOTHY DAY,**                    :
                                    :
    Defendant.                      :
_____ :

## DEFENDANT TIMOTHY DAY'S SUMMARY OF EVIDENCE

NuVasive, Inc. ("NuVasive") initiated a breach of contract action against Timothy Day ("Mr. Day") arising out of a January 6, 2018 employment agreement ("PIIA").[1] The PIIA terminated in January 2019 when Mr. Day signed a distributorship agreement with NuVasive through his corporate entity Rival Medical triggering the one year post termination obligations. NuVasive contends that Mr. Day breached the non-solicitation (Section VI)[2] and the non-compete provisions (Section VII)[3] (collectively "The Restrictions") contained within the PIIA beginning in April 2019. The Court previously agreed in part identifying isolated actions by Mr. Day from April 1, 2019 to May 30, 2019 during a 60 day period when Mr. Day

---

[1] See Exhibit 39 to the evidentiary hearing conducted October 19-21, 2021 ("Hearing").
[2] Section VI (a) of the PIIA only prohibits **intentional conduct** defined by the following actions: "solicit, entice, persuade, induce, call upon or provide services to."
[3] Section VII's prohibition on non-competitive activities involving "conflicting organizations" is expressly modified on page 8, paragraphs 2 and 3 given Mr. Day's position as a "sales associate" or "sales specialist" limiting interactions with "customers" only making it indistinguishable from the non-solicitation restrictions.

1

believed that the Restrictions were unenforceable ("Non-Compliance Period") (D. 185). As a result, the Court issued a preliminary injunction and extended the Restrictions for an additional 60 days ("Injunction Period") (D. 31).

NuVasive now seeks damages from Mr. Day in the form of lost profits associated with alleged declining sales to Dr. Glazer, Dr. Shin and Dr. Kwon for the period of April 1, 2019 through March 3, 2020 ("Loss Period"). While Mr. Day disputes there were any lost sales to Drs. Shin and Kwon, both parties agree that NuVasive's sales to Dr. Glazer decreased in the second quarter of 2019 and declined throughout the remainder of the Loss Period.

During its damage presentation, NuVasive simply compared the projected sales in the Loss Period for Dr. Glazer to the actual sales in the Loss Period and presumed that 100% of the difference was solely and exclusively attributable to the actions of Mr. Day. The evidence directly contradicts NuVasive's **presumption of proximate cause** and shows NuVasive failed to account for contributing causes related to its alleged loss and failed to prove Mr. Day's actions were the direct, natural and proximate cause of its lost profits as required by Delaware law. Therefore, NuVasive is not entitled to any damages.[4]

## I.    NUVASIVE FAILED TO PROVE ACTUAL DAMAGES

---

[4] Great Hill Equity Partners IV, LP vs. SIG Growth Equity Fund I, LLLP, 2020 Del. Ch. LEXIS 76, 76*, C.A. No. 70-6-VCG (Del. Ch. February 27, 2020).

The spine industry is a dynamic environment where products and companies constantly evolve to provide surgeons with new options and improved standards of care. Physicians are under no contractual purchasing obligations and are free to select the products of their choice within hospital guidelines. In order to support the illusion of recoverable damages in this changing market, NuVasive asks the Court to accept all of the following false narratives.

a. Role of the Sales Representative

NuVasive presented the testimony of Derek Haughney and John English in an attempt to exaggerate the importance of the sales representative to the overall sales process. Both Mr. Haughney and Mr. English testified generally that the sales representatives are (1) the "face" of the company maintaining a "boots on the ground" presence, (2) highly skilled and trained in understanding "surgical preferences" and product usage, and (3) a critical component to the sales process.

Neither Mr. Haughney nor Mr. English had firsthand knowledge of the processes and procedures utilized by Dr. Glazer, a world-renowned spine surgeon with over 25 years of experience. The Court learned firsthand that (1) Dr. Glazer is actively involved in product engineering and design and had superior knowledge about Alphatec's and NuVasive's products far exceeding that of any sales representative, (2) Dr. Glazer established direct relationships and lines of

communications with company executives and engineers from Alphatec and NuVasive and is not reliant upon any sales representative as an intermediary, (3) sales representatives assisting Dr. Glazer are not involved in any hardware selection decisions and are simply notified by office staff of the time, date and product choice for each surgery, and (4) sales representatives in the operating room have limited interaction with Dr. Glazer during surgery.

The evidence demonstrates that sales representatives assigned to Dr. Glazer are "logistics" managers whose primary role is to make sure that the products ordered by Dr. Glazer are available, sterilized and ready for surgery. While ensuring timely product delivery is a necessary part of the process, the evidence clearly established that the sales representatives working with Dr. Glazer did <u>not</u> assume an "essential" role during the sales cycle nor did they exercise any degree of control over the product selections made by Dr. Glazer for the benefit of his patients.

   b. <u>Dr. Glazer's Corporate Relationship With Alphatec Drove his Transition.</u>

Despite telling the Court during its opening statement that it takes a "long time to convert" a surgeon's business, NuVasive would like this Court to believe that the entire Dr. Glazer transition was <u>orchestrated</u>, <u>controlled</u> and <u>executed</u> by Mr. Day in a few short days <u>after</u> leaving for Alphatec. The evidence presented at the Hearing

supports NuVasive's opening statement *concession* and establishes that Dr. Glazer began the transition to Alphatec years before his final decision.

Alphatec's solicitation efforts and considerable investment in capturing Dr. Glazer's business began in 2017 with introductory meetings arranged by Pat Miles[5] followed by multiple visits to Alphatec's headquarters in San Diego for in-depth product testing and analysis in Q1 2018, hospital approval of trial products in Q2 2018, successful trial surgeries in Q3 2018, presentation of results to peer review committees[6] in Q4 2018, and formal contract approval[7] in Q1 2019 paving the way for Dr. Glazer's use of most of Alphatec's existing products including its *posterior fixation screws which accounted for the majority of Dr. Glazer's revenue*.[8]

Meanwhile, NuVasive failed to establish executive level relationships with Dr. Glazer after Mr. Miles departure in 2017, failed to address Dr. Glazer's corporate culture concerns[9], rejected Dr. Glazer's design ideas, and threatened to dishonor payments owed under a royalty agreement. More importantly, was Dr. Glazer's belief that Alphatec products provided his patients with the most optimal clinical

---

[5] While Mr. Miles led the solicitation charge of Dr. Glazer, other individuals assisting in Dr. Glazer's transition included Terry Rich, Scott Lish, David O'Dierno, Chad Spear, Jon Allen and Collin Behrman.
[6] See Hearing Exhibits 76, 80, 85, 86
[7] See Hearing Exhibits 80-82.
[8] Mr. Day's limited involvement in getting pricing finalized at Beth Israel Hospital for an anterior screw system during the Non-Compliance Period (Ex. 10) did not contribute to lost sales for NuVasive as both Dr. Glazer and Chad Spear testified Dr. Glazer did not like or utilize the anterior screw system after the initial trials.
[9] NuVasive management was placed on actual notice of Dr. Glazer's concerns in an email from Mr. Day in 2019 but took no steps to ensure his continued business. See Hearing Exhibit 1.

outcomes. Given the <u>number</u> and <u>complexity</u> of factors involved in transitioning from one product manufacturer to another and the weight of evidence supporting the decision-making process, there is no question that Dr. Glazer was driving the transition based upon his corporate relationship with Alphatec long before Mr. Day jumped aboard the last car as it left the station.

c. <u>Impermissible Expert Opinion</u>

NuVasive presented Misty Decker as an expert to support its lost profit estimates. Ms. Decker admitted that she assumed liability and proximate cause in her report but claimed she had conducted a "causal link" analysis to support her contentions.[10] However, she failed to conduct any interviews of the three surgeons listed in her report, failed to analyze any sales data from the three surgeons showing actual levels of production for the Loss Period and disregarded Dr. Glazer's affidavit, the only evidence she had related to her causal link analysis.[11] NuVasive's attempt to use Ms. Decker as a <u>substitution</u> for its burden to prove proximate cause is not supported by the facts or permitted by law.

In concluding that NuVasive suffered lost profits related to business from Dr. Glazer, Ms. Decker relied upon the rough projections Mr. Day prepared <u>prior</u> to his

---

[10] See Hearing Exhibit 35.
[11] Ms. Decker's failure to properly investigate and adjust for other causes of NuVasive's lost profits violates the AICPA Practice Guidelines as outlined by Mr. Dopp. See Hearing Exhibit 52, pg. 13.

notice of Dr. Glazer's transition to Alphatec to calculate a before and after damage scenario.[12] Ms. Decker's use of <u>rough</u> <u>projections</u> prior to a material change in circumstances instead of <u>actual</u>, <u>existing</u> sales data from the Loss Period overstated her lost profits by more than 50%.[13] This fundamental error paired with her misapplication of variable costs overstated NuVasive's lost profits by more than $1 million making her expert opinion entirely unreliable.[14]

Ms. Decker then switched to the "yardstick" method in analyzing lost profits associated with Dr. Shin and Dr. Kwon as the historical approach used for Dr. Glazer would have revealed net gains in profits for NuVasive during the Loss Period after proper allocation of the COVID impact. Specifically, Ms. Decker used information from a NuVasive employee with no firsthand knowledge about Alphatec sales to provide loss estimates.[15] Ms. Decker's changing methodology combined with her failure to validate secondhand sales estimates makes her expert opinion unreliable.

   d.  <u>Overstated Spoliation Claims</u>

Once NuVasive's illusion of damages was exposed, NuVasive turned to an absence of evidence to justify its litigation efforts. NuVasive attacked Mr. Day for failing to preserve and produce text messages in response to discovery requests

---

[12] <u>See</u> Hearing Exhibit 6.
[13] <u>See</u> Hearing Exhibit 52 at pp. 16-17.
[14] <u>See</u> Hearing Exhibit 52 at pp. 16-19.
[15] <u>See</u> Hearing Exhibit 35.

alleging Mr. Day was part of a conspiracy to eliminate proof of his misconduct. Despite possessing all Verizon text message data from Mr. Day for more than a year, NuVasive filed multiple briefs, conducted two (2) separate hearings and argued in favor of a broad "adverse inference" for all lost text messages it claimed supported a pattern of secret, non-solicitation violations. At the Hearing, however, NuVasive was only able to identify two (2) missing text messages between Mr. Day and Dr. Glazer from the responsive discovery period and zero (0) text messages between Mr. Day and Dr. Shin or Dr. Kwon from the responsive discovery period.[16] NuVasive wasted considerable judicial resources and disparaged Mr. Day in the process with full knowledge that its "broad ranging conspiracy" consisted of only two (2) missing text messages. NuVasive's spoliation attempt falls well short.

## I. POST INJUNCTION CONTEMPT ANALYSIS

NuVasive moves for sanctions contending that Mr. Day ignored the Court's preliminary injunction by engaging in conduct that violated The Restrictions during the Injunction Period. NuVasive presented evidence of direct contact between Mr. Day and Dr. Glazer during the Injunction Period but failed to show <u>intentional acts of solicitation</u> as required by the PIIA.

---

[16] <u>See</u> Hearing Exhibit E pg. 1 referencing a May 22, 2019 message from Dr. Glazer to Mr. Day and a June 9, 2019 message from Mr. Day to Dr. Glazer. The remaining text messages on pg. 1 of Exhibit E were never requested in discovery by NuVasive.

8

Indeed, the evidence presented shows that as soon as the injunction was entered, Mr. Day's limited role in the Boston area was eliminated. This decision was communicated in an internal Alphatec email from Mr. Spear on May 30, 2019[17] and then confirmed by Mr. Day in an email to Beth Israel Hospital a few days later.[18] Dr. Glazer also confirmed that Mr. Day played no role in his usage of Alphatec products after the injunction and that his interactions with Mr. Day were limited to personal, social or non-spine related business interests.

NuVasive focused considerable time on a Napa Trip in July 2019 and an Ohio State Football Game as evidence of contempt. The Court heard unrebutted testimony from both Dr. Glazer and Mr. Day that steps were taken <u>not</u> to include Mr. Day in the business meetings and business dinners attended by Dr. Glazer during these two events and that the rest of the trips were personal, family affairs. Their interactions during these events did not include solicitation of Alphatec products and did not rise to the level of contempt. Even if the Court were to find these isolated instances constituted a violation, it has already extended The Restrictions for an additional sixty (60) days more than adequately protecting NuVasive's interests.

II.   **CONCLUSION**

---

[17] <u>See</u> Hearing Exhibit 64.
[18] <u>See</u> Hearing Exhibit 63.

NuVasive carries the burden of proving that Mr. Day breached the PIIA and that the breaches were the <u>direct</u>, <u>natural</u> and <u>proximate</u> cause of provable damages. NuVasive cannot **presume proximate cause** simply by demonstrating a loss in revenue. It must <u>connect</u> or <u>link</u> the breach to the actual harm and properly allocate damages among various <u>components</u> and <u>contributing factors</u>.[19]

While NuVasive intentionally ignored all other causes of its lost revenue including its own failures, Dr. Glazer provided an in-depth analysis of his decision-making process culminating in a transition decision in Q1 2019 <u>prior</u> to any involvement of Mr. Day. Dr. Glazer's unimpeached testimony about the factors he considered before transferring his allegiance from NuVasive to Alphatec shines a direct light on the proximate cause inquiry this Court must follow.[20] The full weight of his testimony crushes NuVasive's causation analysis leaving no question that Mr. Day was neither the <u>direct</u>, <u>natural</u> nor <u>proximate</u> cause of the damages sought by NuVasive in this case.[21]

---

[19] <u>Great Hill</u>, 2020 Del. Ch. LEXIS 76, *76, C.A. 70-6-VCG.

[20] NuVasive presented no evidence that Mr. Day was involved in soliciting or providing any Alphatec related services to Dr. Shin during the Loss Period as these efforts were undertaken by Adam Richard and Chad Spear. Mr. Day's <u>post injunction</u> email (Ex. 22) concerning Boston "area successes" does <u>not</u> indicate or detail any impermissible solicitation of Dr. Shin by Mr. Day during the Injunction Period and does <u>not</u> support NuVasive's proximate causation contentions. Mr. Day's initial efforts in scheduling meetings with Dr. Kwon during the Non-Compliance Period (Ex. 13, 27) were far removed from Dr. Kwon's initial use of Alphatec products which began in Q1 2020 after extensive efforts by Chad Spear and Collin Behrman.

[21] While NuVasive could have submitted evidence of damages directly attributable to the actions of Mr. Day during the Non-Compliance Period such as loss profits from the actual surgery Mr. Day attended, it presented an inflated all or nothing damages theory leaving the Court with no mechanism or formula to measure actual losses related to Mr. Day's specific actions or allocate damages among contributing factors, events or individuals.

Dated this 8th day of November, 2021.

        Respectfully submitted,

        TIMOTHY DAY
        *By his attorneys,*

        <u>/s/ Steven D. Weatherhead</u>
        Steven D. Weatherhead, BBO # 637601
        Marathas Barrow Weatherhead Lent LLP
        One Financial Center, 15th Floor
        Boston, Massachusetts 02111
        (617) 830-5458
        sweatherhead@marbarlaw.com

        <u>/s/ Bryan E. Busch</u>
        Bryan E. Busch, *Admitted Pro Hac Vice*
        Busch Mills & Slomka, LLP
        6400 Powers Ferry Road, N.W., Ste. 391
        Atlanta, Georgia 30339
        Phone: 404-800-4062
        bb@bsms.law

## **CERTIFICATE OF SERVICE**

    I, Bryan E. Busch, hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 8, 2021.

                                      */s/ Bryan E. Busch*