1             UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2

3   _____

4   NUVASIVE, INC.,

5                   Plaintiff,        Civil Action
                                      No. 19-10800-DJC
6   v.
                                      October 21, 2021
7   TIMOTHY DAY,                      9:00 a.m.

8                   Defendant.
    _____
9

10

11        TRANSCRIPT OF EVIDENTIARY HEARING DAY 3

12        BEFORE THE HONORABLE DENISE J. CASPER

13            UNITED STATES DISTRICT COURT

14        JOHN J. MOAKLEY U.S. COURTHOUSE

15               1 COURTHOUSE WAY

16              BOSTON, MA  02210

17

18

19

20
              DEBRA M. JOYCE, RMR, CRR, FCRR
21              Official Court Reporter
            John J. Moakley U.S. Courthouse
22           1 Courthouse Way, Room 5204
                 Boston, MA  02210
23              joycedebra@gmail.com

24

25

1    APPEARANCES:

2    FOR THE PLAINTIFF:

3    CHRISTOPHER W. CARDWELL, ESQ.
     M. THOMAS McFARLAND, ESQ.
4    Gullett Sanford Robinson & Martin PLLC
     150 Third Avenue South
5    Suite 1700
     Nashville, TN 37201
6    615-244-4994

7    HOLLY M. POLGLASE, ESQ.
     Hermes, Netburn, O'Connor & Spearing, P.C.
8    265 Franklin Street
     Boston, MA 02110
9    617-728-0050

10   FOR THE DEFENDANTS:

11   BRYAN BUSCH, ESQ.
     CHRISTOPHER Y. MILLS, ESQ.
12   Busch Mills & Slomka, LLP
     6400 Powers Ferry Road, N.W., Ste. 391
13   Atlanta, Georgia 30339
     404-800-4062
14

15   STEVEN D. WEATHERHEAD, ESQ.
     Marathas Barrow & Weatherhead LLP
16   15th Floor
     One International Place
17   Boston, MA 02111
     617-830-5460
18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on October 21, 2021.)

THE CLERK:  All rise.

Court is in session.  Please be seated.

THE COURT:  Good morning everyone.

ALL:  Good morning, your Honor.

THE COURT:  Counsel, anything we need to address before we begin?

MR. CARDWELL:  I think the only outstanding issues is, are, number one, the issue about the document that we'd like to put in to evidence that you were going to review *ex parte*.  And I think we need to move the text messages to make sure that they are moved into evidence.

THE COURT:  Okay.

So, counsel, and I think there was an exhibit at the end of yesterday.

MR. CARDWELL:  There was a document that we used, yes.

THE COURT:  Are you moving that into evidence?

MR. CARDWELL:  Yes.  If your Honor pleases, we would move that into evidence.

THE COURT:  Any objection to that?  That was the last

```
 1      email, counsel.
 2              MR. BUSCH:  No objection to the email and no objection
 3      to the text messages.
 4              THE COURT:  Okay.
 5              MR. BUSCH:  With respect to the ex parte document, I'm
 6      not even in a position to even speak to that, that's something
 7      Alphatec needs to speak to.
 8              THE COURT:  Okay.
 9              So, counsel, let's just do one thing at a time here.
10              So I think the next number, Ms. Hourihan, is 44.
11              THE CLERK:  Yes.
12              THE COURT:  So 44 will be the email.  Can you identify
13      that for me in some way?
14              MR. McFARLAND:  It's Bates labeled BIDMC 000619.
15              THE COURT:  Okay.
16              MR. McFARLAND:  And I'm going to email it to
17      Ms. Hourihan right now.
18              THE COURT:  That will be 44.
19              (Exhibit 44 received into evidence.)
20              THE COURT:  Okay.  The text messages will be 45.
21              MR. CARDWELL:  And we will email a copy of those.
22              THE COURT:  This is different than former A.
23              MR. CARDWELL:  I believe we handed Ms. Hourihan a copy
24      of the text messages.
25              THE COURT:  Okay.
```

```
 1              (Exhibit 45 received into evidence.)
 2              THE COURT:  And in regards to the document you wanted
 3         me to review, I think this is an Alphatec -- is it a
 4         singular -- I say document.
 5              MR. CARDWELL:  It is -- it is an email chain that is
 6         five pages long.  It is marked "attorneys' eyes only" in
 7         litigation that's pending in either Delaware or California,
 8         perhaps both.
 9              THE COURT:  Okay.
09:03 10             MR. CARDWELL:  I'm confident about Delaware.  And it
11         would --
12              THE COURT:  And what's the date, time frame?
13              MR. CARDWELL:  July 12, 2018 is the last date on the
14         thread.
15              THE COURT:  Okay.  And this is, in NuVasive's view --
16         bears upon the pre- Mr. Day/Alphatec --
17              MR. CARDWELL:  -- relationship.
18              THE COURT:  -- relationship with Beth Israel.
19              MR. CARDWELL:  Yes.
09:04 20             MR. BUSCH:  Who are the "to" and "from" parties on the
21         emails?
22              MR. CARDWELL:  The "to" and "from" --
23              MR. McFARLAND:  So when the email begins on July the
24         11th of 2018, it's an email from Mr. Temple to Mr. Shorooghi,
25         Mr. Spear, Mr. Rhinehart, Mr. Lukianov, and Mr. English.  Those
```

```
 1    individuals communicate, and then eventually that thread is
 2    forwarded to Mr. Terry Rich and Mr. Pat Miles, and Mr. Rich and
 3    Mr. Miles are the two final individuals on the thread on the
 4    12th of July.
 5            THE COURT:  So, counsel, just -- and you say that this
 6    is subject to a protective order in another matter between --
 7            MR. CARDWELL:  NuVasive and Alphatec.
 8            THE COURT:  Okay.
 9            MR. CARDWELL:  And we have asked Alphatec to waive the
10    privilege -- to waive the designation, and they have refused.
11            THE COURT:  Okay.  And is there someone from Alphatec
12    here?
13            MR. CARDWELL:  They were here yesterday, both in house
14    and outside counsel who's on that file.  I don't think they're
15    here today, no, your Honor.
16            THE COURT:  Okay.
17            Mr. Busch, do you want to be heard?
18            MR. BUSCH:  Yeah, I mean, I've never seen the
19    document, Judge.  I don't want speak on behalf of Alphatec.
20    Obviously there's a protective order in place for a reason.
21            And just hearing opposing counsel's description of the
22    document, it appears that Mr. Spear was on maybe an earlier
23    part of the email, but the ones they want to introduce, they're
24    individuals that are not -- have not even come before the
25    Court, so they haven't been witnesses, haven't been identified
```

1      as witnesses.

2              We're so far afield, and it's hard for me to even

3      comment, A, because I've never seen the document; and B,

4      because I don't represent Alphatec, so I can't comment --

5              THE COURT:  Understood.

6              So on this protective order, I'm assuming, but I don't

7      know given the language of the protective orders that I usually

8      sign off on, there's usually an exception for court order; is

9      that true in this regard?

09:06 10        MR. CARDWELL:  I believe -- we will have an answer for

11     you shortly.  I do not believe so.

12             THE COURT:  So I guess I'd like to know that, counsel.

13     And I'd like to know if someone from Alphatec wants to be heard

14     on this issue, whether or not subject to understand they're not

15     waiving anything but whether or not they have a position if

16     there's a court order that it can be released to the court.

17             MR. CARDWELL:  Okay.

18             Mr. Busch, do you have contact information for the

19     Alphatec folks?

09:06 20        MR. BUSCH:  I mean, I can obviously get in touch with

21     them at some point, but they're on West Coast time.  So it's

22     6:00 in the morning out there.  I'm not going to be able to do

23     it right now.

24             THE COURT:  Counsel, why don't we leave that there for

25     the moment, and perhaps you can let me know at the -- when we

```
  1   take our break around 11:00 what the answers to those various
  2   questions are.
  3          I think there was someone here yesterday when I
  4   suggested this, so hopefully they've had some time to think
  5   about what their position would be.
  6          MR. CARDWELL:  Thank you.
  7          THE COURT:  Thank you.
  8          Counsel, anything else, Mr. Busch, on your side?
  9          MR. BUSCH:  No, your Honor, thank you.
 10          MR. CARDWELL:  I guess the last question is, is 1:00
 11   today our drop dead time?
 12          THE COURT:  Pretty much, counsel.  I have a full
 13   afternoon, so, yes.
 14          MR. CARDWELL:  Understood.
 15          THE COURT:  And what about the sequence today?
 16          MR. CARDWELL:  We're going to call Misty Decker, our
 17   expert witness, and then we'll let Paul Glazer go out of turn,
 18   and the last two witnesses are Paul Dopp, their expert, and
 19   Adam Richard.
 20          THE COURT:  Okay.  All right, if there's nothing else,
 21   we can get started.  Again, we'll take our usual break and go
 22   from there.
 23          MISTY DECKER, having been duly sworn by the Clerk, was
 24   examined and testified as follows:
 25          THE CLERK:  Thank you.  Please be seated.
```

09:07 — line 10
09:08 — line 20

```
 1              THE COURT:  Good morning.
 2              And you can remove your mask if you're comfortable
 3     doing so for testimony.  Thank you.
 4              Counsel.
 5                         DIRECT EXAMINATION
 6     BY MR. McFARLAND:
 7     Q.    Good morning, Ms. Decker.
 8     A.    Good morning.
 9     Q.    Just real quick, can you state your name for the record,
10     please.
11     A.    Misty Decker.
12              THE COURT:  And can you spell your last name.
13              THE WITNESS:  D-e-c-k-e-r.
14              THE COURT:  Thank you.
15     BY MR. McFARLAND:
16     Q.    And, Ms. Decker, where are you employed?
17     A.    Elliott Davis.
18     Q.    And what does Elliott Davis do?
19     A.    Elliott Davis is a top 40 accounting firm, full service
20     accounting firm.
21              MR. McFARLAND:  And, your Honor, I believe you've
22     already ruled that Ms. Decker can be admitted as an expert.  We
23     can go through Ms. Decker's qualifications, if necessary, but
24     if we can dispense with that time, that would be great.
25              MR. CARDWELL:  Mr. Busch and I have agreed that both
```

```
 1    experts are qualified.
 2               THE COURT:  Agreed?
 3               MR. BUSCH:  Yes.
 4               THE COURT:  So, yes, noted for the record.  You may
 5    proceed.
 6               MR. McFARLAND:  Understood.
 7    BY MR. McFARLAND:
 8    Q.   Ms. Decker, can you give an explanation to the Court of
 9    what you've been asked to do in this case?
10    A.   Yes.  I was asked to calculate the damages suffered
11    related to the conversion of Dr. Glazer's, Dr. Shin, and
12    Dr. Kwon's business.
13               MR. McFARLAND:  And can we have the HDMI broadcast,
14    please.
15    Q.   And, Ms. Decker, I put a slide up on the screen for a
16    demonstrative.  What conclusions did you reach in this case?
17    A.   Yes.  So through the injunction period on the low end,
18    Dr. Glazer's -- related to Dr. Glazer's business would be
19    $1,388,509.  On the high end for the range there would be
20    $1,747,450.  For Dr. Shin it would be $27,224, and for
21    Dr. Kwon, $18,524.
22               I've also provided numbers for the subsequent 30-day
23    period should the Court find that relevant.
24    Q.   And real quick, you said the injunction period -- just so
25    it's clear for the Court, what exactly is the time frame for
```

1    the injunction period, your understanding?

2    A.   As I understand it, it's April 1, 2019, Mr. Day's

3    resignation, through March 3, 2020.

4    Q.   And you mentioned a time period, the each subsequent

5    30-day period.  What is the each subsequent 30-day period?

6    A.   It would be the lost profits damages for each 30-day

7    period extending after the March 3, 2020 date.  As I understand

8    it, the PIIA has a tolling provision and there's certain

9    evidence related to continuing non-solicitation or solicitation

09:11 10   acts that have occurred after the March 3, 2020 date that are

11   up for the Court's consideration, so I provided that number for

12   the Court to use.

13   Q.   So should the Court elect to extend the loss period post

14   March 3 of 2020, that subsequent 30-day period gives a

15   benchmark for the Court do so for subsequent damages?

16   A.   That's correct.

17   Q.   And, Ms. Decker, what are your understanding as to what

18   Mr. Day's PIIA and any violations thereof in this case?

19   A.   It's my understanding that the Court has entered an order

09:12 20   related to the breach of the PIIA as related to the

21   non-solicitation, non-competition, and proprietary information

22   clauses in that agreement.

23   Q.   Ms. Decker, have you been asked to find an opinion on

24   causation in this case?

25   A.   I have not.  I have been asked to assume liability.

1    Q.   Do you ever provide an opinion on causation in cases?

2    A.   Typically financial experts would only provide an opinion

3    on causation when the matter is related to accounting.  So, for

4    instance, an accounting malpractice matter, a financial expert

5    may provide an opinion there.

6    Q.   None of that in this case.

7    A.   No.

8    Q.   Ms. Decker, can you explain to the Court what a causal

9    link is.

09:13 10    A.   So the plaintiff is required to show a causal link.  I

11    understand, again, the order that the Court has entered states

12    that there is a causal link in this matter.  But basically from

13    a financial expert's perspective, we're required to just

14    understand the evidence that relates to what that causal link

15    would be.

16    Q.   And what evidence of a causal link have you seen in this

17    case?

18    A.   So, in this case, again, I would refer to the Court's

19    order and not want to rehash the things that are listed there

09:13 20    related to pricing and product approval and certain meetings

21    and other things regarding that that are listed there in the

22    order, but from a financial perspective, we certainly see in

23    the data that as of Q1 2019, before Mr. Day leaves NuVasive,

24    sales with Alphatec and specifically Dr. Glazer's hardware

25    sales are $35,000 related to five test cases that had been

1   performed in that quarter.  And then immediately upon Mr. Day's

2   resignation and in Q2 2019, sales with Alphatec increase

3   significantly, so I think about $250,000 that quarter, and they

4   continually increase over time where, as I think the last data

5   we have is Q3 of 2020 and sales are $750,000 in that quarter.

6          Simultaneously we see that in Q1 2019 sales with

7   NuVasive related to Dr. Glazer's business are around $800,000

8   and Q2 they fall, simultaneously fall to around $280,000, and

9   they continue to decline until currently in 2021 those sales

09:15 10   are zero.

11   Q.   Anything else to support your finding that a causal link

12   exists aside from what's detailed in the Court's order, the

13   drop in NuVasive's sales in Q2 of 2019, the uptick in Alphatec

14   sales in Q2 of 2019, anything else to support your finding of a

15   causal link in this case?

16   A.   The only thing I can recall that maybe the order doesn't

17   address is there's a Q1 2020 presentation where Mr. Day is

18   celebrating his top ten successes of the quarter, and he

19   specifically says that he's been super engaged with Dr. Shin

09:15 20   and then lists Dr. Glazer, Dr. Kwon, and Dr. Shin under his

21   successes.

22   Q.   Understood.  And we'll get to that document here shortly.

23          Ms. Decker, did you prepare any sort of report or

24   anything like that in this case?

25   A.   Yes, my amended report is dated March 15, 2021.

1    Q.   And do you have an exhibit in front of you there?

2    A.   I do.

3    Q.   Can you turn to Exhibit 35?

4    A.   Yes.

5    Q.   Is this your amended report dated March 15 of 2021?

6    A.   Yes.

7    Q.   And I want to start at the back.  At the end of this

8    report are various exhibits.  Can you just tell me what is

9    on -- what is detailed in Exhibits A through D of your amended

09:16 10   report?

11   A.   Yes.  Exhibit A is my CV and resumé.  Exhibit B is the --

12   my testimony in the past four years.  Exhibit C is a listing of

13   the documents and testimony that we utilized to calculate the

14   damages in this matter.  And Exhibit D is the details and

15   summary of the financial data and the damages in this case.

16   Q.   So Exhibit D shows how all the calculations are made for

17   your final numbers here.

18   A.   Yes.

19   Q.   Did these reports go through any sort of quality control

09:17 20   or anything like that at Elliott Davis?

21   A.   Yes.  So specifically in my group, which is called the

22   forensic valuation and litigation support group of Elliott

23   Davis, we have specific quality control procedures.  I have a

24   team that works with me to prepare the report, and outside of

25   that team we have someone who's -- all of the quality control

1    procedures have to be someone who's not involved in the matter,

2    and specifically, the first round is to print out all of the

3    exhibits and the databases or financial data that we get and

4    actually manually calculate that with a calculator to make sure

5    there's no Excel formulas that maybe got awry during the

6    calculations.

7            And then, second, we have what we call a cold review,

8    which is where a shareholder/director would read the report

9    from front to back and understand the case, and then we have a

09:18 10   third level where a shareholder, additionally, another

11   shareholder would review the report from front to back.

12   Q.   And did this report go through those quality check steps

13   that you just described?

14   A.   Yes.

15   Q.   Ms. Decker, you mentioned lost profits as the appropriate

16   remedy for NuVasive's damages in this case.  What is lost

17   profits in your field?  How can you describe that?

18   A.   Lost profits would be to put an injured party back in the

19   position they would have been in had the bad acts not occurred.

09:18 20   Q.   How do you calculate lost profits in forensic accounting?

21   A.   Generally there's four widely accepted methods.  There's

22   the sales projection method, the yardstick method, the before

23   and after method, and the market model.

24   Q.   And which method or methods have you used in this case?

25   A.   I have utilized the sales projection method as it relates

1  to Dr. Glazer's hardware sales, and I've checked that with the

2  before and after method; and then I've utilized the yardstick

3  method as it relates to Dr. Glazer's biologics sales and

4  Dr. Shin and Dr. Kwon's sales.

5  Q.   Let's talk about the sales projection method for

6  Dr. Glazer's hardware usage.  Why use the sales projection

7  method for this particular subset of NuVasive damages?

8  A.   So in January, mid-January of 2019, Mr. Day prepared a

9  best-case and worst-case projection in an email to Mr. Richard,

09:19 10  and that projection was prelitigation, so he was projecting of

11  what was expected in sales related to Dr. Glazer's business, as

12  well as other doctors for that year 2019.  And so we've

13  utilized that projection.

14       In our field, to utilize the sales projection method,

15  we would need to consider who prepared those projections, were

16  they prepared in the ordinary course of business and what

17  business acumen would that person have that was preparing the

18  projections.  And in this case, Mr. Day is a businessman

19  obviously.  He's familiar with Dr. Glazer's business, he's

09:20 20  boots on the ground in Boston, and it was prepared in the

21  ordinary course of business prelitigation.

22  Q.   All those factors lead someone in your field to conclude

23  that these projections are reliable.

24  A.   Yes.

25  Q.   And, Ms. Decker, can you flip to Exhibit 6 in your binder

1    there.

2    A.    Yes.

3    Q.    Just so we're clear for the Court, is Exhibit 6 the email

4    you're talking about that contains Mr. Day's sales projections

5    on which you relied?

6    A.    Yes.

7    Q.    Any other thing about -- you mentioned Mr. Day is a

8    businessman, he's skilled with Dr. Glazer, he has a history

9    with him, and he's boots on the ground in Boston.  Anything

09:20 10  else about these sales projections that lead them to be

11   reliable from your perspective?

12   A.    So from our perspective, he's also stating that there had

13   been some contract negotiations that had occurred at Beth

14   Israel in 2018, and that he has, in fact, factored those into

15   his projections going in for 2019.

16   Q.    So his sales projections account for the price erosion at

17   Beth Israel due to the RFP process in 2018?

18   A.    That's what this email indicates, yes.

19   Q.    And you also mention that you checked your sales

09:21 20  projection method with another method, I think you called it

21   the before and after method.  Can you describe what you did

22   using that method to check your work.

23   A.    Yeah, so here on the slide we have Dr. Glazer's usage of

24   spinal hardware with NuVasive in the historical period, so 2016

25   through 2018.  What you can see there that the average sales

1    during that period were about $3.8 million, and then Q1 of

2    2019, prior to Mr. Day resigning, the sales were $806,000.  We

3    analyze that just assuming that it would continue that way,

4    obviously, and that would streamline to about $3.2 million,

5    which would fall right in Mr. Day's projection.

6              And then, again, investigated why, you know,

7    historically the sales had been $3.8 million but the projection

8    was lower.  And you know, obviously that's from the factor of

9    the price erosion or the contract negotiations with Beth

09:22 10   Israel.

11   Q.   So in the analyzed Q1 of 2019, it falls pretty much right

12   in the middle of Mr. Day's projections that he prepared in

13   January of 2019?

14   A.   That's correct, yes.

15   Q.   Ms. Decker, can you look at Exhibit 22, please, previously

16   admitted Exhibit 22.

17   A.   Yes.

18   Q.   You mentioned this quarter recap email a second ago.  Just

19   so we're clear for the Court, this is one of the documents that

09:22 20   you referenced in the first part of your testimony where

21   Mr. Day is celebrating his various successes in the field

22   including with Dr. Shin, Dr. Kwon, and Dr. Glazer?

23   A.   Yes.

24   Q.   And what effect did this document have on your findings?

25   A.   So specifically as related to Dr. Glazer, we looked at

```
 1    this -- obviously this is dated for Q1 2021, but in this email
 2    he says that -- it's actually a presentation I think that's
 3    attached to the email.  But he says that Dr. Glazer -- since
 4    Tim's return, the average per-case revenue has gone up
 5    significantly and we expect 150 to 200 thousand per month of
 6    revenue moving forward, extremely close on safe op and start
 7    biologics.
 8              And when we looked at the 150 to 200 and analyzed
 9    that, that falls right into our but-for sales number that's
09:23 10   shown on this slide that's up.
11    Q.   And I've moved onto slide 3.  You've mentioned but-for net
12    sales.  But-for net sales, correct me if I'm wrong, they take
13    the projected sales for NuVasive under the sales projection
14    method that you just talked about and it removes -- the first
15    thing it does is remove NuVasive's mitigating sales that it
16    actually made; is that correct?
17    A.   That's correct.  So here we're projecting in the
18    worst-case scenario that's outlined in Exhibit 6 and then we're
19    removing any sales that NuVasive continued to make during that
09:24 20   period.
21    Q.   And all of these -- all these calculations are detailed on
22    Exhibit 3; is that right?
23    A.   They're detailed in my Exhibit D.
24    Q.   Exhibit D, I apologize, yes.
25              All right.  You've projected sales under your sales
```

1    projection method and you've backed out NuVasive's mitigating

2    sales.  What's the next step in your analysis to calculate lost

3    profits on Dr. Glazer's hardware usage?

4    A.   So next we would look at what costs NuVasive avoided by

5    not having made those sales, so what did they not incur because

6    they didn't have those sales.

7    Q.   And in your opinion, Ms. Decker, which costs did NuVasive

8    avoid by not taking these but-for sales to Dr. Glazer?

9    A.   In my opinion, after talking with Mr. Chris Burton, who is

09:24 10  the VP of financing at NuVasive, after doing some extensive

11   research regarding the industry and NuVasive's annual reports

12   and other competitors' annual reports, the costs that were

13   avoided were the costs of goods sold, which includes the cost

14   to manufacture, distribute, and the overhead related to the

15   manufacturing, and then the commissions that would have been

16   paid on those sales.

17   Q.   And I don't want to get too far down in the weeds on this,

18   Ms. Decker, but can you give just a brief summary of how you

19   calculated the costs of goods sold and then the commissions --

09:25 20  the costs of goods sold that you deducted from but-for sales

21   and then the commissions that you deducted from that gross

22   profit to reach your final number under the worst-case scenario

23   here.

24   A.   Yes.  In speaking with Mr. Burton at NuVasive, NuVasive

25   utilizes the SAP system, which is -- in our accounting world,

1       the SAP system is widely used.  So from him we obtained a

2       download of what the costs of goods sold were related

3       specifically to Dr. Glazer's hardware business, and as we go

4       forward, each of the costs of good sold numbers will be related

5       to specifically what goods were sold by those doctors in the

6       historical time frame, and utilize the trailing 12 average for

7       that.  And then for commissions on net sales, we also obtained

8       an SAP data historically of what commissions were paid on these

9       sales in the past by distributorship -- to a distributorship.

09:26 10            So, for example, Rival Medical was operating in Q1

11      2019.  Mr. Day went direct with NuVasive for a time period, and

12      before that Mr. Day was with Magellan Medical.  So we utilized

13      the average of what the commissions were with Magellan Medical

14      as a distributorship and the commissions with Rival Medical

15      since direct employed representatives are paid commissions

16      differently than distributorships are.

17      Q.   So the commissions on net sales you deducted, that

18      percentage, which is detailed in your report, that's based on

19      the commissions that were paid in this area to exclusive

09:27 20    distributors, not to direct employees like Mr. Day was in 2018?

21      A.   That's correct.

22      Q.   And, Ms. Decker, one note.  Earlier this week,

23      Mr. Haughney testified and he had number ups up on a

24      demonstrative much like the one that's up the screen.  I want

25      to make sure it's clear for the Court how there can be some

1    differences in how someone like Mr. Haughney sees numbers and

2    somehow like you sees numbers through the SAP system.

3    A.   So, again, speaking with Mr. Burton, the VP of finance

4    with NuVasive, NuVasive utilizes several platforms, Atlas,

5    Cognos, Xactly, those platforms are utilized by different

6    divisions within NuVasive, but they all roll up and integrate

7    with SAP.  But through those systems, different dates are

8    captured.

9         So, for instance, there's a purchase order date that's

09:27 10   captured, there's a surgery date that's captured, and then

11   there's an invoice date.  And NuVasive recognizes revenue for

12   financial reporting purposes and also for paying commissions

13   utilizing the invoice date, and that's the date that we've

14   utilized in our analysis.

15   Q.   And if Mr. Haughney used a different date, say date of

16   surgery, to look at his numbers, there would be some difference

17   in how each of you view those numbers?

18   A.   There could be some timing differences, yes.

19   Q.   Ms. Decker, what -- having arrived at but-for net sales,

09:28 20   deducting NuVasive's mitigating sales, and subtracting the

21   costs of goods sold to reach gross profit and then deducting

22   those commissions on those net sales that would have been paid,

23   what is the final number that you arrived at for the injunction

24   period for NuVasive's lost profits for sales of hardware --

25   spinal hardware to Dr. Glazer?

1    A.    $1,339,005.

2    Q.    And what about for each subsequent 30-day period

3    thereafter?

4    A.    $103,900.

5    Q.    Ms. Decker, I want to go ahead and switch over to

6    Mr. Day's best-case scenario.

7          Anything different about your analysis for Mr. Day's

8    best-case scenario compared to his worst-case scenario?

9    A.    The only difference here would be the projected hardware

09:29 10   sales that Mr. Day presented under the best-case scenario in

11   the email that we discussed earlier.  The mitigating sales

12   would be the same and the costs of goods sold and commissions

13   percentages are the same, but they're just calculated on that

14   different but-for net sales number.

15   Q.    Understood.  And going through all those steps, what are

16   the final numbers you arrived at for lost profits on sales of

17   spinal hardware to Dr. Glazer under Mr. Day's best-case

18   projections in January of 2019?

19   A.    $1,697,946.

09:29 20   Q.    And what about each subsequent 30 day period thereafter?

21   A.    $119,979.

22   Q.    Ms. Decker, we talked about costs of goods sold and

23   commissions.  Any other additional expenses that you considered

24   that should be deducted from but-for sales that you did not or

25   you determined were not appropriate in this case to deduct?

A.   Right.  We certainly considered other selling and general
and administrative expenses which we often call SG&A expenses.
We discussed those again with Mr. Burton, the VP of finance.
We also investigated that through NuVasive's annual report
filings, through the testimony of Mr. Day's accountant, Ms. Roy
I believe is her name, and then the general ledger of Rival
Medical for Q1 of 2019.  And what we found, what my opinion is
that there are no other SG&A expenses that would be deducted in
this matter because, like I said earlier, commissions to
distributorships are much higher than they are to direct
employees because NuVasive is paying for health insurance and
training and sales, you know, meetings and meals and
entertainment and travel as it relates to direct employees.
They're being reimbursed for that or they're paying that on
their behalf.

        With distributorships, they're paid a larger
commission and then they're responsible for paying their sales
representatives' healthcare, 401(k), travel and meals and
entertainment, and that was consistent with Rival Medical's
general ledger.

Q.   Ms. Decker, you mentioned Mr. Burton several times.  Is
speaking with someone that's the VP of finance in a company
like NuVasive, is that typically something that someone in your
industry would customarily rely on?

A.   Yes.

1    Q.   And regarding these SG&A expenses, through those

2    conversations you didn't see any evidence that NuVasive, you

3    know, hired or fired additional IT staff because we lost

4    Dr. Glazer's business.

5    A.   Correct.  We did -- I did ask that question of Mr. Burton

6    specifically as it relates to the business of Dr. Glazer,

7    Dr. Shin, and Dr. Kwon.  Obviously NuVasive is a large company.

8    While these accounts are very important to them, obviously, the

9    revenue is a small percentage, it's less than a half of a

09:32 10   percent of NuVasive's overall revenue.  And so not to be

11   flippant about that point, this is obviously very important,

12   but that just would not move the needle on any SG&A expenses

13   that NuVasive was incurring and related to whether they had to

14   fire a call center person or other administrative help because

15   of the loss of this business, the answer was no.

16   Q.   They don't conduct any additional trainings or hire any

17   customer service representatives because they lose or gain

18   someone like Dr. Glazer.

19   A.   That's correct.

09:33 20   Q.   Ms. Decker, when discussing -- when analyzing Dr. Glazer's

21   hardware sales under either of these scenarios, how did you

22   account, if at all, for the COVID-19 pandemic?

23   A.   So obviously through the injunction period of March 3,

24   2020, COVID had not shut down any elective surgeries as of that

25   point.  But as of March 18, Beth Israel and other hospitals did

1    stop elective surgeries or at least cut back on those elective

2    surgeries.  And so for each subsequent 30-day period, we did

3    need to consider the effect of COVID on the business.

4         Specifically as it relates to Dr. Glazer, there's

5    arbitration testimony where Dr. Glazer himself talks about the

6    impact of COVID on his business.  He testified that through

7    September 30th of 2020, he -- his business was down 50 to 60

8    percent.  He was able to do some cases at another hospital,

9    St. Elizabeth's, during that time period.  And then as of Q3,

09:34 10    he testified that his business was down 25 percent and would

11    continue that way.

12         We investigated that with the numbers that Alphatec

13    provided to us which were through Q3 2020, and those didn't

14    necessarily agree with each other or correlate to each other.

15         For instance, in Q2 2020, Dr. Glazer's business with

16    Alphatec I believe was around $400,000 and as of Q3 it was

17    around $750,000.  So certainly not the 25 percent decrease.

18    But we did take Dr. Glazer's testimony into account, and that's

19    how we projected for the 30-day period, was using his

09:34 20    arbitration testimony.

21    Q.   And using his arbitration testimony led to a more

22    conservative figure for each subsequent 30-day period.

23    A.   Yes, it would.

24    Q.   Ms. Decker, I want to move on to Dr. Glazer's biologic

25    usage.

1          Can you walk me through the steps that you undertook

2     to calculate NuVasive's lost profits on the sale of biologics

3     and disposable products to Dr. Glazer?

4     A.   Well, I guess for time sake, not having been in here for

5     the trial, but to understand biologics, it is a different

6     product, it is stocked differently than hardware.  It is what

7     they call -- what I understand they call a stocking product, it

8     is bought in bulk.  And so for that we had to look, -- you

9     know, NuVasive records those sales attributable to the

09:35 10     hospital.  And so and that's in comparison to hardware where

11     they record the sale specifically with the surgeon.

12          So we did obtain the total biologic sales in the

13     historical period to Beth Israel and St. Elizabeth's Hospital.

14     And then to get Dr. Glazer's biologics total shown there in the

15     second column on this slide, we looked at what Dr. Glazer's

16     percentage of total hardware had been in those hospitals.  So

17     all the doctors considered in that historical period, what was

18     Dr. Glazer's percent of hardware, and it was 89 to 90 percent,

19     which is shown there in that slide.

09:36 20          And so we took that 89 to 90 percent to say what would

21     Dr. Glazer's biologics totals have been.  And then, again, here

22     we're showing the Q1 number of 2019 and analyzing that, and

23     then also showing Q2 2019 through Q4 of 2019.

24          Go ahead.

25     Q.   Ms. Decker, you mentioned that Dr. Glazer's percentage of

```
 1    hardware usage at those facilities was 89 to 90 percent there
 2    detailed at the middle of the page.
 3            Mr. Haughney during his testimony, his numbers I think
 4    equated to about 92 percent.  Would that be explained by the
 5    difference in reporting that we talked about a second ago?
 6    A.   It certainly could be timing differences, depending on
 7    what time frame he pulled his report for and what date he used
 8    for that report.
 9    Q.   Understood.
10            Did Mr. Day perform any sort of sales projection
11    regarding Dr. Glazer's biologic usage for 2019?
12    A.   So again, on Exhibit 6 that we talked about earlier where
13    he's doing projections in the Q1 -- or January of 2019 time
14    frame, he did project a number for biologic usage related to
15    Dr. Glazer's business.
16            I think he actually -- this is projected for Beth
17    Israel Hospital.
18    Q.   And was his projection consistent with actual usage and
19    data that was provided to you by NuVasive?
20    A.   So when you analyze Q1 2019, it was 1.5 million for total
21    biologic use of just the hospital, and I believe Mr. Day
22    projected 1,460,000.
23    Q.   So it was pretty much spot on there.
24    A.   Yes.
25    Q.   But did you utilize Mr. Day's sales projections for
```

09:37  (line 10)
09:37  (line 20)

1    biologics --

2              THE COURT:  I'm sorry, just to back up.

3              So, meaning, the way you calculated it on an

4    annualized basis was similar to the number in Mr. Day's

5    projection to Mr. Richard.

6              THE WITNESS:  That's correct.

7              So if you assume that Q1 of 2019 would have continued

8    going forward with no events, then it would have fall within

9    the range of Mr. Day's projection.

09:38 10             THE COURT:  Okay.  Thank you.

11   BY MR. McFARLAND:

12   Q.   Ms. Decker, we've talked about that projection.  Did you

13   actually utilize that projection when formulating the lost

14   profits numbers for NuVasive on biologics sales?

15   A.   I did not in the sense --

16   Q.   Why is that?

17   A.   As you can see on the slide, obviously biologic sales were

18   declining after Mr. Day's resignation.  That's clear through

19   the numbers shown here on the slide.  And then in 2020, that

09:39 20   usage goes to zero.

21             At the time of my report, there was some speculation,

22   I think, that Dr. Glazer was utilizing biologics products from

23   other suppliers during the 2019 time frame, but we didn't have

24   that evidence.  I think we know now that there was a contract

25   that Mr. Day had in place with Orthofix, which is an

1    alternative supplier, dated August of 2019, and that there's

2    some pricing discussions with Beth Israel regarding using

3    Orthofix in October of 2019.  And again, with the nature of

4    this product being -- it could be a product that has inventory

5    on hand, and there was still usage during that Q2 2019 to Q4

6    2019 time period, I started my loss calculation as of January

7    1, 2020 to be conservative because that's when the usage went

8    to zero.

9    Q.   So the usage of NuVasive's biologics at St. Elizabeth's

09:40 10   and BIDMC went to zero in the first quarter of 2020?

11   A.   Yes.

12   Q.   And how did you calculate -- how did you calculate

13   NuVasive's lost profits starting with that loss period of

14   1/1/2020?

15   A.   So the third column in this slide shows that Dr. Glazer's

16   biologics percentage to total hardware usage.

17         So, again, we know a surgery count that typically the

18   surgeons are utilizing a biologics product with every surgery,

19   but on a dollar-for-dollar basis, we have shown here what the

09:40 20   percentage of biologics was to total hardware.

21         Again, not having the information regarding inventory

22   levels or what might have been happening with the biologics in

23   Q2 through Q4, we utilized the percentage from that -- those

24   three quarters instead of the historical percentage, which

25   obviously, as shown here, is higher than the percentage with

1    that we used.

2            So we took that 28.73 percent and we multiplied it

3    against the actual hardware sales during that 2020 Q1 2020

4    injunction period to project the sales.  And so that actual

5    hardware sales would be hardware that was being purchased

6    through Alphatec, the numbers we had with Alphatec through that

7    time period, as well as if there were any continuing sales with

8    NuVasive.

9            Now what we also didn't have is Mr. Day's selling

09:41 10   Centinel Spine products, I believe, to Dr. Glazer, and so we

11   didn't have the usage related to that.  So if there were any

12   additional uses of hardware that required a biologics, the

13   number would be higher.

14   Q.   And when you said biologics are utilized in spinal

15   surgery, is it your understanding that when hardware is used,

16   biologics are used?

17   A.   That's my understanding.

18   Q.   Okay.

19           Let's look at your next slide here, Ms. Decker.

09:42 20          Having performed those steps and projected NuVasive's

21   biologics sales starting January 1 of 2020 through the

22   injunction period, what number did you arrive at for but-for

23   net sales.

24   A.   So for the injunction period, that would be $114,168.

25   Q.   And I noticed you didn't back out any mitigating sales,

1    that's because there were no mitigating sales; is that right?

2    A.    That's right.

3    Q.    And you had to go through the same steps for cost of goods

4    sold and commissions that we talked about a second ago.

5          Anything different about that analysis aside from the

6    different percentage for cost of goods sold?

7    A.    Right.  The cost of goods sold percentage would be

8    different because it would be directly related to the cost of

9    goods sold to manufacture the biologics product, but the

09:42 10    commissions would be the same percentage.

11    Q.    So doing all those steps, Ms. Decker, what was the final

12    number of NuVasive's lost profits on sales to -- sales of

13    biologics to Dr. Glazer through the injunctive period starting

14    January 1 to March 3 of 2020?

15    A.    So that would be $49,504.

16    Q.    And what about every subsequent 30-day period after that?

17    A.    $25,365.

18    Q.    For the same reasons we discussed a second ago, you

19    declined -- there were no other -- no other avoided costs to

09:43 20    deduct?

21    A.    That's correct.

22    Q.    And I'll ask you the same question I asked about hardware.

23    Is there any effect of COVID incorporated -- did you have to

24    account for COVID in your subsequent 30-day period calculation?

25    A.    Because we utilized that percentage and multiplied it by

1    the actual sales of Alphatec and NuVasive during that period,

2    that would already account for COVID because it is the actual

3    sales that happened, and so there was no need to adjust further

4    for COVID.

5    Q.   So because the hardware sales account for COVID -- so

6    because the hardware sales account for COVID, you don't need to

7    perform another COVID calculation with regard to your biologics

8    sales?

9    A.   Yes, that's right.

09:44 10           THE COURT:  But I guess my question on this one -- and

11    I understand that point -- explain to me why the number for the

12    subsequent 30-day period would be so high in comparison to the

13    total lost profits, right.

14           So on the hardware the subsequent 30-day period is

15    $103,000 as you calculate it compared to 1.3 million for the

16    full injunctive period, whereas lost profits for the full

17    injunctive period on biologics is $49,000 and the subsequent

18    30-day period amount is almost 50 percent.

19           THE WITNESS:  Correct.  So that was, again, just

09:44 20    January 1 through March 3rd is the $49,000.  Each subsequent

21    30-day period the sales with Alphatec that we utilized, the

22    actual sales were increasing, and so that's going to increase

23    that subsequent 30-day period.

24           THE COURT:  Thank you.

25    BY MR. McFARLAND:

1   Q.   So, Ms. Decker, just to put a bow on that, even though

2   we're looking at the whole injunctive period for biologics,

3   there's only that January 1 to March 3 of 2020 for lost profits

4   on biologics compared to the entire injunctive period for

5   hardware?

6   A.   That's correct.

7        THE COURT:   Thank you.

8   BY MR. McFARLAND:

9   Q.   And just to summarize, Ms. Decker, when we add

09:45 10  Dr. Glazer's -- when we calculate Dr. Glazer's hardware and

11  biologics usage, what is the final totals related to -- lost

12  profits associated with Dr. Glazer's business?

13  A.   So on the low end or what Mr. Day classified as worst

14  case, that would be $1,388,509, and on the best case would be

15  $1,747,450.

16  Q.   And that's through the injunctive period?

17  A.   That is through the injunction period.

18  Q.   And for each subsequent 30-day period we have a low and a

19  high?

09:46 20  A.   Yes.  So the low would be 129,266, and the high would be

21  145,344.

22  Q.   Understood.

23       I want to talk about Dr. Shin and Dr. Kwon now.

24       Did you perform analysis related to Dr. Shin and

25  Dr. Kwon sales?

1    A.    Yes.

2    Q.    Can you walk me through that.

3    A.    So as we talked about earlier, I utilized the yardstick

4    method for this as well.  So this is actually looking at what

5    was testified to in the arbitration about what NuVasive lost to

6    Dr. Shin and then also utilizing the Q1 presentation that

7    detailed what Alphatec had gained from Dr. Shin and Dr. Kwon in

8    those periods.

9    Q.    Just briefly, Ms. Decker, can you give an overview of what

09:47 10   the yardstick method is and why you utilized it in this case?

11   A.    So, again --

12   Q.    For these surgeons, I apologize.

13   A.    I'm sorry.

14         So, again, the yardstick method is widely accepted in

15   our industry.  It's basically just looking at another proxy for

16   what would be lost profits.  There's several ways you could do

17   it, but one is to look at what the sales of the defendant were

18   all things being equal.  So you would have to -- you know, in

19   this case, obviously we don't know necessarily that the pricing

09:47 20   was the same, but that would be one factor that you would look

21   at.  But the yardstick method does say that you can utilize

22   either defendant's sales or another competitor's sales,

23   depending on what the facts and circumstances are.

24   Q.    And you utilized Alphatec sales in your yardstick method

25   here?

A.    That's correct.

Q.    And that was based on that document we talked about a second ago, Exhibit 22?

A.    That is correct.

Q.    As well as the testimony of Mr. Hens and Mr. Day himself at the arbitration?

A.    Yes.

Q.    And how did you project sales for Dr. Shin under the yardstick method here, Ms. Decker?

A.    So Exhibit 22 for Dr. Shin states that he came to Alphatec in December of 2019 for VSP, once gained approval was using ATEC for the majority of his cases prior to the pandemic and has been super engaged with Mr. Richard and Day and ATEC corporate and has a desire to move forward with ATEC in a meaningful way.

        And there is a projection there of 50 to 100 a month. But on the second page, which is ATEC 77, Dr. Shin's Q1 revenue is stated to be $60,000.  Mr. Hens testified, as well as Mr. Day, that the loss of NuVasive or the gain of Alphatec had been about -- or around $200,000 for the 2020 year.

Q.    And is that number reflected in your lost profit -- or your but-for sales there to Dr. Shin on this slide?

A.    So for the but-for sales in the injunction period, January 1 through March 3rd, that's the $60,000 prorated for that time period.  And the subsequent 30-day period utilizes the $200,000

1    that was testified to.

2    Q.   And you had to back out cost of goods sold and commissions

3    that would have been paid just like before?

4    A.   That's correct.

5    Q.   The only thing different is the percentage applied to each

6    particular product for cost of goods sold?

7    A.   Yes.

8    Q.   And what conclusion did you reach related to NuVasive's

9    lost profits with sales to Dr. Shin?

09:49 10    A.   Through the injunction period that would be $27,224.

11    Q.   And what about the subsequent 30-day period thereafter?

12    A.   $10,567.

13    Q.   All right.  Let's move on to Dr. Kwon, Ms. Decker.

14         What about Dr. Kwon, how did these documents that you

15    talked about affect your analysis related to Dr. Kwon under the

16    yardstick method?

17    A.   So ATEC 76, again, says Dr. Kwon has been an exclusive

18    NuVasive user for the past five years, started using single

19    step in January and has flipped all his MIS group business to

09:50 20    ATEC, plan to have him be an early adopter for a product and

21    expecting 6 to 8 cases a month of 30 to 40 in revenue a month.

22         And then ATEC 77 states that Brian Kwon's revenue was

23    $40,000 for Q1, and that was consistent with the testimony of

24    Mr. Hens and Mr. Day in the arbitration.

25    Q.   Ms. Decker, anticipating the Judge's question that she

1    asked about biologics a second ago, we don't have any -- we

2    don't have any numbers for April 1 through December 31 of 2019.

3    Is that because Dr. Shin and Dr. Kwon didn't actually start

4    using Alphatec's products until 2020?

5    A.   That's my understanding.

6    Q.   Okay.  And having going through the same analysis, costs

7    of goods sold, net commission, all of that stuff, what are your

8    conclusions regarding Dr. Kwon's lost business?

9    A.   For the injunction period, that would be $18,524.

09:51 10   Q.   What about each subsequent 30-day period thereafter?

11   A.   That is $1,138.

12        So let me explain that because that is lower and it

13   wouldn't necessarily equate to just a division problem, but in

14   the testimony it was -- that he had used $40,000 of business,

15   but he had used less than 50 for the entire year of 2020.  And

16   so this takes -- the subsequent 30-day period takes the $40,000

17   and prorates that, assumes that it would be $10,000 over the

18   quarters in the following period.

19   Q.   So it accounts for the actual sales data?

09:51 20   A.   Yes.

21   Q.   Ms. Decker, why not back out mitigating sales to Dr. Shin

22   and Dr. Kwon under this analysis?

23   A.   So under this analysis, again, this is what specifically

24   NuVasive lost that's been testified to and what Alphatec has

25   gained as related to the actions in this case.

Q.   Ms. Decker, the last thing I want to talk about is
prejudgment interest.

          Can you just walk me through how you calculated
prejudgment interest to apply to the various figures that we've
talked about today?

A.   Right.  So it's my understanding that the PIIA is under
Delaware law, which states that you would use 5 percent plus
the Federal Reserve discount rate as of the date of loss or the
date of damage.  And so in this case, we've utilized the date
of damage related to Dr. Glazer's hardware business as of that
April 1 time frame, and so that's when prejudgment interest
would start, and that would be 8 percent, the Federal Reserve
rate was three percent April 1, 2009.

          For the other business, obviously the loss period that
we discussed started January 1, and that rate was 2.75, I
believe, for 7.2 -- 2.25, which was 7.25 percent, and that's
when the prejudgment interest would start there.

          And we calculated that using a midpoint convention,
which assumes that the lost profits would be earned in the
middle of the year so that you can kind of spread that out so
they're not earned at the beginning or end of the year
affecting the calculation.

Q.   And just because the subsequent 30-day period looks in the
future, you're unable to determine prejudgment interest on
those figures?

A.   We could calculate prejudgment interest once we knew if
the Court was going to find for an additional 30-day period or
additional periods of time.  But for now, that would be an
accurate calculation until we knew that date that it was
extended through.

Q.   And just to summarize, Ms. Decker, I want to walk
through -- I want to walk through the final numbers that you
reach regarding Dr. Glazer's hardware business, his biologics
business, and then the sales to Dr. Shin and Dr. Kwon.

So on this slide we've got a summary there including
prejudgment interest.  What is -- on the low end under
Mr. Day's worst-case scenario, what are the lost profits
enuring to NuVasive including prejudgment interest for
Dr. Glazer?

A.   1,552,581.

Q.   What about under his best-case scenario?

A.   1,955,711.

Q.   And for Dr. Shin and Dr. Kwon?

A.   $29,482 related to Dr. Shin's business, and $20,060
related to Dr. Kwon's business.

Q.   And just to wrap up, Ms. Decker, what is -- to what degree
are you required to reach your opinions in your field in
forensics accounting?

A.   So our field says we should reach -- our calculations
should be to a reasonable degree of certainty.

1    Q.   And did you reach your opinions to a reasonable degree of

2    certainty in this case?

3    A.   I did.  So what that means effectively is it's tethered to

4    the facts, it's grounded in the evidence, it's reasonably and

5    reliably and accurately calculated.

6         Again, when you look at our Exhibit C and the four

7    pages of documents we listed there to get to what the facts of

8    the case are and how that would relate to the damages, it is

9    calculated with a reasonable degree of certainty.

09:55 10        MR. McFARLAND:  Judge Casper, permission to display

11   one of the defendant's demonstratives.

12        THE COURT:  Sure.

13   BY MR. McFARLAND:

14   Q.   Ms. Decker, in this case, Mr. Busch has stated various

15   themes, especially one regarding your testimony.  I'm going to

16   show it to you now.

17        He has stated that you're an expert who lives in

18   wonderland, there down at the bottom right.

19        Just to be clear, all of your opinions are reached to

09:56 20   a reasonable degree of certainty that you just described just

21   then.

22   A.   Yes.  I've never been compared to unicorns and

23   caricatures.

24   Q.   And Mr. Busch's insinuation that you live in some sort of

25   fantasy land or wonderland with your opinions is simply wrong?

```
 1   A.    Completely inaccurate.

 2             MR. McFARLAND:  Thank you.  Those are my questions.

 3             THE COURT:  Mr. Busch.

 4             MR. BUSCH:  Yes, ma'am.

 5                           CROSS-EXAMINATION

 6   BY MR. BUSCH:

 7   Q.    Good morning, Ms. Decker.  Bryan Busch for the defendant,

 8   Mr. Timothy Day in this case.  I just got a couple of follow-up

 9   questions for you based on some of the information you
09:57 10  presented.

11             I'm going to show you a couple of excerpts from your

12   report and just have us kind of go through that here.  It's

13   Exhibit -- there's an exhibit in your binder but you can also

14   follow along here on the --

15             All right.  From page 9 of your report, I just want to

16   try to get an understanding as to the periods that we're

17   discussing here.

18             So with respect to Dr. Glazer on number 1a, you are

19   calculating the loss period or the initial loss period from
09:58 20  April 1, 2019 through March 3, 2020; is that correct?

21   A.    That's correct, related to hardware.

22   Q.    And did you have any understanding that Mr. Day's -- I'm

23   sorry, that Mr. Richard's non-compete actually expired on

24   December 31st of 2019?

25   A.    I understand that Mr. Richard's was not under the
```

1    injunction and that his one year non-compete would have ended

2    then related to the NuVasive PIIA, right.  The Rival PIIA would

3    be different.

4    Q.   So I'm just trying to understand how -- because in your

5    damages here, you've included and you've assessed damages

6    against both Mr. Day and Mr. Richard, correct?

7    A.   At the time that we prepared this report, Mr. Richard was

8    involved in the case, yes.

9    Q.   And you concluded that these -- Mr. Richard was

09:59 10   responsible for this same amount of damages that Mr. Day was

11   responsible for, correct?

12   A.   Well, we certainly didn't allocate any specific numbers to

13   Mr. Day versus Mr. Richard, that there's evidence related to

14   non-solicitation, non-competition and the breach of that PIIA

15   as it relates to Mr. Richard and then also the Court has

16   ordered related to the breach of the PIIA of Mr. Day.

17   Q.   And now that Mr. Richard is no longer involved in this

18   case and he's been dismissed from the case, I'm assuming that

19   you would now need to adjust these numbers to reflect the

10:00 20   damages that you had associated with Mr. Richard?

21   A.   So the damages, again -- I was not asked to apportion to

22   each defendant, and I'm not aware of what the settlement was

23   for Mr. Richard, but, no, I would not subtract what would be

24   related to Mr. Richard.

25   Q.   And that's because you weren't asked to do any sort of

1   apportionment?

2   A.   I wasn't asked to do any sort of apportionment, and my

3   understanding of the Court's ruling is that Mr. Day has

4   breached the PIIA and that he was involved in the solicitation,

5   non-competition, and proprietary information breaches related

6   to these three surgeons.

7   Q.   And same with Dr. Shin.  You've included the loss period

8   from April 1, 2019 to March 3, 2020, even though Mr. Richard

9   was outside of his non-compete beginning in January of 2020,

10:01 10   correct?

11   A.   Well, again, we're not talking about Mr. Richard at this

12   point, we'd be talking about Mr. Day.  And as we talked about

13   in that presentation, you know, Mr. Day says he was super

14   engaged with Dr. Shin in Q1 of 2020.

15   Q.   Did you -- you did this report prior to Mr. Richard being

16   settled in this case, correct?

17   A.   Yes.

18   Q.   Okay.  So the damages that you have stated here for

19   Dr. Shin from April 1, 2020 through March 3, 2020 of $27,224

10:01 20   includes or incorporates any sort of conduct that Mr. Richard

21   would have been engaged in that violated his agreement?

22   A.   As well as the violation by Mr. Day of his agreements.

23   Q.   I understand, but I'm just asking you about Mr. Richard.

24   A.   Okay.

25   Q.   So that number, that $27,000 number at the time you wrote

1    this report, included the conduct of Mr. Richard.

2    A.    Right, it includes the loss that NuVasive suffered as it

3    relates to Dr. Shin.

4    Q.    And Dr. Kwon, the same thing, the same loss period, April

5    1, 2019 to March 3, 2020, you see that?

6    A.    Yes.

7    Q.    That's the loss period.  And you're allocating $18,524

8    worth of damages to both -- as a result of Mr. Day's conduct

9    and Mr. Richard's conduct.

10:02 10    A.    Right.  It's really the conversion of Dr. Kwon's business

11    it's not allocated again to either Mr. Day or Mr. Richard's

12    actions specifically.

13    Q.    So these numbers have nothing to do with Mr. Day or

14    Mr. Richard's actions?

15    A.    It's related to Mr. Day's breach of the PIIA.

16    Q.    Well, at the time you wrote this expert report, it was

17    Mr. Day and Mr. Richard?

18    A.    That's correct.  We did not apportion related to Mr. Day

19    or Mr. Richard.

10:03 20    Q.    And my question is simple.  You haven't reallocated these

21    amounts to account for whatever apportionment between Mr. Day

22    and Mr. Richard when you testified just a minute ago.

23    A.    In my opinion, there would be no need to reallocate as

24    you've stated.  There's been a finding that Mr. Day has

25    breached his PIIA as it relates to Dr. Glazer, Dr. Shin, and

1    Dr. Kwon.

2    Q.   So why include Mr. Richard in the report at all if you

3    were simply just allocated 100 percent of the damages to

4    Mr. Day?  Why would you include that at all?

5    A.   Well, Mr. Richard had also breached his agreements, as the

6    Court had found, and so if there was any allocation or

7    apportionment, that would be something that the Court would

8    rule on.

9    Q.   So you're leaving the allocation and apportionment up to

10   the Court?

11   A.   Well, there's no evidence of any allocation or

12   apportionment that we could do in this case.  So Mr. Day and

13   Mr. Richard were simultaneously soliciting and -- at least they

14   are on the emails and the documentation in the record.

15   Q.   Within the context of your report, Ms. Decker, did you

16   provide the Court with a mechanism on how to allocate the

17   damages between Mr. Day, Mr. Richard, and any other party?

18   A.   So, again, it's my understanding that Mr. Day was

19   Mr. Richard's supervisor, and that the solicitation acts

20   were -- you know, the breach relates to both of them and so,

21   no, we did not have a mechanism to allocate or apportion in

22   this case.

23   Q.   And you testified earlier that you are not here to give

24   any sort of causation assessment in this case.  Is that what

25   you said earlier?

```
 1    A.    I have not provided an opinion on causation.
 2    Q.    Okay.  But you do say in your report, and I'm reading from
 3    page 10 up here on the screen, you say, Under economic
 4    remedies, the damages must be linked to the wrongful acts and
 5    must be determined with reasonable certainty using appropriate
 6    and reliable applied principles and methods.
 7          Do you see that?
 8    A.    Yes.
 9    Q.    And so the linking of the wrongful acts to the damages is
10    something that you did in this case.
11    A.    That's correct.  But, also, the Court has already ruled
12    related to the causal link to damages.
13    Q.    Well, I disagree with that, that that's what the Court
14    said, but we'll take that up later.
15          And so in doing your linking analysis, linking the
16    specific acts of Mr. Day and Mr. Richard, which you did in your
17    report, to your damages, you took a number of steps to try to
18    investigate that linkage, did you not?
19    A.    Yes.
20    Q.    And one of the things you did, Ms. Day -- I mean,
21    Ms. Decker, is you reviewed the pleadings in this case.
22    A.    Yes.
23    Q.    And your testimony was based on the pleadings in this case
24    that Mr. Day was instrumental in moving business away from
25    NuVasive and to Alphatec?
```

```
  1   A.   That was not my testimony.

  2          When you look at Exhibit C -- or that wasn't my intent

  3   with testimony.

  4          When you look at my Exhibit C, it's four pages of

  5   documentation and research that we conducted in this matter to

  6   come to that linkage.

  7   Q.   Well, if you look at page 12 of your report here, you say,

  8   It's my understanding Day was instrumental in transferring a

  9   large portion of Dr. Glazer's business to Alphatec beginning

10:07 10  around the time of his resignation from NuVasive.

 11          Do you see that?

 12   A.   Yes.

 13   Q.   And you have a citation where you're providing support for

 14   that statement, correct?

 15   A.   Correct.

 16   Q.   And your citation is to Exhibit 31, which is NuVasive's

 17   response to defendant's motion for supplemental order, correct?

 18   A.   That's what the citation is I believe -- let me check that

 19   here.

10:07 20         Yes.

 21   Q.   So in order to reach this conclusion that Mr. Day was

 22   instrumental, you had at least in part referred to NuVasive's

 23   pleadings in this case?

 24   A.   In part, yes.  The paragraph goes on to explain what else

 25   we relied upon.
```

1    Q.   You also, to try to figure out whether or not Mr. Day was

2    instrumental in moving business, had an opportunity to look at

3    an affidavit from Dr. Paul Glazer, did you not?

4    A.   I have seen that, yes.

5    Q.   What is your understanding or tell the Court what you

6    recall about Dr. Glazer's affidavit?

7    A.   Well, it's actually been a little bit since I've looked at

8    his affidavit.  I did read also his testimony in the

9    arbitration.

10:08 10         As I recall, Mr. Glazer points to a number of other

11   things related to why he went to Alphatec.

12   Q.   And was it your understanding of reading Dr. Glazer's

13   affidavit that he was stating that Mr. Day was not instrumental

14   in the reason why he moved from NuVasive to Alphatec?

15   A.   He did state that in the declaration.  My reading of the

16   arbitration is that on cross he also stated that he would not

17   utilize products without a great sales rep.

18   Q.   And so when Dr. Glazer testifies in his affidavit, which

19   is a sworn statement, specifically that you reviewed and he

10:09 20   says Mr. Day was not instrumental in moving business from

21   NuVasive to Alphatec, you ignore that evidence and instead rely

22   upon NuVasive's pleadings which you cite to in footnote 31.

23         MR. McFARLAND:  Objection, that misstates her

24   testimony.

25         THE COURT:  Well, sustained as to form.

1              You can ask another question.

2    BY MR. BUSCH:

3    Q.   Ms. Decker, the -- Dr. Glazer's affidavit that you read,

4    you ultimately ignored that affidavit, the evidence that was

5    presented in that affidavit.

6    A.   So I considered that affidavit, but I also considered all

7    the other evidence, the totality of the evidence in the record

8    that is listed on Exhibit C in my report.

9    Q.   And so, ultimately, your conclusion was you disregarded or

10:10 10   you gave no evidence or weight to Dr. Glazer's affidavit.

11   A.   The statements that Dr. Glazer made, they weren't

12   necessarily corroborated by what the evidence was.  And again,

13   as it states in this paragraph that you're pointing to, when

14   you look at specifically when Mr. Day resigned and what the

15   financial numbers did at that time, it correlates to when

16   Mr. Day resigned.

17   Q.   Do you have any idea, Ms. Decker, the efforts and time it

18   takes to move in a hospital from one product to another?

19   A.   I understand that there are pricing and product approvals

10:10 20   that have to go through.  I understand from reading

21   Dr. Glazer's testimony that there's lots of committees on

22   different things that, especially at Beth Israel being a

23   teaching hospital, that have to be laid out, yes.

24   Q.   Looking at page 11 of your report, you did try to estimate

25   the impact that COVID had on the sales to the doctors in this

 1    case, correct?

 2    A.   As I testified to earlier related to Dr. Glazer's hardware

 3    business and what he testified to in the arbitration, yes.

 4    Q.   So you felt it was fair with respect to Dr. Glazer's sales

 5    to try to look at the impact of COVID and not allocate all of

 6    the losses that NuVasive sustained to Mr. Day because of the

 7    COVID pandemic?

 8    A.   In that subsequent 30-day period, yes.

 9         (Pause.)

10:12 10    Q.   I'm going to refer you back here, and we're going to talk

11    for a minute about Dr. Shin.

12         And you state here on page 12 of your report right

13    here, the second paragraph, you state, From 2019 to 2020,

14    NuVasive's sales to Dr. Shin declined by approximately 5

15    percent.

16    A.   I see that, yes.

17    Q.   Okay.  And that was your position and you incorporated

18    that decline into your damage calculations.

19    A.   So, again, my damage calculation for Dr. Shin is what

10:12 20    specifically Alphatec gained during that period and what was

21    testified to as NuVasive's losses.  It wasn't specifically tied

22    to the 5 percent.

23    Q.   And again, the loss period is April 1, 2019 to March of

24    2020, correct?

25    A.   The loss period with Dr. Shin would begin January 1 of

1    2020.

2    Q.   The loss period with Dr. Shin begins on January 1 of 2020?

3    A.   Yes.

4         THE COURT:  Which is why the number, the number

5    attributed to lost profits, is much smaller, not just volume of

6    sales, but also that the period is smaller, unlike Dr. Glazer.

7         THE WITNESS:  That's correct.

8    BY MR. BUSCH:

9    Q.   So in looking at Dr. Shin -- if you could flip over to

10:14 10   Exhibit D13, I'm going to put it up here on the board for just

11   a minute.

12        I'm sorry, it's not D13.

13        (Pause.)

14        MR. BUSCH:  Sorry, your Honor, hold on just a second.

15   I lost my spot there.

16        THE COURT:  Sure.

17        (Pause.)

18        MR. BUSCH:  It was D13, sorry about that.

19   BY MR. BUSCH:

10:16 20   Q.   So looking at Exhibit D13, you were comparing revenue and

21   sales from Dr. Shin from 2019 and 2020.  Do you see that?

22   A.   Yes.

23   Q.   And your conclusion was that the difference between the

24   sales in 2019 and 2020 was a loss of roughly 5.5 percent.

25        Do you see that?

1   A.   Yes.

2   Q.   And Ms. Decker, you will see and you will notice in Q2 of

3   2020 a substantial drop in sales to Dr. Shin, we went from

4   160,000 in Q1 down to 79,000 in Q2.  Do you see that?

5   A.   Mm-hmm.

6   Q.   And would you agree that that drop in sales was because of

7   the COVID problems that Dr. Shin was experiencing over at Mass.

8   General?

9   A.   I would assume that that is likely COVID-19.

10:17 10  Q.   Okay.  And the same adjustments that you made for

11   Dr. Glazer for COVID, you did not make any adjustment for the

12   Q2 sales for Dr. Shin when comparing 2019 numbers and 2020

13   numbers.

14   A.   So I think that maybe you're misunderstanding how I

15   calculated Dr. Shin's lost profits.

16         It wasn't attributed to this 5 percent, it was what

17   was testified to as to what Alphatec gained and NuVasive lost

18   specifically for Q1 2020 and then additionally through the year

19   2020.

10:18 20  Q.   I'm not sure I'm following you, but we'll clean that up

21   later.

22         But for purposes of your chart and for purposes of

23   allocating a 5.5 difference in sales between 2019 and 2020, you

24   did not make any adjustment for the COVID vaccine similar to

25   the adjustment you made for Dr. Glazer for Q2 of 2020.

1    A.   Again, this chart is just an informational chart.  It was

2    not what was utilized to project the sales.  And so there would

3    be no need to allocate COVID for that period.

4    Q.   Had you provided a proper adjustment for COVID in Q2 2020,

5    Ms. Decker, would you agree with me that NuVasive's sales to

6    Dr. Shin would actually have increased from 2019 to 2020?

7    A.   They could have.  As you can see from the historical

8    period, they were increasing over time exponentially really.

9    So barring COVID, they could have been higher than that number.

10   But that's not the number we utilized for lost profits.

11   Q.   Of course not.

12        THE COURT:  Well, counsel, no commentary, but you can

13   ask the next question.

14   BY MR. BUSCH:

15   Q.   The same questions for Dr. Kwon.  Did you make any sort of

16   COVID adjustments for Dr. Kwon when you were allocating what

17   his sales were and the differential in his sales between 2019

18   and 2020?

19   A.   So, again, there's no allocation of the differential in

20   sales.

21   Q.   And is it your testimony, Ms. Decker, that you performed a

22   different analysis for Dr. Kwon and Dr. Shin than you did for

23   Dr. Glazer, different type of analysis?

24   A.   The type of analysis was the sales projection method for

25   Dr. Glazer and the yardstick method for Dr. Shin and Dr. Kwon.

1   Q.   And the sales comparison method that you did for

2   Dr. Glazer, if you had done that method for Dr. Shin, NuVasive

3   would have had no lost profits in this case because their sales

4   in 2020 were, actually, if you adjust for COVID, were more than

5   their sales for 2019?

6   A.   Again, I think you're still misunderstanding how I

7   calculated the damages.

8        Dr. Glazer's damages are based on the projections that

9   Mr. Day made.  If we utilized Mr. Day for Dr. Shin and Dr. Kwon

10:21  10   that he made in that exhibit, it could have been different.

11   But we went with the yardstick method which was actually lost

12   and Alphatec gained.

13   Q.   The actual sales to Dr. Shin, Ms. Decker, if you had

14   allocated for COVID, those sales between NuVasive and Dr. Shin

15   increased from 2019 to 2020.

16   A.   So let me be further clear for the Court.  The sales that

17   we utilized for lost profits related to Dr. Shin and Dr. Kwon

18   are the actual sales that Alphatec made related to Dr. Shin and

19   Dr. Kwon in Q1 --

10:21  20        THE COURT:  Meaning not projections.

21        THE WITNESS:  They are not projections.

22        THE COURT:  They're actual sales.

23        THE WITNESS:  Yes.  And that would already factor in

24   COVID-19.

25        THE COURT:  Right, because it's what's happening.

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  As opposed to projections because
 3    Dr. Glazer is a higher volume -- strike that for a moment.  But
 4    there were projections about Dr. Glazer.
 5              THE WITNESS:  That's correct.
 6              THE COURT:  Which reflected larger sales volume.
 7              THE WITNESS:  That's correct.
 8              THE COURT:  Whereas Dr. Shin and Dr. Kwon had much
 9    smaller sales volume.
10:22 10         THE WITNESS:  That is correct, yes.
11              THE COURT:  Both historically and in 2020.
12              THE WITNESS:  Yes.
13              THE COURT:  And your calculations were based on actual
14    sales in 2020 for the two -- for Dr. Kwon and Dr. Shin.
15              THE WITNESS:  Yes, your Honor.
16              THE COURT:  Thank you.
17    BY MR. BUSCH:
18    Q.   And your proposed actual sales to Dr. Kwon and Dr. Shin
19    are based solely on the testimony of Mr. Hens?
10:22 20  A.   No.  So what I testified to earlier is that there's the
21    chart in Q1 of 2020 which is prepared I believe by Mr. Day
22    which states what the actuals sales were in Q1 of 2020 and then
23    Mr. Hens and Mr. Day testified about those numbers in the
24    arbitration.
25    Q.   With respect to Dr. Glazer, let's turn back to him for
```

1    just a minute.

2           You decided to use actual projections of Dr. Glazer's

3    sales from the exhibit that opposing counsel showed you as

4    opposed to the actual sales data that NuVasive and Alphatec

5    had.

6    A.   Right.  We were provided with the sales that Alphatec had.

7    It was a chart that was embedded in an email that an

8    administrative assistant had provided for the litigation.

9           And to be clear, the record shows that in 2019, after

10:23 10  Mr. Day leaves, there's still pricing and product approvals

11   that are happening with Beth Israel as it relates to

12   Dr. Glazer's business.  So there's a clear ramp up when you

13   look at Dr. Glazer's business with Alphatec, there's a clear

14   ramp up in that 2020 period.  So what NuVasive lost was

15   actually better defined by what Mr. Day projected.

16   Q.   Ms. Decker, it was a very simple question.

17          Did you use actual projections for Dr. Glazer versus

18   the actual sales data from 2019 and 2020?

19   A.   I did utilize the sales projection method which was the

10:24 20  projections that Mr. Day prepared.

21   Q.   Despite the fact that you had actual sales data that you

22   could have gone by.

23   A.   So we did provide for the Court's consideration the number

24   as it relates to sales related to Alphatec for that period of

25   time.  Again, to make the record clear, there is a clear ramp

1    up in sales during this time period and there are other

2    products that we know are being sold by Mr. Day to Dr. Glazer

3    that we did not have the data for so we couldn't account for

4    that.  But that number is actually in the report for the

5    Court's consideration.

6    Q.   Do you know -- prior to Mr. Day's leaving NuVasive in

7    April of 2019, do you know which products had been approved at

8    Beth Israel Hospital for Dr. Glazer's use?

9    A.   Specifically, no.  I know that there are emails that state

10:25 10   some products, but I couldn't name them off of the top of my

11   head without seeing --

12   Q.   Do you know what percentage of Dr. Glazer's usage of

13   products was related to products that were approved prior to

14   Mr. Day's departure and after Mr. Day's departure?

15   A.   Well, it's my understanding from looking at the financial

16   data for sure and the other documentary evidence that there

17   were five test screw cases that I spoke about earlier.  And to

18   my knowledge, that was what was approved at the time Mr. Day

19   left.

10:26 20   Q.   And do you know those screw cases -- and I'll just

21   represent to you that they were of some sort of posterior-type

22   screw case or hardware.  Do you have any understanding or

23   knowledge what percentage of Dr. Glazer's surgeries involve

24   posterior screws?

25   A.   No.  And again, you know, we didn't have that data as it

1    relates to what was going forward in Alphatec's sales.  We

2    weren't provided that detailed information.

3    Q.   But you could have asked for NuVasive data that broke down

4    for Dr. Glazer's usage for posterior versus anterior screws.

5    A.   So when we did get the SAP data, there is specific line

6    items for product descriptions.  So we could have potentially

7    looked at that needing to understand what each product was.

8    Q.   And the product that you recall Mr. Day being involved in

9    and pricing and trying to get approval for after he left

10:27 10   NuVasive and joined Alphatec, do you recall which product line

11   that was?

12   A.   I'm sorry, I got lost in the question.

13   Q.   After Mr. Day left NuVasive and went to Alphatec --

14   A.   Okay.

15   Q.   -- you testified a minute ago that he was involved in some

16   sort of a -- some sort of a product approval and pricing for a

17   product?

18   A.   For a product or products, yes.

19   Q.   Do you recall which product or products those are?

10:27 20   A.   I don't recall.

21   Q.   And did you do any analysis as to what percentage of sales

22   Dr. Glazer utilized in the products that Mr. Day was trying to

23   get approved at Beth Israel Hospital?

24   A.   Related to going forward with Alphatec, I didn't have that

25   information, no.

1    Q.   And did you investigate, Ms. Decker, any sort of potential

2    contributing factors to loss in this case?  For instance, did

3    you do any sort of investigation as to what impact or influence

4    Pat Miles had on Dr. Glazer's decision-making process?

5    A.   So as it relates to what we call intervening causes,

6    that's why we do the extensive research of the industry and

7    read and utilize all the documents that are listed in that

8    Exhibit C, as well as the testimony of the witnesses and

9    depositions that we looked at.

10:28 10         I understand that Pat Miles is the CEO of Alphatec.  I

11   haven't seen any documentary evidence related to a percentage

12   or a contributing factor that he would be in the conversion of

13   Drs. Glazer, Dr. Shin or Dr. Kwon's business.

14   Q.   Did you recall reviewing Dr. Kwon's affidavit in this

15   case?

16   A.   Yes.

17   Q.   Did he mention Mr. Miles' influence on that decision?

18   A.   I don't remember the exact language.  I know that there's

19   testimony that he and Mr. Miles maybe have been friends.

10:29 20   Q.   And that that's the extent of your understanding?

21   A.   Well, if you wanted to pull up the declaration, I'd be

22   happy to review it again.  Sitting here today, that's what I

23   recall.

24   Q.   Did you do any sort of analysis on the current NuVasive

25   projections on sales to Dr. Kwon and Dr. Shin in 2020 and 2021?

```
 1   A.    NuVasive's projections?

 2   Q.    Yes.

 3   A.    No.

 4   Q.    And I believe you testified earlier that the actual sales

 5   from NuVasive to Dr. Kwon and Dr. Shin were not reduced from

 6   the damage amounts that you put in your report.

 7   A.    Could you repeat that question?

 8   Q.    The actual NuVasive sales from -- to Dr. Shin and

 9   Dr. Kwon, you did not reduce those actual NuVasive sales from

10   the damages that you allocate to Mr. Day because of the

11   different method that you used.

12   A.    Well, under this method it would not be necessary because

13   it's the actual sales that Alphatec gained.

14   Q.    And you also participated, Ms. Decker, in the arbitration

15   against Rival Medical; is that correct?

16   A.    Yes.

17   Q.    And did you also -- in that arbitration did you also

18   allocate damages to Rival Medical for the loss in sales to

19   Dr. Glazer from -- for the loss period 2019, April 2019 to

20   March 2020?

21   A.    Yes.

22         MR. BUSCH:  Those are my questions, your Honor.

23         THE COURT:  Thank you.

24         Any redirect?

25         MR. McFARLAND:  Just briefly, your Honor.
```

1              THE COURT:  Sure.

2                      REDIRECT EXAMINATION

3    BY MR. McFARLAND:

4    Q.   Ms. Decker, I'm going to start in reverse there.

5            The question about Rival Medical, your understanding

6    in the Rival Medical arbitration is that NuVasive was pursuing

7    Rival Medical for violations of the sales agreement, not for

8    Mr. Day's violations of the PIIA; is that correct?

9    A.   That's correct.

10:31 10   Q.   Mr. Busch asked you about the difference in methods, the

11   sales projection method and the yardstick method.  Is it

12   typical and customary in your industry to utilize different

13   methods in the same report when presented with different

14   evidence like you were in case?

15   A.   Right, it would be subject to the facts and circumstances

16   under each scenario.

17   Q.   And, Ms. Decker, there was talk about the settlement with

18   Mr. Richard.

19            You don't have any opinion either way -- strike that.

10:32 20            Any damages in this case, do you have an opinion

21   whether they should be set off by any sort of settlement that

22   was entered into with Mr. Richard?

23   A.   I would -- I would lean toward that being an opinion that

24   your Honor would make, but in my read of the evidence, Mr. Day

25   is in breach of the PIIA and that's related to the conversion

1  of Dr. Glazer, Dr. Kwon, and Dr. Shin's business in totality.

2  Q.   Understood.

3       And one final question.  There was talk of -- or

4  Dr. Glazer's affidavit.  You also reviewed the entirety of

5  Dr. Glazer's arbitration testimony; is that correct?

6  A.   That's correct.

7  Q.   You reviewed the entirety of every testimony of all the

8  deposition and arbitration testimony related to this case,

9  right?

10:33 10  A.   Yes.  I believe in this case I had 11 depositions that I

11  reviewed in their entirety, as well as the entire exhibit

12  packages for those depositions.

13  Q.   And it wasn't excerpts, it was the entirety of the

14  depositions.

15  A.   Entirety.

16  Q.   And do you recall that Dr. Glazer testified in his

17  deposition that no matter the products, he won't utilize

18  products without adequate representation?

19  A.   In the arbitration proceedings, yes.

10:33 20  Q.   And back to my first question on redirect, the breach of

21  the sales agreement that NuVasive was pursuing against Rival

22  Medical was for failure -- to your understanding, was that for

23  failure to enforce Rival Medical's PIIAs with its sales

24  representatives?

25  A.   That's my understanding of one of the allegations in that

1    matter, yes.

2              MR. McFARLAND:  Thank you, Ms. Decker.

3              THE COURT:  Thank you.

4              Any recross, Mr. Busch?

5              MR. BUSCH:  No, your Honor, thank you.

6              THE COURT:  Thank you.

7              You're excused, thank you.

8              THE WITNESS:  Thank you.

9              THE COURT:  Counsel.

10:34 10        MR. CARDWELL:  We would call Adam rich now, but I

11   believe Dr. Glazer has some time constraints, so that's fine.

12             THE COURT:  Mr. Busch, do you want to switch to

13   Dr. Glazer?

14             MR. BUSCH:  Yes, we'll call Dr. Glazer.

15             THE COURT:  Thank you.

16             MR. CARDWELL:  While we're doing this, your Honor, you

17   had asked at the pretrial conference for what our request to

18   adverse inference is.

19             THE COURT:  Yes.

10:34 20        MR. CARDWELL:  Would you like us to file that or give

21   it to you or --

22             THE COURT:  I thought I was clear on that from the

23   paper -- from the -- our discussion at the oral argument, but

24   why don't we include that in some of the housekeeping I think

25   we'll have at the end.

         1              MR. CARDWELL:  That's fine.  I guess we should talk
         2     about -- well, that's fine.
         3              PAUL ANDREW GLAZER, M.D., having been duly sworn by
         4     the Clerk, was examined and testified as follows:
         5              THE CLERK:  Thank you.  Please be seated.
         6              THE COURT:  Good morning.
         7              THE WITNESS:  Good morning.
         8              THE COURT:  Sir, you can remove your mask to testify,
         9     thank you.
10:35   10              THE WITNESS:  Thank you.
        11              THE COURT:  Counsel, Mr. Busch.
        12                         DIRECT EXAMINATION
        13     BY MR. BUSCH:
        14     Q.   Dr. Glazer, I'm over here on the other side of the room.
        15     I'm going to be asking you some questions.
        16              Sorry for the distance.
        17              Can you hear me okay, sir?
        18     A.   Yes, sir.
        19     Q.   Can you please state your full name for the Court.
10:36   20     A.   Paul Andrew Glazer.
        21              THE COURT:  And can you spell your last name for the
        22     record.
        23              THE WITNESS:  G-l-a-z-e-r.
        24              THE COURT:  Thank you.
        25              THE WITNESS:  You're welcome.

```
 1   BY MR. BUSCH:

 2   Q.    Sir, where do you currently reside?

 3   A.    Downtown Boston, ███████████████.

 4         THE COURT:  And we'll just keep Downtown Boston and

 5   strike the specific address.

 6         Thank you.

 7   BY MR. BUSCH:

 8   Q.    What do you do for a living, sir?

 9   A.    I'm a spine surgeon.

10   Q.    And where do you perform your spinal surgeries?

11   A.    For the last 25 years, I've been on staff at Beth Israel

12   Deaconess Medical Center here in Boston.  I also have

13   privileges at other institutions here in Boston, including the

14   New England Baptist Hospital and St. Elizabeth's Medical

15   Center.

16   Q.    Which university did you attend?

17   A.    Brandeis University.

18   Q.    And which medical school did you graduate from?

19   A.    Columbia.

20   Q.    And where did you perform your residency?

21   A.    At Columbia as well.

22   Q.    Have you acquired a specialty through training, education,

23   and practice in any particular field?

24   A.    Yes, again, I'm a spine surgeon.  I spent two years at

25   UCSF after completing my orthopedic residency doing a spine
```

1    fellowship and also did a research fellowship at New York prior

2    to becoming a spine surgeon and practice here in Boston.

3    Q.    How many years have you worked as a spine surgeon

4    specialist?

5    A.    Approximately 25 at this point.

6    Q.    And how many spine surgeries would you estimate you

7    perform each year?

8    A.    Three to four hundred.

9    Q.    Would you just give the Court a little bit of

10:37 10   understanding of what types of spine surgeries you're involved

11   in.

12   A.    I have a unique practice in Boston.  I do adult spinal

13   deformity reconstruction, in addition to taking care of the

14   average degenerative disease type of problems, like herniated

15   disks and spinal cord compression types of problems.

16   Q.    And are you also involved in any medical academia, sir?

17   A.    Yeah, I have a teaching role at Harvard.  I'm an assistant

18   clinical professor of orthopedic surgery on a part-time basis

19   as they call it now because I don't work for the hospital, I'm

10:38 20   a private practitioner.

21   Q.    Are you involved in developing or engineering products

22   used for spinal surgeries?

23   A.    Yeah, developing new technologies is a true passion of

24   mine.  I have spent my entire life trying to help create new

25   pathways for surgical interventions.

1    Q.   During the course of your practice, sir, do you have the

2    opportunity to select implantation devices for use in your

3    spinal surgeries?

4    A.   Yes.

5    Q.   And what types of instruments or devices might be used in

6    a spinal surgery?

7    A.   Well, the majority of my cases involve deformity and what

8    we use now are devices such as screws and rods and hooks and

9    all sorts of devices to try to realign the spine and to

10:38 10   maintain its stability while the patient is healing.

11   Q.   How many companies are out there that sell, design or

12   manufacture these type of spinal implant products?

13   A.   I don't know specifically, but I imagine there's over 200

14   at this point.

15   Q.   And how many spinal implant products would you estimate

16   are in the market today?

17   A.   Probably thousands.

18   Q.   And are all the spinal implant devices the same?

19   A.   Absolutely not.

10:39 20   Q.   What are some of the differences between the devices?

21   A.   They may have similar function, but they completely are

22   different in terms of their technology, in terms of their

23   ability for the body to have bone incorporate around them and

24   to provide structural stability.

25   Q.   Could you just generally describe for the Court what steps

1  you take as a surgeon before selecting a spinal implant device

2  company to be used in your surgeries.

3  A.   Yeah, it's not a one instrument fits each patient.  The

4  reality is every patient is different, and they have different

5  anatomy.  So we're always trying to choose the best technology

6  for that individual patient.

7  Q.   How do you go about selecting the implant device you are

8  going to use for each specific patient?

9  A.   Well, we have a discussion actually with the patient when

10:40 10  the patient arrives in my office in terms of what their problem

11  involves and what I think is the best surgical approach for

12  their pathology.

13  Q.   Does technology play a role in the design and engineering

14  of new products?

15  A.   Absolutely.

16  Q.   And would you say that the spinal industry is more dynamic

17  or static?

18  A.   It's completely dynamic.  What we used 20 years ago seems

19  to be is almost infantile relative to the plethora of new

10:40 20  products that we have available to us now.

21  Q.   And have the changes in technology and design to spinal

22  implant products caused you to switch product recommendations

23  to your patients over the years?

24  A.   Absolutely.

25  Q.   I want to try to give the Court a little bit of

1    understanding of the actual process that you go through in

2    selecting and utilizing spinal implant technology.

3           Tell the Court what happens when a typical patient

4    comes into your office with a degenerative disk condition that

5    requires surgery.

6    A.   Certainly.  So, again, the basis of treatment involves a

7    physical examination, the history, and then a determination

8    whether surgical intervention is the appropriate step to

9    undergo.  We always attempt non-operative treatment first for

10   degenerative disease.  But there are times when there are

11   urgent interventions that have to be taken care of by surgery,

12   and then we make a determination of what implants are best for

13   that patient.

14   Q.   And do you have discussions with the patients in your

15   office?

16   A.   Absolutely.

17   Q.   And who is involved in making that hardware recommendation

18   to the patient in your office?

19   A.   It's myself and the patient.

20   Q.   Do you ever consult or discuss those decisions with any

21   sort of hardware manufacturer or sales representative?

22   A.   Never.

23   Q.   After the hardware is selected between you and the

24   patient, do you take any steps as far as the hospital goes to

25   provide notice to the hospital and the reps about which

1    hardware you want for which surgery?

2    A.    Absolutely.  So there's a process after surgery is

3    determined to be the appropriate intervention that I actually

4    fill out a form in the office which includes the patient's

5    demographics in addition to their physical examination, and

6    then I make a determination on which particular implant I wish

7    to use for that particular surgery.

8    Q.    And do you notify the hospital of that?

9    A.    Yes, my secretary or surgical coordinator will coordinate

10:43 10    and send out the sheet of paper to the hospital which then

11    makes sure that that is available for the surgery.

12    Q.    And how are the sales representatives notified?

13    A.    Well, what we found is that the hospital sometimes are not

14    as reliable as they should be in terms of getting the

15    information to the instrumentation representatives, so I

16    believe it's a dual process, a parallel process.  We call the

17    instrumentation company as well as call -- give the information

18    to the hospital.

19    Q.    And are individuals on your staff involved in that

10:43 20    process?

21    A.    Yes.

22    Q.    Between the time the hardware is selected and the time of

23    surgery, do you have -- typically have any communication or

24    conversation with the sales rep about the upcoming surgery?

25    A.    Not usually.  Again, sometimes because I deal with

1    patients with unique anatomy I'll want to have specific

2    instrumentation as backup, so, you know, make a surgical plan

3    for using one instrumentation system but I'll talk to the rep

4    and say, listen, I'm not quite sure I'm going to be able to use

5    this given the patient's anatomy, I want another technology

6    available as well.

7              THE COURT:  Doctor, just a few things.  When you're

8    referring to instrumentation, there's been a lot of reference

9    to hardware.  When you say instrumentation, are you referring

10:44 10   to hardware?

11             THE WITNESS:  Yes, and I take a little offense to the

12   use of hardware as what I'm using at surgery.

13             These are not nails and bolts like we put together a

14   box.  These are devices that have been FDA approved, gone

15   through an FDA approval process that we're using for surgical

16   intervention.  So people call it as hardware because there are

17   nuts and bolts and devices, but really it's spinal

18   instrumentation, that what's we're really talking about.

19             They're used synonymously in this discussion but I

10:45 20   find it actually a little hard to hear the "hardware" term.

21             THE COURT:  Thank you.

22             Counsel.

23   BY MR. BUSCH:

24   Q.   And, Dr. Glazer, if you could just describe a typical

25   surgery room for the Court so that they can understand who's

1    there and what's involved in it.

2    A.    Certainly.  So the operating room is a unique theater like

3    this.  There's an anesthesiologist, usually a team of

4    anesthesiologists; there's myself as a surgeon, I have an

5    assistant, usually a physician's assistant or if I'm training

6    someone, there's a resident or a fellow or medical student; and

7    then there's a surgical tech or a nurse, who's the person who's

8    passing instruments to me, who's in the sterile field itself;

9    and then there's always a circulating nurse, a nurse that's not

10:45 10  sterile, not on in the surgical field but can try to facilitate

11    the surgery.

12          And then there are the reps from the companies, who,

13    again, their entire purpose, in my mind, is to make sure that

14    the instrumentation is available and ready for surgery and

15    sterile and ready to go when we begin the case.

16    Q.    Do you rely on the sales representatives to provide you

17    with any technical advice about the equipment you're going to

18    use during the surgery?

19    A.    No.

10:46 20   Q.    Are you involved in any post-surgery consultations with

21    the sales representatives?

22    A.    No.

23    Q.    Could you perform the surgery with or without the sales

24    representatives being present in the operating room?

25    A.    Absolutely, and I've done that many times.

         1    Q.   For your specific practice, Dr. Glazer, how would you

         2    describe the role of the sales representative?

         3    A.   I believe it's really just a function of efficiency.  The

         4    bottom line is also it's a function of allowing the turnover of

         5    the instrumentation to be efficient, meaning that these -- I do

         6    two to three spinal surgeries usually a day.  These involve

         7    different instrumentation systems, and the reps are important

         8    in making sure that these instrumentation systems are cleaned

         9    appropriately, meaning brought to the appropriate processing

10:47   10    part of the hospital and making sure that they're there for the

        11    surgery intervention.

        12         THE COURT:  Just on that, on sort of the efficiency

        13    front, you mentioned that there are about 200 companies, spinal

        14    companies.  At any typical time, how many of the companies are

        15    you getting instrumentation from?

        16         THE WITNESS:  So that's a good question.

        17         So, interestingly, at the Harvard teaching hospital,

        18    Beth Israel, because they're there are so many different

        19    implant companies, the hospital actually had a reverse auction

10:48   20    relative to the companies that surgeons had selected to be part

        21    of -- basically on site because there's so much literally space

        22    that's required to house the instrumentation.

        23         So the reality is all the surgeons -- the spine

        24    surgeons at Beth Israel created a group of companies that we

        25    were interested in having available for our patients.  The

1    hospital then contracted with these companies.  And the problem

2    is that not every company has an answer for each problem.  So

3    there are times when you need a specific implant from a company

4    that's not been approved by the hospital.

5              The other issue, though, is in terms of this

6    description of the OR, the hospital wants the least number of

7    people in the OR because of the risk of infection.  When you

8    have too many people moving in and out of the operating room,

9    there's a risk of infection for the surgical patient.

10:49 10            THE COURT:  Thank you.

11             THE WITNESS:  You're welcome.

12   BY MR. BUSCH:

13   Q.   Dr. Glazer, for your particular practice, would you

14   describe the role of sales representative as logistics?

15   A.   Absolutely.

16   Q.   I imagine, sir, the last place you wanted to be this

17   morning was inside a courtroom.

18   A.   That's correct.  The reality is this is not my cup of tea

19   to be quite honest.  I'm a surgeon.  I've spent my entire life

10:49 20   trying to take care of patients.  I find it actually a little

21   bit hard to be here today, honestly, because this is about

22   money and business, and I don't consider my job that -- that

23   essentially as a business.  I do this to take care of patients

24   in the best way possible, and this is a battle between two

25   spine instrument companies who I've had wonderful, warm

1    relationships working with both of them, and I've helped

2    develop equipment that's helped not only my own patients with

3    these companies, but other patients across the world.  And

4    that's why I find this difficult today actually.

5              THE COURT:  Thanks.  For what it's worth, most people

6    usually don't want to be here, so I'm not offended.

7              Counsel.

8    BY MR. BUSCH:

9    Q.   Dr. Glazer, as you're testifying here, do you favor one

10:50 10  side over the other, the Alphatec or NuVasive's?

11   A.   No, sir.

12   Q.   And you have friends at both companies?

13   A.   I do.  I've made warm, close relationships with people in

14   both companies.

15   Q.   And you have ongoing business relationships with both

16   companies?

17   A.   I do.

18   Q.   What is your ongoing business relationship with NuVasive?

19   A.   Yes, I helped NuVasive develop a new what we call anterior

10:51 20  interbody fusion device.  It's a very unique device, and I

21   think plays a role in patient care.

22   Q.   And as we sit here today, Dr. Glazer, do you continue to

23   use products from both companies?

24   A.   Yes.

25   Q.   When was the last time you actually used a NuVasive

1    product in surgery?

2    A.    Probably a month ago because I was away for almost two

3    weeks.

4    Q.    When did you actually begin your professional relationship

5    with NuVasive?

6    A.    In about 2012, I believe.

7    Q.    And could you tell the Court how that relationship

8    developed?

9    A.    Yeah, so I was made aware of a new minimally invasive

10:51 10   technology that the NuVasive company had created, and that was

11   called an XLIF or extreme lateral interbody infusion.  What

12   that means is we can now, through this new technology, make a

13   tiny incision, an inch and quarter incision, in the flank

14   allowing us to go behind the abdominal contents to the spine,

15   take out a disk and replace it with a device.

16        And in the old days, I would have to make a gigantic

17   long flank incision in the patient's abdomen creating much more

18   havoc.

19        So this was a minimally invasive approach trying to

10:52 20   gain the same outcome, and I thought that would be fantastic

21   for my patients with bad spinal deformities.

22   Q.    Who was your primary contact at NuVasive?

23   A.    So I met the president of the company actually, his name

24   was Pat Miles.  And Pat over the years has become a friend, not

25   only someone that I trust, but also someone that I believe is

1    truly a leader in the field of spine surgery in terms of

2    development of procedural solutions.  Meaning that it's not --

3    he doesn't focus his company on just the development of the

4    widget, the in-field device, but actually the procedure of how

5    to create a better surgical outcome.

6    Q.   And beginning in around 2012, did you begin transitioning

7    at least part of your practice over to NuVasive?

8    A.   Yes.

9    Q.   And what manufacturer were you transitioning away from?

10   A.   The Biomet or Biomet Zimmer Company at this point.

11   Q.   And are you aware of Biomet suing you or anyone on the

12   NuVasive team you were working with?

13   A.   No.

14   Q.   Once you started -- initially started using NuVasive

15   products in 2012, were you assigned a sales representative or a

16   primary sales team member that you would be working with?

17   A.   Yes, Scott Palmer I believe is the person that was the

18   regional representative for the NuVasive company at that time.

19   I believe he created a company called Magellan Medical.

20   Q.   And Scott and his company, Magellan, serviced your

21   operating room for NuVasive at Beth Israel Hospital?

22   A.   Yes.

23   Q.   Did you like Scott?

24   A.   Very much so.

25   Q.   Did Scott and his team do a good job for you?

A.    Yes.

Q.    And during the time that you were working for -- with Scott Palmer and Magellan Medical did an individual by the name of Tim Day start working in your operating room as a sales representative?

A.    Yes.

Q.    And did Mr. Day cover surgeries for NuVasive in your operating room at Beth Israel Hospital for a number of years?

A.    Yes.

10:54 Q.    Did Mr. Day provide you with any additional support above and beyond the normal sales rep relationship that you had described?

A.    No.

Q.    Did you rely on Mr. Day for any technical advice about NuVasive's products?

A.    No.

        One of the things that you've emphasized is whether I'm dependent on the representative, and the reality is the instrumentation companies actually hired me to teach their
10:55 sales reps on the instrumentation.  So it seems awkward to say the representatives are teaching me the instrumentation at surgery.  That's not really how it works.

Q.    Mr. Day worked in your operating room as a sales representative for many years.

A.    Correct.

1    Q.    Through that business interaction did you develop a

2    friendship with Mr. Day?

3    A.    Yes.  I think as a surgeon, I think most people don't

4    realize the amount of time that we actually spend away from our

5    own families in the operating room; and being at a level 1

6    trauma hospital, like Beth Israel, there are times when we are

7    working 24/7.  And these are people that we're dependent on in

8    terms of what you described as logistics.

9              In order for me to take a patient who emergently needs

10:56 10   surgery to the OR safely, I needed Tim and his team and people

11   like Tim in order to get the surgeries done appropriately.

12   Q.    And did you see Tim socially outside of work?

13   A.    Yes, we did.

14   Q.    And did you and your family vacation with Mr. Day and his

15   family?

16   A.    Yes.

17   Q.    And was Mr. Day and his family in your wedding recently?

18   A.    Yes.

19   Q.    And, Dr. Glazer, were you able to separate Mr. Day as a

10:56 20   business associate and Mr. Day as a friend?

21   A.    Yes.

22   Q.    Beginning in around 2018, Scott Palmer and his Magellan

23   Medical company were terminated by NuVasive.  Do you remember

24   that?

25   A.    Yes.

```
 1    Q.   And what was your reaction to that decision?

 2    A.   I was upset.  Scott Palmer was a friend also.  He had

 3    worked with me in -- with Biomet as the regional

 4    representative, made a transition also to NuVasive, and I

 5    worked with him for many years.

 6    Q.   And after Scott Palmer and Magellan Medical were

 7    terminated beginning in --

 8              MR. CARDWELL:  Objection, your Honor.  There's

 9    absolutely evidence in the record of Scott Palmer being

10    terminated.  In fact, it's just not accurate.

11              THE COURT:  Okay.  Well, counsel, I think you can

12    rephrase to get to your next point.

13              MR. BUSCH:  Sure.

14    BY MR. BUSCH:

15    Q.   When Mr. Palmer and Magellan Medical stopped doing work

16    for you in 2018, did you have an understanding that Mr. Day was

17    promoted internally within NuVasive?

18    A.   Yes.

19    Q.   And you were assigned -- beginning in 2018, you were

20    assigned a new sales representative to be with you in the

21    operating room, and that was Adam Richard, right?

22    A.   Correct.

23    Q.   And Mr. Day, beginning in January of 2018, was no longer

24    involved day to day as a sales representative as he had been

25    previously.
```

1    A.    Correct.

2    Q.    And was Mr. Richard beginning in 2018, was he also a good

3    sales representative for you?

4    A.    Yes.

5    Q.    Dr. Glazer, beginning in 2017 and maybe in 2018, there was

6    a series of events that took place at NuVasive that were

7    troubling to you.  Could you describe those events for the

8    Court?

9    A.    Sure.  So, again, I've had close relationships with the --

10:58 10   they're really the leaders everything these publicly traded

11   companies, which has been really wonderful to get to knows

12   these people.  I was involved in a lot of the decisions, major

13   corporate decisions as an adviser to the company.  I went all

14   the way to Israel to look at a robotics company that they

15   wanted to buy potentially with both the CEO and president at

16   that time.  I enjoyed those relationships.

17         The problem in 2017 was that Pat Miles left the

18   company, and he was my main contact with the leadership at that

19   time, and that was one aspect that was difficult, because when

10:59 20   he left, I felt there was a big dearth of leadership in the

21   company at that point.

22         I was put on several projects, ideas that I had that I

23   thought were important for patient care in the future, and

24   those projects never became active.  We had initial discussions

25   with not only myself as a physician advisor, but other surgeons

1    from New York at a hospital for special surgery that we're on a

2    development team, and the team basically fell apart.  And

3    despite my multiple attempts at trying to contact the newer

4    people who are involved, these fell apart basically, these

5    discussions fell apart.  And that was difficult.

6         The other thing that happened was I -- I'm an

7    inventor.  I like, as I told you, to invent new technologies.

8    I created a device that I think has got a role that would be

9    helpful and less invasive for patients, and I presented that to

11:00  10   NuVasive to see if they would acquire that technology and then

11   they declined.  So that was also disappointing at that point.

12         THE COURT:  Thank you.

13         And, counsel, given the time, I think this would be a

14   good place for us to break.

15         MR. BUSCH:  Sure.

16         THE COURT:  Dr. Glazer, we're going to take our

17   mid-morning break, 20 minutes, and then we'll resume.

18         THE WITNESS:  Thank you.

19         THE COURT:  Counsel, anything I should address before

11:01  20   we do?

21         MR. BUSCH:  No, your Honor.

22         MR. CARDWELL:  Yes.

23         THE COURT:  Okay.

24         MR. CARDWELL:  I think we should do this outside of

25   Dr. Glazer's presence.

| | |
|---|---|
| 1 | THE COURT:  Sure. |
| 2 | Dr. Glazer, you can step down.  You can start your |
| 3 | recess now, thank you. |
| 4 | (Witness left the courtroom.) |
| 5 | THE COURT:  Counsel, briefly, so I can give the |
| 6 | benefit of the full break to everyone else. |
| 7 | MR. CARDWELL:  Sure, I can say it in five words. |
| 8 | THE COURT:  Sure. |
| 9 | MR. CARDWELL:  This is one of those points where -- |
| 11:01 10 | that late night incomplete production is really burdensome |
| 11 | because the email that I've been referencing is very relevant |
| 12 | to his cross-examination. |
| 13 | THE COURT:  And -- |
| 14 | MR. CARDWELL:  So I have reviewed the protective |
| 15 | order, I read it on my phone for what that's worth. |
| 16 | THE COURT:  Sure. |
| 17 | MR. CARDWELL:  My understanding from reading it is |
| 18 | that it is only the Delaware court that can change the -- that |
| 19 | can -- you can only challenge a designation to the -- I'm |
| 11:02 20 | sorry, you can only challenge a designation to the Delaware |
| 21 | court.  That's unfortunate, but that's my reading of it. |
| 22 | THE COURT:  Okay.  So, counsel, what would you suggest |
| 23 | in this regard? |
| 24 | I mean, I think -- well, I'm still listening to the |
| 25 | testimony.  I think a few things. |

1          I don't think that the fact that there was any

2    existing -- preexisting business with Alphatec negates any

3    argument about lost profits as a result of violation of the

4    PIIA.  I understand Mr. Busch's point generally, and I'll give

5    some consideration to that.

6          I think -- I don't envision recalling this particular

7    witness, and I guess, counsel, I wonder if you have a

8    reasonable basis to ask the question without reference to a

9    document that might be in the protective order.

11:03 10          MR. CARDWELL:  I will do my best.

11          THE COURT:  And I think, counsel, we'll see where we

12    are at the end in regards to everything, but that's the

13    guidance I think I can give based on not seeing the document,

14    not having any way to let Mr. Busch see it for the moment.  So

15    I think that's where we are.

16          MR. CARDWELL:  I understand, thank you.

17          THE COURT:  Thank you.

18          THE CLERK:  All rise.

19          (Recess taken.)

11:22 20          THE COURT:  Everyone can be seated, thank you.

21          Mr. Busch.

22          MR. BUSCH:  Yes.

23    BY MR. BUSCH:

24    Q.   Dr. Glazer, when we broke, you were going through a list

25    of concerns that you had with NuVasive kind of beginning in

1  that 2017, 2018 time frame.  Was the one that was most

2  bothersome to you, was that Mr. Miles' departure?

3  A.   Absolutely.

4  Q.   And tell the Court why.

5  A.   Again, Mr. Miles had become a close friend, and I truly

6  believed he's a leader in the spine field of being able to

7  create new solutions for patients.

8  Q.   And at some point in time in 2017, Dr. Glazer, did you

9  become aware that Mr. Miles had become associated with a

11:23 10  company called Alphatec?

11  A.   Yes.

12  Q.   And did you have any sort of previous relationship with

13  Alphatec prior to 2017?

14  A.   I did.  Actually, I had licensed a former patent, a patent

15  of mine, to the Alphatec company prior to Mr. Miles joining

16  them.

17  Q.   And in -- towards the end of 2017, did you meet with

18  Mr. Miles at an NASS meeting to discuss Alphatec products?

19  A.   Yes.

11:23 20  Q.   Tell the Court about that.

21  A.   So the North American Spine Society meeting, which

22  actually just occurred here in Boston about a month ago, is the

23  largest meeting, I think, in the United States of spine

24  practitioners.  It's called the North American Spine Society

25  meeting.  Usually all the companies present their devices and

1    technology at those meetings.

2    Q.    Was Mr. Miles trying to solicit you to move your business

3    from NuVasive over to Alphatec?

4    A.    Absolutely.

5    Q.    After your initial meeting with Mr. Miles, did you then go

6    to Alphatec headquarters in around February of 2018?

7    A.    I did.

8    Q.    And tell the Court what did you at your first visit at

9    Alphatec in February of 2018.

11:24 10    A.    Certainly.  So when you go to -- get invited to the

11    company, usually they try to show you all of the different

12    instrumentation that is available in the company at that time

13    and what their thought process in terms of new developments

14    are.

15    Q.    And were there any particular Alphatec products that you

16    were interested in after your initial visit?

17    A.    Yes.

18    Q.    Which products were those?

19    A.    Well, the posterior and some of the anterior

11:25 20    instrumentation systems I thought were very interesting and

21    might have applications in my practice.

22    Q.    And are those the primary type of hardware systems you use

23    in your spine surgeries?

24    A.    Yes.

25    Q.    And I think you actually visited Alphatec again in May of

```
 1    2018; is that correct?

 2    A.   Yes.

 3    Q.   And what did you do at that second visit?

 4    A.   Again, a more in-depth discussion about not only their

 5    instrumentation systems but the discussion regarding an

 6    application of a trial of some of these instrumentation systems

 7    in the Boston Hospital because of the extensive process to get

 8    new instrumentation into the Harvard teaching hospitals.

 9    Q.   And in the spring of 2018, did you begin working on
```

11:25
```
10    getting Alphatec approved for a trial use at Beth Israel

11    Hospital?

12    A.   I did.  It's quite a process.  There's an online group

13    called the Lumere technology systems, and I'm not sure how

14    that's actually created, but basically it's a pathway where you

15    have to basically explain why you want to bring an

16    instrumentation system in, how it's competitive or similar or

17    different than what you are trying to replace, and also cost is

18    a huge influence in terms of trying to get these systems into

19    the hospital.
```

11:26
```
20         As a surgeon who will do a scoliosis surgery and put

21    maybe 20 screws and rods and devices in people's back, when the

22    screws cost $500 to $700 apiece, there's a lot of scrutiny on

23    me to try to do the least -- or the most cost-efficient

24    surgery, as well as provide the best service to the patient.

25    Q.   In order to get the trial products approved, Dr. Glazer,
```

1    did you have to meet with any peer groups or any other surgeons

2    within the system?

3    A.    Yes.  So, again, it's not just myself, it's not my

4    decision alone, it's actually a whole committee of surgeons in

5    Boston involving neurosurgeons, orthopedic spine surgeons, like

6    myself, who meet, discuss the technology.  Then there's a

7    process where the hospital administration gets involved.  I

8    don't really participate in terms of the negotiation between

9    the companies and the hospital, but certainly I try to

11:27 10    influence the companies when they're presenting that they have

11    to beat or meet the price of the current technology in order to

12    be able to come in because there's this cost pressure.

13    Q.    And were those discussions you had with Mr. Miles in the

14    spring of 2018?

15    A.    Yes, sir.

16    Q.    And ultimately, I believe there was a trial process that

17    was approved, and I think you started maybe sometime in the

18    summer of 2018?

19    A.    Correct.

11:28 20    Q.    And did Chad Spear at Alphatec assist you as a

21    representative during those trials?

22    A.    Yes.

23    Q.    And had you known Mr. Spear previously?

24    A.    Not significantly.  I think I met him during my meetings

25    out in California.

```
 1    Q.    And how did the trials go?

 2    A.    It went very well.  The instrumentation worked very well.

 3    Q.    And moving into the fall of 2018, sir, were you then

 4    involved in trying to get Alphatec full approval at Beth Israel

 5    Hospital?

 6    A.    Yes.

 7    Q.    And is that also a very lengthy process?

 8    A.    It's detailed.

 9    Q.    And did you, again, submit your findings and conclusions

11:28 10    in front of a panel?

11    A.    Yes.

12    Q.    And in the fall of 2018, did you make a recommendation to

13    Alphatec to hire a full-time sales representative to assist you

14    in advance of your continued use of the products?

15    A.    Yes.

16    Q.    And who did you recommend that Alphatec hire?

17    A.    At that time I thought -- well, David Odierno was the rep,

18    I thought a good representative for the hospital because he was

19    a nurse who was formally a scrub tech who had gone back to

11:29 20    school to become a nurse in the operating room but was

21    interested in possibly moving from that position to a role with

22    the instrumentation company.  And I had known David for several

23    years and I thought he might be a good candidate for that

24    position, so I recommended him.

25    Q.    And did Alphatec ultimately hire Mr. Odierno in the fall
```

1    of 2018?

2    A.    Yes.

3    Q.    And, sir, in the summer of 2018 -- let me just back you up

4    a couple of months -- did you have a specific product or some

5    sort of a new technology that you were showing to NuVasive to

6    purchase?

7    A.    Yes.

8    Q.    And what was that technology?

9    A.    So the reality is that when we put devices in the anterior

11:30 10   column in the lower lumbar spine from the front, the anatomy

11    requires us to put screws to fix those devices to the vertebral

12    bodies at a severe angle, and the hard part of affixing that is

13    that we have to sometimes use what we call an angled

14    screwdriver.  If you can try to understand, it has like a

15    hinge.  It's an awkward device, the device can be over a

16    foot-and-a-half long and there are large, very important

17    structures in the front of the spine, such as blood vessels and

18    nerves, and the current technology involving this angled

19    screwdriver is very awkward and it's risky.  You're trying to

11:31 20   tighten something down with a torque and if you translate or

21    hit off the screw, you could hit one of the vessels and cause

22    injury.

23          So one of the technologies I helped develop is a

24    bendable screw so it could be put in line with the implant and

25    have the screw turn or bend within the implant.  I truly

1    believe that may be helpful in helping patients in this

2    fashion.  And there are other applications laterally with this

3    approach.  And so I presented that technology which I had

4    helped develop with engineers to NuVa, to NuVasive, and

5    unfortunately, they declined.  They didn't want to proceed with

6    it.

7    Q.    Did you then subsequently submit that technology for

8    review to Alphatec?

9    A.    Yes.

11:32 10   Q.    Did Alphatec ultimately purchase that technology from you?

11   A.    They did.

12   Q.    Dr. Glazer, sometime in 2018, did you become aware that

13   Beth Israel had formally approved and had a contract with

14   Alphatec to sell products at Beth Israel Hospital?

15   A.    Yes.

16   Q.    And the initial contract, sir, did you have an

17   understanding that that included the use of Alphatec's

18   posterior screw line and hardware?

19   A.    Yes.  Again, the initial trial was based on posterior

11:32 20   instrumentation because that's the majority of the cases

21   that -- most of the devices are used.  And I had specific

22   interest in their use of their particular pedicle screw design,

23   as I was having some trouble with the one at NuVasive that

24   actually I was on the design team with.

25   Q.    And into the first quarter of 2019, after the product

1   approval, did you take any steps to begin transferring or did

2   you make any decisions about transferring your business or part

3   of your business from NuVasive to Alphatec?

4   A.   Yes, I decided to use more of the new Alphatec

5   instrumentation.

6   Q.   And that was around the first quarter of 2019?

7   A.   Correct.

8   Q.   And around this time, the first quarter of '19 when you

9   decided that were you going to utilize more Alphatec product,

11:34 10   did you make any additional recommendations to Alphatec about

11   individuals that Alphatec might hire to assist in that process?

12   A.   Yes.  So, again, Scott Palmer, who I had worked with

13   previously at NuVasive who was no longer working with them, I

14   thought would be a good choice.  Because, again, he had been a

15   friend for a long time and did a very good job as a local

16   representative here in Boston.

17   Q.   In the first quarter of 2019, Dr. Glazer, why didn't you

18   recommend that Alphatec reach out to Mr. Day?

19   A.   Well, I thought that would have been completely absurd.

11:34 20   He had just really taken over this distributorship basically

21   for all of Boston, and I'm not sure exactly what states, and I

22   had heard that the NuVasive territory under Scott Palmer

23   originally, Magellan, was significant.  So when Tim took that

24   over, I thought that would be what he would want to do,

25   continue, I wouldn't expect him to take that position and then

1    try to switch again very quickly.  I thought that would not be

2    reasonable.

3    Q.   And, Dr. Glazer, throughout the first quarter of 2019, was

4    Mr. Day still trying to actively sell NuVasive products to you?

5    A.   Absolutely.  It became a little bit of contention

6    actually.  I remember specifically at a scrub sink where I'm

7    basically washing my hands and paws, as I say it, basically to

8    get ready for surgery, and Tim was there being very vocal about

9    the fact that he was upset that I was using Alphatec products

11:35 10   rather than NuVasive.  So at that point he was actively trying

11   to get me to continue to use the NuVasive product line.

12   Q.   Was Mr. Day able to convince you to change your mind not

13   to transition from NuVasive to Alphatec?

14   A.   No.  I had made that decision prior to any discussion.

15   Q.   And let's fast-forward to the April of 2019 time frame.

16   Did you become aware that Alphatec had started some discussions

17   with Mr. Day and a couple of others about coming over?

18   A.   Yes.

19   Q.   And who told you about those discussions?

11:36 20   A.   Pat Miles.

21   Q.   And ultimately, Alphatec ended up hiring a gentleman by

22   the name of Colin Behrmann to assist in your operating room.

23   Do you know Mr. Behrmann?

24   A.   I do.  Colin Behrmann was a neurophysiologist, actually,

25   initially, and then transferred from that role to a

1  representative and was in my operating room as well.

2  Q.   Were you comfortable with Mr. Behrmann being your sales

3  representative?

4  A.   Yes.

5  Q.   And had you had a previous business relationship with

6  Mr. Behrmann?

7  A.   No.

8  Q.   Had he previously worked as a sales rep --

9  A.   He was my sales rep, but not in any other fashion.

11:37 10  Q.   And did you also learn that Mr. Adam Richard was going to

11  be moving from NuVasive to Alphatec?

12  A.   Yes, I subsequently learned that as well, yeah.

13  Q.   And did -- when Mr. Richard originally came over in April

14  2019, was he still in your operating room as a sales rep or was

15  he somewhere else?

16  A.   I believe he was moved elsewhere.

17  Q.   And what understanding did you have about what Mr. Day's

18  role was going to be at Alphatec beginning in April of 2019?

19  A.   My understanding was that he was more of an administrator

11:38 20  rather than being in the operating room with me.

21  Q.   And did Mr. Day serve the function as a sales

22  representative in your operating room in April or May of 2019?

23  A.   No.

24  Q.   Did Mr. Day's decision to go from NuVasive to Alphatec in

25  April of 2019 have any impact on your plans to transition to

1   Alphatec products?

2   A.   No.  As I would say, like, the train had already left the

3   station.  I had already been trying to use the Alphatec

4   products at that point.  I had already gone through the entire

5   process individually to try to bring them into the Harvard

6   teaching institution.  I had already done that all on my own.

7   Q.   Did you have any sort of custom instruments designed by

8   Alphatec for you to use with their products?

9   A.   I asked for a specific instruments to be reenforced.

11:39 10   Again, I do surgery which involves at times a lot of force

11   anteriorly, and basically we use what we call a Cobb elevator,

12   which looks like a mini crowbar, to be crude about it, but a

13   lot of force is applied to the spine to separate the vertebral

14   bodies that are collapsed.  When the disk space is collapsed

15   and have been for many years, it takes a lot of force to pry

16   them apart.  So I had a problem in the past where one of the

17   Cobb elevators deformed during surgery.  Thank goodness nothing

18   happened to the patient at the time, but I wanted to make sure

19   we had something that was stout enough so I could do the

11:40 20   surgeries in the appropriate fashion.

21   Q.   And did you work with Alphatec's engineering team to

22   design that?

23   A.   Yes.

24   Q.   Beginning in the end of May, beginning of June 2019, did

25   you have an understanding because of various court issues that

1    Mr. Day's role was changing a little bit?

2    A.   Yes.

3    Q.   Tell the Court what your understanding was.

4    A.   Well, again, my understanding was that there was this

5    discussion regarding his non-compete between the two companies,

6    and that there was an injunction basically or something like

7    that, he shouldn't have any interaction with me directly at a

8    certain point.

9    Q.   And is that something you took seriously?

11:40 10   A.   Yes, again, because although you seem very pleasant,

11   ma'am, I don't enjoy being here every day, I'd rather be in the

12   operating room or visiting with my patients.

13   Q.   To your knowledge, did Mr. Day abide by the rules that the

14   Court laid down from May 30th of 2019 through March of 2020?

15   A.   I'm sorry, can you repeat that question?

16   Q.   To the best of your knowledge, did have you any direct

17   contact or was Mr. Day involved in directly soliciting your

18   business between May of 2019 and March of 2020?

19   A.   No.  No.

11:41 20   Q.   Dr. Glazer, after May of 2019, was Mr. Day still your

21   friend?

22   A.   Yes.

23   Q.   And did you still interact with Mr. Day about non-Alphatec

24   issues?

25   A.   Yes.

```
 1    Q.   And did you still speak on the cell phone with Mr. Day
 2    about non-Alphatec issues?
 3    A.   Yes.
 4    Q.   And did you exchange text messages with Mr. Day about
 5    non-Alphatec issues?
 6    A.   Yes.
 7    Q.   There has been some testimony about Mr. Day visiting Beth
 8    Israel Hospital in the summer of 2019 and sitting in the lobby
 9    there of that hospital with you.  I don't know if you remember
11:42 10  the dates correctly, but do you remember Mr. Day coming by the
 11   hospital sometime in the summer of 2019?
 12   A.   Yes, specifically, Mr. Day injured his hand.  I made a
 13   personal phone call to one of the plastic surgeons at Beth
 14   Israel who is a hand specialist and I referred Timmy, or Tim
 15   Day, to the surgeon who's a friend of mine also in order for
 16   his care.  And I believe that he had to have a pin placed in
 17   his finger for a broken finger.
 18        So he was in the hospital, he stopped by, I was
 19   curious to see how he was doing.
11:43 20        That was the discussion regarding the meeting in the
 21   lobby.
 22   Q.   And in July of 2019, there's been some discussion about a
 23   trip to Napa Valley.  Do you recall that trip?
 24   A.   Yes.
 25   Q.   And there was really kind of two legs of the trip.  Do you
```

1   recall where you went first?

2   A.   Yeah, I was invited by Pat Miles to speak to the board of

3   Alphatec.  So I went on -- to San Diego where I spent a couple

4   of days there presenting to board members and presenting our

5   ideas of where the company should go in terms of new

6   technology.

7        And then from that separately, my wife and I and my

8   stepdaughter actually went to Napa with Pat Miles and his wife

9   and Tim and his wife.

11:43 10   Q.   And the second part of the trip from San Diego to Napa,

11   did you consider that business or personal, Dr. Glazer?

12   A.   That was just personal, as friends getting together for a

13   weekend.

14   Q.   And do you recall talking any Alphatec business with

15   Mr. Day during your trip to Napa Valley?

16   A.   I'm smiling internally about that, because my wife doesn't

17   like me talking about any business when we're away.  My life is

18   so involved in what I do as a profession, it's 24/7.  I get

19   woken up, we get phone calls 24/7 from patient issues.

11:44 20        So if we're away on vaccination, the last thing she

21   wants to do is talk about spine business.

22   Q.   And, Dr. Glazer, in October of 2019 --

23        THE COURT:  I'm sorry, does that mean you didn't talk

24   about Alphatec business?

25        THE WITNESS:  Correct.

```
 1              THE COURT:  Okay, counsel.
 2    BY MR. BUSCH:
 3    Q.   In October of 2019, Dr. Glazer, there was an Ohio State
 4    football game that you went to.  Do you have a recollection of
 5    that?
 6    A.   I do.
 7    Q.   And I believe that there was -- first of all, who invited
 8    you to that football game?
 9    A.   Tim.
11:45 10    Q.   And did Mr. Day help you and your wife get tickets to that
11    football game?
12    A.   He did, but I paid for them.
13    Q.   And how did you pay for them?
14    A.   Out of my pocket.
15    Q.   Did you give him cash, sir?
16    A.   Yes.
17    Q.   And during the trip to the football game, I believe there
18    was a dinner the night before the football game on that Friday
19    evening.  Do you recall attending that dinner?
11:45 20    A.   I do.
21    Q.   And do you recall whether Mr. Day was at that dinner or
22    not?
23    A.   I don't believe he was.
24    Q.   And do you recall during the football game, do you recall
25    that your wife was there and Mr. Day and his wife were at, do
```

1   you recall discussing any Alphatec business during that

2   football game?

3   A.   No.

4   Q.   And did you consider that football game a business or a

5   personal trip?

6   A.   Personal.

7   Q.   I'm going to take you back in time a little bit,

8   Dr. Glazer, to the first quarter of 2019 when were you making

9   your decision to transfer from NuVasive over to Alphatec.  Did

11:46 10   you discuss that decision with anyone at NuVasive?

11   A.   Well, I was frustrated with the people that were at

12   NuVasive at that time.

13   Q.   And did you have any conversations with anyone at NuVasive

14   about using or utilizing Alphatec products?

15   A.   Well, we had discussions with Mr. English, John English at

16   that time.

17   Q.   And what is your recollection of what Mr. English told you

18   about your use of Alphatec products?

19   A.   So this is very difficult.  I would like to clarify --

11:47 20        MR. CARDWELL:  Objection, hearsay.

21        THE COURT:  Well, as to what Mr. English said,

22   counsel, what do you say to that?

23        MR. BUSCH:  Mr. English was a NuVasive employee at the

24   time, direct NuVasive employee.

25        THE COURT:  For admissions of a party opponent you

1    mean?

2              MR. BUSCH:  Yeah, absolutely.

3              THE COURT:  Or for state of mind.

4              Overruled.

5              So, Doctor, you can answer the question.

6              Mr. Busch, why don't you repeat so we're clear.

7    BY MR. BUSCH:

8    Q.   Yes.  Do you recall what your discussions with Mr. English

9    were about your use of Alphatec products?

11:48 10  A.   Yeah, this is one of the most upsetting thing in this --

11    that I play a role in.

12              Mr. English was a physician -- I'm not sure what the

13    exact role was, but he was the interaction for the company with

14    physicians who were advisers.  And so he is like one of the

15    main contacts at this point after Pat Miles had left.

16              And I had presented to him -- my understanding is he's

17    an attorney as well.  I presented to him my anxiety related to

18    my bendable screw project because I had shown them the

19    technology and they had declined it.  I was on a project with

11:48 20  them on another device that didn't use that technology, but

21    that my technology would be subsequently potentially

22    competitive with that device that I'm helping them create.

23              And so I talked to him directly about that.  I said,

24    look, this is a conflict.  I'm creating this technology, I've

25    shown it to you, but you declined it.

```
     1          He said to me specifically, I'll never forget this, he
     2     said to my face, You showed it to us first, we've passed on
     3     this technology, we wish you well and hope that you can try to
     4     bring this to market with someone else.
     5          And that's what he said to me.
     6          In subsequent discussions with him when I started to
     7     move my practice to using Alphatec products, he threatened me
     8     personally.  He said, Your royalty stream related to the
     9     current project that you're working with will be at risk if you
11:49 10    continue to work with Alphatec.
    11          THE COURT:  Royalty stream on the NuVasive project.
    12          THE WITNESS:  On the NuVasive project.  That's what's
    13     so upsetting to me.
    14          THE COURT:  Thank you.
    15          THE WITNESS:  You're welcome.
    16          THE COURT:  Counsel.
    17     BY MR. BUSCH:
    18     Q.   Has NuVasive followed through with that threat and paid
    19     you any royalties on the ALIF product?
11:50 20    A.   Not as of yet.
    21     Q.   In fact, Doctor, did NuVasive kick you off the ALIF
    22     product launches or labs that were associated with that?
    23     A.   Yes.  So this product that I had worked on for over
    24     several years, actually, to get to market had a final lab which
    25     I was prepared to come out, I initially received emails about
```

1    joining and then subsequently was disinvited, basically, from

2    going.

3    Q.   Dr. Glazer, did you receive a subpoena from NuVasive in

4    this case to produce certain documents?

5    A.   Yes.

6    Q.   And in response to receiving that subpoena, sir, did you

7    seek legal counsel to represent you in responding to the

8    subpoena?

9    A.   Yes.

11:51 10    Q.   And who did you ultimately end up hiring to help you

11    respond to the subpoena?

12    A.   You, sir.

13    Q.   And did you and I have any sort of previous legal

14    relationship prior to that?

15    A.   No.

16    Q.   And in response to the subpoena that NuVasive sent you,

17    did you review emails and make a production of email documents?

18    A.   Yes, to the best of my ability, yes.

19    Q.   And did you search more than one email account to try to

11:51 20    find responsive documents?

21    A.   Yes.

22    Q.   And, Dr. Glazer, did you also attempt to find responsive

23    text messages to the subpoena?

24    A.   Yes.

25    Q.   And were you able to find responsive text messages?

1    A.    I believe so.

2    Q.    And for how many days did you have responsive text

3    messages that you could provide to NuVasive in response to the

4    subpoena?

5    A.    It's 30 days.

6    Q.    And why was it limited to only 30 days?

7    A.    Because my cell phone has a 30-day limit of text messages.

8    Q.    And why would you activate the 30-day limit of text

9    messages on your cell phone?

11:52  10    A.    Well, unlike many of my colleagues, I still give out my

11    personal phone number to a lot of my patients, and I thought,

12    again, for HIPAA compliance issues, I didn't think that type of

13    information would be wise to have on my cell phone for a long

14    time.

15    Q.    I'm going to show you what has been marked as Defense

16    Exhibit Number 93 to your deposition, sir.

17          THE COURT:  You mean for the trial.

18          MR. BUSCH:  For the trial.  I keep saying that, sorry,

19    Judge.

11:52  20    BY MR. BUSCH:

21    Q.    And I'll submit to you these were the text messages that

22    you produced in response to the subpoena that you received from

23    NuVasive in this case.

24          THE COURT:  And I don't think we've gotten to this

25    one.

1            Any objection, 93?

2            MR. CARDWELL:  I don't understand the relevance.

3     These are text messages from 2021.  I'm sorry, May 29 of 2020.

4            MR. BUSCH:  Your Honor, NuVasive asked for these

5     documents to be produced from Dr. Glazer in a subpoena.

6            He produced them, and it goes to show the

7     communications that Dr. Glazer was having with Mr. Day during

8     the -- you know, during the course of the relationship.

9            MR. CARDWELL:  Well, this would also be communications

11:53 10    that were five months after Mr. Day's -- I'm sorry, two months

11    after Mr. Day's restrictions ended, at least per your last

12    order, and we asked for text messages and all communications

13    from, I believe, 1/1/19 to the present.  And this was all they

14    were able free produce.  I'm sorry, 1/1/18.

15           MR. BUSCH:  I think the Court has just heard why this

16    was, but this is, in fact, a full production of text messages.

17    Unlike the Charlie Crockett one, it has both sides' responses

18    and it is a response to the subpoena and it shows the types of

19    communications and -- that Dr. Glazer and Mr. Day had.

11:54 20          THE COURT:  So, I guess, counsel, on -- given that the

21    objection is relevance, I'll overrule that objection.  They can

22    be admitted.

23           I understand the argument about the time period, but I

24    think this may be reflective on issue of relationship.  So I'll

25    allow it.  93 is in.

```
  1            MR. BUSCH:  Yes, your Honor.
  2            (Exhibit 93 received into evidence.)
  3   BY MR. BUSCH:
  4   Q.   Dr. Glazer, are these text messages that you produced to
  5   me to produce to NuVasive in response to the subpoena?
  6   A.   Yes, sir.
  7   Q.   And tell the Court what you are texting with Mr. Day about
  8   here on May 29th.
  9   A.   I believe this is basically Tim had a ruptured Achilles
11:55 10   tendon and had surgery for that, and I'm just --
 11            THE COURT:  And, Dr. Glazer, can you keep your voice
 12   up, I'm --
 13            THE WITNESS:  I apologize.
 14            THE COURT:  You can move the microphone closer.
 15            THE WITNESS:  I see.
 16   A.   Again, these are text messages that I sent basically
 17   trying to show my concern after he required surgical
 18   intervention.
 19   Q.   I'm going to turn over to the fourth page of this
11:56 20   production.  There is a discussion between you and Mr. Day here
 21   about something called an Emsculpt.  Do you see that?
 22   A.   Yes, sir.
 23   Q.   What is an Emsculpt?
 24   A.   An Emsculpt machine is a device that was created to create
 25   electrical stimulation for the abdominal musculature.  It was
```

1    created for a plastic surgery application where you could lose

2    some weight as well as strengthen your abdominal structure.

3    All of my back patients I think would benefit from it.  So I

4    bought a machine and Mr. Day and I and another physician

5    actually created a business to use that in my practice.

6    Q.   Flip over a couple of more pages, Dr. Glazer, you'll see a

7    photograph of Mr. Day's children that he shared with you.  Do

8    you see that?

9    A.   Yes.

11:57 10    Q.   And the text messages from this time period, this May of

11    2020 time period, is this indicative of your friendship with

12    Mr. Day?

13    A.   Yeah, Tim and I have become close friends.  Our families

14    have learned about his children, I've met his mother.  I know

15    his two brothers, and it's been a positive personal

16    relationship for me.

17    Q.   Dr. Glazer, I'm almost done here.

18          Could you tell the Court whether or not Mr. Day is in

19    any way responsible for your decision to reduce your usage of

11:57 20    NuVasive product beginning in Q2 of 2019?

21    A.   No.

22    Q.   And why is that?

23    A.   Because I had made the decision to move to Alphatec

24    products prior to Tim's moving from NuVasive to Alphatec.

25    Q.   And who would you say in your own words was the most

1    influential helping you make that decision?

2    A.    Pat Miles.

3              MR. BUSCH:  Thank you, Dr. Glazer.

4              THE COURT:  Thank you.

5              Cross-examination.

6              MR. CARDWELL:  Thank you, your Honor.

7              THE COURT:  Do you want the ELMO off?

8              MR. CARDWELL:  If we could start with the ELMO,

9    please.

11:58 10            THE COURT:  It's on.

11                        CROSS-EXAMINATION

12   BY MR. CARDWELL:

13   Q.    Good afternoon, Dr. Glazer.

14   A.    Good afternoon, sir.

15   Q.    Let's start with what you said about Mr. English.

16         You said that Mr. English said that if you work with

17   Alphatec, you will put your royalties at risk.  Is that what

18   you testified to?

19   A.    Yes, sir.

11:59 20   Q.    And at that time, you were working on NuVasive's ALIF

21   project, correct?

22   A.    Correct.

23   Q.    And you're exposed to all kinds of trade secrets and

24   confidential information when you work on one of these

25   projects, correct?

1    A.    There are device-related instrumentation specific

2    information that is presented, yes, that is correct.

3    Q.    You're trying to build a better mousetrap, right?

4    A.    You're trying to provide newer technology to improve

5    patient care, yes.

6    Q.    And what made Mr. English upset wasn't the bendable screw

7    project, it was the fact that you were working on Alphatec's

8    ALIF project at the same time, correct?

9    A.    No, no, I don't believe so.  I believe it was related to

12:00 10   the use of other instrumentation systems from Alphatec rather

11   than NuVasive.

12   Q.    This is a document you produced, correct?

13   A.    Yes.

14   Q.    And it identifies you as a surgeon on the design team for

15   Alphatec's IdentiTI ALIF inner body system, correct?

16   A.    That is correct.

17   Q.    And this is why Mr. English was upset when he learned

18   about this, correct?

19   A.    I don't believe so.

12:00 20         He knew about that prior to being involved in this

21   project, that I was going to be able to try to use my bendable

22   screw technology for this application.

23   Q.    And your contract with NuVasive precludes you from working

24   on a competitive ALIF system, correct?

25   A.    That is true in terms of the contract.  However, the

1    personal discussion I had with Mr. English specifically related

2    to this technology, and this is what's personally so

3    frustrating, sir.  The reality is I don't -- I am the most

4    honest human being that I can be in life, like everyone else, I

5    imagine, but the reality is that when I spoke specifically to

6    him when they declined the use of the -- of acquiring my

7    bendable screw technology, he said specifically to me, You

8    showed NuVasive the technology first, you gave us the first

9    right to pass on it, and we have passed on it, so you are free

12:01 10   to go and use this technology.  That's what he said.  And he

11   said and we wish you well and do well with it.

12   Q.   I don't doubt that, sir, but this is working on a

13   competitive system.  And there is no mention of a bendable

14   screw in this document that you produced, is there?

15        MR. BUSCH:  Objection, argumentative.

16   A.   The reality --

17        THE COURT:  Well, overruled on that basis, given that

18   it's cross-exam.

19   A.   I'm sorry, sir, can you repeat the question?

12:02 20   Q.   There's no mention of a bendable screw in this document

21   that you produced that identifies you as a design surgeon on

22   Alphatec's ALIF project, is there?

23   A.   Sir, to answer your question, not in this particular

24   presentation.  The concept was that this instrumentation, as

25   you see, had no fixation, had none, zero.  The concept was to

1    apply the bendable screw to this technology to use it for the

2    ALIF project.

3    Q.   And there was a question about royalties.  Royalties from

4    the NuVasive project aren't even due and payable yet, are they?

5    A.   I don't know that, sir.  I'm not aware of when it came to

6    market exactly or when it's supposed to be due.

7           I understand that it already hit -- achieved market

8    acceptance.

9    Q.   So I want to understand this.  So this identifies you as a

12:03 10   design surgeon on Alphatec's ALIF inner body system, correct?

11   A.   Is says this on the front page of this, yes.

12   Q.   And you're, in fact, a member of the design team?

13   A.   I was applied to that design team to use the bendable

14   screw technology which I had presented to NuVasive to

15   incorporate into this design.

16   Q.   And since this has been brought up, are you aware that

17   NuVasive said it would place you back on this design team, the

18   ALIF design team if you could just obtain a declaration from

19   Alphatec that says the bendable screw is the only thing you're

12:04 20   contributing to their ALIF project?  Did you know that?

21   A.   No, sir.

22   Q.   Your attorney hasn't shared that with you?

23   A.   I haven't seen any document --

24           MR. BUSCH:  Your Honor, making accusations now.

25           THE COURT:  Counsel, I'm assuming that was an

1    objection.

2              MR. BUSCH:  Yes, your Honor, I'm sorry.

3              THE COURT:  So, counsel, you can rephrase.

4    BY MR. CARDWELL:

5    Q.   You've had discussions with your lawyer about settlement

6    proposals or ways to resolve your issues with NuVasive, have

7    you not?

8    A.   I believe that Mr. Busch has had discussions with NuVasive

9    attorneys trying to resolve this discussion, yes.

12:05 10   Q.   At any time have you gone to Alphatec or thought it was

11   necessary to go to Alphatec to provide a declaration from

12   someone that says that your contributions to this ALIF project

13   are limited to the bendable screw technology?

14   A.   I'm sorry, you'll have to repeat that.  Because the

15   reality of this, my discussions with Alphatec regarding

16   anything that has related to my previous work at NuVasive has

17   not been received, honestly, with a lot of assistance.  The

18   reality is they don't want to share contracts, they don't want

19   to share anything with NuVasive at this point because of the

12:05 20   litigation between the two companies.

21              I'm caught in the middle, sir.  Okay.  The reality is

22   I presented to Mr. English this potential conflict way ahead of

23   time.  And I guess I was wrong.  I trusted him.  I trusted him

24   as a colleague and as a friend to do the right thing and to

25   actually -- possibly it's my fault obviously because I didn't

1    get it in writing from him.

2            But the reality is that this is what happened.  I

3    talked to him about it.  He said NuVasive passed on the

4    technology.  He said you could try to apply it if someone else

5    purchased the technology, and that's what I did.  And now

6    I'm -- we're here today because I'm in conflict doing exactly

7    what I told him was going to happen.

8    Q.   NuVasive had no knowledge of your participation on

9    Alphatec's ALIF project until you produced this document,

12:07 10   correct?

11           MR. BUSCH:  Objection, asked to assume what NuVasive's

12    knowledge of something was.

13           THE COURT:  Sustained as to that question.

14    BY MR. CARDWELL:

15    Q.   The issues you've had with NuVasive which you attribute to

16    John English, that came after you produced this document,

17    correct?

18    A.   I don't know that initial time point.

19           The discussion regarding any work that I was doing

12:07 20   with Alphatec at that point was very early on.  I was still

21    involved in the project of the ALIF when John English knew I

22    started using Alphatec products, and he gave me that

23    threatening tone of voice, saying that if I continued to do

24    anything related to any work with Alphatec, that I would be at

25    potential losing royalty streams.

1    Q.    Again, are you acknowledging that you're on Alphatec's

2    ALIF team, are you or not?

3    A.    I help produce a device that I wish to apply a bendable

4    screw technology which they bought from me.

5    Q.    Are they going forward -- Alphatec is not going forward

6    with your bendable screw technology, though, are they?

7    A.    Not as of yet.

8    Q.    But here, despite their decision not to go forward with

9    that technology, you're shown as a member of their ALIF

12:08 10    project, correct?

11    A.    Again, if you look at the design of this device on this

12    picture, there is no fixation, sir.  There is no way to affix

13    that to the vertebral body.

14          The purpose of my joining this team was to try to use

15    the bendable screw technology for the ALIF.

16    Q.    But you could understand why NuVasive would be upset if

17    you were sharing confidential information about its new ALIF

18    system with a competitor, can't you?

19    A.    Sir, I would never do that.  In reality, this technology

12:09 20    has nothing to do with the technology from the ALIF system from

21    NuVasive.  They're completely distinct technologies.

22    Q.    They both are instrumentation for the same type of

23    surgery, correct?

24    A.    Completely different technology, sir.

25    Q.    My question is, they are both instrumentation for the same

1    type of surgery, correct?

2    A.    They are both implants to put into the intravertebral

3    space, yes.

4    Q.    From an anterior approach.

5    A.    It can be put in.  In the devices that I was using the

6    bendable screw technology could be put in through an anterior

7    or a lateral approach.

8    Q.    Now, I mean no ill will by this question because I believe

9    it was a frivolous lawsuit, but do you recall being sued May 10

10   of 2018 by a person named John Hugo?  Again, I believe it to be

11   a frivolous lawsuit.  But do you recall that being filed?

12   A.    Yes, sir.

13   Q.    And that lawsuit finally ended, I believe, after a number

14   of motions to dismiss and other things --

15   A.    Actually, sir, it was reopened, and it is still going

16   potentially to trial.

17   Q.    Again, I believe it to be frivolous, I'm not -- that's not

18   the point of my question.

19           Do you recall receiving a litigation hold for that

20   lawsuit?

21   A.    A litigation what?

22   Q.    A litigation hold.

23   A.    I don't know what that actually means.

24   Q.    Do you recall being instructed to preserve documents?

25   A.    I don't recall that, sir.

```
 1   Q.   Beth Israel Deaconess is also a defendant in that lawsuit,
 2   correct?
 3   A.   I believe so, yes.
 4   Q.   And no one at Beth Israel Deaconess instructed you to
 5   preserve documents and not destroy them?
 6   A.   I don't recall that, sir.
 7        But I wouldn't destroy patients' records in general,
 8   so why would I do that?  I don't understand the question.
 9   Q.   If you don't recall receiving a lit hold, that's fine.
10        Now, you were nearly -- you used NuVasive products
11   nearly exclusively in your practice for several years, correct?
12   A.   I used the majority of -- in the majority of cases I used
13   NuVasive products for the majority of cases, correct.
14             MR. CARDWELL:  Exhibit 98, please.
15             (Discussion off the record.)
16   Q.   So this is a chart that Alphatec provided us.  Am I
17   correct that you used no Alphatec products prior to the third
18   quarter of 2019?
19   A.   Yes.
20   Q.   And then it was a five-case trial, correct?
21   A.   Correct.
22   Q.   And after that five-case trial, you used no Alphatec
23   products in the fourth quarter of 2018; is that right?
24   A.   Again, it took a long process to go through the
25   application through Beth Israel.  I wasn't involved in that --
```

1    those discussions, but it takes a long time to get any product

2    in onto the formulary of BI.

3    Q.   Is the answer, no, you used no Alphatec products in the

4    fourth quarter?

5    A.   I believe that was the end of the trial.  I think so, I

6    don't recall specifically.

7    Q.   And then in the first quarter of 2019, you used, it says,

8    $34,000 worth of Alphatec products.  I would assume that's four

9    to six surgeries?

12:13  10   A.   Again, sir, I don't know the cost of the individual

11   implants relative to the surgery, so I can't tell you exactly

12   how many surgeries.  That could be one scoliosis surgery as far

13   as I know.

14   Q.   If we know that five surgeries in the third quarter of '18

15   had a value of $25,190, and we know that it was only -- it was

16   the same products that were approved for your use in the first

17   quarter of 2019.  Does that indicate that it's a similar number

18   of surgeries?

19   A.   Again, sir, the problem is there's an incredible

12:14  20   difference in cost per surgery.  I don't know what that

21   actually means.

22   Q.   Okay.  So it could be one surgery in two thousand --

23   A.   It could.

24   Q.   It would be three?

25   A.   Potentially.

1    Q.   But it could not be ten, could it?

2    A.   I don't know.  Again, the reality is, if it's a 1 level

3    surgery, it depends on the cost of the implants.

4    Q.   But, to your knowledge, that's a similar dollar figure

5    between the third quarter of '18 and the first quarter of '19.

6    A.   I think what you're getting at is if looking at this

7    there's a dramatic ramp up in terms of the number of implants

8    that were used in 2019 up to 2020.  Basically what that

9    indicates is I started to convert most of my business or a lot

12:15 10   of my business from the NuVasive implants to the Alphatec

11   products.

12   Q.   Am I correct that Stewart Temple and Scott English came

13   and met with you during some of the surgeries where you used

14   Alphatec products in the third quarter of 2018?

15   A.   I recall Scott English coming to Boston to watch a

16   surgery.  I don't remember Stewart Temple, unfortunately.

17   Q.   And you had a conversation with Mr. English where you told

18   him about the import of being well represented in the OR,

19   correct?

12:16 20   A.   I don't recall that specifically.

21   Q.   Well, you at least acknowledge it's true that a company

22   can have the best products in the world, but you won't utilize

23   them unless they can support them properly in the operating

24   room.

25   A.   I believe that good representation of the company in the

1    OR is helpful as a surgeon in terms of logistics.

2    Q.   Well, isn't it true that you were once approached by a

3    company that offered you a 50 percent discount on its products

4    and you said, Well, that's great, but you don't have adequate

5    representation?

6    A.   The hospital presented an option at one point for a new

7    spine vendor to be brought on.  The problem was that they had

8    no representation in the Boston area.  Again, my life is

9    dependent, or at least when I was taking trauma call routinely

12:17 10   at Beth Israel, of being able to get a patient to the operating

11   room safely and with equipment readily available to use to take

12   care of them.  That requires a representative from a company to

13   be available 24/7 in order to provide that service.

14          So, inherently, no Harvard teaching hospital will want

15   to have a company without representation.

16   Q.   I don't want to get your testimony -- I want to make sure

17   I get your testimony correct.

18          MR. CARDWELL:  Thomas, would you pull up 838.

19          MR. McFARLAND:  Page 838 of --

12:18 20          MR. CARDWELL:  Yes.

21   BY MR. CARDWELL:

22   Q.   Do you recall testifying in arbitration several months

23   ago?

24   A.   Yes, sir.

25   Q.   And I said, Do you agree it takes a team to support you to

1    be able to perform the number of surgeries that you perform?

2         And you said absolutely.

3         And I said, Good sales reps are part of that team.

4         And you said, One would hope.

5         I said, A company can have the best products in the

6    world, but if they can't support those products in the

7    operating room, you're not going to use them, true?

8         And you said, That's true.

9         You agree with that, right, sir?

12:18 10   A.   Yes.

11   Q.   And Tim Day is a fantastic sales rep?

12   A.   I think Tim does a good job as a sales rep.  I think the

13   other people that I trained over the last 15 years, 25 years in

14   Harvard and Boston in my operating room, I think all of those

15   sales reps are quite good.  And the reason for that, sir, is

16   because of the number of surgeries and the diversity of the

17   pathology that I treat in my practice.

18        I teach them why I'm using the implant, I teach them

19   why I'm using their instrumentation, I'm teaching them the

12:19 20   technique in terms of trying to apply those implants.  That's

21   why they're good representatives, sir.

22   Q.   Colin Behrmann, excellent representative.

23   A.   He is.

24   Q.   Adam Richard, excellent representative.

25   A.   I think he's very good.

1    Q.   Those were your last three dedicated NuVasive

2    representatives before they left NuVasive and joined Alphatec,

3    correct?

4    A.   Yes, sir.

5    Q.   We talked about the football game on direct examination.

6         Mr. Day was at that dinner, wasn't he, that dinner the

7    night before?

8    A.   No, sir, I don't believe he was.

9         MR. CARDWELL:  Mr. McFarland, pull up page 870.

12:20 10   A.   I don't recall him being there, that's for sure.

11        MR. McFARLAND:  870?

12        MR. CARDWELL:  870 to 871.

13   BY MR. CARDWELL:

14   Q.   If you would -- I say, question, on line 4, Do you recall

15   having dinner with Pat Miles, Tim Day, and others the night

16   before the game?

17        And you answered, Yes.

18   A.   Again, I may have included Tim in that, but I don't have

19   any recollection of Tim being at the dinner.

12:21 20        I certainly remember Pat Miles and his wife, Candace,

21   was there, and my wife was there.

22   Q.   Mr. Day certainly went to the game with you?

23   A.   Certainly.

24   Q.   And you certainly testified before that he was at that

25   dinner.

```
 1    A.    Again, it was included in that -- your question, but I
 2    remember specifically Pat and not Tim being there at dinner.
 3    Q.    The Napa trip that was talked about on direct examination.
 4    No question Alphatec paid for that.
 5    A.    Again, in lieu of being paid for my presentation and the
 6    amount of time related to that presentation to the board of
 7    Alphatec, I was invited by Pat for the weekend to Napa, yes.
 8    Q.    And Mr. Day and his family or his wife joined you.
 9    A.    Yes.
10    Q.    I'm going to ask you about a few exhibits.
11          Before I do this, you -- I understand that you have a
12    30-day delete on your text messages.  Do you have a similar
13    function on your emails?
14    A.    I don't know, sir.
15    Q.    Okay.
16          MR. CARDWELL:  Thomas, Exhibit 19, please.
17    Q.    While he's pulling that, you frequently exchange text
18    messages -- I mean emails with Mr. Day, don't you?
19    A.    I believe we've texted and e-mailed and talked on the
20    phone many times.
21    Q.    And you often use his personal timday83@gmail.com address,
22    don't you?
23    A.    I don't recall that, sir.  I don't know his specific email
24    address.
25          MR. CARDWELL:  Would you go down to the bottom of this
```

1    exhibit, please, Mr. McFarland.

2    Q.   I have an email from Paul Smith at steward.org.  Who is

3    that?

4    A.   Paul Smith was a former employee of the Steward

5    organization at St. Elizabeth's.

6    Q.   St. Elizabeth's is where you now perform a number of

7    surgeries.

8    A.   Correct, sir.

9    Q.   And this email is dated November 21, 2019?

12:23 10   A.   Yes, sir.

11   Q.   And that was while Mr. Day was still under his non-compete

12   restrictions, correct?

13   A.   I believe that's correct, yes.

14   Q.   And you made an email introduction between Mr. Day and

15   Mr. Smith?

16   A.   I believe that's correct.

17        The reality of that is that I didn't know who to

18   contact in corporate at Alphatec to help me just facilitating

19   obtaining instrumentation at the newer hospital.  And so I used

12:24 20   the introduction to Tim in order to help me with that.

21   Q.   So there was no one else at Alphatec --

22   A.   I could have given him Pat Miles' number, but I didn't

23   think that was appropriate.  So I gave Tim, who was the

24   regional person that I knew was working for them, so that's why

25   I did that.

1    Q.   And you didn't produce the email where you introduced the

2    two of them, did you?

3    A.   No, I don't know where that would have come from actually

4    or whether it was a text versus an email.

5    Q.   It says per introduction via email yesterday evening with

6    Dr. Paul Glazer, do you see that.

7    A.   I did, I just don't know where that's coming from.

8    Q.   Again, you used Mr. Day's personal email address in this

9    one, correct?

12:25 10   A.   Yes, sir, it looks like I did.

11   Q.   And what is it that you wanted Mr. Day to do for

12   Mr. Steward?

13   A.   Mr. Smith I believe.

14   Q.   Mr. Smith, I apologize.

15   A.   No problem.

16        The reality is I just wanted to try to bring some of

17   the products I've been using at Beth Israel to the newer

18   hospital.

19   Q.   And did that happen?

12:25 20   A.   Yes.

21        MR. CARDWELL:  Exhibit 27, please, Mr. McFarland.

22        Go down.  Right there.

23   Q.   You remember having a dinner with Mr. Day and Mr. Richard,

24   Colin Behrmann, and Pat Miles back in May of 2019, don't you?

25   A.   Yes.

```
 1              MR. CARDWELL:  And if you would go down, please.

 2   Q.   I show you the itinerary for that dinner.  You probably

 3   don't know whether Mr. Day picked up Pat from the airport or

 4   not, do you?

 5   A.   I've never seen this prior to this discussion in reality

 6   in terms of what the plans of this visit were.  Again, I knew

 7   Pat was coming into town, he wanted to have dinner and through

 8   the contact of Tim and I believe Colin and I believe Adam was

 9   there for dinner.  We grabbed dinner together.

12:26 10             It was not a major discussion of business by any

11   means.

12   Q.   Well, it says that one of the topics of discussion they

13   wanted to have was hospital approval for the entire Alphatec

14   portfolio.  Do you see that?

15   A.   I do.  But, again, I don't recall that being a topic of

16   discussion at all during dinner.

17   Q.   Do you recall the topics of discussion?

18   A.   Yeah, I think we were talking about the football games.

19   Q.   Were there other topics of discussion?  Did you talk about

12:27 20   football the whole time?

21   A.   And usually family.

22   Q.   And another topic of discussion they wanted to cover is

23   your upcoming visit to ATEC office in mid-June.  Do you recall

24   talking about that?

25   A.   Not specifically.  I don't think -- I don't recall a trip
```

1   in June.

2   Q.   What about feedback on the products that you had used thus

3   far?

4   A.   Again, the reality is at this point I believe I'm already

5   making the move to Alphatec products at the main hospital.

6   Q.   My question, sir, was simply do you recall talking --

7   A.   I don't have any specific recall of product feedback at

8   that point, sir.

9   Q.   Do you recall talking about the Napa trip and football

12:28 10   game plans?

11   A.   I do recall that actually.

12   Q.   Okay.

13        MR. CARDWELL:   Exhibit 10, please, Mr. McFarland.

14        If you would go down to the bottom.

15   Q.   Do you recall in December of '18 having discussions with

16   Joe Boyle at BIDMC about utilizing some different NuVasive and

17   Alphatec products?

18   A.   I don't recall this specifically.

19   Q.   Let's go up.

12:29 20   A.   But the reality is, again, the discussions between myself

21   and Mr. Boyle were always difficult, meaning that he's in a

22   position which actually allows specific implants and

23   discussions with companies to bring instrumentation into the

24   operating room.

25        As I tried to explain before, my practice is very

1    complex.  I do adult spinal revision deformity surgery.  It

2    involves very specific types of technology in order to create

3    the best outcomes for patients.  I was constantly in touch with

4    these people during my discussions at BI and now at

5    St. Elizabeth's about trying to bring in the best technology

6    for my patients.

7          So these discussions happened every week and my

8    frustration was I could never get these implants in fast enough

9    to help my patients.

12:30 10          MR. CARDWELL:  Would you scroll up some.

11          Keep going.

12          Keep going.

13          I'm sorry, go down some, please.

14          Up a little.

15          There.  I apologize, I want the email before this one.

16   Q.    Okay.  So on May 13, 2019, you send an email to Joseph

17   Boyle, correct?

18   A.    It appears so, yes, sir.

19   Q.    And you say that the posterior ATEC systems you're using

12:30 20   are working well and what is the plan to expand the ATEC

21   portfolio here at BIDMC, correct?

22   A.    Yes.

23   Q.    And this is after Mr. Day joined Alphatec, correct?

24   A.    By the time date on it, yes.

25          MR. CARDWELL:  And would you go to the next email,

1  please, Mr. McFarland.

2  Q.   And Mr. Boyle tells you that they are in the midst of

3  negotiating terms on the ALIF product, correct?

4  A.   ALIF product?

5  Q.   I'm in the midst of negotiating pricing on the plates and

6  screws for ALIF procedures so you can undergo the trial.

7       Do you see that?

8  A.   Yes, sir.

9  Q.   And there's -- that negotiation had to complete before you

12:31 10  could start using ALIF -- their ALIF products for five cases,

11  right?

12  A.   I believe so.

13  Q.   But at that time, ATEC hadn't even sent over a document

14  with pricing.

15  A.   I wouldn't be aware of that, sir.

16  Q.   That's what he says, right?

17  A.   That's what it says, yes.

18  Q.   And then Mr. Boyle says, As I remember it, the

19  conversation started with you saying you only wanted to use one

12:32 20  line from ATEC and that their catalog wasn't strong enough to

21  undergo a full evaluation and inclusion in the RFP.

22       Did I read that correctly?

23  A.   Yes, sir.

24  Q.   Do you recall saying that to Mr. Boyle?

25  A.   No.  In fact, I think he was completely misunderstood by

1    that statement.  The reality was that I wanted to try the

2    posterior pedicle screw systems first, because, again, if I

3    wasn't going to be comfortable using that, then I wasn't going

4    to be comfortable using the majority of their products,

5    because, again, the majority of my surgery involves posterior

6    pedicle screw instrumentation.

7              MR. CARDWELL:  Continue to go up, please.

8    Q.   You send -- you forward your and Mr. Boyle's email

9    conversation to Mr. Day, correct?

12:32 10   A.   I guess so.  According to this I did.

11   Q.   Just because you guys are so close, do you often kind of

12   talk business, talk shop like that or share information with

13   each other?

14   A.   Again, I think you're being very general in terms of

15   your -- that description.

16   Q.   Well, let me ask it this way.

17              When you sent over the text message -- I'm sorry, the

18   email chain between you and Joe Boyle to Mr. Day, what was your

19   purpose for doing that?

12:33 20   A.   To show where it was in the discussion.

21   Q.   So to let Mr. Day know when he could start using -- when

22   you could start using Alphatec 's ALIF products?

23   A.   No.  Again, the problem with this is that there's these

24   constant discussions that go on between the physician, the

25   institution, and then the institution deals with the company.

1    I'm not involved in the discussions between the institution and

2    the company.  I'm just in the initial component of trying to

3    get products for my patients on the shelf.  That's the reality

4    of this discussion today.

5         You're making highlights of individual discussions but

6    the reality is it's a constant battle for me to get the best

7    products on the patient -- on the hospital formulary so you can

8    use them for surgery.

9    Q.   How did you know that Alphatec's ALIF products were the

12:34 10   best products?

11   A.   I didn't, that's why I wanted to do a trial.  I wanted to

12   apply those for my patients.

13         MR. CARDWELL:  Exhibit 11, please, Mr. McFarland.

14         You can scroll down.

15   Q.   You perform your first Alphatec ALIF procedure on May

16   20th, correct?

17   A.   I don't recall that specifically, but possibly, yes.

18   Q.   Okay.  You see the email from Tim Day to the folks at

19   Alphatec that said, Dr. Glazer's first IdentiTI ALIF case two

12:35 20   20 degree small windows, let's go, let the fun begin.

21         Do you see that?

22   A.   Yes, sir.

23   Q.   And Mr. Day is acknowledged being in that surgery, do you

24   recall him being there?

25   A.   I don't recall that specifically.

```
  1              MR. CARDWELL:  Let's go up, Mr. McFarland.
  2    Q.    Who's Ali Shorooghi?
  3    A.    He's a product manager at Alphatec.
  4    Q.    It looks like he's pretty excited that you had tried the
  5    ALIF -- their ALIF product, huh?
  6    A.    Yes, I guess so.
  7    Q.    Exhibit -- again, before that, you had never -- that was
  8    the first time you had used that product.
  9    A.    I believe so.  I don't know, sir.
12:35 10   Q.    First time you had used any of Alphatec's products other
 11    than their posterior screws?
 12    A.    I don't recall that specifically in terms of timeline.  I
 13    also used cervical instrumentation as well as other types of
 14    instrumentation including lateral inner bodies eventually.  I
 15    don't recall the timing of application of those devices, sir.
 16    Q.    Okay.
 17              MR. CARDWELL:  Exhibit 18, please.
 18              Go up.
 19    Q.    Do you recall being at a lab at Alphatec in October of
12:36 20   2019?
 21    A.    Not specifically.  I've been to Alphatec a number of
 22    times, sir.  I've been trying to develop new technologies with
 23    them at this point.  Beyond the bendable screw technology, I've
 24    also been trying to gain a knowledge of this PTP approach,
 25    which is listed here, and I believe I did a cadaver lab there.
```

1    And this Rafael Braghini is one of the people working on that

2    particular approach at Alphatec.

3    Q.    And you see that Mr. Day is asking Mr. Braghini to go into

4    the lab and do a PTP.  Do you see that?

5    A.    I see that, yes, sir.

6    Q.    And that's just -- a cadaver lab is where people can

7    practice surgeries on cadavers, right?

8    A.    Yes, sir.

9          MR. CARDWELL:  Would you go up, please, Mr. McFarland.

12:37 10         Keep going.

11   Q.    And, Mr. Braghini responds, Hi, Tim, after the PTP lab

12   I'll have ALIF's meeting with Dr. Glazer.

13         Do you see that?

14   A.    Yes, sir.

15   Q.    And it says -- do you remember Mr. Day being out at

16   Alphatec the same time you were?

17   A.    I don't recall that, I'm sorry.

18   Q.    Do you recall the substance of the ALIF meeting that you

19   had with Mr. Braghini?

12:38 20   A.    Not specifically.  Again, Mr. Braghini, his focus has been

21   the PTP approach, so I'm not sure why he would be there for an

22   ALIF.

23         MR. CARDWELL:  Exhibit 18, please, Mr. McFarland.

24         I'm sorry, 38.

25         Go down.

```
      1    Q.   This is an email that Mr. Day sent on May 6th of 2019 to
      2    Pat Miles' admin, and they're talking about -- I'm sorry, this
      3    is -- would you go up, please?  I'm sorry, actually go back.
      4         They talk about the May 21 and 22 meeting, and they're
      5    also talking about Mr. Miles coming back in July.  Do you see
      6    that?
      7    A.   Yes, sir.
      8    Q.   Do you recall Mr. Miles coming back to Boston in July?
      9    A.   I don't recall that.
12:39 10    Q.   In Mr. Day's discovery responses, he identified a June
     11    dinner with you, Pat Miles, and Adam Richard.  Do you have any
     12    recollection of that, June of 2019?
     13    A.   No, sir, I'm sorry.
     14    Q.   You just don't remember it.
     15    A.   Just don't.
     16    Q.   Okay.
     17         MR. CARDWELL:  Exhibit A, please.
     18         MR. McFARLAND:  A.
     19         MR. CARDWELL:  Yes, the Crockett.
12:40 20    BY MR. CARDWELL:
     21    Q.   Do you recall speaking with Mr. Day about your potential
     22    utilization of Trinity's biologic products?
     23    A.   Again, the Trinity -- I don't recall a specific discussion
     24    with Tim regarding the Trinity product, but I do recall having
     25    multiple discussions with the hospital regarding the bone graph
```

1  substitute that I was using from NuVasive and the relative cost

2  of that in combination with the Medtronic Infuse product that I

3  was working with.  And those discussions led to my potential

4  trying to try the Trinity product at Beth Israel.

5  Q.   And you frequently utilize Trinity's biologic product,

6  correct?

7  A.   In the past I've used Trinity's biologic product, yes.

8  Q.   And you also -- what other biologics are you using

9  frequently these days?

12:41 10  A.   Again, the reality of this is that there's been a huge

11  number of different biologics that I've used over the years,

12  including, again, the most expensive is the Infuse product from

13  Medtronic which is used routinely in combination off label with

14  the patient's knowledge with NuVasive, Alphatec, and other

15  company's products anteriorly, in addition to bone graph

16  substitutes such as demineralized bone matrices with and

17  without allograft stem cells.

18  Q.   Sir, my question is simply -- I'm not talking about over

19  the years.  Recently, in the last two years, which biologic

12:41 20  products have you used?

21  A.   I've used the Infuse product, I've used the biologic from

22  NuVasive in the past, I've also used the Trinity product, I've

23  also used a newer one for the cervical spine by Ceramide --

24  CeraPedics, I've used a number of host of biologics, sir.

25  Q.   And Mr. Day distributes the CeraPedics product, sir?

1    A.    I believe he is CeraPedics product representative, yes.

2    Q.    And he distributes the Trinity product?

3    A.    I believe he did, yes.

4          MR. CARDWELL:  And if you would go to page 6 of this.

5          This is Exhibit 42, your Honor.  It was Exhibit A

6    until it came in.

7          THE COURT:  Sure.  42.

8    Q.    And this -- let me ask, do you know Charlie Crockett,

9    Charles Crockett?

12:42 10    A.    No, sir.  Who is that?

11    Q.    He -- I'll tell you this.

12          This is a text exchange between Charles Crockett, who

13    was a regional representative for Orthofix, and Mr. Day.

14          And here on May 20, 2019, Mr. Day says, I am working

15    with Glazer on submission we are dealing with headwinds with BI

16    regarding approval, but we will be okay.

17          Did it take some time to get the Trinity biologic

18    product approved at Beth Israel?

19    A.    Again, as I tried to tell you previously, it was a lengthy

12:43 20    process to get anything approved at Beth Israel.

21    Q.    And as Mr. Day says here, he was working with you on the

22    submission?

23    A.    I don't recall that specifically.  Again, the only person

24    that can put in a submission to Beth Israel with a physician

25    who is advocating for a product.

1    Q.   But -- I mean, you don't doubt him when he says he's

2    working with you or at least talking to you on the submission,

3    do you?

4    A.   Again, that's what this reads.  I don't recall that

5    specifically.

6         THE COURT:  Counsel, just given the time, where are

7    we?

8         MR. CARDWELL:  If I could have two seconds, I might be

9    done.

12:44 10        THE COURT:  Thank you.

11        (Discussion off the record.)

12   BY MR. CARDWELL:

13   Q.   At the time -- at this time, May 20th of 2019, Beth Israel

14   was making stocking orders, regular stocking orders of

15   NuVasive's biologic product, correct?

16   A.   I don't know specifically their stocking time, sir.

17   Q.   You used the Osteocel product frequently around May 20th

18   of 2019, correct?

19   A.   I don't recall that specifically, but I've used lots of

12:45 20   Osteocel in my practice in the past, yes.

21   Q.   Last question.  You've performed one surgery this year

22   with NuVasive's products and that was about a month ago in

23   September with the new ALIF product, correct?

24   A.   I did use one product before.  I believe that I've

25   requested, actually, NuVasive products to be produced and they

```
 1  weren't able to be presented for my use.
 2  Q.   That happened once, right?
 3  A.   Actually, it's happened a couple of times.  So the reality
 4  of that is that for the specific patients that I want to use
 5  NuVasive products, I will continue to use them.
 6            MR. CARDWELL:  Thank you.
 7            THE COURT:  Thank you.
 8            Any redirect?
 9            MR. BUSCH:  No, your Honor.
10            THE COURT:  Thank you, sir.  You're excused, thank
11  you.
12            THE WITNESS:  Thank you.
13            THE COURT:  Counsel, what do we have left here?
14            Mr. Cardwell, any other witnesses?
15            MR. CARDWELL:  I don't see how I'm going to call Adam
16  Richard.
17            THE COURT:  So, Mr. Dopp, is he here?
18            MR. BUSCH:  Yes.
19            THE COURT:  All right, let's do this.
20            Thank you.
21            (Pause.)
22            THE COURT:  Good afternoon.
23            THE WITNESS:  Good afternoon.
24            PAUL DAVID DOPP, having been duly sworn by the Clerk,
25  was examined and testified as follows:
```

```
 1              THE COURT:  Thank you.  Please be seated.

 2              Good afternoon.

 3              Mr. Busch.

 4              MR. BUSCH:  Yes, your Honor.

 5                      DIRECT EXAMINATION

 6   BY MR. BUSCH:

 7   Q.    Hello, good afternoon, Mr. Dopp.  I'm over here on the

 8   other side of the room.  How are you?

 9   A.    I'm doing well.

12:47 10   Q.    Good, good, sir.

11              So could you please state your full name for the

12   Court.

13   A.    Paul David Dopp.

14              THE COURT:  And thank you.  Could just spell your last

15   name?

16              THE WITNESS:  D as in David, o, two ps as in Paul.

17              THE COURT:  Thank you.

18   BY MR. BUSCH:

19   Q.    Mr. Dopp, could you please tell the Court where you

12:48 20   reside.

21   A.    I reside in Atlanta, Georgia.  I'm a co-leader in forensic

22   accounting practice of B. Riley Financial.

23              THE COURT:  Thank you.

24   Q.    And how long have you been working at B. Riley Financial?

25              MR. CARDWELL:  We'll stipulate to his qualifications
```

1    and that his resumé is accurate.

2            THE COURT:  Mr. Busch, I'll note that for the record.

3            MR. BUSCH:  That will suffice.

4            THE COURT:  Thank you.

5    BY MR. BUSCH:

6    Q.   Mr. Dopp, have you had an opportunity to review the

7    reports that Ms. Decker has prepared in this case?

8    A.   I have.

9    Q.   And I believe you filed a response report, at least to

12:48 10   maybe one of her first reports.  Can you explain that to the

11   Court?

12   A.   Yes, I think there were either one or two, I'm losing

13   track now, but I had filed a report in response to one of her

14   earlier reports before the most recent one.

15   Q.   And you had not formally done any official report in

16   response to her latest supplemental report; is that correct?

17   A.   Yes.

18   Q.   Mr. Dopp, are you familiar with the damages that

19   Ms. Decker is claiming NuVasive has suffered as a result in the

12:49 20   loss in sales to Dr. Shin?

21   A.   Yes.  I think it's lost profits rather than lost sales.

22   Q.   Lost profits, yes, sir.  Are you familiar with how she

23   analyzed that?

24   A.   I am based on my review of her report.

25   Q.   Okay.  And based on your review of her supplemental

1  report, could you tell the Court what your concerns or

2  critiques are with her Shin analysis?

3        MR. CARDWELL:  Objection, undisclosed opinion.

4        THE COURT:  Overruled based on what I thought was in

5  here, so -- overruled.

6        You can answer.

7  A.   I was concerned that it was a different methodology than

8  what she had used in the previous couple of reports as it

9  related to Dr. Glazer.  So instead of doing a sort of an before

12:50 10  and after projection compared to actual, she identified the

11  lost sales by being given that information from someone named

12  Mr. Hens, who I think is a NuVasive employee.  So she just took

13  those numbers, subtracted the avoided costs, and calculated

14  lost profits based on that information that Mr. Hens gave her.

15  Q.   And what is wrong, in your opinion, with that approach?

16  A.   Well, there was no analysis that she performed to identify

17  whether those assumptions she was asked to make were

18  reasonable.  She doesn't, for example, compare what the

19  historical sales that NuVasive made to Dr. Shin and then what

12:50 20  his actual sales were after that in 2019.  She just accepted, I

21  guess, the testimony of somebody named Mr. Hens who said we

22  will give that you information, you don't need to calculate it,

23  we're just going to give you what we think are the lost sales.

24  Q.   And is that a reasonable approach in your opinion?

25  A.   I've not ever seen that where the client asks you to --

1   here, I'm going to give you the lost sales, you don't do the

2   work.

3   Q.   And was there anything else with respect to Dr. Shin's

4   calculations or analysis specifically as it related to the

5   COVID virus?

6   A.   Well, I did notice that there was an exhibit that she had

7   that showed the trend in the historical sales revenue by

8   NuVasive to Dr. Shin, it was over the period 2016 to 2020, and

9   in the 2020 period sales had declined, but it wasn't put in the

12:52 10   context of how much of that decline was attributed to COVID and

11   how much of that decline is attributed to the alleged actions

12   of Mr. Day.

13   Q.   If Mrs. Decker had performed at same COVID analysis that

14   she did on Dr. Glazer, what would the 2020 sales have showed to

15   NuVasive?

16   A.   Well, it would have shown that the decline, if any, was

17   less dramatic if she accounted for or put into context that

18   that decline in sales in 2020 was attributed to some portion

19   for the impact of COVID.

12:52 20   Q.   And did you see -- as you looked through your review of

21   her work, did you see whether or not the -- could you tell

22   whether or not NuVasive actually lost any sales in -- during

23   the loss period relative to their historical sales to Dr. Shin?

24   A.   If you could get me her report I could show you

25   specifically on the exhibit.  Because I'd rather not guess.

```
 1    Q.   Her report, Mr. Dopp, I believe is 43.
 2              MR. McFARLAND:  35.
 3              MR. BUSCH:  35, not even close.
 4    A.   In the binder that I have?
 5    Q.   Yes.  That's already been admitted into evidence,
 6    Mr. Dopp, so you're welcome to look through that, but her
 7    report is there on Exhibit 35.
 8    A.   Okay.
 9              (Pause.)
12:54 10    A.   So looking for the exhibit that has the historical sales
11    for Dr. Shin.
12              So that's Exhibit D13, and Exhibit D13 shows a lot of
13    interesting things.  It shows that in 2019, NuVasive sales to
14    Dr. Shin increased 78 percent.  So that's a huge increase over
15    the historical average.  The previous three years the average
16    453, 78 percent is not quite double, but it's a substantial
17    increase over a period of which nine months Mr. Day had already
18    left NuVasive and gone to ATEC.
19              Do you pronounce it ATEC here or Alphatec?
12:55 20              It doesn't matter, thank you.
21              And then in 2020, it shows that sales decreased 5.5
22    percent from that in 2019.  But if you look at Q2, or quarter
23    2, for 2020, you see that that appears -- that's where the big
24    reduction happens, which appears to be the impact of COVID.
25              So if you normalized Q2 to be preCOVID, you would
```

1   actually have an increase of sales of about 5 percent.

2          So, in other words, this D13 shows that in 2019, long

3   after Mr. Day left NuVasive, NuVasive sales increased

4   significantly to Dr. Shin; and then, in 2020, adjusting for

5   COVID, they appear to have increased again in 2020 over the

6   2019.

7          So what I think in the Decker report they're trying to

8   create this allusion by looking at this 5.5 percent decrease

9   creating this allusion that there was a decline in sales,

12:56 10   trying to attribute that to Mr. Day, when, in fact, the data,

11   once you adjust it for COVID, suggests that the sales are

12   increasing over historical levels.

13   Q.   Mr. Dopp, based on your expertise, do you believe that

14   Ms. Decker's analysis of damages with respect to Dr. Shin is

15   reliable?

16   A.   No, I think it's based on assumptions that haven't been

17   tested yet, the assumption meaning that was Mr. Hens accurate,

18   how many projections has Mr. Hens done, have we ever compared

19   Mr. Hens' projections to past performance to see what his

12:56 20   batting average is.  That's number one.

21          Number two, one of my other critiques is when she

22   subtracts variable costs or avoid expenses, there's only two

23   categories that she subtracts, and there's other categories of

24   variable expenses that she doesn't consider.

25   Q.   Moving on to Dr. Kwon for just a minute there, Mr. Dopp,

1    did you also have the opportunity to analyze Ms. Decker's

2    analysis of Dr. Kwon?

3              MR. CARDWELL:  Same objection, unidentified opinion.

4              THE COURT:  Overruled.

5              You can answer.

6              THE WITNESS:  Thank you, your Honor.

7    A.    Yes, I looked -- I had a chance to look at her report in

8    that connection.

9    Q.    And did Ms. Decker, again, rely upon these alleged

12:57 10  projections for Mr. Hens as the basis for her methodology?

11   A.    Yes.

12   Q.    And tell the Court what you saw as problematic with her

13   approach with Dr. Kwon?

14   A.    Again, if you look at Exhibit D14, the Decker report

15   summarizes the historical sales information made by NuVasive to

16   Dr. Kwon, so pre-2019 and post-2019, and we see that in 2019,

17   sales decreased over the previous average by about 2.3 percent.

18   It's a very small amount.

19             Then in 2020, there is a big decrease.  It's dropped

12:58 20  down by 67 percent.  And so it's hanging out there, again,

21   without any context.  Well, why did that 67 percent decline?

22   Let's have a discussion around that, maybe it's not quite so

23   dramatic, maybe that's wholly attributable to COVID.  I don't

24   know, there's just no analysis into why the numbers

25   dramatically decreased in 2020.

1    Q.   Would you say her analysis with Dr. Kwon is incomplete?

2    A.   Well, it's really not fully put into context of other

3    factors that were occurring that would have caused sales to go

4    down.

5         I think it's incomplete on the damages piece as well

6    that she didn't -- the lost sales didn't do her own methodology

7    but rather just accepted lost revenues and then applied these

8    two categories of variable costs without considering other

9    variable costs.

12:59 10   Q.   I want to turn to Dr. Glazer for just a minute.  The

11   majority of her report relates to that.  And I believe you had

12   three kinds of primary critiques based on her analysis of

13   Dr. Glazer.  Could you explain to the Court what your first

14   concern was as it related to this causal link causation type

15   scenario?

16   A.   Okay.  Well, to be fair, there's a couple of opinions that

17   I had in the report that are no longer really relevant, one of

18   them is she has now accounted for the impact of COVID for

19   Dr. Glazer.  And given that with the passage of time a lot of

12:59 20   the future lost profits have now moved into in the past lost

21   profits category, so the discount rate critique that I had is

22   really a bit moot and not all that material at this point.

23        So my three remaining critiques are that the Decker

24   report fails to consider other causation impacts on the damage

25   calculation, the use of projections for Dr. Glazer rather than

1    the use of actual data for sales from 2019, and the third one

2    is the failure to identify and subtract all variable costs.

3    Q.   And let's just walk briefly through each one of those.

4    The first one relates to the causal link analysis or causation.

5    What was your concerns about her analysis there?

6    A.   My concern was, although she did make an adjustment for

7    the lost -- apparently calculated lost revenues for the impact

8    of COVID-19, she hadn't considered the impact of Dr. Glazer's

9    decision to actually leave NuVasive because he was dissatisfied

01:01 10    with the company and take his business over to Alphatec.

11    Q.   And in your experience as an expert in this area, is that

12    something that she should have considered and analyzed?

13    A.   Yes, as an expert in situations such as this, we're

14    required by our standards to consider all causal impacts so

15    that because the model inherently assumes any difference

16    between the revenues that were projected and the actual

17    revenues were wholly attributed to the defendant or defendants,

18    in this case you have to knock out or quantify and eliminate

19    any other known causal factors.  And there is evidence -- I

01:01 20    think it's not controversial, maybe outside this room, that

21    COVID had a negative impact on the medical sales, that was in

22    NuVasive's press release in 2020.  They said in 2020, COVID, we

23    just don't know what it's going to do, but our sales are going

24    down.  And number two, they withdrew all their earnings

25    guidance, meaning, they didn't know what to project for the

1    next year of what the revenues are going to be because of the

2    uncertainty.

3          So -- so that's been adjusted by Ms. Decker.  However,

4    she didn't consider, you know, the impact or the reduction of

5    damages due to not the actions of Mr. Day, but the decision by

6    Dr. Glazer to move across the street to Alphatec.

7    Q.   And did Ms. Decker report or show anywhere in her report

8    that she had actual knowledge of the rationale behind

9    Dr. Glazer's decision?

01:02 10   A.   Yes.  Interestingly, the -- her list of documents that she

11   considered and relied on listed the declaration from

12   Dr. Glazer, but the body of the report didn't reference it,

13   didn't discuss it, didn't explain whether she considered it or

14   not.  Regardless of what her explanation is, she did not take

15   into account the decision of Dr. Glazer on his own to move to

16   Alphatec as part of her consideration of what the damages were.

17   Q.   Turning to the -- your next category, her use of the

18   projections from 2019 versus the actual data, could you explain

19   that to the Court?

01:03 20   A.   Sure.  Typically when we're dealing with lost profit

21   scenario, you don't know what's going to happen in the future,

22   so the expert has to use assumptions on what would have

23   happened in the future but-for the alleged bad acts.  Then you

24   compare that to what actually happened, and the difference

25   represent the lost sales.

1          In this particular case, Ms. Decker had access to the

2     actual sales of both Alphatec in 2019, as well as NuVasive

3     sales to Dr. Glazer, and the sum of those two would be the

4     total sales to Dr. Glazer.

5          So instead of considering that as the but-for level of

6     sales that NuVasive would have had, she used these projections

7     that were made in the previous year by Mr. Day, and of course

8     they were a million dollars plus higher than what the actual

9     sales were.

01:04 10          So a big chunk of the Decker report damages related to

11     Dr. Glazer relate to failure to meet the projections, which

12     that can't be attributed to anyone's acts.  The companies don't

13     meet their projections all the time.  It just seemed a little

14     unreasonable to include that in the damages.

15          THE COURT:  Mr. Busch, if you want to cover the last,

16     I'll just note for the record for both sides, I have read both

17     reports carefully, and I'll go back to look at them as well.

18          MR. BUSCH:  Sure.

19     Q.   And the final topic being, Mr. Dopp, was the variable

01:05 20     costs, and that's -- your Honor's already read that, so I think

21     she has an understanding, but if you could just comment briefly

22     on it.

23     A.   My 20,000-foot statement on that is that Ms. Decker only

24     identified two categories of variable costs, the cost of goods

25     sold and sales commissions.  This is a billion dollar company.

1    It seems unreasonable and unrealistic to believe a billion

2    dollar company only has two categories of variable costs.

3            Her client explained to her that those were the only

4    two, and she accepted that.

5            I did an analysis called basic -- it's a predictive

6    regression analysis that just looks and sees is there a

7    relationship between SG&A costs and sales and do they go up,

8    does it show a variable relationship, and that's in my report.

9    It showed that there was a variable relationship of about 45

01:06 10  percent.  Ms. Decker identified 20 percent of that as

11   commission, so she and I agree that 20 percent of those

12   variable costs should be excluded.  There's another 20 percent

13   almost, of -- or a little bit more than 20 percent of variable

14   costs that I don't know what it is, she doesn't know what it is

15   because we only have the very summary financial statements, but

16   the data shows there are other variable costs in there that are

17   directly variable, as sales increases, those costs increase.

18   Q.   Final question, Mr. Dopp.  Did Ms. Decker provide the

19   Court with any sort of a formula or summary approach to coming

01:06 20  up with damages if the Court were to find that there were other

21   factors that influenced Dr. Glazer's decision?

22   A.   I don't think so.  I'd have to think that one through.  If

23   there were other percentages you could apply to some of those

24   numbers, but I think the sales are -- the lost sales are

25   overstated.  I think that the avoid costs are understated, so

1    you'd have to really start from the beginning.  You couldn't

2    put a Band-Aid on this thing and fix it.

3            MR. BUSCH:  Thank you, sir.

4            THE COURT:  Less than 45 seconds.

5                        CROSS-EXAMINATION

6    BY MR. CARDWELL:

7    Q.   You and Ms. Decker both talk about a loss period in your

8    reports, correct?

9    A.   Yes.

01:07 10   Q.   And some contracts they -- for example, Mr. Day's

11   contract -- you read the PIIA, correct?

12   A.   Yes.

13   Q.   You saw that he is in breach that his non-compete

14   restrictions extend?

15   A.   That is that the tolling.  I think the legal term is a

16   tolling.

17   Q.   Yes.

18   A.   I read that, yes.

19   Q.   You agree that if a contract tolls, the loss period tolls

01:08 20   with it?

21   A.   Well, it depends what -- that tolling period is sometimes

22   just added on, if there was way two-month breach period, it's

23   added on to the back end.  I'm not a lawyer, so I don't know

24   that I could answer it in all cases.

25           MR. CARDWELL:  That's all.

1          THE COURT:  Thank you.

2          MR. BUSCH:  Thank you, Mr. Dopp.

3          THE COURT:  Thank you, you're excused.

4          Counsel, I appreciate the presentation of evidence.

5          Given our time, what I'm inclined to do is give you a

6    period of time submit not more than 10 pages of your summary of

7    argument in regards to the damages and the contempt proceeding.

8          If there are any chalks that you'd like to attach, no

9    more than five pages of attachments, so 10 pages of text and 5

01:08 10   of attachments.  I think that's how I'll handle argument.

11          If after reading that I think I need to hear from

12   counsel in argument, I'll let you know, but I think I have a

13   good sense of your arguments on either side.

14          Counsel, how much time, would a week's time be fine?

15          MR. CARDWELL:  I was going to ask for -- I was going

16   to ask for ten days, but I think that's the week of real days,

17   so, yeah, that's --

18          THE COURT:  Ten days, what is ten days, Ms. Hourihan?

19          Mr. Busch, do you have a different view?

01:09 20          MR. BUSCH:  Ten days is fine, your Honor.

21          I would just -- I understand your Honor's position on

22   that, but I just wanted to put on the record that we would

23   request that we have oral arguments for closing.  But, you

24   know, obviously, if your Honor feelings differently about it --

25          THE COURT:  Let me -- like I said, let me -- I've

1   stated my position, I'll certainly look at the summaries when

2   they come in.

3           MR. BUSCH:  Thank you.

4           THE COURT:  Ms. Hourihan, what was the date?

5           THE CLERK:  November 8th, counsel.

6           MR. BUSCH:  No problem.

7           MR. CARDWELL:  And we also have the adverse inference.

8   Would you like us to file our requested adverse inference?

9           THE COURT:  Is that something you could just attach to

01:10 10   your summary?

11          MR. CARDWELL:  Sure.  That would be one of our five

12   pages.

13          THE COURT:  Yes.

14          MR. CARDWELL:  And the briefing on the attorney's fees

15   for the spoliation.  I would say that Mr. Busch and I should

16   try to work that out first.  We have worked out similar issues

17   in the past.

18          THE COURT:  I would say if there isn't something that

19   isn't worked out in the filing, in this filing that I've just

01:10 20   said, you should just indicate if there's a need for separate

21   briefing on that what the parties suggest.

22          MR. CARDWELL:  I will.  I just don't think we can

23   redact -- it would cut into his briefing time if he was asked

24   to --

25          THE COURT:  You can just make it a one-page notice,

1  counsel, so it doesn't count against any of your pages about if

2  you weren't able to resolve that what you think the briefing

3  schedule would be.

4        MR. BUSCH:  I'm assuming we will not have the

5  transcript before we --

6        THE COURT:  Ms. Joyce is very good, but she's also

7  working on other things.

8        MR. BUSCH:  This is purely argumentative, is the brief

9  you're expecting from us?

01:11 10        THE COURT:  Yes.

11        Counsel, I appreciate the presentation of all

12  evidence.  There's -- and I will consider oral arguments.

13        Counsel, ten days, you can also continue any informal

14  discussions you may be having about the resolution of this

15  matter as well, so I say that for the benefit of everyone's

16  hearing.

17        Thank you.

18        THE CLERK:  All rise.

19        (Court adjourned at 1:11 p.m.)

20              - - - - - - - - - - - -

21                    CERTIFICATION

22        I certify that the foregoing is a correct transcript

23  of the record of proceedings in the above-entitled matter to

24  the best of my skill and ability.

25

1

2

3    /s/Debra M. Joyce                    November 21, 2021
     Debra M. Joyce, RMR, CRR, FCRR      Date
4    Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                          INDEX

2

3    WITNESS                                                          PAGE

4

     MISTY DECKER
5
         Direct Examination                                             9
6        By Mr. McFARLAND
         Cross-Examination                                             42
7        By Mr. Busch
         Redirect Examination                                          62
8        By Mr. McFARLAND

9    PAUL ANDREW GLAZER, M.D.

10       Direct Examination                                            65
         By Mr. Busch
11       Cross-Examination                                            109
         By Mr. Cardwell
12
     PAUL DAVID DOPP
13
         Direct Examination                                           139
14       By Mr. Busch
         Cross-Examination                                            151
15       By Mr. Cardwell

16

17                               E X H I B I T S

18

19   Exhibit No.           Description                            Received

20
         44                                                              4
21
         45                                                              5
22
         93                                                            107
23

24

25