# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NUVASIVE, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TIMOTHY DAY, )<br>)<br>Defendant. )<br>) | Civil Action No. 19-cv-10800 |

## MEMORANDUM OF DECISION

**March 28, 2022**

## I.    INTRODUCTION

Plaintiff NuVasive, Inc. ("NuVasive"), a manufacturer of products used to treat spinal disease, D. 31 at 2, filed this lawsuit against one of its former sales representatives, Defendant Timothy Day ("Day"), D. 1.[1]  This Court previously found that Day breached non-competition and non-solicitation contractual obligations after he left NuVasive and began working for a competitor, Alphatec Spine, Inc. ("Alphatec").  D. 185.[2]  Subsequently, the parties requested an evidentiary

---

[1] NuVasive also filed a separate but related complaint against Adam Richard ("Richard").  19-cv-10995-DJC.  This memorandum of decision, however, pertains to Day only, as Richard and NuVasive now have settled their dispute.  D. 239 at 3–4.

[2] The Court also dismissed NuVasive's claim against Day for injunctive relief (Count III), D. 78, and granted summary judgment for Day as to the claim for tortious interference (Count I), D. 185.  The Court's Memorandum and Order regarding the parties' respective motions for partial summary judgment, D. 185, contains a full recitation of the procedural history in this case.

hearing regarding damages and whether Day should be held in contempt for violating a May 29, 2019 preliminary injunction ("Injunction Order"), which required Day to comply with the non-solicitation clause of NuVasive's Statement Regarding Proprietary Information, Inventions Assignment, Arbitration, and Restricted Covenants Agreements ("NuVasive PIIA").   D. 31; D. 188; D. 190.  Additionally, the Court allowed a motion by NuVasive for sanctions for spoliation of text message evidence, D. 226 (adopting D. 217), and denied Day's motion to exclude expert testimony at the evidentiary hearing, D. 227.  Accordingly, the matters before the Court during the evidentiary hearing were damages, NuVasive's motion for contempt and its request regarding an adverse inference against Day related to the spoliation of evidence.[3]

During a three-day evidentiary hearing that began on October 19, 2021, the Court heard evidence from witnesses—Day, Derek Haughney ("Haughney") and John English of NuVasive, Chad Michael Spear of Alphatec ("Spear"), Misty Decker ("Decker"), NuVasive's accounting expert, Paul Andrew Glazer ("Dr. Glazer"), a spine surgeon at Beth Israel Deaconess Medical Center ("BIDMC") and Paul David Dopp ("Dopp"), Day's forensic accounting expert—and admitted exhibits proffered by the parties.   D. 232; D. 233; D. 234.[4]  Having considered this evidence and the parties' post-hearing memoranda, D. 235; D. 236, the Court adopts the following findings of fact and conclusions of law.

## II.    **FINDINGS OF FACT**

The Court has already recited certain undisputed facts in this matter in its previous Memorandum and Order, D. 185 at 4–11, and incorporates those undisputed facts by reference

---

[3] NuVasive has also filed a post-hearing motion for attorneys' fees and costs.  D. 244.

[4] References to the trial transcripts are to D. 239, 240 and 241, Days 1, 2 and 3, respectively, of the evidentiary hearing.

here.  The Court addresses below the remaining facts material to its ruling on damages, the pending motion for contempt and the adverse inference related to the spoliation of evidence.

### A.    Day Violated the NuVasive PIIA

1.    NuVasive is a manufacturer of products used to treat spinal disease.  D. 31 at 2.

2.    Day has worked in spine industry sales since 2008.  D. 239 at 115.

3.    NuVasive hired Day in August 2011 as a directly employed sales representative for an exclusive distributor of NuVasive's products.  D. 185 at 4.

4.    On January 1, 2019, Rival Medical LLC ("Rival") became the exclusive distributor of NuVasive's products in Massachusetts and Rhode Island.  D. 185 at 6.  Pursuant to a sales agreement between these two entities, Day transitioned from a direct employee of NuVasive's to an independent distributorship for the sale and promotion of NuVasive products as Rival's president.  D. 185 at 6.

5.    Accordingly, Day sold NuVasive products to surgeons in New England from August 2011 to April 2019, when he joined Alphatec.  D. 185 at 4, 7–8.

6.    Day entered into the NuVasive PIIA.  D. 185 at 4.

7.    The NuVasive PIIA included, among other things, a non-solicitation clause (Section VI) and a non-competition clause (Section VII).  D. 185 at 5.

8.    The non-competition clause required that, during the course of his engagement with NuVasive and for twelve months immediately following termination of same, Day not serve as an employee of any Conflicting Organization.  D. 185 at 5–6.

9.    On April 1, 2019, Day joined Alphatec, a competitor of NuVasive's in the spinal products market and a Conflicting Organization under the NuVasive PIIA.  D. 185 at 7, 17, 19.

10.    The non-solicitation clause barred Day from soliciting, calling upon or providing services to any Customers that he had worked with, had responsibility or oversight of, provided services related to or learned significant information about during his employment with NuVasive for any purpose other than for the benefit of NuVasive.  D. 185 at 17.

11.    Day "called upon and provided services to NuVasive customers for purposes other than to benefit NuVasive during his time at Alphatec."  D. 185 at 18.

12.    Day's violation of the non-competition and non-solicitation clauses of the NuVasive PIIA harmed NuVasive in relation to its sales to its customers.  D. 185 at 18.

13.    NuVasive initiated this action against Day on April 22, 2019 and moved for a preliminary injunction against him the next day.  D. 1; D. 8.

14.    On May 29, 2019, the Court allowed the motion for preliminary injunction to the extent that NuVasive sought to have Day comply with the non-solicitation clause of the NuVasive PIIA with respect to solicitation of NuVasive customers.  D. 31.

15.    On January 23, 2020, the Court ordered that the Injunction Order enjoining Day from violating the non-solicitation clause of the NuVasive PIIA extend until March 3, 2020. D. 101.

16.    On February 18, 2021, the Court entered a Memorandum and Order allowing summary judgment to NuVasive on its claim that Day had violated the non-competition and non-solicitations clauses of the NuVasive PIIA and that NuVasive had been harmed as a result and there was a causal connection between Day's acts or omissions and NuVasive's damages.  D. 185 at 18.

17.    On April 5, 2021, NuVasive renewed its motion for contempt for Day's alleged violation of the Injunction Order.  D. 190.

18.     On October 13, 2021, the Court adopted the Report and Recommendation (Kelley, Chief M.J.) allowing NuVasive's renewed motion for sanctions for spoliation of evidence, including an adverse inference and the award of reasonable costs and expenses.  D. 226 (adopting D. 217).

19.     In adopting the Report and Recommendation, the Court found that Day had failed to preserve text messages by replacing his phone, allowing all the text messages to be deleted and not deactivating his phone's automatic text message deletion function after notice of the litigation hold on April 1, 2019.  D. 217 at 7.

20.     As a result, all of Day's text messages from the time before he left NuVasive were deleted along with all of the text message during his initial time at Alphatec, April 1, 2019 through July 17, 2019.  D. 217 at 7.

21.     Although NuVasive attempted to recover same from third parties, it was largely unsuccessful in recovering the contents of any such text messages sent by Day during this time period.  D. 217 at 8, 14–15.   Phone records, however, revealed that Day had exchanged text messages with Richard, Alphatec executives, numerous surgeons and a BIDMC manager, D. 217 at 16, even if the contents were not available.

22.     Moreover, for the reasons articulated in the Report and Recommendation, D. 217 at 17–19, Day "acted with intent to deprive NuVasive of the lost information in this litigation." D. 217 at 19.

23.     Accordingly, this Court adopted an adverse inference that the lost evidence of Day's text messages was unfavorable to him in ruling on what damages NuVasive was able to prove during the course of the evidentiary hearing.  D. 217 at 19; D. 226 (adopting D. 217).

5

24.     On October 19 to 21, 2021, the Court held the evidentiary hearing regarding the amount of NuVasive's damages as a result of Day's violation of the NuVasive PIIA and whether to grant the contempt motion.  D. 214, 216, 232–34.   The Court heard closing arguments on December 2, 2021.  D. 243.

**B.     Lost Profits**

25.     NuVasive seeks $2,005,253 (comprised of $1,793,198 in lost profits and $212,055 in prejudgment interest) in damages for April 1, 2019 through March 3, 2020 (the "Injunction Period") and $157,049 in lost profits for each subsequent 30-day period that the Court deems appropriate.  D. 235 at 2 & n.5.

26.     The lost profits to NuVasive were from loss of sales associated with Dr. Glazer, John Shin ("Dr. Shin") and Brian Kwon ("Dr. Kwon"), surgeons and users of NuVasive products and now users of Alphatec products.  D. 235 at 2; Exh. 35.

27.     Haughney, currently the Northeast vice president of NuVasive, testified that sales representatives and the relationships they develop with individual surgeons are critical to NuVasive's business.  D. 239 at 27–29.

28.     Although the surgeon will make a hardware recommendation to a patient, the hospital and/or the surgeon will be in touch with the sales representatives to procure the instrumentation (hardware) for surgery.  D. 241 at 71–72.

29.     Sales representatives in the spinal sales field facilitate not just sales, but service to the surgeon in ensuring that the NuVasive product works for the surgical use that surgeon seeks. D. 239 at 29–30.

30.     Surgical sales representatives are sometimes present in the operating room "to make sure that the instrumentation is available and ready for surgery."  D. 241 at 73.

31.     Given the value of these relationships, NuVasive requires the NuVasive PIIA so that when a sales representative leaves, the company "has a chance of keeping the business" by introducing another NuVasive representative "hopefully [to] retain the business."  D. 239 at 73.

32.     BIDMC was NuVasive's largest account in the Boston market.  D. 239 at 31.

33.     At BIDMC, Dr. Glazer was the largest NuVasive user.  D. 239 at 34.

34.     Dr. Glazer became a NuVasive user in 2012 when Pat Miles ("Miles") was its president (Miles later went to Alphatec).  D. 241 at 77–78.

35.     As of January 31, 2019, Dr. Glazer had been an exclusive NuVasive user for the prior seven years.  Exh. 1 (Day email explaining that Dr. Glazer "has been an exclusive Nuva[sive] user for the past 7 years, not one other company in that time frame"); D. 239 at 113–14.

36.     On January 31, 2019, Day expressed his concerns to NuVasive management that Dr. Glazer was concerned about the change in culture at NuVasive, Exh. 1, and Day was concerned that Dr. Glazer had begun to use some of Alphatec's products.  D. 240 at 57.  NuVasive management did not respond to Day's concerns.  D. 240 at 57–58.

37.     In April 2020, recapping Q1 2020, Day identified Dr. Kwon as "an exclusive Nuva[sive] user for the past 5 years."  Exh. 22.[5]

38.     In 2018, Dr. Glazer used $5.4 million in NuVasive hardware and biologics at BIDMC[6]; in 2019, that figure was $2,559,137; in 2020, that total was approximately $95,000; in 2021 (as of the October 2021), that number was zero.  D. 239 at 47–48, 49.

---

[5] To the extent that Day tried to disavow this statement during his testimony, D. 240 at 32, the Court does not credit that disavowal.

[6] These figures assume that Dr. Glazer used the same percentage of biologics that he had used of the hardware, D. 239 at 50, a fair assumption given the correlation of use between the two, D. 239 at 58–59.

39.     While working at St. Elizabeth's Hospital, where he also had surgical privileges, Dr. Glazer used $4,450 in NuVasive products in 2019 and $184,558 in NuVasive products in 2020; and $13,500 in 2021 (as of October 2021 evidentiary hearing).  D. 239 at 48–49; D. 241 at 66.

40.     While employed by NuVasive, Day was responsible for Dr. Glazer's business with the company.  D. 239 at 75, 77.

41.     Dr. Glazer's use of NuVasive products changed in April 2019, D. 239 at 40, 62, the same time that Day left the company for Alphatec.  D. 239 at 62; D. 185 at 7.

42.     Dr. Glazer currently uses Alphatec, Centinel Spine and Trinity products, all distributed by Day.  D. 239 at 43–44.

43.     Dr. Glazer continues to use some NuVasive products.  D. 241 at 76–77.

44.     There continue to be NuVasive sales representatives dedicated to Dr. Glazer at BIDMC, D. 239 at 46, including two sales representatives.  D. 239 at 60–61.

45.     While selling NuVasive products, Day made sales projections for his sales territory. D. 239 at 78, 133, 137; Exh. 6 (January 16, 2019 email from Day to Richard making projections for 2019 for Drs. Glazer, Kwon and others, including "worst case" and "best case" scenarios).

46.     While selling NuVasive products, Day and Richard worked with Dr. Glazer at BIDMC and with Dr. Kwon at New England Baptist Hospital.  Exh. 35 at 7.

47.     Alphatec reported Sunshine Act payments to Dr. Glazer for food, beverage, travel and lodging expenses on July 27 and 29, 2019 and October 25–26, 2019.  D. 239 at 89–91.

48.     Such disclosures are not required to be made for a "purely social event."  D. 239 at 91.

49.     One such disclosure referenced a TLIF product of Alphatec's; Dr. Glazer had previously used NuVasive's TLIF products.  D. 239 at 92–93.

50.     From the time that Day became an Alphatec distributor through July 8, 2021, Dr. Glazer, Dr. Shin and Dr. Kwon were among the Boston-area surgeons who used Alphatec products.  D. 239 at 127.

51.     Although Alphatec's offer of employment to Day was for the assigned territory of Maine, Vermont and New Hampshire, Exh. 40, it allowed him to work with Boston-area hospitals, including those he had previously worked in while at NuVasive.  D. 239 at 129; D. 240 at 66.

52.     Once at Alphatec, Day also provided projections for the Alphatec sales representatives who would be covering Massachusetts, including Richard.  D. 239 at 140–41; Exh. 7 (May 6, 2019 Day email to Spear at Alphatec).

53.     Soon after joining Alphatec, Day solicited surgeons in his former NuVasive sales territory, including but not limited to Dr. Kwon, D. 239 at 145; D. 240 at 100; Exh. 13, and identified them as sales targets for NuVasive products, Exh. 14.

54.     Day's phone contact with Dr. Glazer appeared to increase after he joined Alphatec as well.  D. 240 at 9–10; Exh. 43.

55.     As a result of his spoliation of text messages during this period, the substance of same was not available to the Court.  However, applying an adverse inference as a result of the Court's ruling on spoliation, it is a reasonable inference that, despite their friendship, some of those deleted texts related to Day's solicitation of Glazer's business to Alphatec.

56.     Obtaining product and pricing approval at a hospital is important because a company's products cannot be sold there before such approval.  D. 239 at 83.

57.     Prior to joining Alphatec, Day was aware that only a limited number of Alphatec products were approved for use at BIDMC.  D. 239 at 149–50.

58.     Spear, Day's supervisor at Alphatec, worked with Dr. Glazer on trials of Alphatec products at BIDMC in summer 2018 and tried to get final approval from the hospital for the use of these products.  D. 240 at 120, 136–38; Exh. 78; see Exhs. 72–73; D. 241 at 88–89.

59.     Alphatec then got an initial contract in 2018 at BIDMC for its posterior screw line and hardware.  D. 241 at 92.

60.     Even by 2018, however, BIDMC was only giving Alphatec "a very, very small platform to be able [to] have some trial cases."  D. 240 at 155.

61.     Accordingly, as of Q1 2019, Dr. Glazer was still only using a minimal amount of Alphatec products.  D. 240 at 157.

62.     Dr. Glazer testified that Day's move to Alphatec in April 2019 did not have an impact on the surgeon's plans to transition to Alphatec since he had "already been trying to use the Alphatec products at that point."  D. 241 at 96, 108.  Although Dr. Glazer continued as a user of NuVasive products from 2012 onward, he was disappointed with the company's leadership when Miles left NuVasive for Alphatec in 2017 and Miles began to solicit him for Alphatec products at the end of 2017 and 2018.  D. 241 at 82–83, 86–88.

63.     Despite the fact that Spear was supervising Day and Colin Behrmann ("Behrmann") at Alphatec in spring 2019, when Miles, then the CEO of Alphatec, came to Boston in May 2019 to meet with surgeons including Dr. Glazer, Day organized the itinerary.  D. 240 at 162–63.

64.     Spinal companies often create custom instruments for surgeons in an effort to get them to encourage hospitals to buy their spinal products for surgeries.  D. 239 at 88.

65.     Dr. Glazer still expected custom instruments for use with the hardware, D. 241 at 96, with which Day was well familiar from his service of the surgeon's account at NuVasive.

66.     Soon after joining Alphatec, Day assisted in the negotiation of pricing of more Alphatec products for use at BIDMC, D. 239 at 152; Exh. 10, and was in the operating room with Dr. Glazer when he used an Alphatec ALIF system for the first time in May 2019, a fact that he failed to disclose in discovery requests.  D. 239 at 152, 159–60; Exh. 12 (reflecting response to Interrogatory #1).

67.     Only after the issuance of the Injunction Order on May 29, 2019, D. 31, Day informed BIDMC clinical contract manager that Behrmann would be his direct contact at Alphatec.  Exh. 16; D. 240 at 68.

68.     Similarly, after the issuance of the Injunction Order, Spear instructed his team to remove Day from any and all operations within Boston.  D. 240 at 143.

69.     Day was also involved in Alphatec's efforts to remake reamer-probes that would be acceptable to Dr. Glazer for use with its products in surgery.  Exh. 68 (June 26, 2019 Day email); D. 240 at 19.

70.     Through their business interaction at NuVasive, Dr. Glazer and Day developed a friendship and their families have become close family friends over the years.  D. 241 at 80; D. 240 at 48–49.

71.     Day also acknowledged that Dr. Glazer had become "a very good client" during this time as well.  D. 240 at 88.

72.     As to the Napa trip in July 2019, Day and his wife went on the trip with the family of Alphatec CEO, Miles, and Dr. Glazer's family; flights were arranged through Alphatec and Day's business expense reports reflect expenses incurred on this trip.  D. 240 at 24, 71–72; D. 241 at 98–99; Exh. 17.

73.     Dr. Glazer's revenue generated with Alphatec jumped from $34,265 in Q1 2019 to $242,852.00 in Q2 2019 and increased to over $400,000 in and after Q4 2019.  Exh. 98; D. 240 at 148, 150.

74.     Alphatec reported no revenue generated from Dr. Kwon and Dr. Shin until Q1 2020 and then only $23,390 for Dr. Kwon and $71,274 for Dr. Shin.  Exh. 98; D. 240 at 146–47.

**C.     Calculation of Damages**

75.     NuVasive engaged Decker, a forensic accountant, to calculate damages related to the conversion of business of Drs. Glazer, Shin and Kwon from NuVasive to Alphatec.  D. 241 at 10; Exh. 35.

76.     Decker testified that she reached her conclusions regarding NuVasive's damages with a reasonable degree of certainty after having assumed that liability had been found against Day (as it has been by the Court).  D. 241 at 11, 41.

77.     As to a causal link between Day's conduct and NuVasive's damages, Decker relied upon the Court's ruling regarding same on summary judgment, the drop in NuVasive's sales to these surgeons in Q2 2019, the uptick in Alphatec's sales in the same period and Day's identification of Drs. Glazer, Kwon and Shin as part of his success at Alphatec in Q1 2020.  D. 241 at 13; Exh. 35.

78.     To determine damages, Decker calculated lost profits, which is the measure of damages that would place an injured party in the same position had the contract, namely the NuVasive PIIA, not been breached.  D. 241 at 15.

79.     Forensic accountants utilize four, widely accepted methods to calculate lost profits: sales projection method, yardstick method, before-and-after method and market model.  D. 241 at 15.

12

80.     Decker opined that for the Injunction Period, NuVasive suffered between $1,388,509 (low end) to $1,747,450 (high end) in damages related to the conversion of Dr. Glazer's sales of hardware and biologics, $27,224 in damages as related to Dr. Shin's sales, and $18,524 related to Dr. Kwon's sales.  D. 241 at 10; Exh. 35.

81.     For each subsequent 30-day period after the Injunction Period, Decker opined that NuVasive suffered $129,266 (low end) to $145,344 (high end) in lost profits related to Dr. Glazer's business and $10,567 and $1,138 in lost profits for Drs. Shin and Kwon, respectively.  D. 241 at 34, 37–38; Exh. 35.

*1.     Dr. Glazer's Hardware Sales*

82.     Of the total lost profits calculated above during the Injunction Period as to Dr. Glazer, Decker attributed $1,339,005 (low end) to $1,697,946 (high end) of that total to the conversion of Dr. Glazer's hardware sales business.  D. 241 at 22–23; Exh. 35.

83.     Of the total lost profits calculated above for each subsequent 30-day period after the Injunction Period, Decker attributed $103,900 to $119,979 of that total to conversion of Dr. Glazer's hardware sales business.  D. 241 at 23; Exh. 35.

84.     Decker reached these calculations by using the sales projection method, starting with the best- and worst-case scenario sales projections that Day prepared while still at NuVasive in January 2019 ("2019 Sales Projections").  D. 241 at 15–16; Exh. 6; Exh. 35.

85.     Forensic accountants determine whether using sales projections is a reliable method to calculate lost profits by considering who prepared the projections, their business acumen and whether the projections were prepared in the ordinary course of business.  D. 241 at 16.

13

86.     Day's own 2019 Sales Projections for Dr. Glazer ($3,577,084 as the best-case scenario and $3,141,668 as the worst-case scenario) accounted for the impact on sales from price erosion and contract negotiations.  D. 241 at 18; Exh. 6; Exh. 35.

87.     Decker checked the sales projection method with the "before and after method" (i.e., looking at historical sales for Dr. Glazer in 2016–2018 and sales for Q1 2019) and the average of same fell into the range that Day projected in the 2019 Sales Projections.  D. 241 at 17–18.

88.     From Day's 2019 Sales Projections for Dr. Glazer's hardware sales, Exh. 6, Decker subtracted NuVasive's "mitigating sales," i.e., the sales that it actually made, the costs of goods sold (that were avoided) and distributor commissions that would have been made, D. 241 at 19–23; Exh. 35.

89.     With this calculation, Decker arrived at the (low end) calculation of $1,339,005 (starting from Day's worst-case scenario in the 2019 Sales Projections) and the (high end) calculation of $1,697,946 (starting from Day's best-case scenario in the 2019 Sales Projections) for lost profits as to conversion of Dr. Glazer's sales during the Injunction Period.  D. 241 at 22–23.

90.     Alphatec's revenue from Dr. Glazer's business increased "significantly" after Day joined the company in 2019, and Alphatec expected $150,000 to $200,000 in monthly revenue from Dr. Glazer in 2020.  Exh. 22.

91.     NuVasive's 2016–2018 historical hardware sales as to Dr. Glazer were consistent with Alphatec's 2019 revenue projections.  D. 241 at 18–19.

92.     Day's forensic accountant, Dopp, opined that it was "unreasonable" for Decker to use projected sales for 2019 as opposed to actual sales, which were available to Decker.  D. 241 at 148–49.

93.     Decker's calculations, however, deducted actual sales, D. 241 at 19, and the 2019 Sales Projections upon which Decker relied were Day's own projections for NuVasive, Exh. 35.

94.     Although Decker also subtracted the cost of goods sold (including certain administrative costs) and distributor commissions, D. 241 at 20–21, she considered subtracting other costs, e.g., NuVasive's selling, general and administrative expenses, but found no basis to correlate those to the loss of projected sales to Dr. Glazer.  D. 241 at 23–25.

95.     Accordingly, Dopp's opinion that Decker's calculations were "unreasonable and unrealistic" because she only deducted two categories of variable costs, is not persuasive.  D. 241 at 149–50.

> ### 2.     Dr. Glazer's Biologics Sales

96.     The yardstick method involves using a proxy for determining lost profits.  D. 241 at 35.

97.     Using the yardstick method, Decker calculated lost profits related to Dr. Glazer's biologics sales.  D. 241 at 15–16.

98.     Since biologics are a "stocking product" bought in bulk for the hospital as a whole (and given that a hospital may have inventory on hand from prior years and there was some suggestion that Dr. Glazer may have had an alternative supplier for same), Decker conservatively made this calculation not for the entirety of the Injunction Period, but only from January 1, 2020 to the end of the Injunction Period (March 3, 2020).  D. 241 at 26–27, 29–30.

99.     Decker used the percentage of historical hardware sales attributable to Dr. Glazer at BIDMC and St. Elizabeth's Hospital to calculate his respective share of biologics sales.  D. 241 at 26–27.

100.     Decker determined that Dr. Glazer's biologics sales were approximately 28.73% of his hardware sales.  D. 241 at 30–31.

101.     Then, Decker used that percentage against the actual Alphatec sales as a proxy to calculate lost profits associated with Dr. Glazer's biologics sales.  D. 241 at 35–36.

102.     For the period Q1 2020 through the Injunction Period, Decker multiplied the actual Alphatec hardware sales to Dr. Glazer by 28.73% to calculate the conversion of biologics sales. D. 241 at 30–31.

103.     Using this yardstick method, Decker calculated $49,504 in lost profits related to Dr. Glazer's biologics sales from January 1, 2020 to the end of the Injunction Period.  D. 241 at 16, 30, 32; Exh. 35.

104.     Using the same method, Decker calculated that for each subsequent 30-day period after the Injunction Period, NuVasive incurred $25,365 in lost profits related to Dr. Glazer's biologics sales.  D. 241 at 32.

105.     Dr. Glazer's biologics sales declined after Day's resignation and reached zero in Q1 2020.  D. 241 at 29–30.

106.     Unlike Dr. Glazer's hardware sales, there were no mitigating sales to deduct from the calculation of biologics lost profits because by Q1 2020, NuVasive had no biologics sales to Dr. Glazer.  D. 241 at 31–32.

107.     In reaching the lost profits calculation for biologics, Decker deducted the cost of goods sold and commissions.  D. 241 at 32–33.

### 3.     Drs. Shin and Kwon

108.     Decker utilized the yardstick method to calculate NuVasive's lost profits associated with the business of Drs. Shin and Kwon.  D. 241 at 34–35.

16

109.    Similar to the analysis performed to calculate lost profits associated with Dr. Glazer's biologics sales, Decker considered arbitration testimony and Q1 2020 Alphatec sales data to determine lost profits associated with the conversion of business of Drs. Shin and Kwon.  D. 241 at 35–37; Exh. 35.

110.    As to Dr. Shin, for lost sales from January 1, 2020 to the end of the Injunction Period, Decker relied upon the $60,000 revenue figure in Day's Q1 2020 recap, D. 241 at 36–37, as opposed to any arbitration testimony (which Decker used only as to the 30-day periods after the Injunction Period).

111.    From this calculation, Decker deducted costs of goods sold and commissions. D. 241 at 37–38.

112.    As to Dr. Shin, Decker opined that NuVasive's lost profits were $27,224 during the Injunction Period.  D. 241 at 37.

113.    Decker engaged in a similar analysis as to Dr. Kwon, relying upon the Q1 2020 Alphatec data, including that the revenue for that quarter had been $40,000.  D. 241 at 37; Exh. 22.

114.    Engaging in the same calculus as she did for Dr. Shin, Decker opined that the lost profits as to Dr. Kwon during the Injunction Period was $18,524.  D. 241 at 38.

    *4.    Prejudgment Interest*

115.    Decker calculated prejudgment interest as to damages.  D. 241 at 39.

116.    For Dr. Glazer's hardware sales, Decker applied prejudgment interest in the amount of eight percent (reflecting five percent plus the Federal Reserve discount rate in effect then, as would apply under Delaware law), accruing during the Injunction Period.  D. 241 at 39.

117.    For Dr. Glazer's biologics sales and the sales of Drs. Shin and Kwon, Decker applied prejudgment interest in the amount of 7.25% (reflecting five percent plus the Federal

Reserve discount rate of 2.25% in effect then), as of January 1, 2020 through the end of the Injunction Period.  D. 241 at 39.

118.    Decker calculated the prejudgment interest using a midpoint convention which accounts for profits being earned in the middle of the year.  D. 241 at 39.

119.    Decker calculated lost profits, including prejudgment interest, as to Dr. Glazer (hardware and biologics), Dr, Shin and Dr. Kwon for the Injunction Period and 30-day intervals after that.  D. 241 at 40.

120.     Decker calculated lost profits, including prejudgment interest, as to Dr. Glazer's hardware and biologics sales during the Injunction Period to be $1,552,581 to $1,955,711.  D. 241 at 40; Exh. 35 at 9.

121.    Decker calculated lost profits, including prejudgment interest, as to Dr. Shin's business for the Injunction Period to be $29,482.  D. 241 at 40; Exh. 35 at 9–10.

122.    Decker calculated lost profits, including prejudgment interest, as to Dr. Kwon's business for the Injunction Period to be $20,060.  D. 241 at 40; Exh. 35 at 9–10.

123.    Total lost profits, including prejudgment interest, for Dr. Glazer, Dr. Shin and Dr. Kwon, just for the Injunction Period, total $1,602,123 (incorporating the "worst case scenario" figure for hardware to Dr. Glazer from the 2019 Sales Projections as explained above) to $2,005,253 (incorporating the "best case scenario" figure for hardware to Dr. Glazer from the 2019 Sales Projections as explained above).  D. 241 at 40; Exh. 35 at 9–10.

124.    Decker did not calculate any apportionment of damages between Day and Richard, D. 241 at 43–45, and concluded that there would be no need to do so given the Court's finding that Day had violated the NuVasive PIIA as to Dr. Glazer, Dr. Shin and Dr. Kwon, and "there's no

evidence of any allocation or apportionment that we could do in this case" since Day and Richard were simultaneously in violation of their agreements, D. 241 at 45–46, 62–64.

## III.   **CONCLUSIONS OF LAW**

1.      The Court has already made certain conclusions of law in this matter in its Memorandum and Order allowing in part NuVasive's motion for partial summary judgment, D. 185, and incorporates those conclusions by reference here.  In light of the evidence presented to the Court, the Court makes the following conclusions of law.

2.      As to the breach of contract claim, the NuVasive PIIA provided that Delaware law governs.  Exh. 39 (stating that "[t]his Agreement shall be interpreted and enforced in accordance with Delaware law"); <u>see</u> D. 147 at 2 (citing Delaware case law as to breach of contract claim); D. 159 at 12–13 (citing Delaware case law as to breach of contract claim).

### A.      **Breach of the NuVasive PIIA**

3.      Here, the Court has already ruled that Day violated the contract at issue, specifically the non-competition and non-solicitation clauses of the NuVasive PIIA.  Accordingly, the Court's focus is on what, if any, damages as to this breach of contract are warranted.

4.      Although the Court had already concluded, on summary judgment, that Day caused NuVasive's harm, the record then and now shows that Day caused NuVasive's harm.  <u>Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.</u>, 350 F. Supp. 2d 582, 596–97 (D. Del. 2004) (stating that "Delaware law has established that [i]t is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of contract, must demonstrate with <u>reasonable certainty</u> that [the] defendant's breach caused the loss" (emphasis and alterations in original) (internal quotation marks and citation omitted)).

5.     "Reasonable certainty is not equivalent to absolute certainty; rather, the requirement that plaintiff show defendant's breach to be the cause of his injury with reasonable certainty merely means that the fact of damages must be taken out of the area of speculation." Tanner v. Exxon Corp., No. 79C-JA-5, 1981 WL 191389, at *1 (Del. Super. Ct. July 23, 1981) (internal quotation marks and citation omitted).

6.     Where a defendant's liability for breach of contract has been established, the plaintiff is entitled to compensation to put it in the same financial position as it would have been had the breach not occurred.  Duncan v. Theratx, Inc., 775 A.2d 1019, 1022 & n.6 (Del. 2001) (stating that "the standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante" and that "[t]his principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract" (citing  Restatement (Second) of Contracts § 347 cmt. a)).

7.     That is, the "[o]ne measure of expectation damages is a party's lost profits." PharmAthene, Inc. v. SIGA Techs., Inc., No. CV 2627-VCP, 2014 WL 3974167, at *7 (Del. Ch. Aug. 8, 2014); see Siga Techs., Inc. v. PharmAthene, Inc., 132 A.3d 1108, 1130 (Del. 2015) (explaining that "[e]xpectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost" (quoting Duncan, 775 A.2d at 1022)); see also Base Optics Inc. v. Liu, No. CV 9803-VCG, 2015 WL 3491495, at *16 n.122 (Del. Ch. May 29, 2015) (noting that "in the context of a breach of a non-compete agreement, lost profits from business within the scope of the parties' non-compete are direct, not consequential damages" (citing eCommerce Indus., Inc. v. MWA Intelligence, Inc., No. CV 7471-VCP, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013))).

8.      A plaintiff must show any damages by a preponderance of the evidence. eCommerce Indus., 2013 WL 5621678, at *42.

9.      "[A] plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." LocusPoint Networks, LLC v. D.T.V. LLC, No. 14-CV-01278-JSC, 2015 WL 5043261, at *8 (N.D. Cal. Aug. 26, 2015) (quoting eCommerce Indus., 2013 WL 5621678, at *13); see Accountable Health Sols., LLC v. Wellness Corp. Sols., LLC, 333 F. Supp. 3d 1133, 1153–54 (D. Kan. 2018) (applying Delaware law) (quoting Siga Techs., 132 A.3d at 1131).

10.     "The breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer.  Rather, when a contract is breached, expectation damages can be established as long as the plaintiff can prove the fact of damages with reasonable certainty.  The amount of damages can be an estimate." Siga Techs., 132 A.3d at 1111 (emphasis in original).

11.     Here, NuVasive has shown, by a reasonable degree of certainty through witness testimony, exhibits and expert opinion that the Court credits, that it suffered lost profits as to Dr. Dr. Glazer, Dr. Shin and Dr. Kwon as a result of Day's violation of the NuVasive PIIA during the Injunction Period.

12.     As to Dr. Glazer, although he had some limited business with Alphatec before Day arrived there from NuVasive on April 1, 2019, Day's own 2019 Sales Projections for NuVasive before his departure, the subsequent decrease in NuVasive sales by more than fifty percent, ten-fold increase of Alphatec sales for Dr. Glazer from Q1 to Q4 2019, all in the wake and midst of

Day's breach of the NuVasive PIIA, show that NuVasive suffered lost profits from Dr. Glazer's business as a result of Day's breach.

13.     As to Dr. Shin and Dr. Kwon, the evidence also shows that the lost profits that NuVasive suffered as a result of their business, albeit on a lesser scale, were also as a result of Day's breach of the NuVasive PIIA.

14.     Both Dr. Shin and Dr. Kwon were prior users of NuVasive products.

15.     Day, who handled both their accounts at NuVasive, also identified Dr. Kwon as an exclusive NuVasive user.

16.     Prior to Day's arrival at Alphatec, neither Dr. Kwon nor Dr. Shin generated any revenue for Alphatec and did not do so until Q1 2020.

17.     Although NuVasive seeks lost profits for periods after March 3, 2020, the end of the Injunction Period, the Court declines to award any additional damages given the impact of the pandemic after that time on sales projections, the decrease in surgical needs and impact on sales revenue.

18.     For all of these reasons (and as noted below as to the contempt motion), the Court imposes damages (reflecting lost profits in the Injunction Period and prejudgment interest) in the amount of $1,602,123.

**B.     Motion for Contempt**

19.     To establish civil contempt, a plaintiff must prove noncompliance with a preliminary injunction order "by clear and convincing evidence."  Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir. 1991).  The order must also be "clear and unambiguous in its terms."  Gemco Latinoamerica, Inc. v. Seiko Time Corp., 61 F.3d 94, 98 (1st Cir. 1995).

20.     Any "[a]mbiguities and uncertainties about the scope of a court order are read in favor of 'the person charged with contempt.'"   Dystar Corp. v. Canto, 1 F. Supp. 2d 48, 54 (D. Mass. 1997) (quoting Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir.1991)).

21.     On May 29, 2019, the Court imposed the Injunction Order, which required Day to comply with the non-solicitation clause of the NuVasive PIIA "pending further order of th[e] Court." D. 31 at 18.

22.     On January 23, 2020, the Court extended the Injunction Order through March 3, 2020. D. 101.

23.     NuVasive alleges that Day violated the Court's Injunction Order and provided false testimony about same. D. 191 at 1.

24.     Among other things, NuVasive claims that Day violated the Injunction Order by attending a business dinner with Dr. Glazer and traveling to Alphatec headquarters in June 2019, and attending an Alphatec board meeting in San Diego, CA in July 2019, followed by a trip to Napa. D. 191 at 2–6.

25.     Although, in opposition, Day, among other things, characterizes these interactions with Dr. Glazer as "social," D. 194 at 5–6, as discussed further above, the evidence about the context of such interactions was not purely social, and, at any rate, the Court found that Day violated the NuVasive PIIA with his solicitation after May 29, 2019, the date of the Injunction Order. D. 185 at 9, 10, 17, 20–21.

26.     Accordingly, this Court finds Day in contempt of the Injunction Order, in effect through March 3, 2020, and finds, based upon the record cited in the Court's earlier Memorandum and Order, D. 185, and the findings made above, that such showing was made by clear and convincing evidence.

27.     Given, however, that the Court considered such conduct in the lost profits calculation above, to the extent that NuVasive seeks further remedy for such contempt (i.e., damages beyond those the Court imposes as discussed above, or further extension of the non-solicitation clause of the NuVasive PIIA), the Court declines to do so as it concludes that the reasonably calculated damages and finding of contempt are sufficient.

**C.     Motion for Sanctions**

28.     "[S]poliation is the intentional, negligent, or malicious destruction of relevant evidence" that a party had a duty to preserve.  Gordon v. DreamWorks Animation SKG, Inc., 935 F. Supp. 2d 306, 313 (D. Mass. 2013) (internal quotation marks and citation omitted); Ortiz v. City of Worcester, No. 4:15-CV-40037-TSH, 2017 WL 2294285, at *2 (D. Mass. May 25, 2017).

29.     Once spoliation is found, courts determine the appropriate sanction based upon several factors, namely "'prejudice to the non-offending party' and the 'degree of fault of the offending party.'"  Fireman's Fund Ins. Co. v. Bradford-White Corp., No. 12-cv-10509-NMG, 2014 WL 1515266, at *3 (D. Mass. Apr. 15, 2014) (quoting Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 29 (1st Cir. 1998)).

30.     Following a hearing, Chief Magistrate Judge M. Page Kelley recommended that the Court allow NuVasive's renewed motion for sanctions for spoliation of evidence.  D. 217 at 19.

31.     The Court adopted Judge Kelley's recommendations, D. 226, finding that Day failed to preserve evidence pursuant to Fed. R. Civ. P. 37(e), D. 217 at 2, and that he "acted with

intent to deprive NuVasive of the lost information," D. 217 at 19 (sating that as to damages, the Court should "presume that the lost evidence was unfavorable to [Day]").[7]

32.     Specifically, "without question, Day reasonably foresaw litigation at least from the time he received the 'Notice of Material Breach and Litigation Hold' from NuVasive's counsel on April 1, 2019." D. 217 at 13.

33.     Day did not take reasonable steps to preserve text messages after he acquired a new cell phone on April 24, 2019. D. 217 at 13 (stating that "it is simply not credible that Day, a sophisticated businessman, who was on notice that he was being sued and was required to preserve evidence, and was at that moment represented by an experienced attorney who is well-acquainted with the law in this area, did not know that he was destroying all his text messages when data was transferred from his old to his new phone").

34.     The Court did not credit Day's argument that he "inadvertently either set his new phone to delete all text messages after thirty days, or caused someone else to do so, given the trouble that one would have to go to in order to change the default setting on the phone." D. 217 at 14.

35.     "[T]he lost evidence cannot be restored or replaced through additional discovery." D. 217 at 14–15 (citation omitted).

36.     NuVasive was prejudiced by the spoliation of evidence. D. 217 at 15–17 (finding that the text messages were relevant to NuVasive's claims and stating that "NuVasive [ ] met its

---

[7] Judge Kelley also recommended the Court award NuVasive costs and expenses, including reasonable attorneys' fees, D. 217 at 19, which is now the subject of a separate motion by NuVasive, D. 244, and which the Court will address in a separate ruling.

burden to come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been" (second alteration in original) (internal citation and quotation marks omitted)).

37.     Accordingly, the Court allowed NuVasive's renewed motion for sanctions, D. 195, imposing the sanction of an adverse inference regarding Day's deleted text messages, D. 226 (adopting D. 217), as indicated above in the findings of fact.

## IV.    <u>CONCLUSION</u>

After considering the evidence presented at the evidentiary hearing and in light of the aforementioned findings of fact and conclusions of law, and in light of the earlier Memorandum and Order, D. 185, this Court will enter judgment in favor of NuVasive in the total amount of $1,602,123.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge