# United States Court of Appeals
## For the First Circuit

No. 22-1339

NUVASIVE, INC.,

Plaintiff, Appellee,

v.

TIMOTHY DAY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Howard, Circuit Judges.

Bryan E. Busch, with whom Stephen D. Weatherhead was on brief, for appellant.

Mary Taylor Gallagher, with whom Holly M. Polglase, Michael S. Batson, Hermes, Netburn, O'Connor & Spearing, P.C., Christopher W. Cardwell, M. Thomas McFarland, and Gullett, Sanford, Robinson & Martin, PLLC were on brief, for appellee.

August 9, 2023

**LIPEZ**, <u>Circuit Judge</u>.  In this appeal, Timothy Day challenges district court orders requiring him to pay his former employer more than $1.7 million in damages and attorney's fees for his contractual breaches and spoliation of evidence.  These assessments arose from Day's business interactions with customers of his former employer, appellee NuVasive, Inc., on behalf of his new employer, Alphatec Spine, Inc., in violation of noncompetition and nonsolicitation obligations in Day's contract with NuVasive.  The details of those violations are fully reported in the district court's multiple decisions.  See NuVasive, Inc. v. Day, No. 19-cv-10800, 2022 WL 899244 (D. Mass. Mar. 28, 2022); NuVasive, Inc. v. Day, No. 19-cv-10800, 2021 WL 1087982 (D. Mass. Feb. 18, 2021); NuVasive, Inc. v. Day, No. 19-cv-10800, 2019 WL 2287709 (D. Mass. May 29, 2019); see also NuVasive, Inc. v. Day, 954 F.3d 439 (1st Cir. 2020) (resolving a choice-of-law issue).  We thus assume familiarity with the background facts and limit our discussion to the damages and fees issues.  After careful review of the record and applicable law, we affirm the district court's rulings.

### I. The Damages Award

Under Delaware law, which applies in this diversity action, a plaintiff seeking to recover damages for breach of contract must prove "with reasonable certainty" that the damages claimed were caused by the defendant's breach.  SIGA Techs., Inc. v. PharmAthene, Inc., 132 A.3d 1108, 1111 (Del. 2015); see also

- 2 -

Tanner v. Exxon Corp., No. 79C-JA-5, 1981 WL 191389, at *1 (Del. Super. Ct. July 23, 1981) ("It is axiomatic that a plaintiff . . . must demonstrate with reasonable certainty that defendant's breach caused the loss." (emphasis omitted)); Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc., 350 F. Supp. 2d 582, 596-97 (D. Del. 2004) (quoting Tanner, 1981 WL 191389, at *1). Although that standard requires a connection between the plaintiff's harm and the defendant's breach, the evidence merely needs to be sufficient to take "the fact of damages . . . out of the area of speculation." Tanner, 1981 WL 191389, at *1; see also SIGA Techs., 132 A.3d at 1111. We review the district court's factfinding on causation for clear error. See Moore v. Elec. Boat Corp., 25 F.4th 30, 34 (1st Cir. 2022); VICI Racing, LLC v. T-Mobile USA, Inc., 763 F.3d 273, 293 (3d Cir. 2014).

Day asserts that the district court erred in finding the requisite causal nexus between his improper solicitations and the decisions of Drs. Paul Glazer, Brian Kwon, and John Shin to switch from NuVasive to Alphatec as their primary supplier of spine-related surgical products. Day argues that NuVasive failed to establish the required connection between specific improper conduct on his part and specific damages to the company. Instead, he claims, the district court assumed a connection between his actions and NuVasive's reduced business from the three surgeons that the record does not support.

In asserting the inadequacy of the district court's factfinding, Day disregards the substantial circumstantial evidence in the record. See, e.g., Elenza, Inc. v. Alcon Lab'ys Holding Corp., 183 A.3d 717, 725-26 (Del. 2018) (recognizing that facts may be proven with circumstantial evidence); see also Mirabella v. Town of Lexington, 64 F.4th 55, 59 (1st Cir. 2023) (Lipez, J., dissenting) ("[D]irect evidence is no more valuable than circumstantial evidence."). Contrary to Day's suggestion, in finding a causal connection between Day's breaches and the harm to NuVasive, the district court did not rely solely on the dramatic surge in Glazer, Kwon, and Shin's use of Alphatec products following Day's move to that company. Rather, in its summary judgment and damages opinions, the court found particularly telling the multiple instances in which Day improperly interacted with Beth Israel Deaconess Medical Center ("BIDMC") -- and, most significantly, with Glazer -- in the months immediately after Day's departure from NuVasive in April 2019.[1] Those interactions

---

[1] Before Day moved to Alphatec, Glazer was the largest user of NuVasive products at BIDMC, which in turn was the largest NuVasive account in the Boston market. See NuVasive, 2022 WL 899244, at *4. The district court described the change in Glazer's usage as follows:

> In 2018, Dr. Glazer used $5.4 million in NuVasive hardware and biologics at BIDMC; in 2019, that figure was $2,559,137; in 2020, that total was approximately $95,000; in 2021 (as of . . . October 2021), that number was zero.

- 4 -

included: (1) Day's assistance in negotiating the pricing of Alphatec products for use at BIDMC, see NuVasive, 2022 WL 899244, at *6[2]; NuVasive, 2021 WL 1087982, at *3, *8; (2) Day's involvement in obtaining approval for use of Alphatec's "ALIF" system for spinal fusion surgeries at BIDMC, NuVasive, 2021 WL 1087982, at *3; (3) Day's organizing the itinerary when Alphatec's CEO traveled to Boston to meet with surgeons including Glazer, see NuVasive, 2022 WL 899244, at *5, and (4) Day's presence "in the operating room with Dr. Glazer when he used an Alphatec ALIF system for the first time in May 2019," id. at *6.

Indeed, Day's interactions in April and May 2019 with surgeons who had been on his sales roster at NuVasive prompted the district court to issue an injunction, on May 29, 2019, requiring Day to comply with the nonsolicitation clause in the NuVasive Proprietary Information, Inventions Assignment, Arbitration, and Restrictive Covenants Agreement ("PIIA"). See NuVasive, 2019 WL 2287709, at *8. In January 2020, the court specified that the injunction would remain in effect through March 3, 2020, noting in its ruling that the "incidents of solicitation in violation of the PIIA in April and May 2019 were not isolated incidents." In its

---

Id. (footnote omitted).

[2] Day admitted helping to negotiate the pricing "with some emails and such."

- 5 -

summary judgment decision the following year, the district court cited evidence that Day had served as Alphatec's "primary contact for BIDMC" through June 9, 2019, in violation of his nonsolicitation agreement, and also had taken actions in violation of his noncompetition agreement. NuVasive, 2021 WL 1087982, at *8.

Day highlights Glazer's testimony that Day had nothing to do with his decision to switch from nearly exclusive use of NuVasive products to primary use of Alphatec products and also points to evidence that Glazer's move to Alphatec had been in the works before Day's own move to the company. The district court considered this evidence, however, see NuVasive, 2022 WL 899244, at *5, *11, and it was free to reject Glazer's disclaimer of Day's influence given the undisputed evidence that Day engaged repeatedly with Glazer on behalf of Alphatec during the period in which Day's agreement with NuVasive prohibited him from doing so.[3]

---

[3] We note as well that NuVasive's damages expert, Misty Decker, was questioned in a deposition in July 2020 about Dr. Glazer's statement in his declaration that Day had not "solicited, encouraged, or participated in any solicitation of [him] to use Alpha[t]ec products." When asked if she had "any reason to believe . . . that Dr. Glazer was not telling the truth when he signed this declaration," she responded: "I have to look at the totality of the evidence, not just one piece of oral testimony, and I've given you all the reasons that would not tie directly to Dr. Glazer's declaration." Earlier in her deposition, Decker stated, "I do understand Dr. Glazer has made this statement, but I do understand there is documentary evidence of things that would contradict this statement." The district court credited the expert opinion offered by NuVasive. See NuVasive, 2022 WL 899244, at *11

Moreover, even though Glazer may have shown some interest in Alphatec before Day joined the company, the record indicates that, until Day became involved, Glazer did not have the necessary custom surgical instruments to make the switch to Alphatec's products. See NuVasive, 2022 WL 899244, at *6; NuVasive, 2021 WL 1087982, at *4. The district court also heard testimony on the influential role sales representatives play in retaining the business of surgeon users of medical products. Specifically, John English, who performed both legal and distributor roles at NuVasive, testified that companies require noncompete agreements because "when a sales rep leaves, the company has a chance of keeping the business as long as that sales rep is not still in the room helping the surgeon."[4]

Finally, when viewed alongside the evidence described above, the magnitude of Glazer's near-simultaneous move to Alphatec after Day's transition provides additional circumstantial

---

("Here, NuVasive has shown, by a reasonable degree of certainty through witness testimony, exhibits and expert opinion that the Court credits, that it suffered lost profits as to Dr. Glazer, Dr. Shin and Dr. Kwon as a result of Day's violation of the NuVasive PIIA during the Injunction Period." (emphasis added)).

[4] English answered affirmatively when asked if the sales representative plays the "great[est] role in convincing a surgeon to utilize NuVasive's products." English also testified that he verified while conversing with Glazer that -- as Day previously had assured him -- "Dr. Glazer was going to use whatever product that Mr. Day recommended for him."

evidence of a cause-and-effect relationship. See, e.g., NuVasive, 2022 WL 899244, at *5 (finding that, as of summer 2018, "BIDMC was only giving Alphatec 'a very, very small platform to be able [to] have some trial cases'" of an Alphatec system (alteration in original) (quoting Alphatec's then-senior sales director for the Northeast)); id. (finding that, as of the first quarter of 2019, "Dr. Glazer was still only using a minimal amount of Alphatec products"); id. at *4 (finding that "Dr. Glazer's use of NuVasive products changed in April 2019, the same time that Day left the company for Alphatec" (citations omitted)).[5] We thus see no clear error in the district court's finding that the shift of the bulk of Glazer's business from NuVasive to Alphatec between April 2019

---

[5] In its Findings of Fact in its damages opinion, the district court reported that "Dr. Glazer's revenue generated with Alphatec jumped from $34,265 in Q1 2019 to $242,852[] in Q2 2019 and increased to over $400,000 in and after Q4 2019." NuVasive, 2022 WL 899244, at *6. The court stated the following in its Conclusions of Law:

> [A]lthough [Dr. Glazer] had some limited business with Alphatec before Day arrived there from NuVasive on April 1, 2019, Day's own 2019 Sales Projections for NuVasive before his departure, the subsequent decrease in NuVasive sales by more than fifty percent, ten-fold increase of Alphatec sales for Dr. Glazer from Q1 to Q4 2019, all in the wake and midst of Day's breach of the NuVasive PIIA, show that NuVasive suffered lost profits from Dr. Glazer's business as a result of Day's breach.

Id. at *11.

- 8 -

and March 2020 -- the operative timeframe for Day's nonsolicitation obligation under the PIIA -- was not a coincidence and that Day was indeed the catalyst.

The evidence relating to Kwon and Shin was less abundant than that for Glazer, but it was nonetheless adequate to support the district court's finding that Day was responsible for their switch to Alphatec products. Before Day's move to Alphatec, neither Kwon nor Shin was doing any business with that company. See id. at *11. Both started using some Alphatec products in early 2020, see id., and the record contains references to a "Q1 2020" Alphatec document -- i.e., a first-quarter report -- stating that, in addition to Glazer, Day considered Kwon and Shin among his successes. See, e.g., id. at *6 (citing testimony of NuVasive's damages expert).

More specifically, Day acknowledged that his email to Kwon in May 2019 asking Kwon to meet with Alphatec's CEO was "[t]o some extent" a solicitation, and Day specifically asked in that communication if he could show Kwon an Alphatec "screw system." Day also joined Alphatec CEO Pat Miles for a breakfast meeting with Kwon in May 2019. As for Shin, NuVasive introduced testimony that the surgeon's projected sales for 2021 would have been higher if he had continued using NuVasive's products, as he had historically done, rather than switching to Alphatec. Alphatec's senior sales director for the Northeast, Chad Spear, likewise

- 9 -

testified that the Q1 2020 summary referenced above included an observation that Shin had been "super engaged" with Day.

In short, the district court identified a pattern of improper activity seemingly aimed at switching the affiliation of multiple surgeons from NuVasive to Alphatec -- including a particularly valuable customer, Glazer -- and reached the reasonable conclusion that the campaign worked. Moreover, as explained infra, NuVasive's damages claim was boosted by an adverse inference imposed on Day because he had spoliated evidence -- namely, an inference that text messages he failed to preserve were "unfavorable to him" with respect to "what damages NuVasive was able to prove." Id. at *3, *12-13.[6]

Nor do we find any clear error in the amount of damages awarded. The court held a three-day hearing devoted in large part to the issue of damages, with both parties offering expert testimony and written reports. In calculating "low end" and "high

---

[6] In an apparent effort to discount the strength of the circumstantial evidence on damages, Day contrasts the record here with the facts of Tanner v. Exxon Corp., where the plaintiff's former customers specifically testified that they stopped patronizing the plaintiff's service station because of the station's deteriorating condition resulting from the defendant's contractual breach. See 1981 WL 191389, at *2. As explained above, however, the plaintiff's burden of proof for breach-of-contract damages is "[r]easonable certainty," a showing that "is not equivalent to absolute certainty." Id. at *1. The record here contained an abundance of circumstantial evidence from which the district court supportably inferred the causal link between Day's breaches and NuVasive's harm.

end" damages amounts for the conversion of Glazer's sales to Alphatec, NuVasive's expert relied, in part, on 2019 sales projections that Day himself had prepared while still working for NuVasive -- finetuning the figures to Day's advantage in various ways. NuVasive, 2022 WL 899244, at *7. For hardware sales, for example, the expert subtracted NuVasive's "'mitigating sales,' i.e., the sales that it actually made[;] the costs of goods sold (that were avoided)[;] and distributor commissions that would have been made." Id. For biologics, which are "bought in bulk for the hospital as a whole," the expert made a "conservative[]" calculation covering a limited period because of the possibility, inter alia, that BIDMC would have had "inventory on hand from prior years." Id. at *8. The district court conservatively adopted the low-end estimate for Glazer's sales (including prejudgment interest) calculated by NuVasive's expert ($1,552,581), see id. at *9, *11, and it limited the damages to the period covered by its preliminary injunction order, id. at *11.[7] The expert's calculations, adopted by the district court, were significantly lower for the damages related to Kwon and Shin's lost sales: $20,060 for Kwon and $29,482 for Shin. See id. at *9.

---

[7] NuVasive had sought lost profits for periods after the end of the injunction period, but the district court "decline[d] to award any additional damages given the impact of the pandemic after that time on sales projections, the decrease in surgical needs and impact on sales revenues." NuVasive, 2022 WL 899244, at *11.

- 11 -

Day attempts to discredit the testimony of NuVasive's expert by asserting that she "assumed liability and proximate cause in her report." It was the court, however, that made the liability determination based on the evidence of Day's improper actions and the three doctors' subsequent transitions to Alphatec. See id. at *10-11; NuVasive, 2021 WL 1087982, at *8-9. As described above, the court supportably found that Day's violations of the PIIA caused harm to NuVasive. The expert then converted the court's cause-and-effect finding into specific damages amounts based on her examination of multiple factors, including historical sales data, actual sales in the relevant period, and, as noted above, Day's own projection of sales to Glazer anticipated for 2019. See 2022 WL 899244, at *6-9.[8] The district court permissibly relied on that analysis in determining the damages award.[9]

---

[8] Moreover, the expert, Decker, explained that she drew her understanding of causation from multiple factors, including the details of Day's violations of the PIIA and Day's own claims of success with the three doctors -- in addition to "the drop in NuVasive's sales to these surgeons in Q2 2019 [and] the uptick in Alphatec's sales in the same period." NuVasive, 2022 WL 899244, at *6. Decker also stated that she had reviewed the entirety of eleven depositions taken in the case, "as well as the entire exhibit packages for those depositions."

[9] In so concluding, we briefly note Day's inapt emphasis on an unpublished decision of the Superior Court of Delaware in which the court found that the plaintiff had not established "a causal connection between [a former employee's] alleged actions and [the company]'s purported loss in sales." OmniMax Int'l, Inc. v. Dowd, No. N16C-04-168, 2019 WL 3545848, at *3 (Del. Sup. Ct. Jul. 17, 2019). The circumstances in OmniMax differ markedly from those here. There, the court found that the plaintiff company had failed

- 12 -

## II. Attorney's Fees and Costs

NuVasive successfully sought sanctions against Day based on spoliation of evidence -- specifically, as noted above, Day's failure to preserve certain text messages relevant to his interactions with NuVasive customers after he left the company. Adopting the report and recommendation of the magistrate judge, the district court concluded that NuVasive was entitled to the adverse inference that the lost evidence was unfavorable to Day, plus reasonable attorney's fees and costs to compensate the company for expenses incurred as a result of the spoliation. The court determined that NuVasive was entitled to fees covering a roughly two-year period that began with the company's discovery in August 2019 that evidence had been spoliated. The court awarded NuVasive $127,214.50 in attorney's fees and $2,103.85 in costs related to

---

to prove that its former employee breached the provision of their agreement barring customer solicitation, see id. at *3-4, and the company also offered "no expert who could perhaps correlate its losses to the conduct of" its former employee, id. at *4. Neither shortcoming identified in OmniMax applies here.

We note, in addition, that the Delaware Supreme Court has endorsed "the wrongdoer rule" for assessing expectation damages resulting from a breach of contract, holding that "[t]he breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer." SIGA Techs., 132 A.3d at 1111; see also id. at 1131 n.132. Accordingly, when a party has breached a contract, "the fact" of expectation damages must be proven "with reasonable certainty," but "[t]he amount of damages can be an estimate." Id. at 1111.

the spoliation, including recompense for the company's efforts to recover the lost messages from other sources.

On appeal, Day argues that the district court improperly awarded attorney's fees for work "unrelated and unnecessary to NuVasive's motion for sanctions." He further asserts that the court failed to "fully engag[e] in the nuanced evaluation required under the lodestar method" used in the First Circuit for calculating a reasonable attorney's fee. Day objects particularly to the court's inclusion of fees for work that pre-dated NuVasive's filing of its motions for sanctions,[10] which he characterizes as "general discovery expenses."

We review a district court's award of attorney's fees for abuse of discretion, see, e.g., Díaz-Rivera v. Rivera-Rodríguez, 377 F.3d 119, 124 (1st Cir. 2004), and we find none here. The court explained in its fees order that, immediately after learning of the spoliation in August 2019, NuVasive "took steps to recover [the missing text messages] from other sources (e.g., his phone service providers, Alphatec)," resulting in "attorneys' fees and costs that predate[d] the formal filing of the spoliation motions" but were nonetheless related to the spoliation and covered by the court's order adopting the magistrate

---

[10] The district court denied NuVasive's initial motion for sanctions but granted its renewed motion.

judge's recommendation. The district court thus concluded that the appropriate timeframe for the fee award began with NuVasive's discovery that evidence had been spoliated and extended through NuVasive's filing of the fee petition now at issue. The court further explained that it had reviewed the attorneys' billing records and stated that, "[g]iven the contested nature of the spoliation motions and litigation regarding same, the Court concludes that 217.7 hours for same was reasonable and the time spent attempting to retrieve evidence (258.9 hours) and much less time (33.4 hours through November 30, 2021) spent on the fee petition also was reasonable."

We reject out-of-hand Day's assertion that the court should have awarded only fees "directly related to [NuVasive's] motion for spoliation of evidence." The court's chosen scope for the fee award, covering NuVasive's costs in attempting to find the spoliated text messages or locate other evidence to compensate for their loss was eminently reasonable and certainly not an abuse of discretion. Those efforts by NuVasive were a predictable result of the spoliation. As to the amount of fees for that time period, Day makes only broad-brush arguments in attempting to show that the award was improper. Although he asserts that NuVasive included more than $53,000 in fees by its lead counsel "for general discovery that is entirely unrelated to NuVasive's Motions for Sanctions," he does not identify the entries in NuVasive's listed

- 15 -

hours that he claims would be improper even if we accepted -- as we have -- the district court's determination that the relevant period began in August 2019 and includes discovery made necessary by Day's spoliation of evidence.[11]

In his briefing, Day relies heavily on yet another unpublished decision to challenge the fees amount, highlighting the decision of a federal district court in Massachusetts to award fees related to a spoliation motion in an amount substantially less than had been requested. See Hefter Impact Techs., LLC v. Sport Maska, Inc., No. 15-13290, 2017 WL 5798642, at *3-4 (D. Mass. Nov. 28, 2017). Hefter, however, is readily distinguishable from this case in at least two important respects. First, the Hefter court "ultimately found that the [defendant's] conduct was not sanctionable." Id. at *3. It nonetheless decided to award "fees and costs associated with the extra work plaintiff did to bring the sanctions motion itself" because the motion, although unsuccessful, "was a reasonable response" to the defendant's

---

[11] Day does not even provide examples of such expenditures. Rather, he supports his contention that "[t]he attorneys' fees awarded were unreasonable and excessive" by citing to the full list of hours submitted by NuVasive's primary and local law firms, with a parenthetical explaining that these lists "reflect[] entries for written discovery to Day; subpoenas to Day's new employer, subpoenas to hospitals, doctors, and credentialing companies necessary to establish any alleged breaches of the restrictive covenants, etc." However, any of those tasks could have been part of NuVasive's efforts to obtain the lost evidence or find alternative proof of Day's breach of the PIIA.

- 16 -

conduct.  Id. (emphases omitted).  Here, by contrast, the district court found that sanctions were warranted, and the magistrate judge recommended an award to cover NuVasive's costs both in prosecuting the sanctions motions and "attempt[ing] to recover the lost evidence."  Second, the fee analysis in Hefter was performed by the trial judge.  As the reviewing court, we play a different role, "customarily defer[ring] to the trial judge, whose intimate knowledge of the nuances of the underlying case uniquely positions him to construct a condign award."  Díaz-Rivera, 377 F.3d at 124 (quoting Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001)); see also Pérez-Sosa v. Garland, 22 F.4th 312, 320 (1st Cir. 2022) ("The Supreme Court has cautioned against 'appellate micromanagement' of fee awards." (quoting Fox v. Vice, 563 U.S. 826, 838 (2011))).

The district court must be guided, of course, by the lodestar method ordinarily used by our court to evaluate the reasonableness of attorney's fees.  See, e.g., Pérez-Sosa, 22 F.4th at 321.[12]  Here, the trial judge expressly recognized the lodestar

---

[12] "The 'lodestar' . . . is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate."  Diaz v. Jiten Hotel Mgmt., Inc., 741 F.3d 170, 172 n.1 (1st Cir. 2013).  Day challenges only the number of hours used for the lodestar, not the hourly rates.  A court making a fee award also has the discretion to adjust the lodestar up or down based on various factors, see id. at 173 n.2, including "the amount involved and the results obtained," id. at 177 n.7 (listing the adjustment factors enumerated in Hensley v. Eckerhart, 461 U.S. 424, 430 n.3 (1983)).

- 17 -

inquiry and adhered to its steps. Although the court accepted all hours proposed by NuVasive, it stated that it had "reviewed the billing records produced" and found the time spent on both the spoliation-related work and the fee petition to be reasonable, noting the litigation over the "contested" spoliation motions. The court also "considered the factors for adjusting the lodestar . . . upward or downward, but [found] no basis to do so." (Citation omitted.) We thus detect no legal error in the court's fees analysis and, as noted above, no abuse of discretion in the amounts awarded.

Accordingly, we affirm both the award of damages in favor of NuVasive and the sanctions-based award of attorney's fees and costs.

So ordered.